**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Julie Weiss<br>866 Pearl St.<br>Benton Harbor, MI 49022 | )<br>)<br>) |

Case No.

Judge _____

**COMPLAINT FOR DECLARATORY
AND ADMINISTRATIVE RELIEF,
FOR PRELIMINARY AND
PERMANENT INJUNCTIONS**

Julie Weiss
866 Pearl St.
Benton Harbor, MI 49022              )

     and                                  )

Nicole Moon                          )
134 Territorial Road, #2
Benton Harbor, MI 49022              )

     and                                  )

Emma Kinnard                         )
207 East May
Benton Harbor, MI 49022              )

     and                                  )

James H. Duncan                      )
1160 Broadway St.
Benton Harbor, MI 49022              )

     and                                  )

Lea'Anna Locey                       )
1950 Territorial Rd.
Benton Harbor, MI 49022              )

     and                                  )

Scott Elliott                        )
1989 Colfax Ave.
Benton Harbor, MI 49022              )

     and                                  )

Ronnie Whitelow                      )
1134 Union St.
Benton Harbor, MI 49022,             )

    Plaintiffs,                       )

     -vs-                              )

Dirk Kempthorne, Secretary           )

```
U.S. Department of the Interior    )
1849 C Street, N.W.
Washington DC 20240                 )

      and                          )

Mary A. Bomar, Director,           )
National Park Service
1849 C Street NW                   )
Washington, DC 20240
                                   )
      and                          )

Ernest Quintana, Regional          )
 Director
National Park Service              )
Midwestern Office
601 Riverfront Drive               )
Omaha, NE 68102                    )

      and                          )

Rebecca A. Humphries, Director     )
State of Michigan
Department of Natural Resources    )
Mason Building, Sixth Floor
P.O. Box 30028                     )
Lansing MI 48909
                                   )
      and                          )

City of Benton Harbor              )
Benton Harbor City Hall            )
200 E. Wall Street
Benton Harbor, MI 49022            )

      Defendants.                  )

                                   )
```

\*              \*              \*              \*              \*

Now come Julie Weiss, Nicole Moon, Emma Kinnard, James H. Duncan, Lea'Anna Locey, Scott Elliott and Ronnie Whitelow, Plaintiffs herein, by and through counsel, and set forth the following as and for their Complaint:

## PRELIMINARY STATEMENT

1.  This is a lawsuit wherein the Plaintiffs seek declaratory

judgment relief and administrative determinations of the Court along
with the issuance of preliminary and permanent injunctions.  These
actions are brought against the Secretary of the U.S. Department of
the Interior; the Director of the National Park Service; the Director
of the State of Michigan, Department of Natural Resources; and the
municipal government of the City of Benton Harbor, Michigan. Plain-
tiffs seek to have the Defendants enjoined from permitting, allowing
or causing the legal and physical conversion of any portion of the
municipal Jean Klock Park (hereinafter referred to as "the Park"),
which is located in the City of Benton Harbor, into a golf course and
away from usage as a public park open to all at no charge or minimum
charge. Plaintiffs oppose the change of use of the Park into fairways,
greens and tees of three (3) holes of a private, Jack Nicklaus-
designed "signature" golf course.

## JURISDICTION

2. This lawsuit arises under the National Environmental Policy
Act of 1969, as amended ("NEPA"), 42 U.S.C. § 4321 et seq., and its
implementing regulations, adopted by the Council on Environmental
Quality ("CEQ") and applicable to all agencies ("CEQ NEPA Regula-
tions"), 40 C.F.R. Parts 1500-1508.  Further, this lawsuit alleges
violations of the Land and Water Conservation Fund Act of 1965, 16
U.S.C. §§ 460l-4 through 460l and its regulations, found at 36 C.F.R.
§§ 59.1 through 59.3.

3. Judicial review is sought pursuant to the Administrative Pro-
cedure Act ("APA"), 5 U.S.C. §§ 701-706, which authorizes judicial
review of all federal agency actions. This Court has jurisdiction over
this lawsuit pursuant to 28 U.S.C. §§ 1311 and 1361, and may grant a

declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201 and 2202.

4.  The Court further has jurisdiction over Plaintiffs' Ninth and Tenth Causes of Action, which are based upon state-law grounds, pursuant to the doctrine of pendent jurisdiction of 28 U.S.C. § 1367. The nonfederal claims arise from a common nucleus of operative fact such that Plaintiffs would ordinarily be expected to try those claims within the present judicial proceeding.

<u>**PLAINTIFFS**</u>

5. Plaintiff Julie Weiss is a resident domiciled within the City of Benton Harbor, Michigan who lives in the vicinity of Jean Klock Park, who on dozens of occasions per year uses and enjoys the resources in and around the Park, including the adjacent waters of Lake Michigan, for wildlife viewing, photography, walks, socializing with friends, and general aesthetic and spiritual enjoyment. Plaintiff Weiss will be adversely affected and injured by Defendants' actions in issuing a permit and causing the conversion of 22.11 acres of Jean Klock Park into three holes of a private, 18-hole golf course, as set forth more fully below. Plaintiff Weiss has taken part in adminis-trative proceedings concerning the proposed conversion of the 22.11 acres of Jean Klock Park, including the provision of formal written comments in opposition to the conversion during the public comment period preceding the grant of permission. Plaintiff Weiss' interests in this action fall squarely within the zone of interests protected by the laws sought to be enforced.

6. Plaintiff Nicole Moon is a resident domiciled within the City of Benton Harbor, Michigan who lives within two (2) miles of Jean

Klock Park, and who on dozens of occasions per year uses and enjoys the resources in and around the Park, including the adjacent waters of Lake Michigan for walks, dune-climbing, wildlife viewing, fireworks-observation around July 4th, having her dog swim in the Lake water, photography, bird-watching, rock and beach glass collecting, and storm and weather watching, as well as general aesthetic and spiritual enjoyment. Plaintiff Moon will be adversely affected and injured by Defendants' actions in issuing a permit and causing the conversion of 22.11 acres of Jean Klock Park into three holes of a private, 18-hole golf course, as set forth more fully below. Plaintiff Moon has taken part in administrative proceedings concerning the proposed conversion of the 22.11 acres of Jean Klock Park, including the provision of formal written comments in opposition to the conversion during the public comment period preceding the grant of permission. Plaintiff Moon's interests in this action fall squarely within the zone of interests protected by the laws sought to be enforced.

7. Plaintiff Emma Kinnard is a resident domiciled within the City of Benton Harbor who lives within three miles of Jean Klock Park, and who on over a dozen occasions per year uses and enjoys the resources in and around the Park. Plaintiff Kinnard reads, birdwatches and contemplates there and historically has attended graduation celebra-tions, picnics, reunions, baptisms and weddings at the Park. Plaintiff Kinnard will be adversely affected and injured by Defendants' actions in issuing a permit for the conversion of 22.11 acres of Jean Klock Park into three holes of a private, 18-hole golf course, as set forth more fully below. Plaintiff Kinnard has taken part in administrative proceedings concerning the proposed conversion of the 22.11 acres of

Jean Klock Park, including as a co-signer of a detailed demand letter in February 2008 to the Michigan Department of Natural Resources that there be a formal NEPA-mandated Environmental Impact Statement performed as part of the conversion approval process. Plaintiff Kinnard's interests in this action fall squarely within the zone of interests protected by the laws sought to be enforced.

8. Plaintiff James Duncan is a resident domiciled within the City of Benton Harbor, Michigan who lives within three miles of Jean Klock Park and who on dozens of occasions per year uses and enjoys the resources in and around the Park, including the adjacent waters of Lake Michigan, for fishing, exercise, hiking, napping, reading, birdwatching, meditating, attending musical events, baptisms, reunions and community meetings. Plaintiff Duncan will be adversely affected and injured by Defendants' actions in issuing a permit for the conversion of 22.11 acres of Jean Klock Park into three holes of a private, 18-hole golf course, as set forth more fully below. Plaintiff Duncan has taken part in administrative proceedings concerning the proposed conversion of the 22.11 acres of Jean Klock Park, including as a co-signer of a detailed demand letter to the Michigan Department of Natural Resources that there be a formal NEPA-mandated Environ-mental Impact Statement performed as part of the conversion approval process. Plaintiff Duncan's interests in this action fall squarely within the zone of interests protected by the laws sought to be enforced.

9. Plaintiff Lea'Anna Locey is a resident domiciled within the City of Benton Harbor, Michigan who a couple of miles from Jean Klock Park and who on dozens of occasions per year uses and enjoys the

resources in and around the Park, including the adjacent waters of
Lake Michigan for hiking, wildlife viewing, attending musical
concerts, and meditation. Plaintiff Locey will be adversely affected
and injured by Defendants' actions in issuing a permit for the
conversion of 22.11 acres of Jean Klock Park into three holes of a
private, 18-hole golf course, as set forth more fully below. Plaintiff
Locey has taken part in administrative proceedings concerning the
proposed conversion of the 22.11 acres of Jean Klock Park, including
the provision of formal comments in opposition to the conversion
during the public comment period preceding the grant of permission and
as a co-signer of a detailed demand letter to the Michigan Department
of Natural Resources that there be a formal NEPA-mandated Environ-
mental Impact Statement performed as part of the conversion approval
process.  Plaintiff Locey's interests in this action fall squarely
within the zone of interests protected by the laws sought to be
enforced.

    10. Plaintiff Scott Elliott is a resident of Benton Harbor
Township who lives a short distance outside the City of Benton Harbor,
Michigan and a couple of miles from Jean Klock Park, who on dozens of
occasions per year uses and enjoys the resources in and around the
Park. Plaintiff Elliott paints landscapes and seascapes at the Park,
swims regularly, takes nature walks frequently and enjoys lying on the
beach at the Park. Plaintiff Elliott will be adversely affected and
injured by Defendants' actions in issuing a permit for the conversion
of 22.11 acres of Jean Klock Park into three holes of a private, 18-
hole golf course, as set forth more fully below. Plaintiff Elliott has
taken part in administrative proceedings concerning the proposed

conversion of the 22.11 acres of Jean Klock Park, including the provision of formal comments in opposition to the conversion during the public comment period preceding the grant of permission. Plaintiff Elliott's interests in this action fall squarely within the zone of interests protected by the laws sought to be enforced.

11. Plaintiff Ronnie Whitelow is a resident of and domiciled within the City of Benton Harbor who lives a mile from Jean Klock Park, who on a weekly basis uses and enjoys the resources in and around the Park. Plaintiff Whitelow takes his children there, hikes, plays in the Lake, swims, relaxes in the sand, and has historically attended musical events, baptisms, family picnics and other family outings with games.  Plaintiff Whitelow will be adversely affected and injured by Defendants' actions in issuing a permit for the conversion of 22.11 acres of Jean Klock Park into three holes of a private, 18-hole golf course, as set forth more fully below. Plaintiff Whitelow has taken part in administrative proceedings concerning the proposed conversion of the 22.11 acres of Jean Klock Park, including the provision of formal comments in opposition to the conversion during the public comment period preceding the grant of permission. Plaintiff Whitelow's interests in this action fall squarely within the zone of interests protected by the laws sought to be enforced.

<u>**DEFENDANTS**</u>

12. Defendant Dirk Kempthorne is sued in his official capacity as Secretary of the U.S. Department of the Interior (hereafter "Defendant Secretary").  In that capacity, he is responsible for the oversight of permits granted by the National Park Service for the conversion of parkland under the federal Land and Water Conservation Fund Act

(hereinafter "L&WCFA").  The authority for approval of conversions has been delegated by Defendant Secretary to the Director of the National Park Service, who has in turn re-delegated that authority to the National Park Service Regional Directors.  See 51 FR 34180-01.

13.  Defendant Mary A. Bomar (hereinafter "Defendant NPS") is sued in her official capacity as Director of the National Park Service, an executive officer with oversight of the granting of permits by the National Park Service for the conversion of parkland under the federal Land and Water Conservation Fund Act. The authority for approval of conversions has been delegated by Defendant Secretary to the Director of the National Park Service, who has in turn re-delegated that authority to the National Park Service Regional Directors.  See 51 FR 34180-01.  As Director of the NPS, Defendant Bomar is ultimately responsible for approval of the conversion by virtue of having supported the delegation of authority.

14.  Defendant Ernest Quintana (hereinafter "Defendant NPS Regional Office") is sued in his official capacity as Regional Director of the Midwestern Office of the National Park Service, with oversight of the granting of permits by the National Park Service for the conversion of parkland under the federal Land and Water Conservation Fund Act with the Midwestern Region.  The authority for approval of conversions has been delegated by Defendant Secretary to the Director of the National Park Service, who has redelegated that authority to the National Park Service Regional Directors.  See 51 FR 34180-01.  The parkland conversion permit which is under challenge in this lawsuit was issued by the Midwestern Office of NPS which was at the time of issuance directed by Defendant Quintana.

15. Defendant Rebecca A. Humphries is sued in her official capacity as Director of the State of Michigan, Department of Natural Resources (hereinafter "Defendant MDNR"), an executive state official with oversight responsibility for Defendant MDNR's administration of Land and Water Conservation Fund Act responsibilities within Michigan, and also for compilation and implementation of the terms and conditions of MDNR's State Comprehensive Outdoor Recreation Plan (hereinafter "SCORP"), and further, for the granting of certain approvals of conversions under state law and the federal Land and Water Conservation Fund Act.

16. Defendant City of Benton Harbor (hereinafter "Defendant City") is a municipal corporation constituted under the laws of the State of Michigan which is legally capable of being sued.  A majority of Defendant City's elected Commission voted in favor of the conversion which is the subject of this suit, and its mayor has executed the lease and other documents which effectuate the conversion.

## THE PROPOSED ACTION

17.  Jean Klock Park is a 73-acre, 91-year-old municipal park located on the shoreline of Lake Michigan in Benton Harbor. Benton Harbor is located in Berrien County, which is the southwestern-most in the State of Michigan, some 90 miles from Chicago.  The Park's most significant natural structures are continuously-running sand dunes which extend for nearly the entire half-mile north-to-south length of the Park, parallel to the Lake. The dune summit is elevated about 60 feet above Lake Michigan and offers a commanding view of the beachfront and of Lake Michigan itself. Founded in 1917 by a donation

of land by John and Carrie Klock, who had lost their child, Jean, in early childhood, the Park was given by the Klocks in perpetuity to the City of Benton Harbor, expressly to preserve the dunes and lakeshore, and dedicated the park to "the children".

18.  A nonprofit developer, Harbor Shores Community Redevelopment, Inc., covets the commanding views of Lake Michigan and proposes to construct three golf fairways and holes in Jean Klock Park which will consume virtually all of the lengthy dune summit and encroach on the natural marsh.  The golf course is proposed to be designed by the famed professional golfer, Jack Nicklaus, as a "signature", championship-grade 18-hole course.  The golf designers plan to take advantage of the spectacular overlooks of Lake Michigan in locating the three holes and fairways atop the dunes.  The golf course is the centerpiece of a 500-acre, $430,000,000 second-home residential housing and commercial development.  There have been private plans to take over acreage within Jean Klock Park for purposes of a golf course subdivision as long ago as the early 1990's.

19. The proposal under challenge in this lawsuit is Benton Harbor's second attempt to obtain federal approval of the conversion. The first attempt was rejected in October 2007 by Defendant NPS.  The conversion plan was altered somewhat, the proposed lease between Benton Harbor and Harbor Shores was revised, seven (7) scattered parcels of land along the Paw Paw River near the Park were re-submitted to serve as "mitigation" (replacement) of the Jean Klock Park land lost to conversion.  The second proposal package is not attached to the Complaint because it is 312 pages in length, will be submitted as part of the compulsory administrative record and is known

-11-

to and in the possession of all Defendants.  This proposal was part of
a larger submission not disclosed to the public which was delivered by
Defendant Benton Harbor to the Defendant MDNR in May 2008 following
the close of a public comment period.

20. As part of the first, unsuccessful, application for
conversion, Defendant MDNR avoided NEPA compliance by deliberately
withholding pertinent information from the Federal government. On
Proposal Description/Environmental Screening forms required by
Defendant NPS, an administrator within Defendant MDNR failed to answer
some of the mandatory questions accurately; refused to certify that
the information provided was accurate; and by failing to specify what
NEPA treatment was to be accorded to the conversion, did not properly
assess the environmental impact on the Park, its dunes, its aesthetics
or the project's possible impacts on the minority community.
Responding to the question, "If your LWCF proposal is approved would
it have a disproportionately high and adverse effect on low income or
minority populations (Executive Order 12898)?", Defendant MDNR stated,
"No."  The correct answer, given that the population of the City of
Benton Harbor is over 90% African-American, is "Yes".  A "yes"
response would have triggered the requirement of compiling an
Environmental Impact Statement. Another question inquiring as to
impacts to "minority and low-income populations" was answered: "No
impacts or Not Applicable."  Defendant MDNR failed to indicate by
checking a box as required whether any of the three (3) possible
options (categorical exclusion, environmental assessment, or
environmental impact statement) would be the necessary environmental
document. These omissions were repeated *ten (10) times*, on ten (10)

separate documents filled out precisely the same way, one form for the Park and one form for each of the then-proposed nine mitigation parcels. By this artifice, Defendant MDNR intentionally avoided the preparation of an EIS.

21. When it made its second, 2008, submission, Defendant MDNR was ordered by Defendant NPS to *not* specify by use of the form what environmental document would be needed for NEPA compliance, so no form was submitted from MDNR to NPS along with the conversion application.

22. On June 16, 2008, Defendant MDNR approved Benton Harbor's conversion proposal and recommended the conversion to the responsible federal agency, the National Park Service.  On July 25, 2008, Defendant NPS approved the conversion by letter from Robert Anderson, Chief of the Recreation Grants Division of the Midwestern Office of NPS to James Wood, Manager of the Grants Management section of MDNR (letter appended to this Complaint as "Exhibit A").

## APPLICABLE LAWS

23.  Plaintiffs state that the NPS approval of the conversion of Jean Klock Park was arbitrary and capricious and in contravention of § 6(f)(3) of the Land and Water Conservation Fund Act (hereinafter "L&WCFA"). See L&WCFA, 16 U.S.C. §§ 460l-8(f)(3). This lawsuit is directed to the claimed improper approval by the NPS of the conversion of a portion of parkland to private use and the substitution of other pieces of property as parkland; to the claimed inadequacy of compliance with the National Environmental Policy Act ("NEPA") and its implementing regulations; to the claimed inadequacy of compliance with the L&WCFA and its regulations; and to the noncompliance of Defendants MDNR and City with certain regulations of the State of Michigan

related to parkland conversions.

24.   The involvement of the NPS with the property began in 1975 when the federal government originally invested $50,000 in L&WCFA funds, along with $50,000 of federal Community Development Block Grant funds, for the purpose of "site improvement and one bath house" at Jean Klock Park. See "Land and Water Conservation Fund, Project Agreement" stamped May 2, 1975 (Exhibit B hereto) ("Original L&WCFA Project Agreement").  Because the City of Benton Harbor received state grant funds from the MDNR and Michigan Natural Resources Trust Fund (MNRTF) in 1989 (MNRTF Grant #TF 89-114, $375,000), and federal funds from the L&WCFA through the U.S. Department of Interior, the proposed development of 22.11 acres of Jean Klock Park into three (3) fairways and holes of an 18-hole private golf course constitutes a "conversion" of public parkland which requires a process of approvals from state and federal agencies.

25. Under the L&WCFA, the NPS may approve of this conversion for private use only if it concludes that the conversion of public park-land would be in accord with the statewide comprehensive outdoor recreation plan ("SCORP") and "only upon such conditions as [the NPS] deems necessary to assure the substitution of other recreation properties of at least equal fair market value and of reasonably equivalent usefulness and location." 16 U.S.C. § 4601-8(f)(3).

26. The National Environmental Policy Act, 42 U.S.C. § 4322(2), requires "responsible [federal] officials" to prepare an environmental impact statement (hereinafter "EIS") on proposals for "major Federal actions significantly affecting the quality of the human environment." As detailed below, the National Park Service's process which results

in a permit of conversions of parkland for private or public development is a "major federal action" subject to the EIS requirement. Under NEPA, an agency must prepare an EIS when an "action" may have significant environmental effects, 40 C.F.R. § 1508.3. It is Plaintiffs' contention that in this matter of law an EIS must be prepared by or at the behest of Defendant National Park Service.

27. NEPA further establishes a national policy to "prevent or eliminate damage to the environment and biosphere." 42 U.S.C. § 4321. The Act recognizes "the critical importance of restoring and main-taining environmental quality, "declares that the federal government has a continuing responsibility to use "all practicable means" to minimize environmental degradation, and directs that "to the fullest extent possible…the policies, regulations and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this Act. 42 U.S.C. § 4331(c).

28. The federal Council on Environmental Quality ("CEQ") regu-lations implementing the procedural provisions of NEPA are binding upon all federal agencies, including Defendants Secretary and NPS. Those regulations (entitled "Regulations for Implementing the Pro-cedural Provisions of the National Environmental Policy Act") became effective in 1979 and bind the Department of the Interior and its National Park Service as of that date. 43 Fed. Reg. 55978-56007 (1978), 40 C.F.R. Parts 1500-1508. Each agency was required by the CEQ NEPA Regulations to adopt procedures to supplement those regu-lations. 40 C.F.R. § 1507.3. Pursuant to the CEQ's directive, the Department of the Interior adopted 36 C.F.R. Part 59.

29.  Plaintiffs also charge that by permitting the conversion of 22.11 acres of Jean Klock Park for use as three holes of an 18-hole private golf course under a 105-year lease, the NPS has allowed and/or ratified violations of federal law and regulation by Defendants MDNR and City of Benton Harbor.  Specifically, Plaintiffs state that § 6(f)(3) of the L&WCFA (16 U.S.C. § 460l-8(f)(3)) and regulations promulgated pursuant to it at 36 C.F.R. §§ 59.1 through 59.3 were violated.

30.  The regulations at 36 C.F.R. § 59.3(b) mandate (1) that all practical alternatives to the proposed conversion have been evaluated, (2) the fair market value of the property to be converted has been established and the property proposed for substitution is of at least equal fair market value as established by an approved appraisal (prepared in accordance with uniform Federal appraisal standards) excluding the value of structures or facilities that will not serve a recreation purpose, and (3) the property proposed for replacement is of reasonably equivalent usefulness and location as that being converted.

31.  For the reasons stated below, permitting the implementation of Defendants' conversion proposal will significantly affect the quality of the human environment and will cause Plaintiffs irreparable injury.

## VIOLATIONS OF LAW

### FIRST CAUSE OF ACTION
### (Failure to Prepare EIS)

32. Plaintiffs incorporate by reference and allege as though re-written herein the allegations contained in paragraphs 1 through 31

above.

33. NEPA at 42 U.S.C. § 4321 *et seq.* requires all federal agencies to prepare a detailed EIS on every proposal for a major federal action which would significantly affect the quality of human environment. 42 U.S.C. § 4332(2)(C). That EIS must contain a detailed discussion of environmental impacts (40 C.F.R. § 1502.16) and of alternatives (40 C.F.R. § 1502.14).

34. A "major federal action" under NEPA is defined at 40 C.F.R. § 1508.18 to include "actions with effects that may be major and which are potentially subject to Federal control and responsibility." "Major" is used interchangeably in the NEPA regulations with "significantly." "Significantly" involves "intensity", which at 40 C.F.R. § 1508.27(b) "refers to the severity of impact. "Intensity" requires recognition that environmental impacts may exist even where the federal agency believes that on balance the effects will be beneficial; that the proposed action may affect public health or safety; that there may be unique characteristics of the project such as proximity to historic or cultural resources, park lands, wetlands, or ecologically critical areas; that the effects on the quality of the human environment may be highly controversial; that there may be cumulatively significant impacts which cannot be avoided by breaking the project down into small component parts; that the project may cause loss or destruction of significant scientific, cultural, or historical resources; that the action may adversely affect an endangered or threatened species or its habitat; or that the proposed action may threaten violations of Federal or State laws or requirements imposed for the protection of the environment.

35. According to Defendant NPS' "L&WCF Grants Manual" (Chapter 650.2) an environmental impact statement may be indicated when "[m]arshes, or wetlands, unique animal or plant ecosystems . . . are affected significantly;" or when "the proposed L&WCF project would or might result in major natural or physical changes . . . with the project area or its immediate environs;" or when "[h]ighly contro-versial issues involving the environmental effects of the project exist or are expected."

36. The proposal to allow conversion and usage of 22.11 acres of Jean Klock Park for three (3) holes of an 18-hole private golf course is a "major federal action significantly affecting the quality of the human environment," for all of the cited reasons. Defendants must prepare an EIS. Allowing conversion and implementation of leasehold arrangements between Defendant Benton Harbor and Harbor Shores Community Redevelopment, Inc., the developer of the golf course and the larger project who asserts that the golf course is the development "magnet"), is an action which requires an EIS in order to analyze the direct, indirect and cumulative effects of the project.  The many physically-destructive steps which will accompany the conversion will cause significant environmental effects within the geographical region where the Park is located.  The conversion will cause permanent damage to natural features of the Park and changes in the human usage patterns and viability, outlined below.

*Destruction of the dunes and Park grounds*

37.  The plan for conversion of 22.11 acres for golf in Jean Klock Park will cause permanent destruction of the dune summit for more than three-eighths (3/8) of a mile, running parallel with Lake

-18-

Michigan.  There is not a single descriptive passage in the conversion proposal papers (in these items, which are part of the 312-page proposal which is not attached but will become part of the administrative record: "Environmental Assessment for Conversion Parcels for Harbor Shores Project"; "Summary Document for Public Review"; "Harbor Shores Lease Agreement", Section 2.04; "Summary of Changes/Blacklined version of Harbor Shores Lease Agreement," Section 2.04) which explains and quantifies the physical destruction and reconfiguration of the dunes which is planned in order to make them suitable for golf.  Great Lakes sand dunes are constantly shifting, classic works of sand. Excavation, mining and removal of thousands of cubic yards of sand is clearly contemplated by the golf course proposal, in order to make way for construction in their place of a stable earthen base structure for the golf course fairways and holes. There is no public record narrative or arithmetic discussion whatsoever of this volume removal, nor any but a summary mention of the fact that presumably thousands of cubic yards of topsoil or other fill material will be trucked in to recreate dune ridge mass for golf fairways and tees.

38. The dunes are unique plant ecosystems; those plant ecosystems, especially surface coverings and trees, will be permanently changed or eradicated by bulldozers and the installation of thousands of yards of non-native topsoil and sodding.

39. The conversion proposal and accompanying "improvements" envision destruction of existing roadways and the construction of new, paved roads through the Park for vehicles; construction of an entirely-new, extensive paved parking lot at the south end of the

park curving through the dune area and turning to parallel the beach
alongside Lake Michigan; a new parking lot at the north of the park
paralleling the lakeshore; destruction of a sizable existing parking
lot east of the dune ridge; construction of a new, paved access road
to the beach; construction of new paved golf cart paths; and the
permanent filling of some 3.8 acres of wetlands.  All of these
activities are either planned or are currently under construction,
undertaken without a NEPA-mandated environmental document.  All of
these activities will require grading, the use of fill materials which
are not naturally present within the Park, and will change the
existing surfaces and land uses.  To the extent they are mentioned in
the conversion proposal, these plans are mentioned only on maps, with
little to no elaboration of environmental effects and impacts.

   *The conversion project is part of a larger, unconsidered plan*

      40. The golf course project in the Park represents at least the
third conversion within Jean Klock Park in slightly more than a
decade. The prior conversions involved construction of platted high-
income housing on former Park land pursuant to an earlier rendering of
the development plan called variously "Edgewater Recreational Water-
front Park" plan, "Edgewater Master Plan," "Edgewater Development
Strategy," "River Run," "Melrose" and possibly several other names
which is now known "as Harbor Shores".  None of the earlier project
plans were scrutinized within an environmental impact statement,
despite the fact that there were fee conversions of Jean Klock Park
land for permanent, private use.  One of the two earlier conversions
was accomplished by the City of Benton Harbor with the acquiescence of
Defendant MDNR and without obtaining any approval from Defendant NPS.

That conversion, known as the Marram Shores conversion, facially violates the L&WCFA and its regulations.  It has never been submitted to the NPS and was brought to the agency's attention by proponents of the Park; it has never been mitigated, and takes priority over the Harbor Shores plan by virtue of being first in time.

41.  The use of Jean Klock Park land for a golf course is supposed to showcase what Harbor Shores terms "spectacular" views of Lake Michigan.  The three (3) golf holes on the dunes fronting Lake Michigan are anticipated by the developer to be the investment attraction for a 500-acre development of second homes, a water park, commercial spaces and a hotel. The conversion of Jean Klock Park will be achieved only by causing direct environmental impacts and effects. The larger development scheme will further cause indirect and induced effects limiting and curtailing some future uses of the Park and the converted land within it.  The converted land will cease forever to have any federal protection and will be bound up as a golf course or possibly other private use for at least the coming 105 years, and, after the conversion, could be sold literally at any time by agreement between the City and Harbor Shores.

42.  To date, construction of the fifteen (15) holes of the golf course located on private property near or adjacent to Jean Klock Park has been ongoing for at least two (2) years.  The fifteen private-land fairways and holes are approaching completion and are configured in such a way as to "force", by their proximity and alignment, NPS approval of the final three holes on Klock Park property.  Gaining zoning and other permits for the Harbor Shores development, siting of golf cart paths in wetland zones, and construction of the golf

fairways and holes on private property have occurred throughout the past two years. This "piecemealing" or "segmenting" of the construction permit process for the Harbor Shores development has contributed to the pressure buildup for the conversion and appropriation of Jean Klock Park land. The City of Benton Harbor and Harbor Shores have evaded the detailed scrutiny which would be implicated by an Environmental Impact Statement: analysis of the overall project aims, quantification and detailing of all planned natural resource destruction, and provision of the requisite "hard look" at the golf course, project, the larger plan, and alternatives.

*Nondisclosure of planned pesticide and herbicide use*

43.  The planned golf course will require large volumes of pesticides and herbicides to stimulate and maintain the growth of non-native grasses for golf greens and fairways. The environmental documents assembled by the City of Benton Harbor for public comment provide no quantified data, detail, or discussion of any management plan to protect the physical environment from waterborne chemical runoff, windborne transport or damage to existing plant and animal species within the Park.

*Unanalyzed implications for water quality*

44. The planned golf course will convert the Park's wetland area into an "open water" feature of the golf course, surrounded by golf holes and turf grass. The Environmental Assessment documents contained an admittedly incomplete inventory of animal life in the wetlands for purposes of determining impacts. The Environmental Assessment report on the proposed conversion lands in the Park, (part of the 312 page proposal for conversion which is not attached because it is too

cumbersome, will be made part of the administrative record of this matter and is in the possession of all Defendants) at page 18) states: "Numerous other amphibians and reptiles are expected to be present within the wetlands but time and resource constraints prevented WCR from conducting full herpetological surveys of the parcels." The Eastern Box Turtle, a species of special concern under state law which require protection from chemicals and despolia-tion of habitat, has been sighted by state sources throughout the conversion area in the Park, but are not mentioned in the environ-mental consultant's inventory, proving the incomplete nature of the assessment.

45. Defendant Benton Harbor states in its "Public Comment Summary and Response Document," which is too lengthy to attach and which is in the possession of Defendants:

> There's no direct connection into the waterways adjacent to the golf course whether they are wetlands, river, or the lake. All drainage ways throughout the golf course are to be taken through a 'first-flush' system that is designed to capture runoff up to the first one half inch of rainfall. ... There is also the establishment of a minimum 25-foot native vegetation buffer between manicured turf and wetland areas, streams, rivers and watercourses.

But a 25-foot buffer cannot be constructed on the planned man-made island in the middle of the marsh, so this mitigation measure cannot and will not be implemented to protect the marsh from chemical pollution.

### *Failure to Anticipate Fluctuations in Lake Levels*

46. The Great Lakes are at long-term low elevations. In the 1970's they were at historically high elevations and considerably less beachfront of Jean Klock Park was considered dry land than is present currently. The conversion proposal does not address the prospective

fluctuations in Lake Michigan levels over the 105-year lease period, nor discuss their impacts on use patterns, the potential for reducing viable parkland outside of the conversion area, nor the impacts of construction of a planned new parking lot and access road on the lakefront.

### SECOND CAUSE OF ACTION
#### (Failure to Consider Practical Alternatives to the Project)

47.  Plaintiffs incorporate by reference and allege as though re-written herein the allegations contained in paragraphs 1 through 46 above.

48. Section 59.3(b)(1) of Volume 36 of the Code of Federal Regu-lations requires that "[a]ll practical alternatives to the proposed conversion have been evaluated" before a conversion can be approved. Defendant Benton Harbor failed to show affirmatively that there are no less environmentally-destructive alternatives to the proposed project that would achieve the project's purpose.  There is a legal presump-tion that practicable alternatives do exist which must be rebutted.

49. NEPA and L&WCFA regulations require that: (1) alternatives be presented in comparative form to provide bases for choice by decision makers and the public (40 C.F.R. § 1502.14); (2) that "substantial treatment" be devoted to each alternative considered in detail to enable reviewers to evaluate the comparative merits of each alter-native (40 C.F.R. § 1502.14(b)); and (3) that during the course of the NEPA process no actions go forward that have adverse environmental impacts or that would limit the choice of reasonable alternatives (40 C.F.R. § 1506.1).

50. The City of Benton Harbor has allowed Harbor Shores Community

Redevelopment, Inc. or its contractors to grade, excavate and fill on planned mitigation lands prior to the formal submission of this conversion proposal to Defendant NPS.

51.  Defendant Benton Harbor's consideration of alternatives fails in several respects.  The alternatives are only summarily described.  They were rejected in the absence of any quantifiable data, in favor of the applicant's preferred alternative.

52.  According to the Army Corps of Engineers, Harbor Shores Community Redevelopment, Inc. recently indicated that it had decided to allocate more than six (6) acres of land formerly proposed for residential development to use as a "Golf Course Maintenance and Turf Farm," which in the view of the Corps constitutes a "major change" in the project which "make[s] a final determination of the least damaging alternative difficult to complete."  Letter, Corps of Engineers to Benton Harbor, April 29, 2008, Exhibit C hereto.  This "major change" has never been disclosed nor explained to the public in such a way that it might have been included in discussions of alternatives to the conversion plan.

53. The Corps also has identified "a large upland area . . . to the south and west of Parcel G containing over 5 acres of upland that certainly could accommodate a golf course hole."  Letter from Corps, Exhibit C hereto.  That acreage has never been identified in any way to the public as a possible site for alternative location of the golf course to obviate the need for converting Jean Klock Park.

54.  Respecting the "no action" alternative, which is mandated for consideration by NEPA and its regulations, a Preliminary Schematic Master Plan by Michael Redd Associates dated 2004 depicts and defines

an alternative location for the three holes of golf with the site
marked as "Alternative Golf Routing Not Using Jean Klock Park" and
shows the same 3 holes just north of the Park. There is neither
reference to, nor discussion of, this alternative means of building
the entire course outside the Park. In fact, in discussion of the "no
action" alternative lies the disingenuous suggestion that if there
were no Jack Nicklaus-signature golf course, *all* economic revital-
ization such as the remediation of old factory sites and clearance of
dilapidated factory structures (which has largely occurred already)
will not take place and there will be no economic rebirth of Benton
Harbor.  This is a specious misstatement.

55. The discussion of each of the alternatives postulated by
Defendant Benton Harbor assumes, without any quantified information,
that the project purpose can be achieved only by constructing an
18-hole Jack Nicklaus signature championship golf course.  The range
of alternatives excluded realistic options to a Nicklaus signature
championship course which did not include a taking and destruction of
the dunes in Jean Klock Park.  For example, the language chosen in
rejecting Alternative #5, in order to "maintain the design require-
ments of a Jack Nicklaus signature course", makes it clear that no
other course design occupying a smaller and more flexible geographical
"footprint" has been considered.  Having to "maintain the design
requirements of a Jack Nicklaus" course strictly limits consideration
of the footprint to a professional-grade golf course.  Professional
courses are longer and require greater surface area than other
courses.  The artificial "requirement" of a Nicklaus-designed
signature course barred serious discussion of "practicable" alter-

natives.  As a result, the alternatives analysis falls short of the
legal requirement.

56.  The alternatives analysis fails to enumerate the minimum
parcel size needed to accomplish the project purpose (which is not a
championship golf course, but a golf-centered residential develop-
ment).  Defendant Benton Harbor neither identified nor discussed
alternative golf course designs such as a non-championship grade
course or an "executive style" course or a 9-hole course, or, indeed,
no golf course at all.  Legally, such alternatives must be considered
because they, too, might yield a financially-viable project; yet
Benton Harbor did not mention them. The analysis is anecdotal and
abbreviated and contains no estimates of total development costs for
each alternative as compared to the proposed project.

57. At least one alternative, #4, is rejected because it would
use lands covered by a Michigan statute, "Act 425," which accords
certain tax benefits to the reuse of brownfield parcels, but which
also prohibits those lands from being used for recreation.  However,
Defendant Benton Harbor proposes to use Parcel H, a 1.5 acre brown-
field which is supposed to be capped with 12" of topsoil to be used,
and which is "Act 425" land where recreational usage is prohibited, in
mitigation of the loss of 22.11 acres of prime Jean Klock Park land
including dunes and Lake Michigan overlooks.

58. The true proponents of the Harbor Shores project, the
nonprofit Harbor Shores corporation and its affiliated organizations
(Cornerstone Alliance, Whirlpool Foundation and the Alliance for
World-Class Communities) insist that they must appropriate the
"dramatic element" (their term) of the views of the Great Lake

-27-

Michigan in order to compete against other high-end signature golf course developments to realize "average home prices over double the value" of those in other golf course developments, *i.e.,* for maximum profit.  However, achieving a maximally-profitable 500-acre housing project is the sole justification for the permanent conversion of public park acreage located at the very heart of Jean Klock Park. Less-than-maximum profitability is discussed nowhere among the conversion proposal alternatives.

### THIRD CAUSE OF ACTION
### (Prohibition Against Professional/Semi-Professional Use of Conversion Land)

59. Plaintiffs incorporate by reference and allege as though re-written herein the allegations contained in paragraphs 1 through 58 above.

60. The Original L&WCFA grant for Jean Klock Park is a development grant.  As part of the Park, the 22.11 acres proposed for conversion met all development criteria and remain governed by them.

61. Section 640.3 of the L&WCFA Handbook, which is too large to be annexed hereto but which is a public record known to or in the possession of Defendants, sets forth certain "Criteria for Development" at §§ 6, "Guidelines for Eligible Recreational Facilities," pp. 97-98:

> M. Professional Facilities. Areas and facilities designed primarily for semi-professional or professional arts or ath-letics, such as professional type outdoor theaters, professional rodeo arenas and other similar facilities are not eligible for L&WCF assistance.

62. And 36 CFR § 59.3(b)(5) of the NPS conversion regulation for parkland states that:

> (5) In the case of assisted sites which are partially rather

than wholly converted, the impact of the converted portion on the remainder shall be considered. If such a conversion is approved, the unconverted area must remain recreationally viable or be replaced as well.

63.   The justification for developing a Nicklaus "signature" golf course in the Park is to foster creation of a "championship" golf course for professional and semi-professional tournament play.  Professional golf tournament play will cause closure of the entire Park for days at a time during the peak beach usage season, except to paying spectators and golf participants. These closures will cause the remainder of the Park following conversion to be rendered non-viable for its longstanding recreational purposes. Consequently, the entire Park should be recognized as the Harbor Shores gross appropriation that it is, and the conversion should be disapproved.

### FOURTH CAUSE OF ACTION
#### (Legally-Insufficient Appraisal of Conversion Land)

64. Plaintiffs incorporate by reference and allege as though re-written herein the allegations contained in paragraphs 1 through 63 above.

65. The appraisal value of $900,000.00 for the 22.11 acres of dunes and other parkland slated for conversion was supposed to establish the minimum dollar value of new land to be made publicly accessible to "mitigate" the loss of public access to the Klock Park acreage.  That appraisal figure is untrustworthy.

66.   L&WCFA regulations (36 C.F.R. § 59.3(b)(2)) require that "[t]he fair market value of the property to be converted has been established and the property proposed for substitution is of at least equal fair market value as established by an approved appraisal (prepared in accordance with uniform Federal appraisal standards)...."

This was not done.  The governing regulations have been violated by the assorted acts and approvals of the Defendants.

67. The "uniform Federal appraisal standards" referenced in the regulation are the "Uniform Appraisal Standards for Federal Land Acquisitions" (http://www.usdoj.gov/enrd/land-ack/Landacquis ition.html).

68. The Klock Park appraiser did not follow the Uniform Appraisal Standards and thus concluded a strikingly low appraised value for the loss of the 22.11 acres, by perhaps a factor of ten-fold or more (*i.e.*, the appraisal should have been $10,000,000 to $16,000,000 when compared with recent nearby private sales of lakefront land).  The low appraisal follows the appraiser's insistence that restrictions against development of the Park limited consideration of what is the "highest and best use" according to appraisal standards.  The appraiser did not apply two related federal appraisal principles: (1)  that the appraisal of "highest and best use" must be an *economic* use; and (2) that a "highest and best use" such as conservation, natural lands, preservation, or any use that requires the property to be withheld from economic production in perpetuity, is *noneconomic* and not a valid basis for the estimation of market value.

69.  The appraiser's reliance upon noneconomic considerations (*e.g.*, value to the public, value to the government, or community development goals) to declare "highest and best use" should have caused disapproval of the resulting report for violating the Uniform Appraisal Standards, § A-14.

70. Each potential use of real property must be analyzed in terms of its physical possibility, legal permissibility, financial feasi-

bility, and its degree of profitability. That use which meets the first three tests and is the most profitable use (*i.e.*, results in the highest value) is the property's highest and best use. Uniform Appraisal Standards, § B-3.  This standard, too, was ignored in rendering the appraisal of the 22.11 acres.

71.  The appraiser considered the conversion to golf course usage of Jean Klock Park as a merely recreational one, instead of viewing the proposed use of Park land as a indispensable component of an 18-hole, privately-owned golf course which itself is the core attraction of a large residential/commercial project.  The appraiser decided, incorrectly, that "recreational is the highest and best use as vacant" (from the Appraisal of Jean Klock Park Conversion which is not attached because it exceeds 80 page and is too cumbersome, will be provided as part of the administrative record in this matter and is in possession of all Defendants, p. 14).

72.  The converted land in Klock Park is in fact an utterly commercial anchor for a 500-acre, half-billion-dollar development. The appraiser, who was paid by the developer, violated federal appraisal standards to achieve a 90% to 95% undervalue of the true commercial value of Jean Klock Park land as part of a residential project planned to span at least four (4) generations.

### FIFTH CAUSE OF ACTION
### (Noncompliance with Mitigation Standards)

73. Plaintiffs incorporate by reference and allege as though re-written herein the allegations contained in paragraphs 1 through 72 above.

74. L&WCFA regulations require (at 36 C.F.R. § 59.3(b)(3)) that

"[t]he property proposed for replacement" must be "of reasonably equivalent usefulness and location as that being converted."

75. In a letter rejecting Benton Harbor's first bid for conversion in October 2007, Defendant NPS Regional Director Quintana stated that "the proposed replacement package comprising 42.57 acres is insufficient in magnitude, capacity, and viability to mitigate the subject 22.11 acres or any larger conversion" and "we also do not believe that any [mitigation] parcel is self sufficient as a viable park or recreation unit."

76. In the current, second application for conversion of the Park, no additional mitigation acreage was added to the seven (7) parcels (in fact, three parcels were dropped out of the mitigation bank). The mitigation properties are scattered along the Paw Paw River outside of Jean Klock Park for a dozen miles. Proposed access paths to the parcels will not make them "viable" or self-sufficient, nor will the planned placement of a few park benches, garbage cans and parking spaces. The type of recreation available at these sites, principally walking on a path, is not comparable to the hiking, nature viewing and scenic overlooks from the dunes and dune crests in Jean Klock Park.

77. In particular, Parcel H, a 1.47 acre brownfield which has yet to be remediated, provides poor mitigation. Nearly treeless, it is located on the Paw Paw Riover where it converges with the St. Joseph River, near a planned marina for pleasure boats. Parcel H overlooks the rear of a concrete block-built motel and the gravel piles of a concrete-making firm. It is appraised at $700,000; the river frontage of Parcel H is supposed to nearly entirely substitute

for the lost parkland, dunes, and Lake Michigan views offered by 22.11
acres of Jean Klock Park.  Yet from an aesthetic standpoint, Parcel H
has no comparability to views from the dunes and dune crests.

78.  Benton Harbor maintains that Parcel H would be ideal for
"boat watching" (Mentioned in "Summary Document," p. 15, of the
overall project application, which is 312 pages in length, will be
provided as part of the compulsory provision of the administrative
record and is in the current possession of all Defendants), even
though an existing bridge over the Paw Paw River guarantees that
nothing larger than a canoe or kayak and certainly no yachts or Great
Lakes freighters can ever come so far upstream.

79. Harbor Shores proposes to install a large metal tie-back on
Parcel H to minimize soil erosion, so that Parcel H will protect the
downstream marina from erosion. This is an unrecorded easement, and
gives tenure and control to a private entity over what would osten-
sibly be public parkland. Moreover, the area in which Parcel H is
located is actually identified as future parkland area for the City of
St. Joseph, which is adjacent to Benton Harbor, in St. Joseph's
Community Recreation Plan.  It is located in St. Joseph, the Berrien
County seat.

80.  Parcel H is to be "remediated" as a brownfield by the
placement of a foot of topsoil atop the contaminated soil.

81.  As "425 Act"-covered land, Parcel H is ineligible for use as
recreation under Michigan law, according to a prevailing legal
interpretation rendered by the Michigan Attorney General.  Because it
cannot be used for recreation, Parcel H cannot be used for mitigation
of a park conversion project.  Parts of Mitigation Parcel B and Parcel

-33-

F are also not to be used as mitigation, since they are partially in
the Act 425 area being transferred between the cities of St. Joseph
and Benton Harbor, and would eventually be parks owned exclusively by,
and located within, the boundaries of the City of St. Joseph.

82.  Additionally, while the *converted* land is to be taken
possession of and cordoned off and all public use of it to cease
immediately upon the grant of NPS' permission, significant parts of
the *mitigation* land may not be available for years, in a scheme that
actually makes the underlying contract between Harbor Shores and the
City of Benton Harbor a contract subject to a condition subsequent. At
Section 6.05 of the Lease agreement appear these provisions affecting
mitigation parcels D and F:

> Such response activities and measures are necessary to
> mitigate arsenic exposure on the Remediation Parcels as outlined
> on Part 4.0 of the Document of Compliance with the Part 10 Rules,
> dated November 7, 2007; such remediation includes, without
> limitation, mass excavation, disposal of soil, concrete debris
> and industrial waste, the bulk filling of areas of the Park
> Expansion Property, and the installation of an isolation zone on
> certain areas of the Park Expansion Property. Such response
> activities and measures shall begin within ninety (90) days of
> execution of this Lease and be completed within three (3) years
> of the execution of this Lease in accordance with the timeline as
> detailed in the City of Benton Harbor's Conversion Proposal which
> was submitted to the National Park Service on June 16, 2008."

>       *****              *****              *****

> Nothwithstanding anything to the contrary herein, if Harbor
> Shores' proposed due care/remediation plan is not accepted by the
> appropriate governmental bodies, Harbor Shores, in its sole
> discretion, may review whether to proceed with or cease devel-
> opment of any portion of the Project, including the golf course
> and terminate this Lease and the Park Improvements and Mainte-
> nance Agreement without any further liability. Such determination
> shall be made by Harbor Shores within one hundred eighty (180)
> days of the disapproval of the due care/remediation plan. In the
> event that Harbor Shores does not notify the City of Benton
> Harbor of its decision whether to terminate this Lease because of
> the disapproved due care/remediation plan within such one hundred
> eighty (180) day period, either party may terminate this Lease by

written notice to the other party within sixty (60) days of the expiration of such one hundred eighty (180) day period.

83. The conversion regulation 36 C.F.R. § 59.3(b)(3)) requires that "[t]he property proposed for replacement *is* of reasonably equivalent usefulness and location as that being converted." The obvious contemplation of the regulation is that where there is a conversion, the mitigation lands must be immediately available for the use and convenience of the public *in mitigation of the conversion*. This exposes the problem with the use of polluted land to "mitigate" the taking of prime, unpolluted land via conversion. Since remediation has not been accomplished despite NPS approval on July 25, 2008, and the public will be deprived of the benefit of certain of the mitigation lands for up to three (3) years while the project developer presumably has exclusive use and benefit of the conversion land immediately, the conversion cannot be presently approved and must be held for naught pending resolution of the condition subsequent.

### SIXTH CAUSE OF ACTION
#### (Conversion Not in Accordance with State Comprehensive Outdoor Recreation Plan)

84. Plaintiffs incorporate by reference and allege as though re-written herein the allegations contained in paragraphs 1 through 83 above.

85. Section 59.3(b)(9) of Title 36 of the Code of Federal Regulations requires that "[t]he proposed conversion and substitution are in accord with the Statewide Comprehensive Outdoor Recreation Plan (SCORP) and/or equivalent recreation plans." The Jean Klock Park conversion proposal not only is not in accord with the SCORP, but Benton Harbor has had no statutorily required local community

recreation plan ("CRP") for several years, making the conversion
beyond the purview of the SCORP.

86.  Michigan's SCORP is a plan document that is required and
funded by the Land and Water Conservation Fund Act. The State of
Michigan completed a new SCORP in 2007, see http://www.mi.gov/dnr/
0,1607,7-153-10371_10402-186236--,00.html

87.  The contractor for the SCORP reviewed and analyzed all
existing Community Recreation Plans of Michigan communities, which by
law are maintained on file at Defendant MDNR. Benton Harbor does not
have a current CRP on file, therefore, the City could not express
local recreation and park needs for the SCORP. As a result, Benton
Harbor's recreational needs are not specifically reflected in the
SCORP nor are those needs reflected in the statistical presentations
of recreational priorities.

88.  Without a local Community Recreation Plan and participation
in compilation of the SCORP, there was no community recreational
planning done by the residents/grassroots or the City of Benton
Harbor, so no needs were assessed, no new parkland areas were
identified or articulated, and golf was not identified as a community
recreation need in Benton Harbor. Consequently, the plan for using
parkland for a private golf course is not a legitimately-derived
community need.  The golf course conversion proposal thus is not the
product of a public planning process, openly achieved, but merely
represents a business decision promoted by the private interests that
make up Harbor Shores (the Whirlpool Foundation, associated with the
Whirlpool Corporation; the Cornerstone Alliance, which is Benton
Harbor and vicinity's chamber of commerce; and other nonprofit

business-oriented groups).

89.  The most important current SCORP initiative is resource conservation, which according to the SCORP document "flows directly from the DNR's organic act, Public Act 451 of 1994 as amended." The Summary Document of the Jean Klock Park conversion proposal ignores this goal of the current SCORP to "protect, restore and, where appropriate, enhance natural resource quality related to public outdoor recreation venues," including "acquisition of inholdings. . . ." Placing part of a private golf course inside Jean Klock Park, therefore, constitutes the creation of an inholding, which is contrary to the most important initiative of the SCORP.  Breaking up an intact, 91-year old public park on a Great Lakes shoreline for a prospective period (105 years) that is longer than the Park has existed, destroy- ing dunes and wetlands and the complex of dunes/wetlands, destroying habitat, installing artificial landscaping, and sculpting sand dunes is in serious discord with the operative State Comprehensive Outdoor Recreation Plan.

### SEVENTH CAUSE OF ACTION
#### (Conversion Creates Non-Viable Parkland)

90. Plaintiffs incorporate by reference and allege as though re- written herein the allegations contained in paragraphs 1 through 89 above.

91. Section 59.3(b)(9) of Title 36 of the Code of Federal Regulations requires that "[i]n the case of assisted sites which are partially rather than wholly converted, the impact of the converted portion on the remainder shall be considered. If such a conversion is approved, the unconverted area must remain recreationally viable or be

replaced as well."

92.   The conversion of 22.11 acres within the Park creates a circular ring of three golf fairways and holes which, situated near a pond/wetland in the Park, create a "donut" effect.  The "donut hole", consisting of about a dozen or more acres, is supposed to remain as parkland. The reality with a very expensive, championship golf course, however, will be to limit access to the "donut hole" area to the public, which will be allowed to walk through several very narrow corridors between the sculpted, landscaped and fenced or hedged fairways and holes.  The practical effect of converting the 22.11 acres is to render non-viable for park usage the acreage surrounded by the golf fairways. Additional park acreage north of the golf fairways and south of a housing development would be rendered non-viable. Also, park acreage to the south of the golf holes/fairways and north of the city water plant would be rendered non-viable. The parcels rendered non-viable would be useful essentially for buffering championship, private golf tournaments, which are events closed to the public, than promoting or continuing non-golf, public outdoor recreation.

93.   The conversion fails because additional mitigation would be required, against a much higher appraisal value.

### EIGHTH CAUSE OF ACTION
#### (Violations of Administrative Procedure Act)

94. Plaintiffs incorporate by reference and allege as though re-written herein the allegations contained in paragraphs 1 through 93 above.

95. The acts and/or omissions of which Plaintiffs complain herein comprise, Defendants' knowing and conscious failures to comply with

NEPA and the L&WCFA. Plaintiffs have suffered legal wrongs because of agency actions taken in contravention of law, and further, Plaintiffs are adversely affected and aggrieved by agency action within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702.

96.  Plaintiffs state that the acts and/or omissions of one, some or all Defendants, separately or in combination, to cause and other- wise effectuate the approval of the conversion of land in Jean Klock Park, were and are arbitrary and capricious and an abuse of dis- cretion, not in accordance with law, in excess of statutory juris- diction and lacking in observance of legal procedure within the meaning of the APA and should therefore be declared unlawful and set aside by this Court as such are violative of the federal Administra- tive Procedure Act, 5 U.S.C. §§ 701-706.

### NINTH CAUSE OF ACTION
#### (Violation of state-law requirement of two appraisals)

97.  Plaintiffs incorporate by reference and allege as though re- written herein the allegations contained in paragraphs 1 through 96 above.

98. Michigan Natural Resources Trust Fund Board Policy 94.1 governs conversions of parkland.  Paragraph 5 of the Policy requires that "[t]o be approved, a replacement property must generally be: . . . (c) consistent with MNRTF goals and meet all current application requirements for new MNRTF acquisition applications. . . ."

99. MNRTF Board Policy 91.1, paragraph 6 requires that "All MNRTF land acquisition grantees must have an appraisal of the property conducted prior to the acquisition (two for lands valued at over $500,000)."

100.   Paragraph 6 of Board Policy 94.1 states, pertinently:

The value of the replacement property must be of equal or greater to the fair market value (FMV) of the property to be converted, based on the DNR-approved appraisal(s) of the converted and substituted parcels completed at the time of conversion.

101.  Thus *two* (2) appraisals were required to be made of the 22.11 acres of conversion land, and those appraisals were required to be contemporaneous to the conversion (July 2008).  The sole, 2006, appraisal under challenge elsewhere in this lawsuit cannot by state requirements stand alone. It must be set aside and considered null and of no effect in support of the conversion proposal.

### TENTH CAUSE OF ACTION
### (No Michigan Natural Resources Trust Fund Approval of Conversion Proposal)

102. Plaintiffs incorporate by reference and allege as though re-written herein the allegations contained in paragraphs 1 through 101 above.

103.  The Michigan Natural Resources Trust Fund board (hereinafter "MNRTF") must approve the proposed conversion of land within Jean Klock Park.  The only conversion for Klock Park which the MNRTF ever approved was for the Grand Boulevard conversion in 2004-05. That conversion was approved by NPS. The only conversion for Klock Park for the Harbor Shores project MNRTF ever approved was for a proposal submitted to Defendant NPS in 2007 which was rejected by Defendant NPS in October 2007. The conversion challenged in this lawsuit is different from the 2007 proposal which was rejected by Defendant NPS and the Trust Fund board therefore should have taken up the matter of reviewing and approving or denying it anew.

104.  At § 2.07 of the Lease agreement which has recently been

executed between the City of Benton Harbor and Harbor Shores Community Redevelopment, Inc., there is an express contractual clause requiring MNRTF board approval:

> The Parties further acknowledge that the Parties have sought and obtained approval of the Project from the MDNR, *MNRTF Board,* and the NPS. *The MNRTF Board approval is subject to the conditions as detailed in its final approval, including, without limitation, a review and approval of this Lease.* (Emphasis supplied)

105.  This approval was neither sought nor attained.  Consequently, all conversion-related agreements are void and must be suspended. Plaintiffs have been denied procedural due process and the Lease and conversion approvals must be canceled, set aside and held for naught.

### *PRAYER FOR RELIEF*

**WHEREFORE**, Plaintiffs respectfully pray that this Court:

1) Declare the Defendants' actions in approving the conversion of land within Jean Klock Park without first having prepared a detailed Environmental Impact Statement and alternatives to the conversion constitute violations of NEPA, L&WCFA and the APA and the approval of the conversion is therefore null and of no legal force and effect;

2) Issue a mandatory injunction requiring Defendants to rescind the approval of the conversion and prohibiting any activities to be conducted pursuant to the conversion plan until such time as all Defendants have complied with NEPA and the L&WCFA and have prepared an adequate Environmental Impact Statement and have come to a decision in light of that statement and pursuit of the procedures under NEPA and L&WCFA;

3) Award Plaintiffs their costs of this action, including attorney fees; and

4) To grant such other and further relief as the Court deems just and proper in the premises.

_/s/ Oliver Hall_
Oliver Hall, Esq.
D.C. Bar No. 976463
1835 16th Street N.W. #5
Washington, D.C. 20009
(202) 248-9294 (office)
(617) 953-0161 (cell)
oliverbhall@gmail.com

Trial Counsel for Plaintiffs

 

# United States Department of the Interior

National Park Service

Midwest Region
601 Riverfront Drive
Omaha, Nebraska 68102-4226

26-00568(MWR-P/G)

JUL 2 5 2008

Mr. Jim Wood
Manager, Grants Management
Michigan Department of Natural Resources
P.O. Box 30425
Lansing, Michigan 48909-7925

Dear Mr. Wood:

This correspondence is in response to the city of Benton Harbor's revised request for National Park Service (NPS) approval to convey control and tenure for 22.11 acres of Jean Klock Park to Harbor Shores Community Redevelopment, Inc. This park was developed with assistance from the Land and Water Conservation Fund under grant 26-00568 entitled Jean Klock Park Bathhouse. The purpose for this conveyance is to allow Benton Harbor to lease the subject parkland for the placement of 3 holes of an 18-hole public golf course. Based upon our review of the information provided in the revised conversion proposal, we are approving the city's request.

Enclosed are an executed copy of amendment number 3 and a copy of the Standard Form 424 for this action.

The issues related to this conversion have been somewhat unusual in nature and complexity, and we thank you for your patience as we completed our review. Any questions you have may be directed to Jim Krejci at 402-661-1560.

Sincerely,

Robert Anderson
Chief, Recreation Grants Division

Enclosures 2



NAT RES 3503

### MICHIGAN DEPARTMENT OF NATURAL RESOURCES
Land and Water Conservation Fund

AMENDMENT TO PROJECT AGREEMENT

Amendment #1

| SUBJECT OF AMENDMENT | | |
|---|---|---|
| County | Local Government Jurisdiction - Participant | Project Number |
| | City of Benton Harbor | |
| Berrien | Jean Klock Bathhouse | 26-00568 |

This amendment to the Project Agreement, entered above, is hereby made between that participating Local Governmental Jurisdiction and the State of Michigan, Department of Natural Resources, acting through its Local Grants Coordinator, pursuant to the Land and Water Conservation Fund Act of 1965, 78 Stat. 897 (1964).

The Local Governmental Jurisdiction and the State of Michigan in mutual consideration of the promises made herein and in the agreement of which this is an amendment to promise as follows:

That the above mentioned agreement is amended by adding the following:

The project period covered by the agreement and the project period are hereby extended from "Date of Approval through December 31, 1977" to "Date of Approval through December 31, 1978".

All other parts of the Project Agreement remain the same.

In all other respects the agreement of which this is an amendment, and the plans and specifications relevant thereto, shall remain in full force and effect. In witness whereof, the parties hereto have executed this amendment as of the date entered below.

#### State of Michigan

Name *Jeanne L. Powers*

Title   Jeanne L. Powers
      Assistant Grants Coordinator

Date    January 20, 1978

#### Local Governmental Jurisdiction

Name *M____ Parm___*

Title *City Manager*

Date *January 24, 1978*

NAT RES 3503

**MICHIGAN DEPARTMENT OF NATURAL RESOURCES**
**Land and Water Conservation Fund**

AMENDMENT TO PROJECT AGREEMENT

| | SUBJECT OF AMENDMENT   Amendment #1 Local | |
|---|---|---|
| County | Local Government Jurisdiction - Participant City of Benton Harbor | Dated |
| Berrien | Jean Klock Bathhouse          26=00568 | December 10, 1976 |

This amendment to the Project Agreement, entered above, is hereby made between that participating Local Governmental Jurisdiction and the State of Michigan, Department of Natural Resources, acting through its Local Grants Coordinator, pursuant to the Land and Water Conservation Fund Act of 1965, 78 Stat. 897 (1964).

The Local Governmental Jurisdiction and the State of Michigan in mutual consideration of the promises made herein and in the agreement of which this is an amendment to promise as follows:

That the above mentioned agreement is amended by adding the following:

The project period is hereby extended from "March 14, 1975 through December 31, 1976" to "March 14, 1975 through December 31, 1977".

All other parts of the Project Agreement remain the same.

In all other respects the agreement of which this is an amendment, and the plans and specifications relevant thereto, shall remain in full force and effect.  In witness whereof, the parties hereto have executed this amendment as of the date entered below.

**State of Michigan**

Name  _Victor G. Harvath_

Victor G. Horvath

Title  Local Grants Coordinator

Date  December 10, 1976

**Local Governmental Jurisdiction**

Name  _Lynn Mey_

Title  _Planning Director_

Date  12/7/76

MICHIGAN DEPARTMENT OF Natural Resources
Land and Water Conservation Fund

PROJECT AGREEMENT

| County<br>Berrien | Project Number<br>26-00568 |
| --- | --- |
| Project Title   . Jean Klock Bathhouse | |
| Project Period<br>Date of Approval to 12-31-76 | Period Covered by this Agreement<br>Date of Approval to 12-31-76 |

Project Scope (description of project)

The City of Benton Harbor will develop approximately one acre of land located within the Jean Klock Park to be used for public outdoor recreation purposes, as further described in the project proposal.

Proposed developments will include the following:

1) Site improvement
2) One bathhouse
3) Permanent Land and Water Conservation Fund acknowledgement sign.

Pre-agreement costs incurred from November 20, 1974 to date of project approval in an amount not to exceed $1,200 shall be allowable under this agreement.

Project Stage Covered by this Agreement

**Total Project**

Project Cost

| | |
| --- | --- |
| Total Project Cost of Proposal | $ 100,000 |
| Fund Support Ceiling | 50% |
| Fund Amount Requested | 50,000 |
| Cost of this Stage of Project | 100,000 |
| Fund Assistance Requested this Stage | 50,000 |
| Federal Funds Obligated by this Agreement | 50,000 |

| Year | Amount |
| --- | --- |
| 1975 | $50,000 |
| | |
| | |

Attachments Included

RECEIVED

MAY 2 1975

GRANTS-IN-AID SECTION
DEPT. OF NATURAL RESOURCES

R 3502

26-00568

The State of Michigan, represented by the Local Grants Coordinator, Department of Natural Resources, and the local governmental jurisdiction named above (hereinafter referred to as the Local Governmental Jurisdiction), mutually agree to perform this agreement in accordance with the Land and Water Conservation Fund Act of 1965, 78 Stat. 897 (1964), and with the terms, promises, conditions, plans, specifications, estimates, procedures, project proposals, maps and assurances attached hereto and hereby made a part hereof.

The State of Michigan hereby promises, in consideration of the promises made by the Local Governmental Jurisdiction herein, to take the necessary action to enter into an agreement with the U. S. Department of the Interior, Bureau of Outdoor Recreation, to obtain Federal funds for that portion of the project referred to previously in this agreement as "federal funds," and to accept such funds from the United States for disbursal to the Local Governmental Jurisdiction to reimburse that portion of the obligation for this project or stage of project that is the United States' share.

It is understood by the parties hereto that this agreement shall not obligate the State of Michigan funds for project costs described herein in event that federal funds are not available within one year from the date of this agreement and that this agreement is then null and void. The Local Governmental Jurisdiction hereby promises, in consideration of the promises made by the State herein, to execute the project or project stage described in this agreement in accordance with the terms of this agreement. It is implicitly understood that costs incurred will not be reimbursed without written approval that such federal funds have been obligated.

The following special project terms and conditions were added to this agreement before it was signed by the parties hereto: - The State shall transfer to the City of Benton Harbor all funds granted hereunder. *** This agreement is not subject to the provisions of Section B.2(d) of the attached General Provisions, dated December 1965. *** Reference to $10,000 in B.2(a), (b) and (c) of the General Provisions is changed to $2,500. *** The City of Benton Harbor agrees to comply with the terms and intent of the Flood Disaster Protection Act of 1973 (Public Law 93-234) and all applicable regulations and procedures implementing such Act. *** Should a grant be made for this project under the Housing and Community Development Act, the City of Benton Harbor shall, in the performance of this project, comply with the provisions of the Davis-Bacon Act, as amended (40 USC 276a-276a-7) and the regulations of the Secretary of Labor (29 CFR3:29CFR5), and shall insert or cause to be inserted in all contracts affected by such regulations the contract provisions as set forth in 29CFR5.5. *** The City of Benton Harbor agrees to bury all new electrical and telephone wires located within the project site.

In witness whereof, the parties hereto have executed this agreement as of the date entered below.

STATE OF MICHIGAN
Dennis R. Adams
Assistant Grants Coordinator

BY _____
~~XXXXXXXXXXXXXXXXXXXX~~
Department of Natural Resources

DATE  March 26, 1975

LOCAL GOVERNMENTAL JURISDICTION

BY X_____
   Charles F. Joseph

TITLE  Mayor

DATE  April 21, 1975

26- 00568



5/23/51
JY

■ Park Boundaries
● Bath house location

**DEPARTMENT OF THE ARMY**
DETROIT DISTRICT CORPS OF ENGINEERS
BOX 1027
DETROIT, MICHIGAN 48231-1027

April 29, 2008

IN REPLY REFER TO

Engineering & Technical Services
Regulatory Office
File Number: LRE-2005-0540020

Richard Marsh
City Manager
City of Benton Harbor
200 E. Wall Street
Benton Harbor, MI 49022

Dear Mr. Marsh:

This letter is intended for your written record regarding your Public Hearing on Proposed
Conversion of City parklands at Jean Klock Park for use as a privately held golf course operated
by Harbor Shores Community Redevelopment Inc. (HSCRI). As you know, the Corps of
Engineers has asserted jurisdiction over navigable waters and wetlands adjacent to these waters
and has reviewed the HSCRI proposals in various iterations since 2005. The Corps of Engineers
denied the HSCRI permit application without prejudice on November 9, 2007 after the National
Park Service denied a proposal for conversion of Jean Klock Park Lands to accommodate three
holes of the proposed golf course. We understand that you held a Public Hearing on this subject
on April 17, 2008 and will accept written comments to add to the public record until May 3,
2008. While we were not notified of the date of the public hearing, or given advance notice of
the materials under discussion, we have obtained (through J.F. New, Inc., HSCRI's agent for the
Department of Army permit application) a copy of your public notice materials titled: City of
Benton Harbor, Michigan Jean Klock Park Conversion and Mitigation Proposal In Reference to
Land and Water Conservation Fund Grant #26-00568.

We offer the following comments regarding the materials presented at and for the Public
Hearing.

1. Background: The Corps of Engineers' authority to regulate certain activities on the
properties in question is found in Section 10 of the Rivers and Harbors Act (Section 10), and
Section 404 of the Clean Water Act (Section 404). Waters in Department of Army jurisdiction
within the proposed golf course include the Paw Paw River, and wetlands and open water
adjacent to the Paw Paw River. A Department of Army permit from the Corps of Engineers is
required for work in Section 10 waters such as the Paw Paw River and for discharges of fill
material in certain Section 404 waters such as wetlands adjacent to the Paw Paw River. The
Corps of Engineers suspended its evaluation of the HSCRI application for the golf course work
when the National Park Service denied a land conversion proposal for Jean Klock Park.

- 2 -

Some typical examples of structures or work requiring Section 10 permits within this jurisdictional area include beach nourishment, boat ramps, breakwaters, bulkheads, dredging, filling or discharging material such as sand, gravel or stones, groins and jetties, mooring buoys, piers (seasonal or permanent), placement of riprap for wave protection or stream bank stabilization, boat hoists, pilings and construction of marina facilities.

Section 404 requires a Corps permit for the discharge of dredged or fill material into waters of the United States and in wetlands adjacent to those waters. The area of Corps jurisdiction under Section 404 extends to the OHWM, and to the upland boundary of any adjacent wetlands. Projects involving discharges typically include placement of fill material for homes and landscaping, impoundments, causeways, road fills, dams and dikes, riprap, groins, breakwaters, revetments, and beach nourishment. Section 404 also regulates discharges of dredged material incidental to certain activities such as grading, mechanized landclearing, ditching or other excavation activity, and the installation of certain pile-supported structures.

2. Alternatives: The discussion of alternatives on pages 4 and 5 of the "Summary Document for Public Review" (Summary Document) and specifically those remarks describing the need for a "dramatic element," that is a view of Lake Michigan as part of the golf course, represents the views of the applicant and its pre-selected golf course designer and not those of the Corps of Engineers.

3. Avoidance and Minimization of impacts to Special Aquatic Sites: Critical to our evaluation of proposed discharges in special aquatic sites such as wetlands, is the demonstration that the work represents the least damaging alternative. In this case, we agree that that the applicant has consulted with us regarding a reduction in proposed wetland discharges from over 13 acres to 3.82 acres since 2005. However, our agency has not made a final determination on whether the current proposal meets the least damaging alternative standard. We have in fact recommended to HSCRI that consideration be given to further reducing wetland discharge areas, or making use of the currently proposed wetland mitigation (mitigation for wetland discharges, not for park land conversion) areas (7.84 acres) within the project area as part of the golf course, while pursuing other wetland mitigation alternatives outside of the immediate vicinity. The proposed wetland mitigation areas are currently non-wetland areas and conversion of these areas would not require a Department of Army permit. In addition, it appears that more properties are currently under consideration for the overall HSCRI project than were included in the Department of Army permit application. These new areas may provide more flexibility to reduce impacts to wetlands. Although the application materials submitted to our office show the eastern end of the development area at Paw Paw Avenue, we note that Park Land Conversion Parcel G lies east of Paw Paw Avenue, and a large upland area lies to the south and west of Parcel G containing over 5 acres of upland that certainly could accommodate a golf course hole. Materials recently submitted to the Corps of Engineers show a new "Golf Course Maintenance and Turf Farm" of over 6 acres that was presented in permit application materials as "future development" for housing. This is an example of a major change in this large and complex project that make a final determination of the least damaging alternative difficult to complete.

- 3 -

4. Wetland Mitigation. The currently proposed wetland mitigation plan involves three parcels totaling 7.84 acres in extent. These areas would be excavated, planted, and maintained as natural resource areas. On-going maintenance including possible adjustments to water levels and control of invasive plant species will likely be required. Our review of the proposed park land mitigation parcels A-H shows that there would be no effect on or conflict with the wetland mitigation parcels, so long as no structures such as raised viewing platforms are constructed within the new wetland areas.

5. The following specific comments relating to the Park Land Conversion Plan and Trail System are offered. The Corps of Engineers reviews a number of public interest factors in evaluating permit applications, including economics, recreation, safety, floodplain management, and fish and wildlife habitat.

a. Summary Document, page 5. There is no guarantee that the proposed golf course will in fact produce an operating profit for distribution to Benton Harbor for its Community Benefits Fund. HSRCI has presented projected housing and commercial development in upland areas near the golf course as the economic engine for community benefits in materials provided in support of the Department of Army permit application.

b. Jean Klock Park Trail System Map. A future canoe and kayak launch is shown at the Paw Paw Avenue Bridge over the river. Hole #13 involves active golf play over the river just a few hundred feet downstream. The launch would require a Department of Army permit when it is proposed, but also represents a likely conflict between boaters and golfers.

c. Jean Klock Park Trail System Map. It appears that the public trail and golf cart paths use the same two bridges over the river. This could be a potential use conflict during the golf season.

d. Park Land Mitigation Parcel B. This property may include the proposed water intake structure at the river to provide irrigation water for the golf course.

e. Park Land Mitigation Parcel D. The Environmental Assessment for the park land mitigation sites states that fish can access the old river channel on this site during high water. An unpaved access road cuts the river channel in half on this parcel. Consideration should be given to constructing a section of the trail on pilings, or to the use of culverts at this location so the two parts of the old channel are reconnected, thus increasing fish habitat value at this site. This parcel is also being used as a "compensatory cut" area to satisfy flood plain requirements in the Michigan Department of Environmental Quality permit for the golf course. From the Corps' perspective, this does not seem to be a conflicting use.

f. Park Land Mitigation Parcel E. The Environmental Assessment for the park land mitigation parcels states that the public trail and wetland observation platform are a safe distance from the nearby par three Hole #17. A protective fence along the length of the trail should be installed in addition to protective and aesthetic screening with trees and shrubs.

- 4 -

In summary, the purpose of this letter is to summarize the status of the Corps of Engineers review of the HSCRI Department of Army permit application. This agency should not be viewed as supporting or opposing the golf course project as currently proposed. The Corps of Engineers will reach a final decision on the HSCRI permit application once the issue of park land conversion is resolved. Our decision on the permit application could be to deny, modify, or issue a permit with special conditions.

If you have any questions, please contact Thomas E. Allenson of this office at the above address or telephone (313) 226-2221 or E-Mail Thomas.E.Allenson@lre02.usace.army.mil. Please refer to File Number: LRE-2005-0540020.

Sincerely,

T.A.

John Konik
Chief, Regulatory Office
Engineering and Technical Services

Enclosures

Copy Furnished

James Wood, MDNR, Grants Division
James Krejci, NPS
Joseph van Wahlde, JF New, Inc.

**CIVIL COVER SHEET**

JS-44
(Rev.1/05 DC)

| | |
|---|---|
| **I (a) PLAINTIFFS**<br><br>Julie Weiss, Nicole Moon, Emma Kinnard, Lea'Anna Locey, James Duncan, Scott Elliott, Ronnie Whitelow | **DEFENDANTS**<br><br>Dirk Kempthorne, Secretary of Interior, National Park Service, Michigan Dept of Natural Resources, City of Benton Harbor, MI |

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
**(IN U.S. PLAINTIFF CASES ONLY)**
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Oliver Hall, Esq.
1835 16th Street N.W. #5
Washington, D.C. 20009

ATTORNEYS (IF KNOWN)

Michael Mukasy, U.S Attorney-General, and unknown others

---

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ● 3 Federal Question (U.S. Government Not a Party)
- ○ 2 U.S. Government Defendant
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

---

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

**○ A. Antitrust**

- ☐ 410 Antitrust

**○ B. Personal Injury/ Malpractice**

- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 368 Asbestos Product Liability

**○ C. Administrative Agency Review**

- ☐ 151 Medicare Act

Social Security:
- ☐ 861 HIA ((1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g)
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g)

Other Statutes
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☒ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

---

**○ E. General Civil (Other)    OR    ○ F. Pro Se General Civil**

Real Property
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

Personal Property
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

Bankruptcy
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

Property Rights
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

Federal Tax Suits
- ☐ 870 Taxes (US plaintiff or defendant
- ☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

Other Statutes
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| G. *Habeas Corpus/ 2255* | H. *Employment Discrimination* | I. *FOIA/PRIVACY ACT* | J. *Student Loan* |
|---|---|---|---|
| ☐ **530 Habeas Corpus-General** <br> ☐ **510 Motion/Vacate Sentence** | ☐ **442 Civil Rights-Employment** (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation) <br><br> *(If pro se, select this deck)* | ☐ **895 Freedom of Information Act** <br> ☐ **890 Other Statutory Actions (if Privacy Act)** <br><br> *(If pro se, select this deck)* | ☐ **152 Recovery of Defaulted Student Loans (excluding veterans)** |

| K. *Labor/ERISA (non-employment)* | L. *Other Civil Rights (non-employment)* | M. *Contract* | N. *Three-Judge Court* |
|---|---|---|---|
| ☐ **710 Fair Labor Standards Act** <br> ☐ **720 Labor/Mgmt. Relations** <br> ☐ **730 Labor/Mgmt. Reporting & Disclosure Act** <br> ☐ **740 Labor Railway Act** <br> ☐ **790 Other Labor Litigation** <br> ☐ **791 Empl. Ret. Inc. Security Act** | ☐ **441 Voting (if not Voting Rights Act)** <br> ☐ **443 Housing/Accommodations** <br> ☐ **444 Welfare** <br> ☐ **440 Other Civil Rights** <br> ☐ **445 American w/Disabilities-Employment** <br> ☐ **446 Americans w/Disabilities-Other** | ☐ **110 Insurance** <br> ☐ **120 Marine** <br> ☐ **130 Miller Act** <br> ☐ **140 Negotiable Instrument** <br> ☐ **150 Recovery of Overpayment & Enforcement of Judgment** <br> ☐ **153 Recovery of Overpayment of Veteran's Benefits** <br> ☐ **160 Stockholder's Suits** <br> ☐ **190 Other Contracts** <br> ☐ **195 Contract Product Liability** <br> ☐ **196 Franchise** | ☐ **441 Civil Rights-Voting (if Voting Rights Act)** |

**V. ORIGIN**

☉ **1 Original Proceeding**   ☐ **2 Removed from State Court**   ☐ **3 Remanded from Appellate Court**   ☐ **4 Reinstated or Reopened**   ☐ **5 Transferred from another district (specify)**   ☐ **6 Multi district Litigation**   ☐ **7 Appeal to District Judge from Mag. Judge**

**VI.  CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**
Violations of Natl /Environmental Policy Act, •42 U.S.C. § 4321 et seq, and Land & Water Conservation Fund Act, • 16 U.S.C. §§ 460l-4

**VII. REQUESTED IN COMPLAINT**    CHECK IF THIS IS A **CLASS** ☐ **ACTION** UNDER F.R.C.P. 23    **DEMAND $** ▢ -0- ▢    Check YES only if demanded in complaint
**JURY DEMAND:**    YES ☐    NO ☒

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐    NO ☒    If yes, please complete related case form.

**DATE** _____    **SIGNATURE OF ATTORNEY OF RECORD** _____

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

       I.      COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT  (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C.,  and 99999 if plaintiff is outside the United States.

       III.     CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed <u>only</u> if diversity of citizenship was selected as the Basis of Jurisdiction under Section **II**.

       IV.     CASE ASSIGNMENT AND NATURE OF SUIT:  The assignment of a judge to your case will depend on the category you select that best represents the <u>primary</u> cause of action found in your complaint. You may select only <u>one</u> category. You <u>must</u> also select <u>one</u> corresponding nature of suit found under the category of case.

       VI.     CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

       VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.