**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Julie Weiss,<br>Nicole Moon,<br>Emma Kinnard,<br>James H. Duncan,<br>Lea'Anna Locey,<br>Scott Elliott,<br>and<br>Ronnie Whitelow,<br><br>     Plaintiffs,<br><br>     v.<br><br>Dirk Kempthorne, Secretary,<br>  U.S. Department of the Interior;<br>Mary A. Bomar, Director, National Park Service;<br>Ernest Quintana, Regional Director, National Park<br>  Service;<br>Rebecca A. Humphries, Director, State of Michigan<br>  Department of Natural Resources;<br>and<br>City of Benton Harbor,<br><br>     Defendants.<br><br>     and<br><br>Harbor Shores Community Redevelopment, Inc.<br>    400 Riverview Drive, Suite 420<br>    Benton Harbor, MI 49022<br><br>     Applicant for Intervention. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>Case No. 1:08-cv-01400<br>(EGS) |

## MOTION OF HARBOR SHORES COMMUNITY
## REDEVELOPMENT INC. TO INTERVENE

Pursuant to Fed. R. Civ. P. 24, Harbor Shores Community Redevelopment Inc. ("Harbor

Shores") hereby respectfully moves to intervene as a defendant in this case.

The undersigned counsel for Harbor Shores has contacted counsel for the parties to the case to determine their individual and respective positions on this motion. Plaintiffs do not consent to Harbor Shores' intervention. Defendants Michigan Department of Natural Resources and the City of Benton Harbor do consent to Harbor Shores' intervention. Defendants United States Department of Interior, National Park Service are awaiting appointment of counsel at this writing.

### POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO INTERVENE

**I.      INTERESTS OF  MOVANT HARBOR SHORES REDEVELOPMENT INC.**

1.      Harbor Shores Redevelopment Inc. ("Harbor Shores") is a non-profit consortium of community-based organizations that was established with the encouragement and support of local and state government to help revitalize the economy of the City of Benton Harbor and environs on Lake Michigan in southwestern Michigan and to serve as an enabler for community transformation. Harbor Shores is a not a typical business developer but rather a champion for a community that is urgently seeking to reverse and overcome decades of economic decline.

2.      Harbor Shores was formed specifically "for the purpose of fostering redevelopment and revitalization of blighted real property and remediation of environmental contamination; encouraging the creation of employment and educational opportunities, economic growth, and housing; sponsoring and funding programs that will benefit the disadvantaged in Berrien County, Michigan; and pursuing other eleemosynary purposes." Ex. 1, Articles of Incorporation of Harbor Shores Community Redevelopment Inc., Article II.

3.      Harbor Shores' member organizations are IRC Section 501(c)(3) nonprofit associations long engaged in extensive community redevelopment and revitalization in Berrien County, Michigan.[1]

4.      Harbor Shores was conceived by and for the local community.  Following civil unrest in Benton Harbor in 2003, Governor Granholm convened a Benton Harbor Task Force[2] to set forth priorities for improving the community.  Ex. 2 at p. x.  The Task Force Report recommended developing a strategy to improve the tax base and employment opportunities within Benton Harbor by creating a tourist destination development project.  Ex. 2 at 16.  One of the suggestions in the report was the development of a golf course.  Ex. 2 at 16.  Harbor Shores was created in response to these recommendations in the Benton Harbor Task Force Report.

## II.      FACTUAL BACKGROUND

### A.      The Evolution and Purpose of the Proposed Work in the Park

5.      Guided by the Benton Harbor Task Force's recommendations, Harbor Shores worked closely with the City and the local community to create a plan for the multipurpose development of underutilized areas in the City's downtown area.  The plan, which evolved through scores of public meetings and City Council hearings, as well as dynamic public discussion in a variety of forums, called for, as its centerpiece, a Jack Nicklaus Signature golf

---

[1] The consortium's members are Cornerstone Alliance, Alliance for World Class Communities and the Whirlpool Foundation. *See* Articles of Incorporation, Article V. Cornerstone Alliance, http://www.cstonealliance.org; Alliance for World Class Communities: Cornerstone Chamber of Commerce, http://www.cornerstonechamber.com/affiliate/awcc.taf; Whirlpool Foundation, http://www.whirlpoolcorp.com/social_responsibility/buildingcommunities/whirlpoolfoundation.asp.

[2] Cornerstone Alliance, one of the non-profit entities that belongs to the Harbor Shores consortium, was an original member of this Task Force.  *See* Ex. 2, Excerpts from Benton Harbor, A Plan for Positive Change: *Final Report of the Governor's Benton Harbor Task Force*, at iii, ix, Oct. 2003 (hereinafter "Task Force Report").

course to be constructed and operated for (a) the public to enjoy, and (b) the attraction of essential capital needed to fund community initiatives, such as improving K-12 student performance, increasing literacy, providing adults with life skills and workforce training, and facilitating home ownership opportunities. Ex. 3, Harbor Shores Lease Agreement at Section 2.03(c); Ex. 4 Dr. Marcus Robinson Aff., *Weiss v. Kempthorne*, No. 1:08-cv-01400 (EGS) (D.D.C) at ¶ 13, Sept. 2, 2008.

6.      It is the considered judgment of local and state government officials, local business owners, religious and community representatives, and Harbor Shores that the success of the Jack Nicklaus Signature 18-hole golf course is an essential economic driver for the community's overall plan to attract investment, create jobs, and improve the physical environment for the benefit of all residents.[3]   There exist only 32 Jack Nicklaus Signature 18-hole golf clubs in the country.   http://www.nicklaus.com/nicklaus_facts/facts.pdf.

7.      Harbor Shores worked openly and diligently with the City to purchase dilapidated buildings and unimproved parcels of real estate that were contaminated and in need of serious environmental remediation.  Harbor Shores performed the remediation at its own unreimbursed expense.  With these land purchases and remediation and with other agreements with the City and local government, Harbor Shores will be able to substantially complete 15 of the 18 holes for the planned golf course before the summer 2009 opening of the course.  Ex. 4 McFeeter Aff., *Weiss v. Kempthorne*, No. 1:08-cv-01400 (EGS) (D.D.C.) at ¶ 6, Sept. 3, 2008. In addition, Harbor Shores is working to develop thousands of yards of new public bike and pedestrian paths and outdoor gathering and recreational areas in and around the golf course.  The excitement in

---

[3] Ex. 4, Robinson Aff. at ¶¶ 13, 15; Ex. 2 at xiii.

the community as the work has progressed has been palpable.  Ex. 6, Newspaper Editorials Articles About the Harbor Shores Development.

8.     To help ensure the success of the plan, the City leased to Harbor Shores approximately 22 acres of the 74-acre Jean Klock Park ("the Park"), for the placement of the three remaining holes for the golf course.  Ex. 3 at Section 1.01(k).  The three holes will not extend to the windward side of the dunes, nor will they negatively impact the public enjoyment of the beach.  The depressed condition of the Park had been noted in the Task Force Report.  Ex. 3 at Section 1.01(f); Ex. 2 at 15 (observing that City parkland located along Lake Michigan was substantially overgrown with brush and weeds, causing it to be unappreciated and underutilized by residents within the community).  Pursuant to the lease, Harbor Shores committed to make substantial improvements in the Park, such as refurbishing the degraded facilities and providing better physical access for residents to the Park and the contiguous shore.  Ex. 3 at Section 2.03(b).

9.     The three holes planned for the Park are critical to establishing a high-caliber attraction such a Jack Nicklaus Signature golf course.  The leased portion of the Park provides superb views over the dunes to Lake Michigan, thus providing the dramatic element necessary to attract the golfers whose greens fees and secondary expenditures provide the revenues that undergird the community benefits plan.

10.     The lease specifically requires that <u>all</u> of the net operating revenues of the golf course be plowed back into the community. Ex. 3 at Sections 2.03(b)(viii), 2.03(c).  None of the proceeds in excess of operating costs will be used for private benefit.  Ex. 3 at p. 2.

11.     The overall project, of which the golf course is an essential element, will create a tax base estimated at $400 million (Ex. 7, Affidavit of Wendy Dant Chesser, *Drake v. City of*

*Benton Harbor*, No. 08-0247-CE (Mich. Berrien County) at ¶ 5, Aug. 18, 2008) and it will provide or fund hundreds of new jobs and skills training so sorely needed in the poorest city of Michigan.  Ex. 4, Robinson Aff. at ¶¶ 12, 16.

**B.**     **The Peril of Delay**

12.     The success of the City's and the community's investment in the overall revitalization project, including the golf course, now stands at a critical juncture.  If there is any further delay in the commencement of the work planned in the Park:

a.     A whole season will be lost, as the opening of the golf course in Summer 2009 would be delayed until 2010, with a corresponding loss of revenue for the community benefit plan.  Ex. 8, D. Jeffrey Noel Affidavit, *Drake v. City of Benton Harbor*, No. 08-0247-CE (Mich. Berrien County) at  ¶ 3, Aug. 18, 2008; Ex. 7, Chesser Aff. at ¶ 6;

b.     Hundreds of recent graduates from community job-training courses will not have the benefit of the jobs that are anticipated and for which they trained.  Ex. 7, Chesser Aff. at ¶ 10; Ex. 4 Robinson Aff. at ¶¶ 16-17;

c.     $2.56 million in carrying costs would accrue on existing financing.  Ex. 8, Noel Aff. at  ¶ 3;

d.     Timely repayment of low-interest loans from the U.S. Environmental Protection Agency and the Michigan Department of Environmental Quality totaling $2 million for environmental cleanup associated with the project will be jeopardized. Ex. 7, Chesser Aff. at ¶ 7;

e.     Various governmental grants and matching grants totaling millions of dollars will be jeopardized.  Ex. 7, Chesser Aff. at ¶ 8;

  f.  A $16 million note that comes due in February 2009, may be called if a definitive path to repayment cannot be shown by a development start date tied to the developer's interest. Ex. 8, Noel Aff. at ¶ 3; and

  g.  Independent developers (such as for a hotel) may be deterred from committing to the project. Ex. 8, Noel Aff. at ¶ 3.

  13.  These would be grievous losses to a community that has spent years developing a viable and courageous plan to revitalize Benton Harbor after other plans had been attempted and failed. Ex. 2 at p. x. Completion of the work in the Park is essential to ensure that the goals of the Benton Harbor Task Force are accomplished for the lasting benefit of the Benton Harbor community and its environs.

  14.  The urgency of proceeding within days to commence work in the Park cannot be overstated. The golf course is scheduled to open in the summer of 2009. Ex. 8, Noel Aff. at ¶ 3. Meeting this deadline, on which so many community hopes and financial commitments depend, requires strict adherence to a timeline whose limits are established by Mother Nature. Ex. 9, Robert McFeeter Affidavit, *Drake v. City of Benton Harbor*, No. 08-0247-CE (Mich. Berrien County) at ¶ 8, Aug. 18, 2008. The planned work in the Park encompasses both the construction of improvements to the non-golf areas of the park (Ex. 9, McFeeter Aff. at ¶¶ 4, 5) and the construction of the three golf holes. Ex. 9, McFeeter Aff. at ¶ 9.

  15.  The advancing winter prevents any substantial work from being completed in the Park after early November, which is when asphalt – necessary for the community's new access

roads to be improved and built – becomes unavailable in Benton Harbor.[4]  Given the 65-day work schedule just for the improvements, Harbor Shores has already missed the window for accomplishing the seeding of grass in 2008.  Given the time needed for seed to take root, germinate and grow, it is now critical that all other work be completed in the Park before the cold sets in, so that seeding or sodding can occur at the earliest opportunity in Spring 2009.

16.    If the construction work in the Park (other than seeding or sodding) does not commence within days, it cannot be completed before early November, with the result being that all work in the Park must be commenced and completed after the Spring thaw – a 130-day period of work and grassing that precludes opening an 18-hole course in 2010.  Ex. 5, McFeeter Aff. at ¶ 11.

17.    The direct costs associated with just the delayed work – apart from the jeopardy to the community programs, grants, and loans from delayed golfing revenues – are formidable. Costs for labor, materials and construction would increase by $942,000, plus an additional $700,000 in course maintenance costs for the portions of the golf course outside the park, which would not be played on by paying golfers while the entire course is incomplete.  Ex. 5, McFeeter Aff. at ¶ 13.

## C.    The Positive Impact on the Park and the Dune

18.    It should be stressed that the work planned for the Park would improve, not diminish, the value of the Park for the community as well as from an environmental perspective. First, contrary to the Plaintiff's implication that the dune would be debased, (Complaint for Declaratory and Administrative Relief, For Preliminary and Permanent Injunctions, *Weiss et al.*

---

[4] Asphalt must be worked hot.  Moreover, asphalt roads must be worked to completion without appreciable interruption, thus precluding the partial laying of asphalt before winter and the resumption of road work in spring.  Ex. 5, McFeeter Aff. at ¶ 8.

*v. Kempthorne et al.,* No. 1:08-cv-01400 (EGS) (hereinafter "Compl." at ¶ 37, 55)) none of the holes will entail work on the windward or beach side of the dune, Ex. 9, Affidavit of Robert McFeeter Aff. at ¶ 9, and the crest of the dune will remain unbuilt.  Ex. 10a, Proposed Improvements to Jean Klock Park; Ex. 10b, Jean Klock Park Trailway System Map.

19.    Moreover, despite Plaintiffs' allegations that the dune in Jean Klock Park is "unique," Compl. at ¶ 38, this dune is <u>not</u> classified as a critical dune area under the Sand Dune Protection and Management Act (Part 353 of Natural Resources and Environmental Protection Act, as amended).  Ex. 11, Michael Hayes Affidavit, *Weiss v. Kempthorne*, No. 1:08-cv-01400 (EGS) (D.D.C.) at ¶ 6, Sept. 2, 2008.  The dune does not qualify as a "unique, irreplaceable, and fragile" resource that must be protected.  Ex. 11, Hayes Aff. at ¶ 6.  In fact, the dunes in the Park have already been substantially disturbed by human activity, asphalt trails through the center of the dune, the 3.75 acre asphalt parking lot built on the back of the dunes, and structures constructed on the crest of the dune.  Ex. 11, Hayes Aff. at ¶ 4-5.

20.    The proposed activities associated with the Project "do not represent a significant increase in the impacts to the existing dunes."  Ex. 11, Hayes Aff at ¶ 4.  Indeed, an important improvement that is planned is the <u>restoration</u> of a section of dune that was removed to accommodate the current access road.  Ex. 9, McFeeter Aff. at ¶ 5.  Moreover, from an ecological perspective, "[t]he re-establishment of a native plant community will maintain the quality of the local dune ecosystem at a level equal to or above the current conditions."  Ex. 11, Hayes Aff. at ¶ 7.  Moreover, the spatial integrity and continuity of the dunes will be improved. Ex. 11, Hayes Aff. at ¶ 8.

21.    Other improvements in the Park (totaling approximately $1.5 million) include significantly improved beach access, a refurbished pavilion, a new picnic area, and a new

parking area to replace the car lot that currently covers the backside of the dune.  *See* Ex. 12, City of Benton Harbor Conversion and Mitigation Proposal Summary at 3-4.  An additional $1.5 million investment will be made in a new 12.8-mile community trail system with foot bridges to better integrate the residential and arts communities with the Park and to provide access to new facilities such as fishing piers, and viewing stations, as well as providing recreational opportunities such as volleyball, picnicking, hiking, fishing, biking, canoeing, golfing, and viewing wildlife, wetlands, and the Paw Paw and St. Joseph rivers.  Ex. 12, at 4, 8.

**III.    MOVANT HARBOR SHORES IS  WELL-POSITIONED TO DEMONSTRATE THAT PLAINTIFFS HAVE NOT AND WILL NOT EXPERIENCE ANY HARM, LET ALONE IRREPARABLE HARM**

**A.    The Uncertain Harms to the Plaintiff Are Not Comparable**

22.    In contrast to the measurable and immeasurable harms to the community and Harbor Shores that would accrue from delay, Harbor Shores is unaware of what, if any, substantial harm Plaintiffs may suffer as a result of the project.  Despite filing their complaint on August 12, 2008, Plaintiffs have failed to submit to this Court a separate motion for a preliminary injunction alleging such harm.  Pursuant to D.C. Loc. R. 65.1(c), any such motion must be supported by all of the requisite affidavits.

23.    If Plaintiffs meant to imply that they will suffer irreparable harm from construction in the Park, their concerns are unfounded.  As an initial matter, the work performed in the Park can be undone. Ex. 5, McFeeter Aff. at ¶ 12.  Furthermore, the dunes themselves will not be obliterated or even substantially impaired: none of the work associated with the three golf holes will occur on the beach or on the lakeside of the dunes, and the improvements include restoring portions of the dune and improving access to the windward or beach side of the dune. Ex. 9, McFeeter Aff. at ¶¶ 9, 5.  In fact, the re-establishment of a native plant community will

maintain the local dune ecosystem at a level equal to or above the current conditions.  Ex. 11, Hayes Aff. at ¶ 7.

24.    In the absence of affidavits substantiating irreparable harm to the Plaintiffs, perhaps Plaintiffs intend, by slow-playing their prosecution of the Complaint and not filing a motion for preliminary injunction, simply to disrupt the use of the permits complained of by the Plaintiffs, without requiring argument on either the merits or the balance of harms that would result.  We note that such a delay strategy, if intended here, is not new in the context of this project.

25.    Despite their strong opposition to the City's approval of the Harbor Shores project, which was granted on June 9, 2008, State Plaintiffs waited until July 7, 2008 to file a lawsuit in Berrien County Circuit Court, challenging the validity of the lease.  These State plaintiffs then waited until July 7, 2008 to file their lawsuit in Berrien County Circuit Court, challenging the validity of the lease between the City of Benton Harbor and Harbor Shores, which allowed the construction of the three golf course holes within the Park.  These State plaintiffs similarly sought a preliminary injunction from the Berrien County Circuit Court, but also failed to file the motion required to initiate the court's consideration of the injunction.

26.    Upon information and belief, the State plaintiffs represented through counsel to Defendant City of Benton Harbor that they intended to seek a preliminary injunction, but still failed to file the requisite motion.  Defendant City of Benton Harbor through counsel encouraged the expeditious filing of the requisite motion to keep the project on schedule.  By July 29, 2008, these State plaintiffs had still not filed their motion for a preliminary injunction, so Defendants City and Harbor Shores each filed a motion for Summary Judgment.  On August 6, 2008, State plaintiffs finally filed a motion for preliminary injunction.  By then, the window for completing

the construction in the Park had narrowed to a thin margin.  Ex. 9, McFeeter Aff. at ¶¶ 8, 9, 11-12.

27.     On August 22, 2008, following oral argument by Dennis W. Archer,[5] on behalf of Harbor Shores, the Honorable Scott Schofield ruled from the bench affirming summary judgment in favor of Harbor Shores.[6]

28.     In the instant action, Plaintiffs posted on their website[7] a copy of a complaint against Defendants on or about August 5, 2008.  Actual filing with the court did not occur until August 12, 2008.  Despite the request for preliminary injunction in the complaint, no motion for such an injunction has yet been filed by Plaintiffs.  This is not the behavior of plaintiffs fearful of irreparable harm.

29.     The timing of this lawsuit collides with the fast-approaching deadline to commence work on the project, and threatens to frustrate the careful, several-years-long process of achieving community consensus and local, state and federal government approvals to complete the project.[8]

---

[5] In the event that the Court grants this Motion, we intend to file a motion *pro hac vice* for Mr. Archer's admission as co-counsel in the instant case.  Mr. Archer served as Mayor of Detroit from 1994-2001, and is now a Member and the Chairman of the law firm of Dickinson Wright – the firm that represented Harbor Shores in the recently concluded state litigation.  Mr. Archer was chief counsel in that litigation.

[6] The question at issue was whether the proposed three holes of golf were consistent with an earlier Settlement Agreement and Consent Judgment involving the use of the Park.  This Consent Judgment prohibited the use of Jean Klock Park "for any purpose other than a bathing beach, park purposes, or other public purpose related to bathing beach or park use. . . ."  Ex. 13, Consent Judgment, *Bury v. City of Benton Harbor*, No. 03-3430-CE-F (Mich. Berrien County) at ¶ 3, Jan. 27, 2004.  The Berrien County Circuit Court issued summary judgment in favor of Harbor Shores, finding that a golf course was a legal use of the Park.

[7] Protect Jean Klock Park, http://www.protectjkp.com/.

[8] See *Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989) ("Equity demands that those who would challenge the legal sufficiency of administrative decisions concerning time sensitive public construction projects do so haste and dispatch.  To

30. Intervenor must and will commence its long-scheduled work in the park as soon as possible and within a matter of days. Intervenor will proceed with this work at is own peril.

31. Intervenor has every confidence that Defendants will ultimately prevail on the merits in this case, but are respectful of the jurisdiction and discretion of this Court to decide the merits of this dispute and of the right of Plaintiffs to raise these challenges to the federal approvals.

**B.    <u>The Real Interests of the Community</u>**

32. Further clouding the intentions of the Plaintiffs is their suggestion that Harbor Shores is a money-minded business developer foisting itself upon the community of Benton Harbor. *See* Compl. at ¶ ¶ 58, 88 (alleging that "achieving a maximally profitable 500-acre housing project is the sole justification for the permanent conversion of public park acreage located at the very heart of Jean Klock Park" and that the Project represents "a business decision promoted by . . . private interests"). As the non-profit structure, community-based roots and revenue-sharing obligations of Harbor Shores' consortium plainly demonstrate, little could be further from the truth. The project – including specifically the use of the Park for, among other things, three holes of golf as part of a public golf course – is an elemental part of the engine intended to fund and support numerous community initiatives. The proposed use was developed through an exceptionally transparent and interactive community dialogue over many years in response to the recommendations of a highly public, blue-ribbon task force focused directly on the interests of the community. Ex. 4, Robinson Aff. at ¶¶ 2, 7.

33. The Project has received the overwhelming approval of the citizens of Benton Harbor and government officials. The positive public comments received during the public

---

require any less could well result in costly disruptions of ongoing public planning and construction").

notice period outnumbered those in opposition by a ratio of over six to one. Ex. 14, Jean Klock Park Conversion and Mitigation Proposal Summary. The City of Benton Harbor Commissioners approved of the Project by a margin of seven to one. Ex. 15, Resolution Regarding the Revised Conversion and Mitigation Proposal for a Portion of Jean Klock Park, Resolution No. 060908-1, June 9, 2008. Both Governor Granholm and U.S. Congressman Fred Upton, whose 6th District includes Benton Harbor, approve of and support the Project. Ex. 16, Office of the Governor Press Release: Granholm, Upton Applaud NPS Decision, July 25, 2008. The Project is supported by a wide array of local business owners, community foundations, and individuals. Ex. 4, Robinson Aff. at ¶ 15. The Michigan Department of Natural Resources ("MDNR") and the National Park Service have both issued approvals for the Project. Ex. 17, Letter from MDNR Transmitting Application for Conversion, June 16, 2008; Ex. 18, Letter from Robert Anderson, Chief Recreation Grants Division, U.S. Department of Interior, National Park Service, July 25, 2008.

34.     Community support for the Project is so strong[9] because the idea for building the golf course was developed by the Benton Harbor Task Force, which was comprised of community members. Approximately 175 public meetings were held to gather input from the community about the Project and obtain feedback. Ex. 4, Robinson Aff. at ¶ 7. The City Council of Benton Harbor has been actively involved in the Project's development and acquisition of funding for construction. *See* Ex. 7, Chesser Aff. at ¶ 7-8. After the Project failed to receive initial approval from the National Park Service during the permitting process, the

---

[9] For a brief explanation of the community's need for the Project, the history behind the development of the Project idea, and comments from Benton Harbor citizens who support the Project, see Harbor Shores' video, *available at* http://www.harborshoresdevelopment.org/index.php?option=com_content&task=view&id=38&Itemid=31.

citizens in Benton Harbor urged Harbor Shores and the City to continue with their efforts to obtain final approvals for the Project.  Ex. 8.

## IV.    ARGUMENT

### A.    Harbor Shores Qualifies for Intervention as of Right

35.    Harbor Shores seeks to intervene in this case as a matter of right.  Fed. R. Civ. P. 24(a)(2).  In order to intervene as of right, an intervenor must meet the following four requirements:  (1) timeliness; (2) a cognizable interest; (3) impairment of that interest; and (4) lack of adequate representation by the original parties.  *City of Williams v. Dombeck*, No. 00CV66, 2000 WL 33675559, at *2 (D.D.C. Aug. 17, 2000).  For the reasons set forth below, Harbor Shores satisfies these requirements.

36.    Harbor Shores' Motion to Intervene is timely.  Plaintiffs filed this case against defendants on August 12, 2008.  The defendants have not yet filed an answer.  This action is at the very earliest stages and granting this motion would not cause any delay that would be prejudicial to the original parties.  *Id.* at *2-3.

37.    Harbor Shores possesses a cognizable interest in the pending action. To obtain intervention as of right, an applicant must demonstrate a cognizable interest in the pending action.  *Id.* at *2.  The injunctive relief that Plaintiffs are requesting would obviously have a direct and major effect on Harbor Shores' plans to lease and develop the Project.  *Foster v. Gueory,* 655 F.2d 1319, 1324 (D.C. Cir. 1981) (noting that "[a]n intervenor's interest is obvious when he asserts a claim to property that is the subject matter of the suit").

38.    Moreover, Harbor Shores' interest in intervening is not merely economic.  *Cf. Dombeck*, 2000 WL 33675559 at *3.  As a non-profit consortium, Harbor Shores has an interest in the citizens of Benton Harbor and the community in which they live.  *See Fund for Animals v. Norton,* 322 F.3d 728, at 736-37 (D.C. Cir. 2003) (allowing intervention as of right by non-profit

group that was concerned about the "people" and natural resources). Harbor Shores has spent $6 million to clean up contaminated properties in Benton Harbor in conjunction with this Project. Ex. 15 at 40. The Project will improve not only lands on which the golf course will be built, but also public areas including the beach itself that are beyond the scope of building the golf course. Ex. 3 at Section 2.03(b).

39.     Other attempts to revitalize Benton Harbor have been attempted but failed. Ex. 2 at p. x. Completion of this Project is critical to ensure that the goals of the Benton Harbor Task Force are accomplished through the creation of a golf course that might achieve what other attempts have not been able to do – provide a better future for Benton Harbor and its citizens. Harbor Shores' plans to make these improvements would be affected by whatever actions this Court may take. Thus, Harbor Shores has a cognizable interest that justifies intervention in this case.

40.     Exclusion from this litigation would impair Harbor Shores' ability to institute a successful revitalization project within Benton Harbor. If the Court accepts the arguments laid forth by plaintiffs and delays construction of the Project, Harbor Shores would not be able to open the golf course on time in 2009. Ex. 9, McFeeter Aff. at ¶ 12; Ex. 8, Noel Aff. at ¶ 3. The construction and grassing of the three holes at issue will take approximately 130 working days. Ex. 9, McFeeter Aff. at ¶ 9. The grassing season ends around October 31. Ex. 9, McFeeter Aff. at ¶ 9. Delaying construction would prevent these areas from being grassed until mid-summer 2009. Ex. 9, McFeeter Aff. at ¶ 12. The 18-hole course would simply not be playable until 2010. Ex. 9, McFeeter Aff. at ¶ 12. Further, this delay would cause the cost of the Project to increase by approximately $1,642,000. Ex. 9, McFeeter Aff. at ¶ 13. Therefore, excluding

Harbor Shores from this litigation would directly impair the consortium's ability to avoid this undesirable result.

41.    Harbor Shores' interests are not adequately represented by existing parties.  The existing Defendants in this case are all governmental entities and none of them are a proponent of the Project that can adequately represent the community development and revitalization interest of Harbor Shores.  Fed. R. Civ. P. 24(a)(2).  The D.C. Circuit has noted that "we have often concluded that governmental entities do not adequately represent the interests of aspiring intervenors."  *See Fund for Animals,* 322 F.3d at 736-37; *see also Greater Yellowstone Coalition v. Kempthorne*, 2008 U.S. Dist. LEXIS 33641 (D.D.C. Apr. 24, 2008) (granting motion to intervene to organization dedicated to promoting snowmobiling in case where plaintiffs alleged NEPA violations).  The City of Benton Harbor, a defendant in this case, has very strong concerns about any delay in the project.  Yet, unlike the government defendants in this case, as the developer of the Project, Harbor Shores has additional and major concerns, as discussed above, regarding undue delays and expenses created by this lawsuit and its outcome that may affect the feasibility of the Project, as well as Harbor Shores' ability to complete construction on time.  For this reason, the interests of Harbor Shores are not being adequately represented in this matter.

**B.**    **Harbor Shores Also Meets the Criteria for Permissive Intervention.**

42.    In the alternative, Harbor Shores seeks permissive intervention under Fed. R. Civ. P. 24(b)(1)(B).  Permissive intervention may be granted if the applicant "has a claim or defense that shares . . . a common question of law or fact [with the main action]."  *Id*.  An intervenor must show: (1) an independent ground for subject matter jurisdiction, (2) file a timely motion, and (3) have a claim or defense that has a question of law or fact in common with the main action.  *Equal Employment Opportunity Comm'n v. Grier*, 146 F.3d 1042, 1046-48 (D.C. Cir. 1998).  For the following reasons, Harbor Shores fulfills these criteria:

43.     The Court has subject matter jurisdiction over Harbor Shores' defenses.  Harbor Shores shares questions of law and fact in common with defendants.  Harbor Shores is not asking the court to "exercise jurisdiction over an additional claim on the merits."  *Id.* at 1047.   The Court already has jurisdiction over Harbor Shores' defenses and the subject matter at hand, which arise under the National Environmental Policy Act of 1969, as amended, 42 U.S.C. § 4321 *et seq.* ("NEPA"); the Land and Water Conservation Fund Act of 1965, 16 U.S.C. §§ 460l-4 through 406l-11; and the Administrative Procedure Act, 5 U.S.C. § 500 *et seq*.  Harbor Shores does not agree with Plaintiffs' allegations that the Project contravenes these laws.

44.     Harbor Shores' Motion to Intervene is timely.  As noted in Section III.A.1., allowing Harbor Shores to intervene will not cause any prejudice to the existing parties to the case because none of the government defendants have submitted an answer to the complaint, which was filed August 12, 2008.

45.     Harbor Shores' defenses raise common questions of law or fact.  Furthermore, Harbor Shores' defenses to Plaintiffs' claims would involve common questions presented before the original parties.  *See Dombeck*, 2000 WL 33675559, at *3-4 (allowing a developer to intervene in a NEPA case permissively).

46.     For these reasons, Harbor Shores meets the standards for permissive intervention under Fed. R. Civ. P. 24(b)(1)(B), in addition to the criteria required under intervention as of right.

47.     The federal governmental Defendants' Answers are not due until mid-October 2008.  Plaintiffs report that they are going to request a preliminary injunction and we take them at their word despite their delay in so moving.  Because of the importance of this project to the community of Benton Harbor and the urgency of meeting the construction timetable here,

Movant has taken the unusual step of filing to intervene at the earliest possible time and of providing in this Motion a great deal of information about the background of the project and Harbor Shares' interest in it, including its expected defenses. We do this so that the Court will be able to evaluate this motion and so that the plaintiffs and the U.S. government will be able to make a meaningful response to the Motion – the City of Benton Harbor and the Michigan state party having already consented to it. This level of detail, we submit, is consistent with and satisfies the purpose of Federal Rule of Civil Procedure 24(c). This level of detail provides the Court with sufficient information to decide whether Harbor Shores qualifies as a matter of right and/or under permissive intervention rules to intervene in this case.

## V.    <u>CONCLUSION</u>

For the reasons set forth above, Harbor Shores is entitled to intervene as of right in this proceeding under Fed. R. Civ. P. 24(a)(2). In addition, Harbor Shores has demonstrated that it

qualifies for permissive intervention under the criteria developed under Fed. R. Civ. P. 24(b)(1)(B). Harbor Shores therefore respectfully requests that this Court grant Harbor Shores' motion to intervene in this case pursuant to Fed. R. Civ. P. 24(a)(2) with full rights as a party.

Respectfully submitted,

_____/s/_____.
Carol Elder Bruce
D.C. Bar No. 202200
Bracewell & Giuliani LLP
2000 K Street, Suite 500
Washington, D.C.  20006
(202) 828-5809 (phone)
(202) 828-4827 (fax)
*Attorneys for Harbor Shores Community*
*Redevelopment Inc.*

September 3, 2008

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I have this 3rd day of September, 2008 served a copy of the foregoing documents by first class mail, postage prepaid, upon the following:

Dirk Kempthorne, Secretary
U.S. Department of the Interior
1849 C St. NW
Washington, D.C.  20240

Mary A. Bomar, Director
National Park Service
1849 C St. NW
Washington, D.C.  20240

Ernest Quintana, Regional Director
National Park Service
Midwestern Office
601 Riverfront Dr.
Omaha, NE  68102

Rebecca A. Humphries, Director
State of Michigan
Department of Natural Resources
Mason Building, Sixth Floor
P.O. Box 30028
Lansing, MI  48909

City of Benton Harbor
Benton Harbor City Hall
200 E. Wall St.
Benton Harbor, MI  49022

Mike Tiernan
Department of Interior
Office of the Solicitor General
950 Pennsylvania Avenue NW
Washington D.C. 20530-0001

Pamela C. Enslen
Miller, Canfield, Paddock & Stone P.L.C.
277 South Rose St.
Kalamazoo, MI  49007

Oliver Hall
1835 16th St NW #5
Washington, D.C.  20009

Keith Saxe
U.S. Department of Justice
Environmental & Natural Resources
Division
950 Pennsylvania Ave. NW
Washington, D.C.  20530-0001

_____/s/_____.
Carol Elder Bruce
D.C. Bar No. 202200
Bracewell & Giuliani LLP
2000 K Street, Suite 500
Washington, D.C.  20006
(202) 828-5809 (phone)
(202) 828-4827 (fax)
*Attorneys for Harbor Shores Community*
 *Redevelopment Inc.*

502

Exhibit 1
Case No. 1:08-cv-01400

| MICHIGAN DEPARTMENT OF LABOR & ECONOMIC GROWTH | |
|---|---|
| **BUREAU OF COMMERCIAL SERVICES** | |
| Date Received | (FOR BUREAU USE ONLY) |
| | **FILED** |
| | This document is effective on the date filed, unless a subsequent effective date within 90 days after received date is stated in the document |
| | **MAY 2 6 2005** |
| | Administrator BUREAU OF COMMERCIAL SERVICES |
| Name | |
| John R. Marquis,  Warner Norcross & Judd LLP | |
| Address | |
| 85 East Eighth Street, Suite 310 | |
| City | State | Zip Code | |
| Holland | MI | 49423 | Effective Date: |

Tran Info:1  10703318-1  05/19/05
ChkN: 370654    Amt: $20.00
ID:  WARNER NORCROSS & JUDD LLP

794-643

# ARTICLES OF INCORPORATION
## OF
## HARBOR SHORES COMMUNITY REDEVELOPMENT INC.

Pursuant to the provisions of Act 162, Public Acts of 1982, the undersigned corporation executes the following Articles:

### ARTICLE I

### Name

The name of the corporation is Harbor Shores Community Redevelopment Inc.

### ARTICLE II

### Purposes and Powers

The corporation has been formed for the purpose of fostering redevelopment and revitalization of blighted real property and remediation of environmental contamination; encouraging the creation of employment and educational opportunities, economic growth, and housing; sponsoring and funding programs that will help the disadvantaged in Berrien County, Michigan; and pursuing other eleemosynary purposes.  Accordingly, the corporation may exercise the following powers:

To acquire and assemble, by purchase or gift, and to hold, develop, and sell property of all kinds;

-1-



To solicit, receive, and administer funds for such charitable, scientific, literary and educational purposes as are from time to time permitted for organizations defined in Section 501(c)(3) of the Internal Revenue Code;

To receive and to administer funds for the above purposes without limitation except such as may be provided in these Articles or imposed by law;

To deal with and distribute the corporation's property in such manner as will best promote its objectives and purposes, without limitation except such, if any, as may be contained in instruments under which such property is conveyed to the corporation; and

To exercise generally any power which is not inconsistent with the purposes described above and which a nonprofit corporation organized under the provisions of the Michigan Nonprofit Corporation Act may exercise.

Notwithstanding any other provision of these Articles, the corporation shall not carry on any activities not permitted to be carried on by (i) an organization exempt from federal income taxation under Section 501(c)(3) of the Internal Revenue Code and other related legislation and regulations as they now exist or may hereafter be amended or (ii) an organization contributions to which are deductible under Section 170(c)(2) of the Internal Revenue Code and related legislation and regulations as they now exist or may hereafter be amended.

No substantial part of the corporation's direct or indirect activities shall consist of carrying on propaganda or otherwise attempting to influence legislation. The corporation shall not participate in or intervene in (including publication or distribution of statements) any political campaign on behalf of or in opposition to any candidate for public office.

## ARTICLE III

### Registered Office and Resident Agent

The address of the registered office and the mailing address is 900 Fifth Third Center, 111 Lyon Street NW, Grand Rapids, Michigan 49503. The name of the resident agent at the registered office is John G. Cameron, Jr.

## ARTICLE IV

### Form of Organization, Assets and Financing

This corporation is organized on a nonstock membership basis.

The description and value of its personal property assets are:

    Real Property:  None

    Personal Property:  None

The general plan under which the corporation is to be financed is by contributions of funds and property for its purposes as stated in these Articles and for no other purpose.

## ARTICLE V

### Membership

The corporation's initial members are:  Whirlpool Foundation, a Michigan nonprofit corporation, of 2000 North M-63, MD 2200, Benton Harbor, Michigan 49022; Cornerstone Alliance, a Michigan nonprofit corporation, of 38 West Wall Street, PO Box 428, Benton Harbor, Michigan 49023; and The Alliance for World-Class Communities, a Michigan nonprofit corporation, of 38 West Wall Street, Benton Harbor, Michigan 49022.  The corporation's membership and manner of member admission shall be as prescribed in the corporation's bylaws.

## ARTICLE VI

### Members' Action Without Meeting

Any action required or permitted to be taken at an annual or special meeting of members may be taken without a meeting, without prior notice, and without a vote, if consent in writing, setting forth the action so taken, is signed by members having not less than the minimum number of votes that would be necessary to authorize or take the action at a meeting at which all members entitled to vote thereon were present and voted. Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to members who have not consented in writing.

## ARTICLE VII

### Incorporator

The name and address of the Incorporator are as follows:

<u>Name</u>                     <u>Address</u>

John G. Cameron, Jr.          900 Fifth Third Center
                              111 Lyon Street NW
                              Grand Rapids, MI 49503

## ARTICLE VIII

### Board of Directors

The board of directors shall consist of four directors, one selected by Cornerstone Alliance, one by The Alliance for World-Class Communities, and two by Whirlpool Foundation.

## ARTICLE IX

### Limitation of Volunteer Director's and Officer's Liability

A volunteer director or volunteer officer shall not be personally liable to the corporation or its members for monetary damages for a breach of the director's or officer's fiduciary duty, except that the liability of a director or officer is not eliminated or limited for:

(1)     a breach of the director's or officer's duty of loyalty to the corporation;

(2)     acts or omissions not in good faith or that involve intentional misconduct or a knowing violation of law;

(3)     a violation of Section 551(1) of the Michigan Nonprofit Corporation Act, which section relates to the making of unauthorized distributions or loans;

(4)     a transaction from which the director or officer derived an improper personal benefit; or

(5)     an act or omission that is grossly negligent.

If the Michigan Nonprofit Corporation Act is amended to further eliminate or limit the liability of a volunteer director or officer, then a volunteer director or officer (in

-4-

addition to the circumstances in which a director or officer is not personally liable as set forth in the preceding paragraph) shall, to the fullest extent permitted by the Michigan Nonprofit Corporation Act as so amended, not be liable to the corporation. No amendment to or alteration, modification or repeal of this Article shall increase the liability or alleged liability of any volunteer director or officer of the corporation for or with respect to any acts or omissions of such director or officer occurring prior to such amendment, alteration, modification or repeal. Provisions of this article added by amendment shall apply only to acts or omissions and to breaches of duty occurring after the date the amended article was adopted.

## ARTICLE X

### Assumption of Liability for Acts of Volunteers

The corporation shall assume all liability to any person other than the corporation for all acts or omissions of a volunteer director incurred in the good faith performance of the volunteer director's duties as such. Except as provided in the previous sentence, the corporation shall assume the liability for all acts or omissions of a volunteer director, volunteer officer or other volunteer, if all of the following conditions are met:

(1)     the volunteer was acting or reasonably believed he or she was acting within the scope of his or her authority;

(2)     the volunteer was acting in good faith;

(3)     the volunteer's conduct did not amount to gross negligence or willful and wanton misconduct;

(4)     the volunteer's conduct was not an intentional tort; and

(5)     the volunteer's conduct was not a tort arising out of the ownership, maintenance, or use of a motor vehicle for which tort liability may be imposed as provided by Section 3135 of the Michigan Insurance Code of 1956.

No amendment to or alteration, modification or repeal of this article shall reduce the scope of the corporation's assumption of liability under this article for or with respect to any volunteer's acts or omissions that occur before such amendment, alteration, modification or repeal. Provisions of this article added by amendment shall apply only to acts or omissions and to breaches of duty occurring after the date the amended article was adopted.

## ARTICLE XI

### Dedication of Assets

The corporation shall hold and administer all its assets and accumulated income to effectuate its tax-exempt purposes. No part of the income or assets of this corporation shall inure to the private benefit of any individual or trustee. If the corporation's purposes fail or if the corporation ceases to be approved as a tax-exempt organization under the Internal Revenue Code, and any such defect is not cured by appropriate amendment, or if the corporation voluntarily dissolves, then all of the corporation's assets and accumulated income shall be distributed to such other organizations as the trustees (or in default of designation by the trustees, the Circuit Court for the County of Berrien, Michigan) shall designate as best accomplishing the purposes for which the corporation was formed, provided that the organizations receiving such assets are qualified as tax-exempt under Section 501(c)(3) of the Internal Revenue Code or the corresponding provisions of any subsequent federal tax laws. The corporation shall be dissolved after all its property has been so distributed.

## ARTICLE XII

### Indemnification of Directors and Officers

The corporation shall indemnify any director or officer of the corporation who was or is a party or is threatened to be made a party to any threatened, pending, or completed action, suit, or proceeding by reason of the fact that he or she is or was a director or officer, or is or was serving at the request of the corporation in another capacity, to the fullest extent permitted by the Michigan Nonprofit Corporation Act. A change in the Michigan Nonprofit Corporation Act, these Articles, or the corporation's bylaws that reduces the scope of indemnification shall not apply to any action or omission that occurs before the change.

## ARTICLE XIII

### Amendments

The corporation may amend or repeal any provision contained in these Articles of Incorporation and add additional articles upon such an amendment receiving the affirmative vote of a majority of the membership interests entitled to vote thereon.

* * *

\* \* \*

The Incorporator has executed these Articles of Incorporation on May _16_, 2005.

John G. Cameron, Jr.

1118398-3

**Exhibit 2**
**Case No. 1:08-cv-01400**

# Benton Harbor, A Plan for Positive Change:
## *Final Report of the*
## *Governor's Benton Harbor Task Force*

### October 15, 2003

Prepared for:
Governor Jennifer M. Granholm
and the Benton Harbor Community

Submitted by:
Governor's Benton Harbor Task Force

# Table of Contents

Letter from the Co-Chairs ......................................................................... ii

Governor's Task Force Members ................................................................ iii

State and Federal Resource Members ......................................................... iv

Citizens for Progressive Change Members ................................................... v

Acknowledgments ................................................................................. viii

Executive Summary ................................................................................. x

Economic Development, Housing and Job Training ..................................... 1
- Community Development, Evaluation and Monitoring ........................... 2
- HOPE VI ........................................................................................ 4
- Revolving Loan Fund ...................................................................... 7
- Small Business Funding .................................................................. 9
- Development of Waterway .............................................................. 11
- Benton Harbor/Benton Charter Township Consolidation Feasibility Study .... 13
- Development of Entertainment Venue .............................................. 15
- Job Training .................................................................................. 17
- Summer Youth Employment Program ............................................... 19
- Neighborhood Block Clubs .............................................................. 21

Education .............................................................................................. 23

Health Awareness and Improvement ........................................................ 31

Police Community Relations ..................................................................... 52

Diversity with Inclusion .......................................................................... 59

Parenting and Family .............................................................................. 64

Criminal Justice ..................................................................................... 68

Recreation, Arts and Culture .................................................................... 72

Communications ..................................................................................... 74

Faith Based Community ........................................................................... 77

Conclusion ............................................................................................ 81

# Letter from the Co-Chairs

Dear Members of the Governor's Task Force and Citizens for Progressive Change:

As co-chairs of the Governor's Task Force and active members of Citizens for Progressive Change, we want to formally thank you for your participation in this exciting process of creating a brighter future for Benton Harbor.

As we reflect on the past several months, this has been both an inspiring and challenging experience. There have been some highs, some lows, obstacles to overcome, successes, and a whole lot of learning to make it to where we are today. The one thing that shines through is the strong dedication of citizens from Benton Harbor and the surrounding communities.

In June, when Governor Jennifer M. Granholm came here to listen to the community and pledge her help, she knew she could not do it without the support of individuals like you who were willing to roll up your sleeves to get this very important work done.

As the next steps are taken, we look forward to continuing our work with each of you for the betterment of this community. Thanks to your efforts, the future of this community is very bright. Your talents have proven that when faced with a hurdle, this community can overcome it with dignity, grace, and hard work.

We strongly encourage each of you to continue your involvement in efforts to improve the City of Benton Harbor. Now is not the time to walk away - rather now is the time to continue to take things to the next level.

Thank you once again for all of your time and energy. May God bless you and keep you.

Sincerely,

Reverend James Atterberry
Co-Chairperson
Governor's Task Force

Greg Roberts
Co-Chairperson
Governor's Task Force

# Governor's Task Force

**Reverend James Atterberry – Co-Chairperson, President, Southwest Michigan Ministerial Alliance**
**Greg Roberts, Co-Chairperson – Director of Community Based Initiatives, Office of the Governor**

Karen Aldridge-Eason – Foundation Liaison, Office of the Governor
Betty Boone – Executive Director of Michigan Council for the Arts and Cultural Affairs
Bennie Bowers – Sergeant, Michigan State Police
Maurice Burton – Trooper, Michigan State Police
Paula Dawning – Superintendent, Benton Harbor Area Schools
Rev. Kenneth Gavin – Pastor of the Second Baptist Church
Leroy Harvey – Benton Harbor City Commissioner
Rev. Yvonne Hester – Executive Director of the Benton Harbor Street Ministry
Rep. Alexander C. Lipsey – Michigan House of Representatives
Rev. Steven McCoy – Pastor of the McCoy Memorial COGIC, Benton Harbor City Commissioner
Helen Mitchell – A Young Adult from Benton Harbor
Mark Mitchell – President and Executive Director, Council for World Class Communities (CWCC)
Jeff Noel – President, Cornerstone Alliance
Hector Shamley – Assistant Director of Operations – Detroit, Michigan Department of Civil Rights
Lisa Webb Sharpe – Cabinet Secretary & Public Policy Director-Office of the Governor
Robert Swanson – Deputy Director, Michigan Department of Consumer and Industry Services
Congressman Fred Upton – U.S. Representative (R-St. Joseph)
Tom Watkins – State Superintendent of Public Instruction
Dr. Kimberlydawn Wisdom – Michigan Surgeon General
Charles Yarbrough – Mayor, Benton Harbor
Willie Young – A Young Adult from Benton Harbor

# State and Federal Resource Members

Dr. Lloyd Bingman – Special Assistant to the Superintendent for Closing the Achievement Gap
Yvonne Blackmond – Director, Office of Drug Control Policy
Warren Bonam – Director, Civil Rights Operations, Michigan Department of Civil Rights
Sue Carnell – Education Policy Advisor, Office of the Governor
Lorretta Davis-Satterla – Division Director of HIV/AIDS – STD
Pearl Dekker – Executive Assistant, Public Policy Division, Office of the Governor
Margaret Flanagan – Criminal Justice Policy Advisor, Office of the Governor
Emily Fleury – Policy Research Analyst, Office of the Governor
Jerry Frank – Director, Berrien County FIA
Julie Gardner – Michigan State Housing Development Authority, Community Dev. Specialist
Walter Herbert – Civil Rights Representative, Michigan Department of Civil Rights
Lisa Lehman – Michigan State Housing Development Authority, Home Ownership Specialist
Rep. Alexander C. Lipsey – Michigan House of Representatives
Chuck McCallum – Executive Director/CEO – Berrien/Cass/Van Buren – Michigan Works!
Daedra McGhee – Director of Government and Business Affairs, Office of the Governor
Cathy Milett – Director of the Partnership Team (Retired), Michigan Department of Civil Rights
Joel Patterson – Benton Harbor City Manager
John Proos – Deputy Chief of Staff and District Director for Congressman Upton
Eric Rader – Policy Research Analyst, Office of the Governor
Dr. Nanette Lee Reynolds – Director, Michigan Department of Civil Rights
Jessie Taylor – Regional Director, U.S. Justice Department
Randy Thelen – MEDC, Urban Initiative Specialist
Pam Wong – Chief of Staff, Michigan Department of Education



# Citizens for Progressive Change

**Sandra Dudley – Co-Chairperson,**
**Rev. Steve McCoy – Co-Chairperson**

**Economic Development,**
**Housing and Job Training**

**Rev. Kenneth Gavin – Co-Chairperson**
**Maurice Golliday – Co-Chairperson**
**Kevin Hunter– Co-Chairperson**
**John Proos – Co-Chairperson**

Kevin Amos
JoAnn Bailey
Latysha Bates
Mary Bethea
Dr. Barbara Boyd
Ruby Brower
Belinda Brown
Nicol Brown
Ronald Evans
Julie Gardner
Yolanda Ferguson
Beatrice Hardy
Barb Henderson
Juanit Henry
Waymon Hodges
Angela King
Charles LeBlanc
Michelle Longley
Chuck McCallum
Dorothy Moon
Emma Payne
Barbara Rose
Brenda Scarborough
Robert Stover
Bob Swanson
Randy Thelan
Greg Vaughn
Phyllis Watson
Robert Wilder
Sherron Wilder
Doug Wood

**Education**

**Paula Dawning – Co-Chairperson**
**Trinette Wilder – Co-Chairperson**

Rev. Willie Askew
Sue Carnell
Rev. Yvonne Hester
Sister Mary Jo Holmes
Senator Ronald Jelinek
Virginia Maxwell
Barbara Peeples
Dr. Gladys Peeples-Burks
Eric Rader
Jeff Siegel
Claudia Vescolani
Thomas Watkins
Pamela Wong

**Health Awareness**

**Rev. James Hightower – Co-Chairperson**
**Brenda Scarborough – Co-Chairperson**

Charles and Ruth Brock
Loretta Davis-Satterla
Ruthie Haralson
Mary Harper
Rosie Hudson
Dr. Rick Johansen
Debra Johnson
David London
Alise Merrow
Laura Miles
June Moore
Michael Mortimore
John Nelson
Darrell and Darlene Pargo
Elizabeth Pargo
Dr. John Spriegel
Dr. Don Tynes
Eileen Willits
Dr. Kimberlydawn Wisdom

## Police Community Relations

**Daedra McGhee – Co-Chairperson**
**Rev. John Price – Co-Chairperson**

Rev. Russell Baker
Paul Bailey
Ross Bates
Robert Birkhols
Bishop Walter Bogan
Bennie Bowers
Belinda Brown
Rev. Brown
Rose Brown
Dr. Ken Brown
Odis Brewer
Maurice Burton
James Cherry
James A Cherry
Rev. James Childs
Mark Clapp
Jerry Clayton
Jimmie Coburn
Valeria Moon Conerly
Chris Cook
Arthur Cotter
Alzenie Cruymble
Sandra Dudley
Ronald Evans
Odis Floyd
Liz Garey
Martha Gipson
Malisie Gollidug
Joyce Gowens
David Grant
Robert Greer
Dr. Roy L Greer
Jean Harris
Samuel Harris
Mildred Hart
Don Head
Chuck Heit
John D. Howard
Bob Humphrey
Berne Jones
Barnette Jones
Donna Jones

Bryan Joseph
Dorothy King
J Darlene Haw King
Rick Knapp
Charles Le Blanc
Randy Leng
Brian Lennon
Arthur Lotter
Paul Maloney
Jim Marohn
Cathy Milett
Rev. Daniel Miller
Al Mingo
Father Tim Nelson
Frank O'Brien
Rev. Doug Peterson
A.J. Pointer
Rev. John Price
Brian Ray
Dr. Nanette Lee Reynolds
Kellie Robbins
Jim Robertson
Jim Rodbard
Brenda Scarborough
Hector Shamley
Darrell Singleton
Elder Kenneth Stewart
Rev. Timothy Stokes
Dan Sullivan
Achie Terris
Rev. Freelon Threlkeld
Lucy Tisdell
Denise Valentine
Fran Walker
Emma Watkins
Pastor Alan West
Danethel Whitfield
Robert & Sherron Wilder
Bishop Herbert Williams
Tim Yungfer
Joseph Zangaro
Walter Zych

## Diversity With Inclusion

**Mark Mitchell – Chairperson**

Karen Aldridge-Eason
Velois Bowers
Cheryl Edwards
Cathy Milett
Hector Shamley

## Parenting and Family

**Commissioner Ricky Hill – Co-Chairperson**
**Kevin Hunter – Co-Chairperson**

Annabelle Bankston
Neldine Edwards
Dennis Fitzsimons
Commissioner Etta Harper
Rosie Hudson
Rev. Kent Meyer
Georgia Sanders

## Criminal Justice

**Walt Herbert - Co-Chairperson**
**Rev. Edward Pinckney-Co-Chairperson**

Jackie Allen
Sheletha. Barnes
Belinda Brown
Carl Brown
Lisa Carnell
S.C. Christian
Scott Elliot
Gerie Gamble
Joyce Gouwens
Commissioner Etta Harper
Mathew Kyles
Lamar Myart
Reymond Payne
Dorothy Pinckney
Marletta Seats
Joyce Smith
Dr. Don Tynes
Bessie Williams
Rodney Williams

## Recreation, Arts and Culture

**Yvonne Blackmond – Co-Chairperson**
**Commissioner Leroy Harvey – Co-Chairperson**

Dillon Barnes
Betty Boone
Jerry Brown
Tashama Brown
Melvin Burton
Ron Evans
Kenny Harper
John Howard
Emma Hull
Bonita Mitchell
Minnie Sims
Al Ward
Sherron Wilder

## Communications

**Helen Mitchell – Co-Chairperson**

Juanita Henry
John Howard
Charles LeBlanc
Curtis Murphy
Princella Tobias

## Faith Based

**Rev. Walter L. Brown-Co-Chairperson**

Rev. Willie Askew
Rev. Joe Bruins
Rev. Willie Burton
Rev. James O. Childs
Rev. George Dewberry
Rev. Robert DeFrance
Rev. Rodney Gulley
Rev. Milton McAfee
Rev. Howard Thomas
Rev. Nathaniel Wells III
Rev. Eddie Wright

# Acknowledgments

**Individuals**

Dr. Charles G. Adams – Pastor, Hartford Memorial Baptist Church
Ismael Ahmed – Executive Director, ACCESS
Paul Bailey – Sheriff, Berrien County Sheriff Department
Jamie Balkin – Cornerstone Alliance
Dr. Ken Brown – Consultant, University of Michigan
Marvis Cofield – Director, Alkebu-lan Village
Amanda Collins – Student Intern, Public Policy Division, Office of the Governor
Linda Collins – Executive Assistant, Public Policy Division, Office of the Governor
Howard Cousins – Principal, Benton Harbor High School
Harold Curry – Attorney
Robert Davis – Director, Governor's Office for Southeast Michigan
Paula Dawning – Superintendent of Benton Harbor Area Schools
Pearl Dekker – Executive Assistant, Public Policy Division, Office of the Governor
Dr. Gerald K. Smith – President/CEO, Detroit Youth Foundation
Jerry Frank – Director, Berrien County Family Independence Agency
Dr. Delbert Gray – Michigan Minority Business Development Council
Samuel Harris – Chief, Benton Harbor Police Department
Senator Ron Jelinek – Michigan Senate
Barnett Jones – Chief, Sterling Heights Police Department
Eleanor Josaitis – Founder and Executive Director, Focus: HOPE
Representative Charles LaSata – Michigan House of Representatives
Lisa Lehman – Michigan State Housing Development Authority Home Ownership Specialist
Chuck McCallum – Director, Berrien/Cass/Van Buren-Michigan Works!
Pastor Marvin N. Miles – International Gospel Center
Sandra Bomar-Parker – Director, Operation Get Down
Chico Parks – Host of Hearing Our Voice, WSJM 1400 AM
Veronica Putt – Cornerstone Alliance
Virgie Rollins – Consultant
Darrell Singleton – Youth Specialist, Berrien County Juvenile
Col. Tadarial Sturdivant – Director, Michigan State Police
Alice Thompson – President/CEO, Black Family Development
Greg Vaughn – Cornerstone Alliance
Deborah Williams – Citizens for Progressive Change

## Organizations

Alkebu-lan Village
ACCESS (Arab Community Center for Economic and Social Services)
Andrews University Students (assisted Parenting & Family Workgroup)
Benton Harbor Area Schools
Berrien County Health Department
Black Family Development, Inc.
Brotherhood of All Nations Church of God in Christ
City of Benton Harbor
Cornerstone Alliance
Council for World Class Communities (CWCC)
Detroit Youth Foundation
Family Investment Center
Focus: HOPE
Governor's Office for Southeast Michigan
Hartford Memorial Baptist Church
International Gospel Center
Lakeland Regional Hospital
Lake Michigan College
Michigan Legislative Black Caucus
Michigan State Police
Neighborhood Information and Sharing Exchange (NISE)
Operation Get Down
Second Baptist Church
Southwest Michigan Ministerial Alliance

# Executive Summary

## Background

Following civil unrest in Benton Harbor, Governor Granholm, after listening closely to Benton Harbor residents, named a 22 member Task Force charged with probing further and getting the community's priorities for improving the quality of life in this struggling city in Southwest Michigan. The Task Force was represented by community residents, civic, business, faith, and government leaders.

Benton Harbor has historically been the subject of numerous studies and notable community-wide initiatives that have promised wide ranging systemic change, but have yielded limited results. A number of community members have become cynical and distrustful of the "real intentions" behind entities that have come to "help" the Benton Harbor community.

In order to broaden the range of voices at the table, the Citizens for Progressive Change (CPC) was formed and designed to elicit input from a varied cross section of the community. Membership was open to anyone that wanted to participate. CPC workgroups identified their desired vision for the community, challenges, opportunities, recommendations, and stakeholders that must be engaged for success. Given the condition of our national economy and its impact on our State, workgroups and Task Force members were to search for solutions and partnerships that involved leveraging existing public resources with private corporation, foundation, and charitable resources.

## The Process:  Planning and Recommendations

The Task Force recognized the critical need to be inclusive, not only during the information gathering process, but also in articulating the vision and defining goals in the planning and recommendation process.

The Task Force directed the CPC to establish eight workgroups with the task of identifying issues and developing recommendations for submission to the Task Force. The workgroups established were: Recreation, Arts and Culture, Health Awareness and Improvement, Police Community Relations, Education, Diversity with Inclusion, Criminal Justice, Communications, and Economic Development, Housing and Job Training. The CPC suggested adding two additional workgroups, Parenting and Family and Faith Based Community for a total of ten workgroups.

Biweekly meetings were held for the Task Force and CPC. CPC workgroups, which also included Task Force members, met to recommend and explore possible solutions. Each workgroup developed a process that allowed community partners and stakeholders the opportunity to present proposals that would help achieve the community's desired vision.


Each workgroup was tasked with prioritizing and narrowing their list of recommendations to five for submission to the Task Force. This process was not without conflict, frustration, and pain, but this exercise yielded growth, compromise, and change.

A primary objective of the Task Force was to maximize the active involvement of residents within the City of Benton Harbor. The report contains voices from a significant number of Benton Harbor residents who met regularly to establish a vision for their community over the short and long term.

Some activities offered to improve communication and engage community members include:

> The CPC sponsored an adult-oriented community forum, along with a youth forum, held at Benton Harbor High School. The CPC also held several meetings, at different venues in the community, including the Benton Harbor/Benton Township Senior Citizen Center, and an outdoor forum, located in the area where the civil unrest occurred.

> The CPC and Task Force visited seven community organizations in the Detroit area to learn about best practices within nonprofit, community based human service organizations. The group visited Operation Get Down, Alkebu-lan Village, Black Family Development, Inc., Focus Hope, Hartford Memorial Baptist Church, ACCESS, and the International Gospel Center.

> In an effort to focus stakeholders on working together, a "Lay it on the Line" discussion was held for Task Force and CPC membership. The goal of the meeting was to address deep seated distrust and ill feelings against individual stakeholders or stakeholder groups that were long standing barriers preventing collaboration. This seven-hour meeting allowed stakeholders to voice their opinions, and share their thoughts with the limitation that they respect one another. An agreement was made to work together collaboratively to develop recommendations going forward.

> Governor Granholm came to Benton Harbor for "Governor Granholm Day." The day included a luncheon with civic, faith, business, and community leaders that emphasized "One Michigan." Governor Granholm challenged the faith based community to take on leadership roles in youth mentoring and volunteerism, specifically with Harbor Habitat. She visited Benton Harbor High School and talked to an assembly of students. During the assembly, youth who participated in the Summer Youth Employment program, with funds allocated by the Governor through Michigan Works!, were recognized.

> The Police Community Relations workgroup sponsored a policy community relations "Day of Dialogue." Over 300 people attended, including many

students. During this session, community and law enforcement leadership engaged in serious dialogue to develop proactive strategies to inform and address issues of policy community relations in Benton Harbor. The dialogue facilitators included Dr. Ken Brown, Consultant, of the University of Michigan, and Barnett Jones, Chief, Sterling Heights Policy Department, and former Oakland County Sheriff's Department. The keynote address was delivered by the first African American to hold the post of Director with the Michigan State Police, Col. Tadarial Sturdivant.

➢ Additionally, facilitation training was held to support workgroup co-chairpersons. A community celebration was held at Second Baptist Church with area faith leaders. Rev. Tyrone Crider delivered the sermon and incorporated the value of economic development in any thriving community.

**In reviewing the report, the Task Force encourages the reader to recognize the significance of allowing a structured process to encourage such open and candid involvement of residents.**

As an example, it may not be realistic to expect a new credit union or a multi-million dollar loan pool from area corporations to be established for, and run by, community residents in the short-term, but rather it is important to understand the reasons for such an aggressive goal. The key is not the amount of funding sought, but rather the consensus that access to capital is a difficult challenge, but important goal, for Benton Harbor residents and small businesses.

Other goals, such as those established under the housing initiative, do not require new funding. Rather, they create an integrated process by which access to existing programs can ultimately lead to a balanced mix of public, private, and federal investments. While a goal of $45 million in new housing development and increased home ownership by five percent may seem ambitious over five years, it is through a structural change of existing programs grounded in collaboration of multi-disciplined stakeholders that these goals can become reality.

Some of the recommendations point to a process change. The Recreation, Arts and Culture Committee believes a community-wide recreation board to leverage all state, federal, and local resources will create comprehensive, structured, and quality programming for youth. The recommendation itself points to a need for the county and local government to help channel resources toward youth recreation. This process change and requisite resource leveraging, in and of itself, demonstrates the need for collaboration and support among units of government – sharing resources to achieve the desired community vision.

Throughout this process, the following community messages were clear:

- All community and established stakeholder groups must find ways to actively enhance citizen participation, oversight, and ultimately see real results and benefits from the dollars spent in this community.
- The community recognizes it must implement programs and create change where community safety and security become reality. Efforts for safety and security must be equally matched by improvements in the education system.

The focus on safety and education allows other initiatives, i.e., economic development, to ultimately be incubated in an environment where success can be achieved. Because this must be achieved with limited resources, stakeholder partnerships, resource leveraging, and active involvement are key.

## Recommendations

The recommendations in this report are meant to address some of the most persistent challenges facing the Benton Harbor area community. These proposals reflect the input of area residents, suggestions from key stakeholders, and the advice of public officials. Some of the recommendations in this report can be accomplished in the short-term. Most of the proposals will require long-term strategies for implementation. This important work requires the involvement of local residents and creative partnerships among various community organizations. Members of the community need to develop sustainable strategies for implementing these recommendations, and identify the public and private resources necessary to achieve these goals.

The Governor's Benton Harbor Task Force worked closely with the Citizens for Progressive Change (CPC) work groups to develop the recommendations in this report. These work groups identified the long-term challenges facing the community and sought public input on potential solutions. The report contains many key findings:

*Economic Development*
  ➢ Comprehensive job development strategies must be implemented in the Benton Harbor area
  ➢ The Benton Harbor community should take advantage of its unique natural features to develop a comprehensive tourism plan for the area
  ➢ Coordinated workforce development strategies must be identified and implemented, including a summer youth work program
  ➢ Establish greater access to capital through the possible creation of a revolving loan fund
  ➢ Eradicate substandard housing in Benton Harbor by 2025 through various community and governmental efforts

*Education*
- Reducing the high school drop-out rate in Benton Harbor is central to improving the life chances of area youth
- The Benton Harbor community must focus attention on early childhood care and education and develop effective programs through partnerships with the State and educational organizations
- Transportation barriers need to be eliminated in order to maximize the ability of students to participate in after-school programs
- Benton Harbor Area Schools should examine the physical infrastructure of school buildings and direct the recently passed millage to those schools in the most need
- Benton Harbor Area Schools should examine the technology needs of the schools and develop solid technology plans that will allow the district to participate in programs such as the statewide Freedom to Learn initiative

*Health Awareness and Improvement*
- Health care professionals and local leaders must work on increasing Benton Harbor area residents' access to quality affordable health care
- Educational efforts must be undertaken with parents in Benton Harbor to reduce infant mortality
- Educational efforts must be undertaken in the community to educate the public about lead poisoning and ways to protect families against its dangerous effects

*Police Community Relations*
- Staffing and retention must be improved in the Benton Harbor Police Department
- The Policy Community Relations coalition must be sustained through local collaboration in the Benton Harbor area
- Community policing should be instituted in Benton Harbor with a focus on awareness of problems in the community

*Diversity with Inclusion*
- Communitywide diversity training must be provided in the Benton Harbor area to teach everyone in the community about the importance of understanding and respecting each other's differences
- Law enforcement diversity training must be provided to Benton Harbor area police agencies to increase law enforcement awareness and sensitivity to differences within the community
- The Civil Rights Health Assessment developed by the Michigan Department of Civil Rights, should be conducted in the Benton Harbor area community to provide a meaningful non-judgmental assessment of the state of civil rights in the community and on-going challenges

*Parenting and Family*
- The community must support and expand parenting classes and support services
- Leaders in the community must increase high-risk families' knowledge of and access to vital community services
- Parental access to child care must be expanded

*Criminal Justice*
- The Benton Harbor Community will work with local officials and the Michigan Supreme Court toward the establishment of a Magistrate and possible future District Court in Benton Harbor to respond to citizen perceptions about the current Criminal Justice System

- The Benton Harbor Community will work toward reform in their indigent defense system including creation of a pilot indigent defender's office

- The Benton Harbor Community will work toward the creation of a Citizens' Complaint Review and Oversight Board modeled after the Kalamazoo Oversight Board which allows citizen input on handling of complaints related to criminal justice system

- The Benton Harbor Community must work internally to increase community response to jury duty notification, and thus allow for greater diversity in the jury selection of Berrien County juries

- The Benton Harbor Community should explore the feasibility of adopting a juvenile justice system that encourages community-based care management for adjudicated youth

*Recreation, Arts and Culture*
- Create a Recreation, Arts and Culture After-school Programs committee in Benton Harbor to focus on developing viable recreation programs in the area
- Identify existing recreation, arts and cultural programs which serve the citizens of Benton Harbor, and create a database of these activities to make accessible to the community

*Communications*
- Increase the capacity of the community access channel in Benton Harbor
- Connect the Benton Harbor Community to the Internet to bridge the existing digital divide
- Take advantage of community publications to increase awareness of positive news and events in Benton Harbor

*Faith Based Community*
- Faith leaders in Benton Harbor should develop a housing construction/rehabilitation program

> ➤ The Faith Consortium in Benton Harbor should meet with area lending institutes and discuss ways in which they can work with conventional lenders to increase access to affordable mortgage financing.
> ➤ Faith leaders in Benton Harbor should create an outreach ministry that focuses on, but is not limited to, mentoring and volunteerism in cooperation with Harbor Habitat for Humanity

## Purpose of the Report

The purpose of this report is to provide a set of recommendations to address issues in the following areas:

- Economic Development, Housing and Job Training
- Education
- Health Awareness and Improvement
- Police Community Relations
- Diversity with Inclusion
- Parenting and Family
- Criminal Justice
- Recreation, Arts and Culture
- Communications
- Faith Based Community

The report is organized by the above listed categories and includes the desired vision of the community, challenges, opportunities, recommendations and stakeholders needed for success.

The Task Force's vision for Benton Harbor is a city with strong community and governmental leadership focused on collaboration, leading to continuous quality of life improvements. Benton Harbor should have safe neighborhoods, affordable housing, and a strong education system with an emphasis on early childhood development. The city should have adequate, positive recreation outlets for children/youth, with no barriers to transportation. There should be a thriving downtown, with a blossoming arts district, restaurants, entertainment venues, and a bustling waterway, with commercial and residential development, which will spur further economic development in Benton Harbor. Finally, Southwest Michigan should be a region in which the Twin Cities, Benton Harbor, and St. Joseph, along with its surrounding communities, work in harmony to build a world class community that will be a model for the entire State.

## Next Steps

Proposals made are wide ranging, from public safety, health and well-being, and economic development, to recreation and parenting. Given the short time frame in which these reports were developed, it is an outstanding compilation of a multitude of voices seeking a common goal to create a community of choice in the City of Benton Harbor and enhancing the southwest region of Michigan.

The Task Force and CPC agreed that in order to implement and sustain the recommendations contained in this report, the CPC must continue.

The Task Force strongly recommends the permanent CPC Committee establish a mandate to create collaboration and cooperation with established organizations including, but not limited to, the Council for World Class Communities (CWCC), United Way, City of Benton Harbor, Berrien County, Lake Michigan College, the Family Independence Agency (FIA), Southwest Michigan Ministerial Alliance, Cornerstone Alliance, The Neighborhood Information and Sharing Exchange (NISE), and a multitude of various state and federal entities.

The CPC Committee will further prioritize the recommendations and themes identified in this report. The CPC will actively seek implementation of the prioritized recommendations in a methodical and structured manner.

At the heart of implementation must be a structured process in which the active involvement of community members is incorporated into the work of the community-at-large. The Neighborhood Information and Sharing Exchange (NISE) will provide organizational support to the CPC. Finally, the recommendations submitted will be made available at area websites, and public access locations.

# ECONOMIC DEVELOPMENT AND HOUSING/JOB TRAINING

# Community Development, Evaluation and Monitoring

## Desired Vision for the Community

Public and private funds that flow to Benton Harbor have true impact and achieve the desired result. Accountability is key.

## Challenges

There are over 350 nonprofit service providers, quasi-governmental agencies, and organizations doing business in the Benton Harbor Metropolitan Statistical Area (MSA). These organizations receive approximately $300 million annually. In addition, the state and federal government reported $100 million worth of investment through tax incentives and direct funding into the Benton Harbor area over the past two years.

Benton Harbor's statistical data is often subsumed under the MSA data for the surrounding area. This may obscure information on persistent social ills in Benton Harbor. This is important, because federal funding is based on MSA data.

According to the Executive Director, Michigan Works! staff testified before Congress in an attempt to relax federal regulations in order to have flexibility and meet local needs. With the establishment of a Community Development Evaluation and Monitoring (CDEM) Agency, the state and federal government would have a direct line of communication to the citizens they represent and the intended beneficiaries of public funds.

## Opportunities

Creation of a direct outlet for citizens to get information about available programs and how public dollars are spent in Benton Harbor, as well as to identify methods to help hold public officials accountable.

## Recommendations

- ➢ Create and fund a local CDEM Agency that is acknowledged by our state partners
- ➢ Create a federal and/or state law that would use municipal statistical data, not Metropolitan Statistical Area data, when allocating funds
- ➢ Acquire broad-based support from local stakeholders without threatening individual programs that are effective
- ➢ Mobilize a critical mass of funders to work together to achieve this public initiative

According to the "strategic plan" in the Benton Harbor Empowerment Zone Application, the long-term success of the Zone depended upon citizen input and involvement. Stakeholders agreed to provide funding for a local "Citizen's Monitoring Agency." We believe this concept has merit.

Economic Development, Housing and Job Training

If implemented, the following should occur:

➤ Creation of one central mechanism for collecting local community development data
➤ Focus all local stakeholders, citizen groups, and government agencies toward one strategic community development goal
➤ Create a statewide framework for urban redevelopment planners
➤ Allow certain reporting from stakeholders to CDEM Agency
➤ Notification of CDEM Agency prior to funding any local stakeholders
➤ Transparency for agencies receiving state funding

### Key Stakeholders Needed to Achieve Desired Results

All branches of local, county, state, and federal governments
All local community stakeholders
Citizens for Progressive Change (CPC)
The Benton Harbor Citizens Empowerment Corporation

Economic Development, Housing and Job Training

# HOPE VI

## Desired Vision for the Community

Development of affordable and market rate housing in Benton Harbor which include relevant support services, and creation of The Homeownership Institute

The goals for developing success in this area are as follows:

- Successfully compete for $20 million in U.S. Department of Housing and Urban Development (HUD) funding through Hope VI
- Eradicate substandard housing in our community by the year 2025
- Increase home ownership by at least 5 percent over five years
- Complete over $45 million in new housing development in the Benton Harbor area in five years
- Stimulate an additional $35 million in ancillary development
- Increase home ownership for diverse individuals in the greater region by over 15 percent

## Challenges

The Benton Harbor Housing Commission has, on two occasions, applied for Federal Hope VI funding. Hope VI is an innovative federal program that provides dollars that are matched with local investments to create new communities within housing authority service areas.

The two previous applications submitted by the Benton Harbor Housing Commission, while scoring very high, did not garner the points necessary to obtain funding. The primary weakness in the local community's application was a lack of linkages to existing programs and delivery mechanisms, along with the leveraged investments necessary to compete against similar initiatives nationwide.

The Housing Authority portfolio currently consists of 94 severely distressed one, two, three, and four bedroom units constructed as two story apartments on slab foundations. These units are small, old, and obsolete and are not sufficient to serve the Benton Harbor area residents.

Furthermore, with a 700+ family waiting list to obtain affordable housing within the community, it is clear a more massive integrated community strategy is needed to create quality affordable housing for the community.

We also must address the ineffective use of city-owned, scattered site housing properties. The City has over 80 rental homes in its scattered site program, and these properties do not provide tax revenue to the City. Many occupants probably qualify for home ownership.



*Governor's Benton Harbor Task Force – Final Report*

4

The challenge is for the U.S. Department of Housing and Urban Development (HUD), Michigan State Housing Development Authority (MSHDA), and the City of Benton Harbor to work together to modify the HUD grant. These homes could then be sold, instead of rented, and the proceeds from each sale could go toward the construction of a new home that could also be sold, thus rebuilding the City's housing stock and simultaneously increasing the rate of homeownership and tax revenue. Additionally, small contractors could work to rebuild homes and hire and train local residents in the construction business. Proceeds from the sale of each home would be used to either build a new scattered site home that would be sold, or they could be used as a matching grant to assist other homeowners near a scattered site with renovation costs.

## Recommendations

The nine-step plan to achieve our HOPE VI coordinated housing plan is outlined as below:

> The community developed a strong proposal to become the site of the Jimmy Carter Work Project (JCWP) with Habitat for Humanity International through our local Harbor Habitat affiliate in 2005
> Build on the mammoth volunteer effort required for the JCWP 2005 to carry over into other community housing and redevelopment efforts to, in effect, create community-wide involvement in the entire community redevelopment process
> Create a community-wide support mechanism to sustain the Harbor for Habitat Initiatives from 2005 through 2010
> The collaborators have collectively endorsed and will fully participate in the advancement of the HUD HOPE VI application for our local housing authority that centers on holistic personal growth and advancement
> Integrate several tax credit and MSHDA proposals for the City of Benton Harbor into the HOPE VI and JCWP efforts
> Form and fund a Home Ownership Institute to serve as a common vehicle. We will create a one-stop shop for all who are interested in safe affordable housing to link all housing tools with housing needs
> Create a common strategy to promote and integrate the Harbor Town Development, the Airport Runway Extension, and Housing Relocation program
> Organize a common intake system to support the MSHDA housing at Pavone and Empire
> Integrate the development strategies of the local Renaissance Zone, Core Community, and Edgewater development to create a "cool livable community"

If these recommendations are implemented, the following should occur:

> Construction of 70 off-sight three and four bedroom single-family homes
> Development of 24 on-sight town home public housing units
> Creation of 48 single family rent-to-own homes through the Brunson Hill development supported by MSHDA tax credits

Economic Development, Housing and Job Training

> Creation of a delivery system that will provide home ownership training, small business counseling and workforce training on site at the HOPE VI development
> Creation of retail and commercial space for local residents to implement entrepreneurial activities

## Key Stakeholders Needed to Achieve Desired Results

American Electric Power
Bank One
Benton Charter Township
Benton Charter Township Housing Authority
Benton Harbor Area Schools
Benton Harbor Housing Authority
Berrien County Economic Development
Chemical Bank Shoreline
Council for World-Class Communities
Fifth Third Bank
First Source Bank
Harbor Habitat for Humanity
Horizon Bank
Michigan State Housing Development Authority
Northside Business Association
Southwestern Michigan Association of Realtors
Southwestern Michigan Homebuilders Association
Southwest Michigan Planning Commission
The City of Benton Harbor
Whirlpool Corporation

Economic Development, Housing and Job Training

## Revolving Loan Fund

### Desired Vision for the Community

- Establish greater access to capital
- Raise the median household income of Benton Harbor residents
- Reduce unemployment rates to reflect the county average of four percent
- Create a housing mix of 65 percent homeowners and 35 percent renters

### Challenges

In May 1999, The Woodstock Institute in Chicago released "An Analysis of Residential Lending Patterns in Benton Harbor and St. Joseph, Michigan," by Daniel Immergluck and Marti Wiles. The report concluded the following: "[w]hile the raw numbers are somewhat small, the large disparity in loan denial rates for home purchase loans between middle and upper income African-American and white residents of the combined communities are troubling. Denial rates for middle and upper-income whites are extremely low at three percent.  Increased attention to this issue by lenders and regulators is warranted." (Page 2)  Some scholars and practitioners conclude that, "[w]hile the Community Reinvestment Act (CRA) does not mandate lending institutions to disclose commercial or recreational lending data, mortgage-lending data will provide ample information about an institution's overall lending practices."  If the aforementioned information holds to be true, we can then draw only one conclusion:  there is currently no financial institution in Benton Harbor that caters to the capital and credit needs of low-to-moderate income families or small businesses.

Mobilizing the critical mass of capital needed for Benton Harbor citizens to keep pace with regional development is also a challenge we face as we work to create these opportunities for aspiring entrepreneurs.

### Opportunities

- Establishment of an alternative institution that acts as a center for capital retention and plugs economic leakages
- Increased median household income through infusion and circulation of capital
- Decreased unemployment through increased small business expansion and start-ups
- Increased home ownership through concentrated mortgage lending
- Increased capital generated from loan interest rates and other credit services
- Implementation of a risk-reduction strategy through joint-venturing with local financial institutions
- Benton Harbor residents and businesses can increase capital investments as co-owners in economic development projects

Economic Development, Housing and Job Training

## Recommendations

➤ Create a community controlled revolving loan fund and market the fund to local community stakeholders to attract corporate investment. This institution will serve the credit needs of low to moderate income individuals and small businesses

The Revolving Loan Fund would initially mirror an existing Loan Fund operated by the regional economic development agency. Cornerstone Alliance has agreed to administer the Revolving Loan Fund for the Economic Development Group of the CPC at minimal to no cost. This strategic partnership offered by Cornerstone Alliance would further add to the existing pool of Renaissance Development Funds giving citizens and small businesses a better chance at access to capital, and developing credit.

The Cornerstone Alliance office will be the application intake office. The CPC Economic Development group will establish a loan board, which will screen applications and make final approval of loans.

In addition to administering the actual loan fund, Cornerstone Alliance also offers technical assistance and other small business development services. These services are essential to potential borrowers to begin the process of business planning, acquiring a home or simply repairing damaged credit.

## Key Stakeholders Needed to Achieve Desired Results

Cornerstone Alliance
CPC
State of Michigan



Economic Development, Housing and Job Training

# Small Business Funding

## Desired Vision for the Community

Local businesses will become competent, highly qualified to compete at every level for funding, and provide quality products and services.

## Challenges

To provide the necessary training and initial funding to assure the success of small and minority owned businesses in the City of Benton Harbor, and assist them in competing for other available funds and contracts.

There are several for profit, not for profit, and sole proprietorship businesses with great goals and visions, but they lack the knowledge and skills to operate a successful business or to obtain grants and other funding.

## Opportunities

Businesses will gain vital training and information regarding structure, integrity, and accountability, and will be able to apply directly to funding sources for financial assistance to implement business goals and missions.

With adequate training and assistance businesses will be able to seize opportunities offered by grantors and other businesses. Training in accountability is vitally needed in the community. Many other business entities are in need of the same training that is available through the Northside Ministerial Alliance Training Institute, or the Michigan Minority Business Development Council (MMBDC).

## Recommendations

> Secure state, federal, or other seed funding for small businesses or organizations that complete training of appropriate training through Northside Ministerial Alliance and/or Michigan Minority Business Development Council
> Evaluate companies and organizations to ensure their efforts are successful
> Pursue training and capitalization for nonprofit and for-profit businesses
> Build the capacity of minority nonprofit and for profit businesses

Economic Development, Housing and Job Training

## **Key Stakeholders Needed to Achieve Desired Results**

City of Benton Harbor
Cornerstone Alliance
HUD
MMBDC
Northside Ministerial Alliance Training Institute
Michigan Department of Consumer and Industry Services

Economic Development, Housing and Job Training

# Development of the Waterway

## Desired Vision for the Community

Recreate a working harbor, building on the $5 million already invested to link the harbor to land, and a working rail bed.

## Challenges

Benton Harbor reached its economic peak between 1930 and 1965. The driving forces for this economic prosperity came from the convergence of agricultural production and manufacturing prowess relying on commercial and industrial lake traffic.

Benton Harbor continues to be one of the most successful working ports on Lake Michigan, yet due to a lack of infrastructure to support the working harbor, the spin-off benefits of manufacturing, warehousing, and agricultural production have been lost.

## Opportunities

Over the past several years, the City of Benton Harbor has been working to recreate the linkages between these driving elements to the lake and river port traffic. Accordingly, the City of Benton Harbor has removed condemned buildings along Graham Avenue and now has over forty-five acres of prime development property owned by the City of Benton Harbor.

It is reasonably estimated that over 300 new jobs could be created through the production, manufacturing, and warehousing directly related to a working harbor.

The added benefit of the site chosen includes an active rail terminal to link the river and lake barges with CSX mainline between Chicago and Detroit, coupled with newly improved access through I-94 and US 31.

## Recommendations

➢ The City of Benton Harbor requests a $425,000 economic development grant through the Michigan Department of Transportation to link Graham Avenue and its existing 300,000 sq. ft. of industrial space, and 45 acres of vacant land to the working harbor at Riverview Drive. This connection will be the final phase of a multifaceted $5 million project already funded and completed in partnership with the U.S. Department of Labor

Economic Development, Housing and Job Training

➢ Engage the two current working port owners in the community along with representatives from the agriculture and industrial community to identify potential port users. Develop a proposal for a Fruit Market to locate back onto Graham Avenue for its operation as part of the airport extension. Such a development would enhance the comprehensive tourism proposal being constructed by linking the world's largest fruit market to tourist activities

➢ Begin active marketing efforts to potential port users for investment and job opportunities. We propose that the Michigan Economic Development Corporation (MEDC) develop an incentive package for the Fruit Market relocation

➢ Michigan Works! should create workforce development training needed for warehouse and distribution employees. Institute a comprehensive communication plan for screening and training the Benton Harbor residents who are under-employed

➢ Develop a comprehensive marketing program to notify private developers

➢ Utilize the New Markets Tax Credit, federal and state funds, along with private investment, to begin an implementation stage that will lead to at least three development opportunities over the course of the next three years, creating at least 200 jobs

## Key Stakeholders Needed to Achieve Desired Results

Army Corps of Engineers
Berrien County Economic Development
Citizens for Progressive Change
City of Benton Harbor
Cornerstone Alliance
Department of Environmental Quality
Michigan Department of Agriculture
Michigan Department of Transportation
Michigan Economic Development Corporation
Michigan Farm Bureau
Michigan State University
National Association of Agriculture Engineers
Surrounding Property Owners
U.S. Department of Housing and Urban Development

Economic Development, Housing and Job Training

## Benton Harbor/Benton Charter Township Consolidation Feasibility Study

### Desired Vision for the Community

Effectively utilize limited taxpayer revenue through shared opportunities and shared responsibilities. Commission a study to evaluate the impact of the consolidation of the City of Benton Harbor and Benton Charter Township to expand economic growth, share resources and eliminate service duplication for more effective use of taxpayers' dollars.

### Challenges

In order to increase economic growth and stability, a community must first have political stability. For the past 20 years, the City of Benton Harbor has been faced with the flight of businesses to malls and other political jurisdictions because of instability evidenced by numerous recall elections, a shrinking tax base, poor housing stock, high turnover of city managers, police officers and other employees, unemployment, and the lack of land space for industrial and commercial development. Furthermore, it is necessary for economic growth that residents' income be turned over at least three or four times within the community before leaving the community, which has not been the case in Benton Harbor. Most of the dollars spent by the residents of the City of Benton Harbor turn over in Benton Charter Township.

### Opportunities

The majority of the populations of both communities are African-Americans; therefore, consolidation of the two communities would not diminish the political power base of the ethnic composition of the two communities. Each municipality has a police department, fire department, assessor, treasurer, attorney, clerk, engineer, inspection department, manager, and a housing commission as well as other similar offices or departments. Each municipality spends a considerable amount of taxpayer dollars on various elections.

Most of the larger churches are located in the Township. Most of the meetings of the Governor's Task Force take place in the Township, and several members of the Task force and CPC reside in the Township. It is difficult to address the problems of Benton Harbor without considering the same issues in Benton Township. Can we effectively address the recreational, economic, and social needs of Benton Harbor without addressing the same problems of the Township? Residents often move between the City and Township. The students attending Benton Harbor Area Schools live in both the City and Township.

Economic Development, Housing and Job Training

Some contend that many of the federal, state, local and foundation grants awarded to this area are awarded based on the statistical data with the zip code of 49022 which consists of Benton Harbor, Benton Township, and a few other small municipalities. While the 49022 zip code is known as Benton Harbor, numerous arguments have been made that the City of Benton Harbor does not benefit from most grants awarded on the basis of the City's statistics.

If citizens are going to be asked to vote on a merger or consolidation of the City and the Township, significant data should be collected and provided to the citizens so that an informed and intelligent decision can be made.

Several national models exist on ways local communities have come together to improve governance issues. The structures have ranged from outright merger, to "compact" forms of government in which each unit's political structure was maintained while municipal services were merged. Cities such as Louisville, Kentucky and Battle Creek, Michigan are examples of communities that have followed well-defined processes.

Financial resources exist to assist communities seriously considering the benefits of a merger and as such, funding should be sought through the Kellogg Foundation, the Urban Land Institute, and other foundations that specialize in governmental structure.

## Recommendations

➢ Secure funding to study the feasibility of consolidating Benton Harbor and Benton Township.

If this recommendation is adopted, friction and envy between the two communities may diminish; economic development organizations would be able to better serve the community; taxpayers would realize a savings of over $1 million annually that is currently spent on duplicative services; and political stability would be restored to the community as well as increased economic development. The savings to the two communities could be utilized to fund other economic development and recreational priorities of the community.

➢ Battle Creek and Battle Creek Township consolidated several years ago as the result of a recommendation from the Kellogg Foundation. Valuable information could be obtained from the Battle Creek experience.

## Key Stakeholders Needed to Achieve Desired Results

Citizens for Progressive Change
City of Benton Harbor and Benton Charter Township
Office of the State Attorney General
Michigan Department of Management and Budget
The Kellogg Foundation



# Development of Entertainment Venue

## Desired Vision for the Community

Utilization of natural and abundant assets to create tourist destinations, jobs and revenue.

## Challenges

The City of Benton Harbor currently has over 90 acres of pristine parkland located along Lake Michigan with substantial overgrowth of brush and weeds. This asset is woefully unappreciated and underutilized by residents within the community. It is estimated that less than 700 people visit the park and beach annually.

## Opportunities

The City of Benton Harbor is also located along the St. Joseph River, considered by some to be the prime fishing river in the Midwest. Furthermore, Benton Harbor has Ox Creek that traverses through its area with an abundance of wetlands, natural habitat, and prime development opportunities along unique marsh, pond, and creek locations. No economic development along any of this land has occurred.

Berrien County has seen the number of hotel rooms double over the past seven years, and a resulting influx of an ever-strengthening tourism market. However, due to the lack of destination development opportunities and failure to create comprehensive training programs in tourism and hospitality management, the residents of Benton Harbor are neither benefiting from this new tourism, nor are tourist stays extended beyond more than one or two days. As such, the ability to capture significant revenues from tourism is lost until such time as a more comprehensive destination development opportunity can be created.

Given the growth of tourism in Berrien County and Benton Harbor's proximity to Chicago, Indianapolis, and Detroit, the Berrien County market is within a four-hour drive of millions of people. The ability to grow tourism can create job opportunities ranging from entry level wait staff to hospitality management professionals.

Furthermore, increasing tourism in this market creates an improved identity for a community, which ultimately results in creating enhanced business and investment growth ranging from new manufacturing, service sector and second home markets.

Economic Development, Housing and Job Training

Some sample opportunities are:

- Amusement park
- Aquarium
- Kayak runs down the old ship canal
- Children and senior fishing points at the Old Celery Farm along Ox Creek
- Canoe and kayak tours along Ox Creek
- Natural wildlife and education programs along Ox Creek
- Indoor soccer facility to conduct regional tournaments during the winter and colder months
- Indoor roller skating, rock climbing, and other activities that combine opportunities for tourists and residents alike
- Golf course and first tee program that affords Benton Harbor residents preferred opportunities in conjunction with the influx of tourism
- Snowmobile routes for winter activities
- Development of a fishing village for second home purchases
- Waterfront park
- Land and development of Great America and other tourism venues
- Outdoor boat and drive-in movie theater

## Recommendation

➤ Develop a comprehensive strategy to create tourism destination development projects to improve Benton Harbor's tax base and employment opportunities for Benton Harbor residents

## Key Stakeholders Needed to Achieve Desired Results

Army Corps of Engineers
Berrien County Recreation Department
Citizens for Progressive Change
City of Benton Harbor
Cornerstone Alliance
Department of Environmental Quality
Economic Development Administration
Michigan Economic Development Corporation
Southwestern Michigan Tourist Council
State of Michigan Tourism Department
Surrounding Property Owners
U.S. Department of Housing and Urban Development

# Job Training

## Desired Vision for the Community

The vision for the City of Benton Harbor and Benton Township would be a responsive and coordinated system of remedial, educational, vocation, and job-training resources in the community that would best serve the greatest number of residents. Further, the agencies involved in the delivery of these services would better understand the specific needs of its population and better communicate the needs and the resources available to the community as a whole. If the agencies are able to coordinate the delivery and services that are available, then a coordinated advertising and marketing plan could be implemented to address the lack of information and dissemination of the opportunities that exist in the community.

Further, the business and industry partners would consistently and effectively provide the agencies involved with the latest employment needs. This will allow the development of a model that will better coordinate job training to meet employment needs.

Finally, the ultimate goal is for the residents of the City of Benton Harbor and Benton Township to achieve full employment with a livable wage augmented by the benefits that allow for self-sufficiency.

## Challenges

The residents of the City of Benton Harbor and Benton Township are served by several disparate job training delivery systems in the community including Michigan Works!, Benton Harbor Area Schools, Berrien County Intermediate School District, Lake Michigan College, and Workforce Skills Development. Each is designed to move residents from remedial to specific job skills and ultimately into full employment. While the goals and objectives of each entity may differ, the expected outcomes for each participant in the program remain the same: full employment, livable wages, and benefits from self-sufficiency.

Amongst the residents in communities served by the job training programs, it is commonly believed that there is duplication of services and competition for scarce resources. For example, each of the entities listed as collaborators provide similar remedial services related to resumé construction.

Residents report a lack of knowledge regarding services provided by the agencies dedicated to job training. This lack of community knowledge leads to the perception that each is ineffective in the delivery and success of their job training and preparation models. Further, residents report little understanding of the resources that exist in the community to address their specific job skills needs.

Economic Development, Housing and Job Training

There must be a 360-degree model for effective feedback by employers in the community that are recruiting employees to augment their business models. These participating businesses should be included in the development of the model to ensure that the goals of each are addressing the needs of the community as a whole.

The workforce development delivery system must continuously review, refine and improve its services to remain responsive. The greatest challenge in developing a coordinated delivery system for the community remains interagency competition and communication. Each agency is entrenched in either governmental requirements or grant restrictions that each must maintain to comply with the contract.

There will be a significant challenge in coordinating the delivery of training modules to avoid duplication, and each will view this proposal as its own territory. However, that duplication depletes the resources available to increase communication through new and innovative methods, as there remains little capital for this goal given the current competitive state of affairs.

## Opportunities

There are many opportunities for success in the community with the coordinated efforts of service providers in the region. Each, if agreed upon, would have the task of implementing a specific phase of job training services that would not compete with the other, allowing each to become proficient in that sector of responsibility. Further, the community residents would have a greater understanding of the agent that best suits their specific need for the achievement of full employment.

## Recommendations

> Implement a planning process with a professional facilitator to identify achievable goals and objectives of the agencies listed as stakeholders in this section. This recommendation requires strategic cooperation by each agency and the local business, employer community.
> Encourage the community to agree upon a common integrated workforce training initiative to drive employability for current residents and attraction of new employment.
> Allow broader community representation on all workforce development boards.

## Key Stakeholders Needed to Achieve Desired Results

Benton Harbor Area Schools
Berrien County Intermediate School District
Cornerstone Alliance
Cornerstone Chamber Services
Lake Michigan Community College
Michigan Works!
National Foundation for Teaching Entrepreneurship (NFTE)
Workforce Skills Development

Economic Development, Housing and Job Training

## Summer Youth Employment Program

### Desired Vision for the Community

The desired vision for the community is to develop a program that informs community youth of the many opportunities that exist beyond the cycle of poverty that is all-too-often the norm. Further, youth will recognize a clear path to future success should the student develop the skills necessary to succeed in the workplace where he/she participates. For example, youth will see the benefits of a high school education, continuing and technical education beyond high school, and the tangible effects of education upon his/her earning potential.

### Challenges

Following the disturbances of June 2003, the Governor earmarked $309,000 to the tri-county Michigan Works! to develop a six-week summer youth training experience, allowing residents of Benton Harbor to see tangible effort by the state and local agencies and employers to address the myriad of problems that exist in a community with high unemployment. This program, while successful in many areas, exposed many of the problems that exist within inter-agency communications, local business partnerships, and governmental support and leadership. This program, while not addressing those residents who are over the age of 22, did allow youth to participate in a worthwhile job experience with hope that they derive substantial educational experiences for the good of their future.

The summer youth job training program was formed in a very short window of time by several collaborating agencies including Michigan Works!, Cornerstone Alliance, the Council for World Class Communities, and the Michigan Department of Transportation. These agencies developed the intake criteria, designed the job requirement criteria consistent with state and federal funding requirements, and pursued interested businesses to ensure that jobs were available for participants accepted into the program.

The program concluded in August 2003 with no specific plan for future funding.

The challenge of this program is to determine a source of funding for a sustainable program that can properly address the needs and expectations of clients and employers who participate in this program. After all, a chance in this program may open the door to future opportunities that youth may never again have at their disposal.

### Opportunities

Each participating business will have the benefit of augmenting their staff and general work environment with bright, energetic, and prepared youth that will help to dispel any potential stereotypes that exist within that work environment.

Economic Development, Housing and Job Training

Youth have the opportunity to enhance their remedial job skills through the coordinated training programs.  They will be given the chance to witness, first-hand, the benefits of a quality work environment that places specific goals and expectations upon employees for a full day's pay.  This pay will assist with the basic needs of individuals and the families while also educating youth about the benefits of contributing to society through established and accepted tools of employment.

## Recommendation

> ➢  To achieve this level of involvement among youth in the community, there must be a sustained program of job evaluation, training of youth, and funding.

### Key Stakeholders Needed to Achieve Desired Results

Benton Harbor Area Schools
Berrien County Intermediate School District
Cornerstone Alliance (Education and Lifelong Learning)
Cornerstone Chamber Services (Business recruitment and Training)
Local, Community and Corporate Foundations
Local Employers (Predominately from Benton Harbor and Benton Township)
Local Job training agencies
Michigan Works! (Lead Agency)

# Neighborhood Block Clubs

## Desired Vision for the Community

Create a redevelopment fund for use by local neighborhood block clubs. Organized and involved communities are strong communities.

## Challenge

Currently, no sustained or systematic funding exists to create resources to reward formation and implementation of strong neighborhood block clubs.

## Opportunities

The City of Benton Harbor and Cornerstone Alliance have provided funding for a group of 20 local Benton Harbor residents to receive training from the U.S. Department of Housing and Urban Development's Grass Root Community Organization program. This training has resulted in several block clubs being created coupled with several existing block clubs within the community.

Several other block clubs, such as All People Who Love Benton Harbor provide neighborhood cleanups and mentoring programs.

The community policing proposal submitted by the Police Chief of the City of Benton Harbor also outlined the need to create active, strong neighborhood block clubs to assist in the community policing effort.

## Recommendations

➢ Establish a $50,000 per year, three-year commitment to a structure and process for providing block club grants within the community. These initiatives can include landscape improvements, neighborhood cleanups, conversion of abandoned buildings to recreation centers, and sponsorship of youth organizations, etc.

➢ The Benton Harbor Police Department would certify the existence of neighborhood block clubs based upon:

- A committee with officers
- A defined geographic boundary
- A record of at least two months with meetings and priorities established by the neighborhood block club
- At least one meeting with identified police officers and the neighborhood block club
- Adequate postings and public notices of block club meetings

Economic Development, Housing and Job Training

> Create a Citizens' Oversight Committee to work with available resources in the community to seek additional leveraged funds for reallocation through the process as deemed appropriate

## Key Stakeholders Needed to Achieve Desired Results

Benton Harbor Police Department
Berrien County Economic Development
Churches
Citizens for Progressive Change
City of Benton Harbor
Civic Organizations
Cornerstone Alliance
Economic Development Administration
Family Independence Agency
Michigan Department of Agriculture
Michigan Department of Transportation
Michigan Economic Development Corporation
Michigan State University
Surrounding Property Owners
U.S. Department of Housing and Urban Development
Western Michigan University

# EDUCATION

## Desired Vision for the Community

Benton Harbor will be a community that values education, as demonstrated by residents, school officials, community leaders and organizations. They will all actively support and participate in school activities and community-sponsored programs in order to develop hopeful youth and promote the overall achievement of all students. We will identify the educational needs, strategies, and resources that will provide hope and prepare 100 percent of Benton Harbor community students for a secondary education or career.

## Challenges – Children

### Early Childhood

Many children have parents that are unaware of early brain development and the cognitive needs of their very young (prenatal to three years of age) children. The majority of parents work and care is often provided by relatives rather than licensed childcare providers. Also, these relative care providers often lack the knowledge and resources to assist the child in attaining early literacy skills. Because the Family Independence Agency (FIA) Child Day Care provides support ($2.25-$2.75 per hour) for relatives providing day care, many children remain with a family member rather than attending available preschool programs for four year olds, such as the Michigan School Readiness Program and Head Start, so as not to forfeit this small income.

### Nutrition

Although 98.5 percent of the students participate in the free/reduced breakfast and lunch meal plan, some still are not consuming enough food to function well in school.

### High Drop-Out Rate

Student retention is an issue at Benton Harbor High School. Data show students are dropping out of school at unacceptably high levels.   Of the 435-student cohort that would have graduated in 2003, 212 students (48.7 percent) dropped out prior to graduation. Of the 223 students who graduated from high school in the 2002-2003 academic school year, 80 (35.8 percent) were boys—meaning fewer boys are graduating and more are dropping out of school.

### Drug Influence

The drug culture sustains a flourishing sub-economy, which provides competition to Benton Harbor Area Schools for the minds and souls of youth and families.

*Academic Performance*

Academic achievement is an area of concern, and support from the community, and state and federal programs, is essential in allowing those students who are starting with disadvantages to overcome their deficits. Class size, after-school programs, and enrichment initiatives are all critical in uplifting these students.

*Suspension and Expulsion*

Students are challenged with conflict management and resolution in controlling their anger or behavior. Failure in this area has resulted in excessive suspensions from school. During the 2002-2003 academic school year, there were 760 elementary student suspensions—totaling 2,311 days of students missing school; and 4,036 middle and high school suspensions in Benton Harbor —totaling 10,171 days of students missing school, in a population of 2,350 students.

*Lack of Home Stability*

Approximately 30 percent of the student population lives on their own, with friends similar in age, or with elderly grandparents. Many lack positive parental role models and seek relationships and role models through gangs and relationships that lead to sexual activity and sometimes becoming parents during pre-teen and teenage years. Those students who lack motivation to participate in extra-curricular activities inside or outside of school increase the possibility of involvement in unhealthy and dangerous activities. Many boys and girls do not have positive father figures or role models, and as a result, fall prey to father figures or role models offered through gangs and other unhealthy relationships. Moreover, many girls, not having their emotional needs met in a healthy, nurturing environment, and not developing interests and hobbies at an early age, turn to unhealthy choices.

*Lack of Exposure to Positive African-American Role Models*

Students lack exposure to professionals such as African American attorneys, businessmen and women or entrepreneurs. Consequently, there are few positive African American men and women to whom students can talk to about taking advantage of college and career opportunities.

*Lack of Job Training*

High levels of unemployment in the community and even higher levels of teenage unemployment leave students more vulnerable to negative influences and less likely to have developed job skills, employment opportunities, and motivation to take advantage of career counseling. If students held paid internships and part-time jobs after school

this could lead to increases in their job skills and abilities, while contributing economically to meeting their financial needs. Furthermore, by holding part-time jobs or internships, students would have little time to participate in non-productive activities such as gang and/or other criminal activities.

*Lack of After School Program Participation*

Many students are not able to participate in after-school programs because of the economic circumstances of their families. There is a significant increase in negative activity in neighborhoods when students are left unattended at home. With the lack of positive, structured alternatives, students have greater exposure to negative alternatives. If transportation was provided through a contractual arrangement with a local service, students would be able to be picked up and dropped off at designated safe locations, such as area churches.

## Recommendations

- ➤ Reduce the dropout rate, taking advantage of alternative schools to increase the student retention rate

- ➤ Create an alternative school for suspended students, so they are never out of school

- ➤ The Intermediate School Districts should open a charter school in Berrien County for expelled students, providing educational, counseling and emotional services

- ➤ Support the Governor's proposed increase to age 18 for exiting school

- ➤ Develop effective early childhood care and education programs involving partnerships between BHAS and the surrounding community, in conjunction with Project Great Start at the state level

- ➤ Provide nutrition education to children and families, encouraging them to take advantage of free/reduced breakfast/lunch programs and other government-sponsored nutritional programs. Parents also need additional training and outreach from the Berrien County Health Department about the importance of proper nutrition

- ➤ Provide students with paid employment opportunities and internships to gain work experience and income

- ➤ Provide transportation for after school programs to facilitate improved student achievement

Education

- ➤ Increase investment in teacher subject matter competence to fulfill the requirements of the No Child Left Behind (NCLB) Act

- ➤ Encourage teachers and structure the environment to facilitate nurturing of all students, preschool through 12th grade

- ➤ Provide incentives to teachers to reduce turnover

- ➤ Invest in professional development in literacy, mathematics, science and social studies

- ➤ Develop partnerships with higher education institutions to increase the number of student teachers, experimental programs and lab opportunities

- ➤ Utilize parent coordinators to build bridges and increase communications in a holistic manner such that the staff becomes sensitized to the environmental issues of the students' homes and the parents become more aware of classroom issues

- ➤ Increase the availability of support services for emotional health and character building for students

### Challenges – Parents

*Socioeconomic Variables*

Many parents lack the necessary academic skills and financial means by which to successfully contribute to their children's educational attainment and to meet their family's basic material and personal development needs. According to the 2000 Census, the median household income level for Benton Harbor residents is approximately $17,000.  The percentage of residents who hold high school diplomas or General Equivalency Degrees (GEDs) is approximately 60 percent, according to data from the Adult Education program. Furthermore, according to the 2000 U.S. Census, 52.5 percent of children 18 years and under live in poverty. This large student population lacks the necessary economic means to adequately function on a daily basis.

The evidence is in the disproportionate income levels and dropout and graduation rates of Benton Harbor residents and students, which have negatively impacted students' level of hope and their capacity for academic excellence.  As a result of these academic and economic deficiencies, along with other factors such as limited school resources, students are dropping out of school at a higher rate (6.9 percent), and graduating at a lower rate (50.1 percent) per the Benton Harbor Area Schools (BHAS) records, as reported to Michigan Department of Education (MDE) and compared to the average graduation rate and dropout rate of Michigan Public Schools (87.8 percent and 3.3 percent, respectively) for the 2000-2001 school year.



*Governor's Benton Harbor Task Force – Final Report*

*Lack of Transportation*

A lack of transportation and job flexibility often hinders parents from participating in school-related activities and training efforts. Thus, parents are not informed of their children's school responsibilities and their obligations as parents to assist them in completing homework assignments. In addition, parents who have a desire to attend parenting classes and conferences often lack transportation.

*Under-educated Parents*

Poor, under-educated parents have few books in their home, read less themselves, and often do not regularly converse and read with their children. Under-educated parents are often not able to help their children with homework assignments. Under-educated parents often have feelings of embarrassment and/or inadequacy that keep them from participating in parent-teacher conferences and other school-related activities. Many parents do not understand the concept of "lifelong learner," thus they do not understand the importance of participating in parenting classes and other learning opportunities, for example, in the area of technology. This de-valuing of education and the resulting lack of knowledge and skills not only leads to feelings of inadequacy, but, also, is passed on to the children, further perpetuating the cycle of inter-generational poverty.

## Recommendations

> Increase the availability of adult education and GED preparation courses

> Provide adult education classes, parenting skills and training in locations that are within close proximity to the parents' homes to diminish transportation difficulties

> Work with the Berrien County ISD to introduce the MDE "Great Parents, Great Start" early childhood program in the community

## Challenges – Educational Infrastructure and Materials

*Learning Environment*

A positive environment for learning is critical to the work of teachers as they instruct their students. Many of the school buildings in Benton Harbor are old and in need of substantial improvements. Some of the school buildings in Benton Harbor contain asbestos and lead, posing severe health risks to students. There is also a lack of adequate classroom space in many Benton Harbor schools.

Education

*Materials and Furniture*

Benton Harbor students do not have up-to-date books and supplemental materials. Many of the desks and chalkboards in Benton Harbor classrooms are old and warn. Benton Harbor classrooms lack adequate audio-visual equipment such as overhead projectors. The computer hardware and software in Benton Harbor school buildings is often outdated, leaving area students behind in a fast-paced, technologically advanced world.

## Recommendations

- ➤ Conduct an evaluation of all school buildings sites that are older than 50 years of age to determine the scope of capital funds needed

- ➤ Make effective use of the 2-mill levy recently passed by a strong majority of Benton Harbor voters to repair local schools

- ➤ Develop a solid technology plan for Benton Harbor schools that will allow the district to participate in technological partnerships such as the statewide Freedom to Learn initiative

## Challenges – Community-at-Large

There is no coherent, strategic means by which to locate available resources necessary to assist teachers, administrators, parents, students and the community-at-large in promoting student achievement. There is no community-wide structure / process for inter-issue dialogue, prioritizing and strategies.

## Recommendations

- ➤ Select an ombudsperson to facilitate cross-functional communications and implementation

- ➤ Create a resource guide of all the childhood development and educational services, museums, educational institutions, youth and family services organizations in the area

## Key Stakeholders Needed to Achieve Desired Results

Benton Harbor Area Schools
Berrien County Great Start Initiative
Berrien County Intermediate School District
Bessie H. Cohn Day Care Center, Inc., Rainbow 4's Preschool
Charter Schools
Early Childhood Development Organizations

Education

Helping Our Youth Achieve (HOYA)
Lake Michigan Catholic Schools
North Berrien Community & Adult Education
Salvation Army
Southwestern Michigan Alternative Learning Collaborative
Technology Bus/ "Tek-bus"

# HEALTH AWARENESS AND IMPROVEMENT

## Desired Vision for Community

The Health Awareness and Improvement workgroup's vision for the Benton Harbor community is the following:

- Every person receives equal access to health care and excellent health care services from medical providers
- Incidences of infant mortality, substance abuse, and HIV/AIDS/sexually transmitted diseases are virtually non-existent,
- Every person in Benton Harbor resides in safe, lead-free homes in good condition

The role of the workgroup was to learn what health issues existed in Benton Harbor according to the people who live in Benton Harbor, gather and analyze data (surveys, U.S. Census Information, Healthy Berrien Consortium reports, Berrien County Behavior Risk Factor Survey, Michigan data, Berrien County Health Department data and reports, and Western Michigan Regional Minority Health report) to identify additional health needs, obtain an understanding of those issues, conduct a survey in the community of Benton Harbor, prioritize the health issues, identify successful strategies, and make recommendations.

The workgroup made an undisputed agreement that in order to determine the top health priorities in Benton Harbor, there must be input from the citizens of Benton Harbor. The workgroup conducted a health survey with the people who live in Benton Harbor. The workgroup developed and implemented a survey in August 2003 that asked the community the following four questions:

- What are your health concerns that are not being met?
- What are your family's health concerns that are not being met?
- What do you feel are Benton Harbor's health concerns that are not being met?
- If the State was going to give resources (money, people) for health issues in Benton Harbor, where would you want it spent?

In addition, questions were asked to find demographic information such as age, race, sex, and residence.

Four hundred forty-four Benton Harbor and Benton Township residents were surveyed (approximately one third male, two thirds female). Several workgroup members conducted the survey in churches, door-to-door, and at the Berrien County Health Department. The racial distribution of the survey population was the following: 90 percent African American, 3.6 percent White, and 2.0 percent Native American. The sample that participated in the survey largely reflected the population of the City of Benton Harbor (92.4 percent African American, 5.5 percent White, and 0.2 percent Native American).

*The survey was exempt from Institutional Review Board approval by the Michigan Department of Community Health.*

The Berrien County Health Department developed a Benton Harbor health service matrix, which contains a comprehensive list of all of the services related to health that are available in Benton Harbor. As listed in the matrix, there are many diverse health service programs that are currently available to the Benton Harbor community or were operating at one point in time (see Addendum at end of section). These programs impact many areas of health concern such as cancer, diabetes, HIV/AIDS, immunizations, lead rededication, maternal and child health, infant mortality, sexually transmitted diseases, teen pregnancy, adolescent health, dental health, hunger, etc.

The Health Awareness and Improvement Workgroup utilized the results of the survey, health data, and the previous or current existence of the health programs (the matrix), and went through a group process to prioritize the top five health issues for the City of Benton Harbor and Benton Township. Theses priorities include:

- Health insurance access
- Drug and alcohol abuse
- Infant mortality
- HIV/AIDS and sexually transmitted diseases
- Health hazards in housing

## Challenges

*Increase the number of individuals who can access health insurance*

According to a Behavior Risk Factor Survey in Berrien County conducted in 2002, 21.3 percent of people ages 18-64 do not have any health insurance, which is a significantly greater percentage compared to the Michigan and U.S. populations. Of the African American population in Berrien County, 33.3 percent did not have health insurance compared to the 19.3 percent in the Caucasian population. According to the 2000 U.S. Census, 31.5 percent of Benton Harbor residents do not have a vehicle available and 18.4 percent do not have a telephone. Lack of transportation and telephones are barriers to obtaining medical care.

Based on Benton Harbor Health Survey findings, residents desire access to medical providers in the community. The issue of access may be two-fold: 1) decrease the waiting time for an appointment at the clinic and for services at the clinic, and 2) ensure that when Medicaid participants are randomly assigned to a health plan, they are assigned a provider with offices in Benton Harbor, since many cannot access transportation.

*Reduce drug and alcohol abuse in the Benton Harbor community, and provide timely assistance to individuals considering drug and/or alcohol treatment*

Drug and Substance Abuse continues as a public health issue for Benton Harbor. A recent survey completed by 444 residents of the Benton Harbor City and Township identifies drugs and alcohol as a leading health concern for the community. Preliminary 2002 statistics generated by the Michigan Department of Community Health, Division of Substance Abuse, report 27,916 individuals in Berrien County are in need of substance abuse treatment. The locally operated Berrien County Substance Abuse Treatment Service served over 1,600 patients in 2002. These clients are primarily Benton Harbor residents and approximately 75 percent are referred through the criminal justice system.

*Prevent the occurrence of HIV/AIDS and STD in Benton Harbor.*

Berrien County has an extremely high prevalence of HIV/AIDS and sexually transmitted diseases. As of July 1, 2003, Berrien County was second only to Wayne County for estimated HIV/AIDS prevalence.

Since Chlamydia is the most common sexually transmitted bacterial infection in the United States and Gonorrhea continues to be the most frequently reported communicable disease in the United States, they are used as health indicators of progress in reducing the sexually transmitted infection rates among the population. Berrien County's rates for Chlamydia and Gonorrhea are both higher than the Michigan rates. In 2001, the rate for Chlamydia was 486.9 per 100,000 in Berrien County and 313 per 100,000 for Michigan. The Gonorrhea case rate in 2001 was 290.6 per 100,000 in Berrien County as compared to the State of Michigan case rate of 172 per 100,000.

The rate of teen pregnancy is an indicator for sexual activity among teens. The pregnancy rate in 2001 for Berrien County for females aged 15-19 far exceeds the State of Michigan rate. As an example, for 2001 the pregnancy rate in Michigan for females ages 15-19 was 63.8 per 1,000. The same year, Berrien County had a pregnancy rate for the same age group of 93.4 per 1,000. According to these statistics the teens in Berrien County are sexually active and are at risk for contracting HIV/AIDS and sexually transmitted diseases.

*Improve the housing conditions in Benton Harbor*

Many of the homes in Benton Harbor contain lead-based paint and lack basic plumbing and kitchen facilities. According to the 2000 U.S. Census, there are 3,072 homes in Benton Harbor built before 1959. Children, who reside in homes that were built before 1950 and are not properly taken care of, are at an extremely high risk for having a lead problem because the paint is now chipping, flaking and cracking.

It is important to explore multiple approaches to achieve improved housing conditions that provide improved health of occupants. Presently, many homes in Benton Harbor

do not meet basic code requirements for electrical, plumbing, mechanical and structural components. Additionally there is a need to renovate or demolish abandoned structures. Lastly, there is a need to improve the overall esthetics quality of the homes, which improves housing values, tax base, public education and city services.

Housing conditions and lead-based paint hazards are directly linked to homes built prior to 1978 when the use of lead-based paint was banned for residential consumers. Homes in poor repair will contribute significantly to the amount of lead hazards available to occupants. Therefore any efforts to improve the structural components of a house will directly impact the lead-base paint hazards in the building.

## Recommendations

> Educate Benton Harbor residents (through public service announcements, church bulletins, etc.) about strategies to maximize their health benefits

> Encourage medical residents and students to make use of student loan reimbursement programs in medically under-served areas by contacting the three medical schools in Michigan: Michigan State University, the University of Michigan, and Wayne State University

> Work with the Boys and Girls Club, Council for World Class Communities, Youth Domain, School-Based Clinic, local schools, churches and other organizations to identify what youth programs are currently in existence to reduce substance abuse

> Work with the community to promote existing Alcoholics and Narcotics Anonymous groups

> Limit the number of liquor stores and licenses distributed in Benton Harbor

> Hire a coordinator for substance abuse prevention and outreach. Strategy includes empowering community members of all ages to monitor neighborhoods and discourage drug trafficking

> Establish a local inpatient drug rehabilitation facility

> Implement a halfway house for those who have been receiving inpatient/outpatient services and are transitioning back into their previous environments

> Continue to support Berrien County Health Department's Nurse-Family Partnership Program and existing Maternal Support Services (MSS) and Infant Support Services (ISS) Programs at Lakeland Family Clinic and Intercare Collaborate with the Maternal Support Service

Health Awareness and Improvement

➤ Promote early and adequate prenatal care

➤ Educate medical personnel, hospital personnel, and the public about positional asphyxiation (accidental suffocation)

➤ Support the current efforts by the Infant Mortality Reduction Task Force and the Fetal Infant Mortality Review Committee, initiation of a Safe Sleep campaign, promotion of early prenatal care, printing of maternal and child health resource directory for service providers and families, purchase of Pack-N-Plays (as a substitute for a crib), and printing of stickers with warning signs of labor and delivery that would be put on the prenatal vitamins

➤ Enhance the Benton Harbor Area School's Family Life Education Curriculum

➤ Support the Lakeland Family Clinic's Baby Steps (incentive) Program

➤ Provide abstinence education to Benton Harbor youth to prevent teen pregnancy

➤ Initiate a lead coalition to increase awareness about lead and its effects

➤ Demand an ordinance on home inspections

➤ Work with the Lead Hazard Rededication Program (LHRP) and the Childhood Lead Poisoning Prevention Program (CLPPP)

➤ Pass an ordinance to make landlords take care of their properties - if they do not take care of the properties, then they should lose possession of the home

➤ Implement recommendations from the Statewide Childhood Lead Prevention Plan

➤ Continue to work on prevention/treatment of substance abuse resulting in eventual decreased morbidity, mortality, and complications due to HIV and STD, especially in high-risk populations

➤ Increase HIV/AIDS education and HIV/AIDS testing in the Benton Harbor community through church groups, schools and awareness pamphlets

## Key Stakeholders Needed to Achieve Desired Results

Andrews University
Benton Harbor Area Schools
Berrien County Juvenile Center
Circuit Court
Community AIDS Resource and Education Services (CARES)
Cornerstone Alliance

Health Awareness and Improvement

Council for World Class Communities
Fifth District Court
Gospel Against AIDS
Healthy Berrien Consortium
Individual, Family and Community Development
InterCare Community Health Network
Juvenile Detention Facility
Lakeland Family Clinic
Lakeland Regional Health System
Lakeshore Central Diagnostic Referral
Lakeshore Coordinating Agency
Michigan Addiction Prevention Services
Michigan Department of Community Health
Michigan Department of Corrections
Michigan Department of Education
Michigan Family Independence Agency
Michigan State Housing Development Authority
Neighborhood Organizations
Office of Drug Control Policy
Riverwood Mental Health Authority
Rural Family Partnership Program
The Berrien County Health Department
The Michigan Department of Community Health
United Parents Against Lead
Volunteer Center of Southwest Michigan

Exhibit 3
Case No. 1:08-cv-01400

# HARBOR SHORES
# LEASE AGREEMENT

**(BLACKLINED TO SHOW CHANGES MADE BASED ON COMMENTS RECEIVED DURING THE PUBLIC REVIEW PROCESS AND FROM THE ATTORNEY GENERAL)**

# HARBOR SHORES LEASE AGREEMENT

This Harbor Shores Lease Agreement (this **"Lease"**) is entered into by and between the City of Benton Harbor, a Michigan municipal corporation, whose principal business address is 200 East Wall Street, Post Office Box 648, Benton Harbor, Michigan 49023-0648, and Harbor Shores Community Redevelopment Inc. (**"Harbor Shores"**), a Michigan non-profit corporation, whose principal business address is 400 Riverview Drive, Suite 420, Benton Harbor, Michigan 49022. The Parties (as hereinafter defined) hereby amend and restate the terms and conditions on which the City of Benton Harbor will lease to Harbor Shores portions of Jean Klock Park (as defined below) and portions of property contiguous to Jean Klock Park commonly known as Parcel 8A (as defined below) for development of three (3) golf holes that will be included in a public golf course that is part of the Harbor Shores Project (as defined in Section 1.01(k) below). The City of Benton Harbor and Harbor Shores shall be collectively referred to in this Lease as the **"Parties."**

## Recitals

On May 4, 1917, J.N. Klock and Carrie E. Klock (collectively, the **"Klocks"**) executed a deed (**"Deed"**) conveying certain property to the City of Benton Harbor "and to its assigns." Also, on June 18, 1947, Judge Edward Westin of the Berrien County Circuit Court entered a decree (**"Decree"**) reforming the Deed by eliminating that portion of the property that the Klocks granted to the City of Benton Harbor without warranty. As a result, the City of Benton Harbor owns in fee simple the remaining property commonly known as "Jean Klock Park."

On November 3, 2005, the City of Benton Harbor and Harbor Shores entered into a Development Cooperation Agreement (**"Act 425 Agreement"**) by and among the City of Benton Harbor, St. Joseph, and Harbor Shores. The subject of the Act 425 Agreement is an economic development Project (as defined in Section 1.01(k) below) to be located in the City of Benton Harbor, Benton Township, and St. Joseph, Michigan. Also, on April 13, 2006, the City of Benton Harbor and Harbor Shores entered into a Memorandum of Understanding, as amended, regarding the Project (**"Memorandum of Understanding"**). The Memorandum of Understanding provides for sale of certain City of Benton Harbor-owned land (not including any portion of Jean Klock Park) for the Project and sets forth additional terms regarding community benefits, parks and recreation, and zoning. Additionally, Harbor Shores and the City of Benton Harbor entered into a Rezoning Agreement relating to the Project (**"Rezoning Agreement"**).

Pursuant to the foregoing agreements, the City of Benton Harbor and Harbor Shores entered into the Harbor Shores Golf Course Agreement, dated effective January 22, 2007 (**"Prior Agreement"**) to expand and improve Jean Klock Park as part of the Project, to provide for the maintenance and operation of Jean Klock Park, Parcel 8A and the Park Expansion Property (as defined in the Prior Agreement) and to lease certain interior portions of Jean Klock Park and portions of Parcel 8A to Harbor Shores for construction and operation of three (3) holes of a public golf course, contingent upon approval by the Michigan Department of Natural Resources (**"MDNR"**), Michigan Natural Resources Trust Fund (**"MNRTF"**) Board, and National Park Service (**"NPS"**), and based on the terms and conditions set forth in the Prior Agreement.

Based upon comments from the NPS and MDNR, and pursuant to Section 7.27 of the Prior Agreement, which requires the Parties to execute any additional documents reasonably requested by the other party to carry out the intent of the Prior Agreement, the Parties have agreed to separate the Prior Agreement by entering into this Lease and a separate Park Improvements and Maintenance Agreement (**"Park Improvements and Maintenance Agreement"**) to modify the terms of the Prior Agreement to the extent necessary to satisfy the requirements of the NPS and MDNR.   The Parties agree that this Lease and the Park Improvements and Maintenance Agreement shall replace and supersede the Prior Agreement in its entirety and upon the effective date of this Lease and the Park Improvements and Maintenance Agreement, the Prior Agreement shall automatically and immediately terminate.  In the event of any conflict or inconsistency between the terms and conditions of this Lease and the terms and conditions of the Park Improvements and Maintenance Agreement, the terms and conditions of this Lease shall control.

The Parties hereby acknowledge that Harbor Shores intends to provide an initial capital expenditure of at least Eighteen Million and no/100 Dollars ($18,000,000.00) for a public golf course to be partially located within portions of Jean Klock Park.  The Parties also hereby acknowledge that Harbor Shores will not receive a monetary return from the golf course operations or otherwise.  Additionally, the Leased Premises (as defined below) do not include any portion of the Lake Michigan beach.

## Terms and Conditions

The City of Benton Harbor and Harbor Shores agree as follows:

## Article I

**Section 1.01.  Definitions.**  In addition to terms defined elsewhere in this Lease, terms used in this Lease shall have the following meanings:

(a)    **"City Commission"** means the City Commission of the City of Benton Harbor, its legislative body.

(b)    **"City Manager"** means the City Manager of the City of Benton Harbor and his/her designee.

(c)    **"Day"** means a calendar day.

(d)    **"Golf Course Oversight Panel"** means a five-member panel created by the City of Benton Harbor to be comprised of (i) a member of the City Commission who is the head of the City of Benton Harbor's Parks and Recreation Committee; (ii) the head of the Berrien County Parks another member of the City Commission nominated by the City of Benton Harbor's Mayor and approved by the City Commission; (iii) a representative from a reputable golf course management company selected by Harbor Shores, in its sole discretion the Management Firm (as defined below), who does not have a vote on the panel; (iv) a City of Benton Harbor resident employee nominated by the City of Benton Harbor's Mayor and approved by the City

Commission to serve for the period of time during each Mayor's term; and (v) a City of Benton Harbor resident that is a certified public accountant (or professional equivalent) selected by ~~Harbor Shores, in its sole discretion~~the City of Benton Harbor, who does not have a vote on the panel. The authority and duties of the Golf Course Oversight Panel are set forth in Section 2.06 of this Lease. All meetings of the Golf Course Oversight Panel shall comply with the requirements of the Open Meetings Act. Additionally, the Golf Course Oversight Panel shall comply with the requirements of the Freedom of Information Act.

(e)    **"Jean Klock Park"** means the real property commonly known as Jean Klock Park, as depicted and legally described on **Exhibit A** hereto.

(f)    **"Golf Course Improvements"** means the improvements to be constructed by Harbor Shores necessary to maintain and operate three (3) golf holes of a public golf course on the Leased Premises according to the standards set forth in the Park Improvements and Maintenance Agreement (as defined below).

(f)    **"Leased Premises"** means portions of real property within Jean Klock Park and portions of real property within Parcel 8A, totaling approximately 30.16 acres in size, and acknowledged to be owned in fee simple by the City of Benton Harbor, as collectively depicted and legally described in **Exhibit B** to this Lease. The Leased Premises are comprised of approximately 22.11 acres of Jean Klock Park and 8.05 acres of Parcel 8A.

(g)    **"Parcel 8A"** means the real property commonly known as Parcel 8A, as depicted and legally described on **Exhibit C** hereto.

(h)    **"Park Improvements and Maintenance Agreement"** means the Park Improvements and Maintenance Agreement entered into at the same time as this Lease regarding such items including the expansion of, improvements to, operation of, and maintenance of Jean Klock Park, Parcel 8A and the park expansion property (as described in such agreement).

(i)    **"Permitted Use"** means a public golf course and related uses that are necessary ~~or appropriate~~ to construct, maintain, and operate a public golf course~~, and shall include the public use of the trails and golf cart paths located within~~. The City of Benton Harbor and members of the general public shall be permitted, during the non-golfing season, to use the Leased Premises for non-motorized winter activities~~, which~~ (including, without limitation, cross country skiing) as long as such activities do not impede on the golf course operations ~~as~~or damage the golf course, as reasonably determined by ~~the City of Benton Harbor~~ Harbor Shores in ~~Harbor Shores' sole discretion~~. The City of Benton Harbor, with input from Harbor Shores and the ~~City of Benton Harbor shall mutually agree upon~~Management Firm, shall make and adopt reasonable rules and regulations for the use of the Leased Premises by the public for such winter activities. Such rules and regulations shall ensure that such activities do not impede on the golf course operations or damage the golf course. During the non-golfing season, the City of Benton Harbor and members of the general public shall not use the greens, tee boxes and sand traps to be located within the Leased Premises. Sledding shall not be permitted on the portion of the golf course within the Leased Premises at any time. For purposes of this Subsection, **"non-golfing season"** shall mean

3

the extended period of time during the winter months when the golf course is no longer open for members of the public to play golf and will not be open for golf.

(j)    **"Person"** means any individual, corporation, limited liability company, partnership, association, joint venture, trust or government agency, division or political subdivision.

(k)    **"Project"** means the planning, development, construction, financing, ownership and sale of the "Harbor Shores Development Project," which is a mixed use development project that may consist of commercial and retail buildings, residential homes, hotel(s), a public golf course, marina(s) and other recreational uses to be located in the City of Benton Harbor, Benton Township, and St. Joseph, Michigan.  The Leased Premises will be used for the construction, maintenance and operation of three (3) golf holes within a public golf course along with appropriate golf safety zones, all of which are part of the "Project."

(l)    **"State"** means the State of Michigan.

Section 1.02.  **Exhibits.**  All Exhibits attached to this Lease shall be operative parts of this Lease and incorporated by reference where mentioned in this Lease, except that in the event of any conflict between any Exhibit and the terms and conditions of this Lease, the terms and conditions of this Lease shall control.  Capitalized terms in the Exhibits to this Lease shall be given the same meaning as in this Lease, unless otherwise indicated.  In the event of any conflict or inconsistency between the terms and conditions of this Lease and the terms and conditions of the Park Improvements and Maintenance Agreement, the terms and conditions of this Lease shall control.    From and after the Effective Date, this Lease and the Park Improvements and Maintenance Agreement shall amend and restate the Prior Agreement in its entirety.  Reference to supplemental agreements, approvals, certificates, consents, notices, requests and the like means that such shall be in writing whether or not a writing is specifically mentioned.

Section 1.03.  **Contingencies.**  This Lease shall not be executed by the Parties until they receive prior written approval of it from the NPS.  This Lease is contingent upon execution of the Park Improvements and Maintenance Agreement.  In the event that this contingency is not satisfied, this Lease shall terminate upon written notice from a party to this Lease to the other party to this Lease, and neither party to this Lease shall have any further liability to the other party.

## Article II

Section 2.01.  **Leased Premises.**  Subject to the conditions set forth in ~~Article III~~this Lease, the City of Benton Harbor hereby leases and demises to Harbor Shores and Harbor Shores hereby hires and leases from the City of Benton Harbor the Leased Premises.  Harbor Shores acknowledges that it has had the opportunity to inspect the Leased Premises and that as of the date of this Lease and except as otherwise provided in this Lease, Harbor Shores shall accept the lease of such property "AS IS" and "WHERE IS" without representation or warranty as to the condition of the premises by the City of Benton Harbor or any of its representatives.  Simultaneous with the entry of this Lease, the parties will also enter into the Park Improvements

4

and Maintenance Agreement to set forth terms and conditions regarding Harbor Shores' access rights to Jean Klock Park and Parcel 8A (other than the Leased Premises), and the park expansion property (as described in the Park Improvements and Maintenance Agreement) to carry out the agreed-upon plans for expanding and improving Jean Klock Park as part of the Project. Harbor Shores acknowledges that its Permitted Use of the Leased Premises shall not be deemed an ownership interest, which remains with the City of Benton Harbor, but rather a leasehold estate in the Leased Premises for a specified term in consideration of Harbor Shores' agreement to provide consideration to the City of Benton Harbor as further provided in this Lease and in the Park Improvements and Maintenance Agreement.

Notwithstanding anything to the contrary herein, the City of Benton Harbor represents and warrants to Harbor Shores that, to the best of the City of Benton Harbor's knowledge, Harbor Shores' Permitted Use of the Leased Premises does not violate any City of Benton Harbor law or ordinance, including, but not limited to, zoning ordinances. The City of Benton Harbor shall indemnify, defend and hold Harbor Shores harmless from any breach of the foregoing representations and warranties only to the extent permitted by applicable law. If approval from the City of Benton Harbor of any land division under the Michigan Land Division Act, which is Michigan Act No. 288 of the Public Act of 1967, as amended, shall be required in connection with this Lease, the City of Benton Harbor shall hereby be deemed to have granted its approval.

The City of Benton Harbor shall work with, join, and support Harbor Shores in any actions, causes of action, claims, and suits arising out of or in connection with a violation of any building restrictions, restrictive covenants, the Consent Judgment (as defined below) governing Jean Klock Park, the Deed, laws, ordinances, or other requirements solely arising out of a challenge to Harbor Shores' Permitted Use of the Leased Premises under this Lease. All expenses, legal fees associated with the City of Benton Harbor's support of Harbor Shores as provided in the preceding sentence and all expenses, legal fees, settlements and judgments incurred by the City of Benton Harbor should the City of Benton Harbor be named in any action, causes of action, claim, or suit challenging the Permitted Use of the Leased Premises shall be paid for by Harbor Shores. For any other legal challenges to this Lease, the Parties agree to work in good faith to defend such challenges.

Harbor Shores shall work with, join, and support the City of Benton Harbor in any actions, causes of action, claims, and suits arising out of or in connection with a violation of any building restrictions, restrictive covenants, the Consent Judgment, laws, ordinances, or other requirements solely arising out of a challenge to Harbor Shores Permitted Use of the Leased Premises under this Lease.

**Section 2.02. Term.** The initial term of this Lease shall be for thirty five (35) years, which began at 12:00 a.m. on January 22, 2007, and ends at 11:59 p.m. on January 22, 2042 ("**Initial Term**"). Provided that Harbor Shores is not in default as to any material term of this Lease at the time of any renewal, as reasonably determined by the City of Benton Harbor, this Lease shall automatically renew for two (2) additional thirty five (35) year terms on and subject to the same terms, covenants and conditions as set forth herein, unless Harbor Shores notifies the City of Benton Harbor of its intent not to renew this Lease no later than one hundred eighty (180) days prior to the end of the current lease term or applicable renewal term. Notwithstanding the

foregoing, the Parties acknowledge that the Consideration (as defined in Section 2.03 below) to be paid under this Lease shall be reviewed and negotiated at each, separate renewal period (i.e., at the end of the first thirty-five (35) year term in calendar year 2042 and at the end of the second thirty-five (35) year term in calendar year 2077) consistent with the Consideration Negotiation Process outlined in Section 2.03 below.

### Section 2.03. Consideration.

(a)  **Rent**. In consideration of the leasehold estate of the Leased Premises granted to Harbor Shores and the covenants of the City of Benton Harbor provided in this Lease, Harbor Shores shall pay to the City of Benton Harbor annual installments of rent ("**Rent**") for each year of the initial thirty-five (35) year term and each year of all renewal terms. Except for the first installment of Rent, each annual installment of Rent shall be payable on the first day of the applicable year of the term. The first installment of Rent for the first year of the term shall be payable upon commencement of construction of the golf course or by June 30, 2007, whichever is earlier. For the first year of the term, Rent shall be Thirty Thousand and No/100 Dollars ($30,000.00). For each succeeding year thereafter during the Initial Term, Rent shall be increased by one percent (1%) annually over the Rent for the previous year. Following each such adjustment, the term "Rent," as used in the Lease, shall mean Rent as most recently adjusted.

(b)  **Additional Rent**. Additionally, in consideration of the leasehold estate of the Leased Premises granted to Harbor Shores in this Lease, during the Initial Term of this Lease Harbor Shores shall provide the following which shall be considered "**Additional Rent**":

(i)  Harbor Shores' fee simple conveyance of the park expansion property as defined and described in the Park Improvements and Maintenance Agreement. This consideration has a total estimated value of Nine Hundred Ninety Nine Thousand Five Hundred and no/100 Dollars ($999,500.00) and has previously been conveyed to the City of Benton Harbor under the terms and conditions of the Prior Agreement;

(ii)  Harbor Shores' construction and conveyance of the park improvements for Jean Klock Park and Parcel 8A as described in the Park Improvements and Maintenance Agreement. This consideration has a total estimated value of One Million and no/100 Dollars ($1,000,000.00);

(iii)  Harbor Shores' construction and improvement of West Klock Road pursuant to the letter from Jeffrey Noel to Pete Mitchell attached as **Exhibit D** to this Lease, contingent upon the proceeds of the applicable MDOT Grant in the amount of Five Hundred Forty Four Thousand Five Hundred Fifty and no/100 Dollars ($544,550.00) being utilized for the improvement of West Klock Road. The total cost of the West Klock Road project is One Million Eight Hundred Eighty-Five Thousand Four Hundred Twenty-Two and no/100 Dollars ($1,885,422.00). Harbor Shores will pay One Million Three Hundred Forty Thousand Eight Hundred Seventy Two and no/100 Dollars ($1,340,872.00) towards the West Klock Road project;

(iv)    Harbor Shores' construction and improvement of East Klock Road pursuant to the letter from Jeffrey Noel to Pete Mitchell attached as **Exhibit D** to this Lease, contingent upon the proceeds of the applicable MDOT Grant in the amount of Four Hundred Ninety Eight Thousand Three Hundred and no/100 Dollars ($498,300.00) being utilized for the improvement of East Klock Road. The total cost of the East Klock Road project is Eight Hundred Seventy-Three Thousand Nine Hundred Fifty-Four and no/100 Dollars ($873,954.00). Harbor Shores will pay Three Hundred Seventy Five Thousand Six Hundred Fifty Four and no/100 Dollars ($375,654.00) towards the East Klock Road project;

(v)    Harbor Shores' construction and improvement of Graham Avenue pursuant to the letter from Jeffrey Noel to Pete Mitchell attached as **Exhibit D** to this Lease, contingent upon the proceeds of the applicable MDOT Grant in the amount of One Million Nine Hundred Ninety Thousand Eight Hundred and no/100 Dollars ($1,990,800.00) being utilized for the improvement of Graham Avenue. The total cost of the Graham Avenue project is Three Million One Hundred Thousand Five Hundred Sixty-Six and no/100 Dollars ($3,100,566.00). Harbor Shores will pay One Million One Hundred Nine Thousand Seven Hundred Sixty Six and no/100 Dollars ($1,109,766.00) towards the Graham Avenue project;

(vi)    Harbor Shores' construction and conveyance of the park expansion improvements as described in the Park Improvements and Maintenance Agreement.  This consideration has a total estimated value of Five Hundred Thousand Eight Hundred Fifty and no/100 Dollars ($500,850.00);

(vii)    Harbor Shores' maintenance, as described in Sections 3.03(a) of the Park Improvements and Maintenance Agreement, of Jean Klock Park and Parcel 8A (but not including the Leased Premises), and the park expansion property (as defined in the Park Improvements and Maintenance Agreement), which includes, but is not limited to, the following: sand and dune maintenance; trash removal; cleaning of public restrooms; grass mowing and related landscaping trimming and maintenance; and other customary park maintenance items. Notwithstanding the foregoing, Harbor Shores' maintenance obligations under this Subsection (vii) do not include maintenance as the result of special events or public road maintenance or repair or replacement of any of the non-golf course related infrastructure located within Jean Klock Park, Parcel 8A or the park expansion property as described in the Park Improvements and Maintenance Agreement. The Parties acknowledge that the consideration under this Subsection (vii) has a total estimated value of One Hundred Fifteen Thousand and no/100 Dollars ($115,000.00) annually (based on 2006 dollars); and

(viii)    Beginning with the first year of the term of this Lease, Harbor Shores' annual payment to the City of Benton Harbor Community Benefits Program (as defined below) which will be used by the City of Benton Harbor for the City of Benton Harbor Community Benefit Program to be developed by the City of Benton Harbor with input from the Golf Course Oversight Panel solely to support activities directly related to the City of Benton Harbor Community Benefits Program (as defined below). For purposes of this Lease, the annual amount that Harbor Shores must pay to the City of Benton Harbor Community Benefits Program shall be the greater of: (i) Five Thousand and no/100 Dollars ($5,000.00), or (ii) the amount

7

determined pursuant to the following formula: twenty percent (20%) of the **"Annual Net Operating Income"**, which will be defined as all golf course gross income (including greens fees, pro shop fees, range and lesson fees, as well as golf course facility rental fees, food/beverage/alcohol fees), less: (1) golf course operation expenses, (2) prior operation deficits or shortfalls, (3) annual Rent payments made to the City of Benton Harbor (as defined above), (4) the actual cost of Harbor Shores' maintenance obligations set forth in Subsection (vii) above, (5) annual booked capital improvements, clubhouse lease and equipment leases, and (6) appropriate annual booked reserves necessary to fund the operation and maintenance of the public golf course in accordance with the operation and maintenance standards set forth in the Park Improvements and Maintenance Agreement (**"Annual Community Benefits Payment"**). The Annual Community Benefits Payment shall be reasonably estimated by Harbor Shores by March 31 of each year during the term of this Lease and such estimation shall be provided to the Golf Course Oversight Panel at that time. Harbor Shores will make payment of this amount to the City of Benton Harbor semi-annually with one-half of the payment made approximately at the halfway point of the current year of this Lease (July 22) and the remaining one-half balance of the payment to be made on the last day of the current year of this Lease (January 21).

(c)    **Community Benefits Program**. In addition to the foregoing, Harbor Shores will apply all of the remaining eighty percent (80%) of the Annual Net Operating Income (as determined pursuant to the formula set forth above) to a community benefits program that will (1) be established and operated by Harbor Shores, and (2) benefit residents of the City of Benton Harbor, St. Joseph and Berrien County (the **"Harbor Shores Community Benefits Program"**).

(d)    **Annual Statement**. For each year during the term of the Lease, Harbor Shores shall provide the City of Benton Harbor with an itemized statement of the Annual Community Benefits Payment before March 1 of the following year. If the total of Harbor Shores estimated payments in any year exceeds the total of the calculated Annual Community Benefits Payment due for such year, then the City of Benton Harbor shall credit Harbor Shores for the difference against the Annual Community Benefits Payment due from Harbor Shores for the next year of this Lease. If the total of Harbor Shores estimated payments in any year are less than the total of the Annual Community Benefits Payment for such year, then Harbor Shores shall pay the difference to the City of Benton Harbor Community Benefits Program within forty five (45) days of such determination. Any amounts owed to Harbor Shores or the City of Benton Harbor Community Benefits Program under this Section shall be calculated on a prorated basis for the last year encompassed by the term of this Lease, if this Lease does not expire at the end of a year encompassed by the term of this Lease.

(e)    **Audit**. Harbor Shores shall maintain at its offices complete records of the Annual Net Operating Income and Annual Community Benefits Payment formula and payment calculations for eighteen (18) months following the applicable calendar year. At any time during the eighteen (18) month period referenced above, the City of Benton Harbor may audit the applicable Harbor Shores records, including, without limitation, inspecting invoices and records, and Harbor Shores shall reasonably cooperate with the City of Benton Harbor in such audit. If such audit shows that the itemized statement caused Harbor Shores to under fund the City of Benton Harbor Community Benefits Program, Harbor Shores shall pay such deficiency to the City of Benton Harbor Community Benefits Program within forty five (45) days of such

determination. If such audit shows that the itemized statement caused Harbor Shores to over fund the City of Benton Harbor Community Benefits Program, then the City of Benton Harbor shall credit Harbor Shores for the difference against the Annual Community Benefits Payment due from Harbor Shores for the next year of this Lease.

      (f)    **Definition**. For purposes of this Lease, **"City of Benton Harbor Community Benefits Program"** shall mean the contribution of funds by the City of Benton Harbor to any and all community benefits plans that include, but are not limited to, a local business consortium, a community ventures development consortium, an arts and culture consortium, programs for literacy, programs for workforce development, programs for improved housing, small business development, adult education, housing and community ventures programs, programs for local business development, minority contractor programs, the establishment and operation of a transportation program for residents to encourage the use of Jean Klock Park during the summer months, and community and youth special events to be held at the public golf course, including, but not limited to, First Tee special events and local high school athletic events.

      (g)    **Negotiation Process**. For any applicable renewal term, Rent and Additional Rent (collectively, **"Consideration"**) shall be established according to the following process (**"Consideration Negotiation Process"**). Twenty four (24) months prior to the expiration of the Initial Term or any renewal term, the Parties shall begin to negotiate the Consideration for the respective renewal term. The Parties will negotiate Consideration that is reasonably appropriate for the applicable renewal term and will agree to review all of the Consideration terms set forth in this Lease (except as otherwise provided below) as a guide for negotiations for any renewal term of this Lease. The Parties will use the same methodology used to calculate the Consideration for the Initial Term (except as otherwise provided below) and specifically review the terms set forth in this Section 2.03 (including the Rent paragraph and subsections (b) (vii) and (b) (viii) above. The Parties will also review needed improvements for Jean Klock Park, the park expansion properties as described in the Park Improvements and Maintenance Agreement and Parcel 8A, and will conduct market evaluations to help determine the appropriate Consideration to be paid during any applicable renewal terms, which evaluations shall recognize the value added to the property owned by the City of Benton Harbor by Harbor Shores' improvement of such property. Harbor Shores shall not pay increased Consideration as a result of its added value to the property owned by the City of Benton Harbor under this Lease. Notwithstanding anything to the contrary contained in this Lease, the Parties agree that the Consideration for any applicable renewal term shall be an amount that permits the golf course to be operated and maintained by Harbor Shores according to the operation and maintenance standards set forth in this Lease and the Park Improvements and Maintenance Agreement, including appropriate reserves, and permits the golf course to be operated and maintained with a positive Annual Net Operating Income (as defined above). Notwithstanding anything to the contrary contained in this Lease, the Parties agree that the Consideration shall include the Annual Community Benefits Payment exactly as provided above and that the items provided by Harbor Shores in subsections (b)(i), (b)(ii), (b)(iii), (b)(iv), (b)(v) and (b)(vi) in this Section 2.03 above are one time capital improvements made by Harbor Shores which are not required to be repeated during any renewal term. The Parties acknowledge that they may mutually decide to include capital improvements as Consideration for any applicable renewal term. It is the intent of the Parties to continue the Annual Community Benefits Payment as provided above as Consideration

for applicable renewal terms. If the Parties are unable to mutually agree upon Consideration for the next succeeding renewal term prior to eighteen (18) months of the expiration of the Initial Term or renewal term, whichever is applicable, then Consideration for such renewal term shall be established pursuant to Section 7.11~~7.12~~ of this Lease, subject to the criteria established under this subsection. Notwithstanding anything to the contrary herein, the operation of the public golf course shall not be disrupted for any reason during the Consideration Negotiation Process. The Consideration Negotiation Process shall not affect the automatic nature of the renewal terms as provided in Section 2.02 above. The Parties will negotiate Consideration that is reasonably appropriate for the applicable renewal term and will agree to review all of the Consideration terms set forth in this Lease and the provisions of this Section 2.03 as a guide for negotiations for any renewal term of this Lease.

**Section 2.04. Use of Leased Premises.** Harbor Shores shall use the Leased Premises for the Permitted Use only and shall not use, allow, or cause the Leased Premises to be used for any other purpose without the prior written consent of the City of Benton Harbor, <u>except for those uses by the City of Benton Harbor and members of the general public as permitted under Subsection 1.01(i)</u>. During the term of this Lease, Harbor Shores shall be solely responsible for all costs relating to the Leased Premises, including all costs to construct, maintain, and operate the golf course and related activities that comprise a Permitted Use under this Lease. Harbor Shores shall not use, allow, or cause the Leased Premises to be used in any way that may commit waste to the Leased Premises, result in a public or private nuisance, violate any law, rule, or regulation, or, with respect to the portion of the Leased Premises located on Jean Klock Park ~~or Parcel 8A~~, the Consent Judgment dated January 27, 2004, and recorded June 30, 2004, at Liber 2476, Page 1365, with the Berrien County Register of Deeds (**"Consent Judgment"**) ~~or permit any alcoholic beverage~~. <u>Harbor Shores and the City of Benton Harbor shall not use, allow, or cause the portion of the Leased Premises located on Jean Klock Park to violate the terms of the Deed, including, without limitation, that such portions of the Leased Premises shall be used for bathing beach, park purposes, or other public purposes; and at all times be open for the use and benefit of the public, subject only to such rules and regulations as the City of Benton Harbor may make and adopt. Harbor Shores shall not allow, suffer, or permit any intoxicating liquors or drinks</u> to be manufactured, sold, or given away ~~on~~<u>upon</u> Jean Klock Park.

For avoidance of doubt, the Leased Premises, which will be utilized for a public golf course, shall not include any portion of the Lake Michigan beach or <u>any portion of the dunes within Jean Klock Park that are to the west of</u> the western ~~portion~~<u>boundary</u> of the ~~dunes facing Lake Michigan~~<u>Leased Premises</u>, and the public golf course shall be minimally invasive to the ~~eastern~~ portion of the dunes ~~facing inland~~<u>within the Leased Premises</u> (i.e., only to the extent necessary for grading, other construction, and maintenance).

**Section 2.05. Open to the Public<u>; Fee Schedule</u>.** Harbor Shores shall assure the City of Benton Harbor that the golf course to be partly located on the Leased Premises shall <u>at all times</u> be open ~~to the public~~<u>for the use and benefit of the public, subject only to such rules and regulations as the City of Benton Harbor may make and adopt</u>. Once the golf course is open to the public for play, Harbor Shores shall furnish the Golf Course Oversight Panel with a fee schedule, including the normal rates and discounted rates for the public golf course and the effective times of such rates (**"Fee Schedule"**) on or before March ~~31 of each calendar year for~~

~~review and comment. On or before March 31 of each calendar year,~~ 1 of each calendar year, which fee schedule shall become effective upon the approval of the Golf Course Oversight Panel, which approval shall not be unreasonably withheld, delayed or conditioned. The Golf Course Oversight Panel shall either approve or reject such Fee Schedule on or before March 31 of the same calendar year. In the event the Golf Course Oversight Panel fails to respond in writing to the proposed Fee Schedule within such period, the Golf Course Oversight Panel shall be deemed to have given its approval of such Fee Schedule. In the event that there is a dispute regarding the Fee Schedule, such dispute shall be resolved pursuant to Section 7.12 of this Lease and the golf course shall operate using the prior year's Fee Schedule. The Fee Schedule shall be prepared by the Management Firm (as defined below). Notwithstanding anything to the contrary herein, the Fee Schedule shall be set at rates that are reasonably calculated to fund the operation and maintenance of the Golf Course in accordance with the operation and maintenance standards set forth in Subsection 2.06(c) and Section 3.03 below, permit the additional public access in accordance with the standards set forth in Subsection 2.06(c) below, and maximize proceeds available to the Harbor Shores Community Benefits Program (as defined in Section 2.03(c) of this Lease) in accordance with the provisions of Section 2.03 to this Lease; provided, however, the Fee Schedule shall include discounted rates provided to Berrien County residents. The discounted rates shall be calculated to ensure that the golf course is open for the use and benefit of Berrien County residents according to the terms of this Lease. In order to provide for a lower discounted rate to Berrien County residents, discounted rates shall be calculated so that the discounted rates charged to Berrien County residents do not generate surplus funds payable as proceeds to the Harbor Shores Community Benefits Program. Harbor Shores shall also furnish the Fee Schedule to the administrator of the MNRTF and the Land and Water Conservation Fund programs within the MDNR or state department currently administering these programs. ~~The Fee Schedule shall be prepared by a reputable golf course management company selected by Harbor Shores, in its sole discretion.~~ upon a written request from such party.

**Section 2.06. Authority and Duties of Golf Course Oversight Panel.** The Golf Course Oversight Panel shall determine whether Harbor Shores and the golf course management company engaged to manage the public golf course (**"Management Firm"**) comply with the following requirements:

(a)     The golf course and related facilities, including, but not limited to, the practice range and golf buildings built for the Project (collectively, for purposes of this Section referred to as the **"Golf Course"**) shall be equally available to all members of the public without discrimination.

(b)     The Golf Course shall be open for play during dates and times as reasonably customary for public golf courses of a similar character.

(c)     The Golf Course shall be operated and maintained by Harbor Shores and the Management Firm according to the standards detailed under this Lease and the Park Improvements and Maintenance Agreement. Harbor Shores and the Management Firm shall permit members of the Golf Course Oversight Panel reasonable access to inspect the Golf Course to determine compliance with these operation and maintenance standards.

(d)     Once the Golf Course is open to the public for play, the Fee Schedule for the Golf Course shall be established, with ~~review and comment~~ approval by the Golf Course Oversight Panel on an annual basis, ~~at rates that are reasonably calculated to fund the operation and maintenance of the Golf Course in accordance with the operation and maintenance standards set forth in Subsection (c) above, permit the additional public access in accordance with the standards set forth in Subsection (e) below, and maximize proceeds available to the Harbor Shores Community Benefits Program (as defined in Section 2.03(c) of this Lease) in accordance with the provisions of Section 2.03 to this Lease~~ as provided in Section 2.05 above.

(e)     The Golf Course and/or golf range shall:

(i)     Be made available for play by Berrien County residents at a discounted rate in accordance with ~~the operation and maintenance standards set forth in Subsection (e)~~Section 2.05 above;

(ii)     Be made available for at least two (2) high school athletic invitational competitions sponsored by both the City of Benton Harbor and the City of St. Joseph's public schools in conjunction with the golf course operator (one competition shall be a girls event and one shall be a boys event), and in accordance with the operation and maintenance standards set forth Subsection (c) above; and

(iii)     Be made available to the Boys and Girls Club First Tee program seven (7) to ten (10) days annually.

The Golf Course Oversight Panel shall also provide suggestions and comments regarding the transportation program that Harbor Shores will provide to area youth and area residents to encourage them to use Jean Klock Park. In the event that the Golf Course Oversight Panel determines there has been any failure to comply with the requirements set forth in this Section, the Golf Course Oversight Panel shall notify the City and Harbor Shores of the determination in writing, and the matter shall be resolved pursuant to the dispute resolution provisions set forth in Section ~~7.11~~7.12 of this Lease. The Golf Course Oversight Panel shall from time to time ~~establish~~make and adopt rules, regulations and procedures to carry out its duties under this Lease, including approving the Fee Schedule. In the event that a member of the Golf Course Oversight Panel resigns, the remaining members of the Golf Course Oversight Panel shall ~~take appropriate steps to secure the appointment of~~continue to operate the Golf Course Oversight Panel and a new member shall be appointed in accordance with the membership requirements set forth in Section 1.01(d) of this Lease.

Harbor Shores shall maintain at its offices complete records of the operating income and expenses of the golf course operations for three (3) years following the applicable calendar year. At any time during the three (3) year period referenced above, the Golf Course Oversight Panel may audit or review the applicable Harbor Shores records, including, without limitation, inspecting invoices and records, and Harbor Shores shall reasonably cooperate with the Golf Course Oversight Panel in such audit.

**Section 2.07.   Approval by the MDNR, the MNRTF Board and the NPS.** The Parties acknowledge that Jean Klock Park is subject to the following agreements ("**Grant Agreements**") previously entered into by the City of Benton Harbor: (a) Development Project Agreement - Land and Water Conservation Fund, Project Number 26-00568; (b) Development Project Agreement - Michigan Natural Resources Trust Fund, Project Number 89-114; (c) Development Project Agreement - Michigan Department of Natural Resources Recreation Bond Program, Project Number BF 92-327; and (d) Development Project Agreement - Clean Michigan Initiative Recreation Bond Program, Project Number CM99-203. The Parties further acknowledge that the Parties have sought and obtained approval of the Project from the MDNR, MNRTF Board, and the NPS. The MNRTF Board approval is subject to the conditions as detailed in its final

approval, including, without limitation, a review and approval of this Lease. The Parties shall use their best efforts to assist and cooperate fully with each other with regard to meeting any conditions imposed by the MDNR, MNRTF Board, the NPS and any other appropriate and/or required governmental bodies necessarily required for the development, construction, operation, maintenance and use of the portion of the public golf course on the Leased Premises or for the performance of this Lease by the Parties. Application and approval costs, including reasonable attorney fees, appraisal expenses, environmental reports, and mitigation sites, shall be borne by Harbor Shores.

Section 2.08.  Utilities.  This Lease is subject to all utility easements pertaining to the Leased Premises, whether or not of record. Harbor Shores, or its agents, at their sole cost and expense, may lay pipes and cables and do all things reasonably necessary to utilize, tap and tie into, and to construct, extend and enlarge, install, repair and maintain all utility services or systems now or hereafter to be located on Jean Klock Park and Parcel 8A (not including any utilities located on any portion of the Lake Michigan beach or ~~the western~~any portion of the dunes ~~facing Lake Michigan~~ within Jean Klock Park that are to the west of the western boundary of the Leased Premises) to service all or any portion of the Leased Premises as is reasonably necessary for the Permitted Use, including, without limitation, electrical and water. Notwithstanding the foregoing, in the event that Harbor Shores utilizes any utilities provided by the City of Benton Harbor, it must do so in accordance with all applicable City of Benton Harbor ordinances and specifications, including, without limitation, having the City of Benton Harbor tap and tie into such utilities on Harbor Shores' behalf. In connection with any such activities, Harbor Shores shall promptly repair any damages caused as a consequence of such activities, at its sole cost and expense, and shall act reasonably to minimize interference with the use and enjoyment of Jean Klock Park by the general public. The City of Benton Harbor shall not unreasonably interfere with any utilities used or to be used by Harbor Shores under this Lease. Harbor Shores shall, at its expense, pay for all utility services for the Leased Premises before such amounts become delinquent. Prior to the commencement of the construction or installation of any new utilities, Harbor Shores shall submit a written request to the City of Benton Harbor regarding the location of such utilities and shall obtain the written consent of the City of Benton Harbor for the location of any such utilities, which consent shall not be unreasonably withheld, delayed or conditioned. In the event that Harbor Shores does not receive a written response from the City of Benton Harbor to its proposed location of such utilities within sixty (60) days of its initial written request, the consent of the City of Benton Harbor shall be deemed to have been given. The City of Benton Harbor shall not be responsible for any installation, construction, maintenance, repair or replacement of any utilities serving the Leased Premises.

Section 2.09.  Taxes and Assessments.  During the term of this Lease, the Parties acknowledge and agree that Harbor Shores shall pay any and all ad valorem taxes and assessments with respect to the Leased Premises and Golf Course Improvements that become due and payable, if any. Such taxes shall be paid before delinquency, directly to the applicable taxing authority. Taxes due and payable for any partial calendar year shall be prorated on a calendar year basis, with Harbor Shores paying only for taxes related to the term of this Lease.

**Article III**

14

**Section 3.01.  Park Jurisdiction.**  The City of Benton Harbor, as fee simple owner of Jean Klock Park and Parcel 8A, through its representatives, shall remain in charge of the operation and maintenance of all portions of Jean Klock Park and Parcel 8A not encompassed by the Leased Premises, consistent with the Park Improvements and Maintenance Agreement and this Lease.  Harbor Shores, through its representatives, shall be in charge of the operation and maintenance of all portions of the Leased Premises and the Golf Course Improvements during the term of this Lease consistent with the Park Improvements and Maintenance Agreement and this Lease.

**Section 3.02.  Improvements.**  The Park Improvements and Maintenance Agreement sets forth a detailed list of the park improvements which shall be completed by Harbor Shores in conjunction with this Lease.  The Parties acknowledge that Harbor Shores intends to complete at least One Million and no/100 Dollars ($1,000,000.00) in capital improvements for such park improvements as detailed in the Park Improvements and Maintenance Agreement for Jean Klock Park and Parcel 8A and at least Five Hundred Thousand Eight Hundred Fifty and no/100 Dollars ($500,850.00) in capital improvements for the park expansion property as described in the Park Improvements and Maintenance Agreement.  The Parties further acknowledge that Harbor Shores intends to provide a~~an~~ initial capital ~~investment of approximately~~expenditure of at least Eighteen Million and no/100 Dollars ($18,000,000.00) for the public golf course, which amount Harbor Shores will not receive in return from the golf course operations or otherwise.

**Section 3.03.  Maintenance and Operation.**  Harbor Shores shall, at its cost, perform and pay for or cause to be performed and paid for all maintenance, operations, wages and fees, repair and replacement reasonably necessary to keep the Leased Premises clean, sanitary, presentable, safe and in good order, condition and repair consistent with a Jack Nicklaus Signature Golf Course, and in compliance with all applicable laws, ordinances, rules and regulations during the term of this Lease.

**Section 3.04.  Community Benefits.**  The Parties agree to consider the use of locally owned and operated businesses in the design and construction of the Project. Further, Harbor Shores commits to use its best efforts in selecting ~~a certain number of~~ locally owned and operated businesses in the design and construction of the Project where appropriate and reasonable.  Harbor Shores also agrees that at least forty percent (40%) of the employees that will maintain Jean Klock Park and the golf course shall be City of Benton Harbor residents.  Additionally, Harbor Shores agrees to use a good faith effort in hiring the City of Benton Harbor residents in an amount of at least ten percent (10%) of the employees for construction of the golf course, including, but not limited to, demolition and site clearing work.  Finally, Harbor Shores agrees to provide funding for the City of Benton Harbor to contribute to a community benefits program as detailed and described in Section 2.03.

**Section 3.05.  Access.**  The City of Benton Harbor hereby grants to Harbor Shores reasonable access over and across Jean Klock Park, Parcel 8A and the park expansion property (as described in the Park Improvements and Maintenance Agreement) for the purpose of allowing the construction installation, replacement, repair, improvement, maintenance, and removal of the Golf Course Improvements, for the purpose of ingress to and egress from the Leased Premises, and for the purpose of performing its maintenance obligations as detailed in

15

Section 3.03 above ("**Golf Course Access Rights**").  Notwithstanding the foregoing, Harbor Shores shall not have access under this Lease to any portion of the Lake Michigan beach or ~~the western~~any portion of the dunes ~~facing Lake Michigan~~ within Jean Klock Park ~~under this Lease~~that are to the west of the western boundary of the Leased Premises.  Notwithstanding anything to the contrary herein, in all instances, the public's right to use all areas of Jean Klock Park and Parcel 8A (other than the Leased Premises), and the Park Expansion Property shall be dominant compared to Harbor Shores' use of all such areas under this Agreement; and, the City of Benton Harbor ~~and Harbor Shores~~ shall, as may be required from time to time, with input from Harbor Shores and MDNR staff, ~~agree upon~~make and ~~implement~~adopt reasonable rules and regulations regarding Jean Klock Park uses by Harbor Shores consistent with the terms of this Lease to minimize and resolve any conflicts between Harbor Shores' use and all other uses in such a way that promotes the public's use of Jean Klock Park.  The Golf Course Access Rights shall be for the use of Harbor Shores and its agents.  However, the City of Benton Harbor hereby reserves the right of ingress and egress over and across the Leased Premises for the purpose of inspection, replacement, repair, maintenance and improvement of any currently existing public or private utilities therein (the "**City of Benton Harbor Reservation**").  The City of Benton Harbor Reservation may only be exercised by the City of Benton Harbor upon reasonable notice to the local representatives of the Management Firm operating the public golf course.  The City of Benton Harbor shall use its commercially reasonable best efforts to minimize interference with the operation of the public golf course in exercising its rights under the City of Benton Harbor Reservation.  Harbor Shores acknowledges that Jean Klock Park and Parcel 8A have state-listed threatened plants species and that Harbor Shores shall reasonably comply with necessary and appropriate design and construction measures so that such threatened plants species are not threatened or adversely impacted.

## Article IV

Section 4.01.  **Harbor Shores' Representations**.  Harbor Shores represents and warrants that:

(a)    It is a Michigan nonprofit corporation duly organized, validly existing, and qualified to do business in the State, with the right, power, and authority to enter into, execute, deliver, and perform this Lease;

(b)    The entry, execution, delivery, and performance by Harbor Shores of this Lease has been duly authorized by all necessary action, and does not and will not violate its Articles of Incorporation and Bylaws, both as amended and supplemented, any material applicable provision of law, or constitute a material breach of, material default under, or require any consent under any other material agreement or instrument to which Harbor Shores is now a party or by which it may become bound, other than ongoing compliance with the Consent Judgment, subject to any approval process required by applicable law;

(c)    There are no actions or proceedings by or before any court, governmental body, board, or any administrative agency pending or, to the best of its knowledge, threatened that would materially impair its ability to perform under this Lease; and

(d)    To the best of its knowledge, after due inquiry, there is no default by Harbor Shores or any other party under any material agreement, contract, instrument, lease, option, or commitment to which it is a party or by which it or its properties is bound and which would have a material adverse impact upon Harbor Shores' ability to perform under this Lease.

**Section 4.02.   The City of Benton Harbor Representations.**  The City of Benton Harbor represents and warrants that:

(a)    It is a municipal corporation under the laws of the State with the power and authority to enter into, execute, deliver, and perform this Lease;

(b)    The entry, execution, delivery, and performance by the City of Benton Harbor of this Lease has been duly authorized by all necessary action, and does not and will not violate its city charter, both as amended and supplemented, any material applicable provision of law, or constitute a material breach of, material default under, or require any consent under any other material agreement or instrument to which the City of Benton Harbor is now a party or by which it may become bound, other than ongoing compliance with the Consent Judgment, and subject to any approval process required by applicable law;

(c)    There are no actions or proceedings by or before any court, governmental body, board, or any administrative agency pending or, to the best of its knowledge, threatened that would impair its ability to perform under this Lease; and

(d)    To the best of its knowledge, after due inquiry, there is no default by the City of Benton Harbor or any other party under any material agreement, contract, instrument, lease, option, or commitment to which it is a party or by which it or its properties is bound and which would have a material adverse impact upon the City of Benton Harbor's ability to perform under this Lease.

**Section 4.03.   Survival of Representations and Warranties.**  All representations and warranties set forth in this Lease shall be true, accurate, and complete at the time of the Effective Date (as defined below) of this Lease and remain in effect until termination of this Lease unless specifically provided otherwise in this Lease.

**Article V**

**Section 5.01.   Harbor Shores' Covenants.**  Harbor Shores agrees and covenants as follows:

(a)    Harbor Shores shall pay all costs and expenses incurred in designing, constructing, operating, maintaining, and repairing the Leased Premises, Golf Course Improvements and the Project during the term of this Lease;

(b)    All actions of the Board of Trustees of Harbor Shores required to be taken to authorize execution and performance of this Lease shall be validly and duly taken and a

representative shall be duly authorized to execute this Lease for and on behalf of Harbor Shores; and

(c)    Harbor Shores shall not enter into any transaction that would materially and adversely affect its ability to perform its obligations under this Lease. Harbor Shores shall immediately notify the City of Benton Harbor of any event or action which may materially affect the ability of Harbor Shores to perform its obligations under this Lease.

**Section 5.02. The City of Benton Harbor's Covenants.** The City of Benton Harbor agrees and covenants as follows:

(a)    All actions of the City Commission required to be taken to authorize execution of this Lease shall be validly and duly taken and the Mayor of the City of Benton Harbor, City Manager, City Clerk of the City of Benton Harbor, or the City of Benton Harbor counsel shall be duly authorized to execute this Lease for and on behalf of the City of Benton Harbor; and

(b)    The City of Benton Harbor shall not enter into any contractual transaction that would materially and adversely affect its ability to perform its obligations under this Lease. The City of Benton Harbor shall immediately notify Harbor Shores of any event or action which may materially affect the ability of the City of Benton Harbor to perform its obligations under this Lease.

**Article VI**

**Section 6.01. All Risk Insurance.** During the term of this Lease, Harbor Shores shall, at its own expense, cause the Project to be insured against loss or damage by fire, windstorm, hail, explosion, and civil commotion, smoke damage, and such other risks as are from time to time included in "extended coverage" endorsements (including, during construction, builder's risk insurance) in an amount and form so that the proceeds are sufficient to provide for actual replacement of the Golf Course Improvements. Said policy of insurance shall, if reasonably available, provide for waivers of subrogation and shall name the City of Benton Harbor as an additional insured. Harbor Shores further agrees to provide on an annual basis to the City of Benton Harbor a current declarations sheet for this coverage.

**Section 6.02. General Liability Insurance.** During the term of this Lease, Harbor Shores shall, at its own expense, maintain or cause to be maintained general liability insurance against claims for personal injury or death and property damage occurring upon, or in the Leased Premises and the Project with coverage in an amount not less than Two Million Dollars ($2,000,000) with respect to injury or death to one or more persons arising out of any one occurrence and in an amount of not less than One Million Dollars ($1,000,000) with respect to damage to property per occurrence. Said policy of insurance shall, if reasonably available, provide for waivers of subrogation and shall name the City of Benton Harbor as an additional insured. Harbor Shores further agrees to provide on an annual basis to the City of Benton Harbor a current declarations sheet for this coverage. The amounts of coverage under said policy of insurance shall increase during the term of this Lease to be equal to coverage that is normal and customary in the insurance industry for similarly situated properties.

**Section 6.03. Indemnification by Harbor Shores.** Harbor Shores agrees that during the term of this Lease and all extension periods of this Lease, Harbor Shores shall defend, indemnify and hold the City of Benton Harbor, its officers, commissioners, employees, agents, invitees or licensees ("**City of Benton Harbor Indemnified Parties**") harmless from and against any actions, causes of action, claims, costs, damages, liabilities, suits, settlements, judgments and expenses (including, without limitation, reasonable attorney fees) incurred by the City of Benton Harbor Indemnified Parties arising from or in connection with (a) the use of the Leased Premises by Harbor Shores, its invitees, agents, employees or contractors, (b) the use of the "Southwest Park Corridor" (as defined in the Park Improvements and Maintenance Agreement) by Harbor Shores, its invitees, agents, employees, or contractors, (c) the development, construction, use and work performed by Harbor Shores, its agents, employees, or contractors related to the Leased Premises or Golf Course Improvements or under this Lease, (d) a material misrepresentation of Harbor Shores in this Lease or in any information Harbor Shores is required to provide to the City of Benton Harbor pursuant to this Lease, (e) the failure of Harbor Shores to promptly cure or otherwise correct any material misrepresentations or omissions of Harbor Shores in this Lease or any other agreement related to this Lease, or (f) any Environmental Violation (as defined below) resulting from Harbor Shores' or its invitees', agents', employees' or contractors' use of and actions on the Leased Premises. Notwithstanding the foregoing, such obligations to defend, indemnify and hold the City of Benton Harbor harmless by Harbor Shores shall not include those which shall result, in whole or in part, directly or indirectly, from the default, negligence, or willful misconduct of the City of Benton Harbor Indemnified Parties.

An "**Environmental Violation**" under this Lease means any condition or situation that (a) constitutes a violation of any federal or State environmental law, regulation, or ordinance; (b) forms the basis of any public or private claim or cause of action for the cleanup or remediation as a result of the release, threatened release, migration, or the existence of any contaminants, pollutants, petroleum and petroleum byproducts, crude oil, chemicals, wastes, or other substance (including, without limitation, regulated substances, hazardous wastes, and hazardous substances as terms are commonly used and understood within the framework of existing federal and State laws); or (c) constitutes a release or a threatened release of hazardous wastes or hazardous substances under applicable law. Pursuant to Section 6.05, Harbor Shores acknowledges that it is leasing the Leased Premises in an "AS IS" condition from the City of Benton Harbor.

**Section 6.04. Indemnification by the City of Benton Harbor.** Only to the extent permitted by applicable law, the City of Benton Harbor agrees that during the term of this Lease and all extension periods of this Lease, the City of Benton Harbor shall defend, indemnify and hold Harbor Shores, its officers, directors, trustees, invitees, licensees, employees or agents ("**Harbor Shores Indemnified Parties**") harmless from and against any actions, causes of action, claims, costs, damages, liabilities, suits, settlements, judgments and expenses (including, without limitation, reasonable attorney fees) incurred by the Harbor Shores Indemnified Parties arising from or in connection with (a) the use and operation of portions of Jean Klock Park and Parcel 8A that do not include the Leased Premises, or the park expansion property set forth in the Park Improvements and Maintenance Agreement by those other than the Harbor Shores Indemnified Parties, (b) a material misrepresentation of the City of Benton Harbor in this Lease or in any information the City of Benton Harbor is required to provide to Harbor Shores pursuant

to this Lease, (c) the failure of the City of Benton Harbor to promptly cure or otherwise correct any material misrepresentations or omissions of the City of Benton Harbor in this Lease or in any information the City of Benton Harbor is required to provide to Harbor Shores pursuant to this Lease; or (d) any Environmental Violation resulting from the City of Benton Harbor's use of and actions on Jean Klock Park, Parcel 8A or the park expansion property, as set forth in the Park Improvements and Maintenance Agreement, after the Effective Date (as defined below) of this Lease. Notwithstanding the foregoing, such obligations to defend, indemnify and hold Harbor Shores harmless by the City of Benton Harbor shall not include those which shall result, in whole or in part, directly or indirectly, from the default, negligence, or willful misconduct of the Harbor Shores Indemnified Parties.

**Section 6.05. Environmental.** Except as otherwise provided herein, the City of Benton Harbor shall lease the Leased Premises to Harbor Shores in its "AS IS" condition. Notwithstanding the foregoing, the City of Benton Harbor and Harbor Shores hereby agree and acknowledge that because most of Jean Klock Park, Parcel 8A and the Park Expansion Property (as defined in the Park Improvements and Maintenance Agreement) is in an area which historically has been the home of heavy industry and landfilling, there may be environmental contamination that may need to be addressed before development of the Jean Klock Park, Parcel 8A or the Park Expansion Property can be undertaken as required by this Lease and the Park Improvements and Maintenance Agreement. Current analysis indicates that remediation activities are required to be performed on Park Mitigation Parcels D and F as described on **Exhibit B** to the Park Improvements and Maintenance Agreement (**"Remediation Parcels"**) by Harbor Shores. Such response activities and measures are necessary to mitigate arsenic exposure on the Remediation Parcels as outlined on Part 4.0 of the Document of Compliance with the Part 10 Rules, dated November 7, 2007; such remediation includes, without limitation, mass excavation, disposal of soil, concrete debris and industrial waste, the bulk filling of areas of the Park Expansion Property, and the installation of an isolation zone on certain areas of the Park Expansion Property. Such response activities and measures shall begin within ninety (90) days of execution of this Lease and be completed within three (3) years of the execution of this Lease in accordance with the timeline as detailed in the City of Benton Harbor's Conversion Proposal, which was resubmitted to NPS on _____, 2008. The City of Benton Harbor agrees to cooperate with and assist Harbor Shores in accessing and obtaining funds for any such investigation and remediation of Jean Klock Park, Parcel 8A and the Park Expansion Property and any investigation, due care and remediation costs incurred in excess of those funds received shall be the responsibility of Harbor Shores and not the City of Benton Harbor. The City of Benton Harbor agrees that Harbor Shores shall be permitted to conduct environmental assessment(s) of Jean Klock Park, Parcel 8A and the Park Expansion Property, at its expense. The City of Benton Harbor shall provide access and information to, and otherwise cooperate with Harbor Shores in any environmental assessment(s) it conducts. Harbor Shores shall, at its expense, have the right to prepare and submit to the Michigan Department of Environmental Quality (**"MDEQ"**) a "baseline environmental assessment," or "BEA" of Jean Klock Park, Parcel 8A and the Park Expansion Property, pursuant to MCL 324.20126. In the event that the BEA is not approved by the MDEQ and Harbor Shores does not attempt to resubmit a new BEA to the MDEQ within one hundred eighty (180) days of receipt of the disapproval letter for the original BEA, either party to this Lease may terminate this Lease by written notice to the other party. Such termination would also automatically terminate the Park Improvements and Maintenance

Agreement.  Harbor Shores may also, at its expense, prepare and submit to the MDEQ a plan to meet due care obligations at Jean Klock Park, Parcel 8A and the Park Expansion Property imposed under MCL 324.20107a.  Notwithstanding anything to the contrary herein, if Harbor Shores' proposed due care/remediation plan is not accepted by the appropriate governmental bodies, Harbor Shores, in its sole discretion, may review whether to proceed with or cease development of any portion of the Project, including the golf course and terminate this Lease and the Park Improvements and Maintenance Agreement without any further liability.   Such determination shall be made by Harbor Shores within one hundred eighty (180) days of the disapproval of the due care/remediation plan.  In the event that Harbor shores does not notify the City of Benton Harbor of its decision whether to terminate this Lease because of the disapproved due care/remediation plan within such one hundred eighty (180) day period, either party may terminate this Lease by written notice to the other party within sixty (60) days of the expiration of such one hundred eighty (180) day period.

## Article VII

**Section 7.01.  Termination**.  This Lease will terminate at the end of the term identified above in Section 2.02 or upon the exercise of any termination right contained herein.  Notwithstanding the foregoing or anything to the contrary contained herein, during the twelve (12) months after the Effective Date of this Lease, Harbor Shores may terminate this Agreement upon sixty (60) days prior written notice to the City of Benton Harbor in the event that Harbor Shores does not commence or complete construction of the portion of the public golf course within the Leased Premises or abandons the public golf course portion of the Project without any further liability under this Lease (**"Termination Right"**).    Notwithstanding anything to the contrary herein, in the event that this Lease is terminated under the Termination Right in this Section or the termination right contained in Section 6.05 above, the following shall be the only termination penalties of Harbor Shores to the City of Benton Harbor under this Lease: (a) the already completed conveyance of the park expansion property (as described in the Park Improvements and Maintenance Agreement) to the City of Benton Harbor; provided, however, the City of Benton Harbor shall have the option to convey any of the park expansion property (as described in the Park Improvements and Maintenance Agreement) to Harbor Shores within ninety (90) days of such termination of this Lease by Harbor Shores; and (b) Harbor Shores must deliver the Leased Premises to the City of Benton Harbor in substantially the same condition as existed as of the date of execution of this Lease within ninety (90) days of exercising the Termination Right.

**Section 7.02. 7.02     Surrender of Possession.   Except as otherwise stated in this Lease, upon the expiration or termination of this Lease, whether by lapse of time, operation of law or pursuant to the provisions of this Lease, Harbor Shores shall: (a) fill in the sand traps and remove the tee boxes and holes from the Leased Premises and reseed such areas with grass seed as reasonably appropriate, if requested to do so by the City of Benton Harbor; (b) restore the dunes within the Leased Premises to their original state as reasonably appropriate, if requested to do so by the City of Benton Harbor; and (c) surrender possession of the Leased Premises to the City of Benton Harbor.**

**Section 7.03.** **The City of Benton Harbor Default and Harbor Shores' Remedies.** The City of Benton Harbor shall be deemed to be in default under this Lease if the City of Benton Harbor shall fail to perform any of its obligations required under this Lease or the Park Improvements and Maintenance Agreement within one hundred twenty (120) days after receipt of written notice to perform the same when required hereunder.

In the event the City of Benton Harbor shall be in default hereunder and shall not cure the same within any period allowed therefore by the terms of this Lease, Harbor Shores shall have the right to: (a) bring an action for specific performance or damages and/or cure the same for and on behalf of the City of Benton Harbor, at the City of Benton Harbor's expense, and; or (b) in the event of a failure to perform any material obligation, after providing the City of Benton Harbor with an additional notice of its default and a sixty (60) day period in which to cure such default and after following the Dispute Resolution Process under Section 7.12, terminate this Lease, in which event Harbor Shores shall immediately surrender the Leased Premises to the City of Benton Harbor as provided under Section 7.02 above. In connection with the exercise of Harbor Shores rights under this Section, the City of Benton Harbor shall reimburse Harbor Shores for any expenditures made by Harbor Shores in connection therewith plus interest thereon at the Prime Rate (as defined below) less two percent (2%) per year or the highest rate permitted by any applicable laws, whichever is lower (**"Interest Rate"**), within thirty (30) days after Harbor Shores' demand, or at Harbor Shores' option, Harbor Shores may deduct its charges from any amounts due to the City of Benton Harbor under this Lease for its expenses incurred. In no event shall such deduction be the basis of forfeiture of this Lease nor constitute a default in the provision of any consideration due hereunder by Harbor Shores unless Harbor Shores shall fail to pay the amount of such deduction within thirty (30) days after a final adjudication that such amount is owing to the City of Benton Harbor. For purposes of the Lease, the term **"Prime Rate"** shall mean a rate of interest, per annum, equal to the prime rate of interest as published from time to time by the *Wall Street Journal.*

**Section 7.03. 7.04.** **Harbor Shores' Default and City's Remedies.** Harbor Shores shall be deemed to be in default under this Lease if Harbor Shores:

(a)    Fails to perform any of its obligations required under this Lease or the Park Improvements and Maintenance Agreement within one hundred twenty (120) days after receipt of written notice to perform the same when required hereunder.

(b)    Fails to commence construction of the public golf course within five (5) years of the Effective Date; or

(c)    Fails to complete the park improvements that Harbor Shores is required to complete under the Park Improvements and Maintenance Agreement within five (5) years of the Effective Date.

In the event that Harbor Shores shall be in default under subsections (b) or (c) above, this Lease shall terminate and Harbor Shores shall become immediately liable for the early termination penalties set forth as follows in addition to the already completed conveyance of the park expansion property (as described in the Park Improvements and Maintenance Agreement);

22

provided, however, the City of Benton Harbor shall have the option to convey any of the park expansion property (as described in the Park Improvements and Maintenance Agreement) to Harbor Shores within ninety (90) days of such termination; and Harbor Shores shall have no further liability to the City of Benton Harbor under this Lease:

(i)     In the event that the ~~golf course~~ construction ~~is not completed~~of the portions of the golf course within the Leased Premises is not commenced, deliver the Leased Premises to the City of Benton Harbor in its condition as of the execution of this Lease, reasonable wear and tear and casualty excepted; or

(ii)     In the event that the ~~golf course construction is completed, remove the greens and holes from the Leased Premises and reseed such areas with grass seed as reasonably appropriate, if requested to do so by~~construction of the portions of the golf course within the Leased Premises has commenced, surrender the Leased Premises to the City of Benton Harbor ~~in a writing~~as provided ~~to Harbor Shores~~in Section 7.02 above.

In the event that Harbor Shores shall be in default under subsection (a) above and shall not cure the same within any period allowed therefore by the terms of this Lease, the City of Benton Harbor shall have the right to: (a) bring an action for specific performance or damages and/or cure the same for and on behalf of Harbor Shores, at Harbor Shores' expense~~, and~~; or (b) in the event of a failure to perform any material obligation, after providing Harbor Shores with an additional notice of its default and a sixty (60) day period in which to cure such default and after following the Dispute Resolution Process under Section 7.12, terminate this Lease, in which event Harbor Shores shall immediately surrender the Leased Premises to the City of Benton Harbor as provided in Section 7.02 above. In connection with the exercise of the City of Benton Harbor's rights under this paragraph, Harbor Shores shall reimburse the City of Benton Harbor for any expenditures made by the City of Benton Harbor in connection therewith plus interest thereon at the Prime Rate (as defined below) less two percent (2%) per year or the highest rate permitted by any applicable laws, whichever is lower ("Interest Rate"), within thirty (30) days after the City of Benton Harbor's demand, or at the City of Benton Harbor's option, the City of Benton Harbor may deduct its charges from any amounts due to Harbor Shores under this Lease for its expenses incurred. In no event shall such deduction be the basis of forfeiture of this Lease nor constitute a default in the provision of any consideration due hereunder by the City of Benton Harbor unless the City of Benton Harbor shall fail to pay the amount of such deduction within thirty (30) days after a final adjudication that such amount is owing to Harbor Shores. For purposes of the Lease, the term **"Prime Rate"** shall mean a rate of interest, per annum, equal to the prime rate of interest as published from time to time by the *Wall Street Journal*.

**Section ~~7.04~~ 7.05. Assignment Requirements.** This Lease may not be assigned by Harbor Shores without the prior written consent of the City of Benton Harbor, ~~except that such consent shall not be required for an assignment of this Lease (a) to any parent, subsidiary or entity related or affiliated with Harbor Shores, (b) made as part of a merger, consolidation or reorganization of Harbor Shores, or (c) made as part of the sale of the stock of, an interest in, or the assets of, property of Harbor Shores. Except as provided above~~which consent shall not be unreasonably withheld, delayed or conditioned. Harbor Shores shall provide the City of Benton Harbor with sixty (60) days prior written notice of the material details of such assignment and its

request to consent to such assignment. In the event that the City of Benton Harbor does not respond in writing to such request during such sixty (60) day period, the City of Benton Harbor's consent shall be deemed given. Additionally, should Harbor Shores propose to assign, convey, sell or otherwise transfer a majority of its ownership and/or management interest in Harbor Shores, Harbor Shores must provide the City of Benton Harbor with written notice of the material details of Harbor Shores' proposal to assign said interest and the City of Benton Harbor shall have thirtysixty (3060) days to approve the proposal; provided, however that the City of Benton Harbor acknowledges that Harbor Shores intends to partner with one or more parties in connection with the Project and that those partnerships shall not constitute assignments even if one or more partner(s) assume overall responsibility for a particular aspect of the Project.

Regarding the selection of and entering into agreements with reputable golf course management companies, Harbor Shores, in its sole discretion, shall select reputable companies for the design, construction, maintenance, and operation of the golf course to be partially operated on the Leased Premises. Harbor Shores shall provide the Golf Course Oversight Panel with sixty (60) days' prior written notice of a proposed change in management with regard to the golf course following its initial selection. During such sixty (60) day notice period, the Golf Course Oversight Panel shall review the proposed change in management and provide Harbor Shores with reasonable input regarding the selection of any new management company.

Section 7.05.7.06. **Time of Essence**. Time is of essence with respect to this Lease. All dates and terms shall be strictly adhered to unless waived in writing by the parties.

Section 7.06.7.07. **Non-Discrimination and Affirmative Action**. Harbor Shores agrees not to discriminate against any employee or applicant for employment to be employed in the performance of services under this Lease with respect to hire, tenure, terms, conditions or privileges of employment, or any matter directly or indirectly related to employment, because of race, color, religion, national origin, age, sex, height, weight, handicap or marital status. Breach of this covenant may be regarded as a material breach of this Lease as provided for in Act 453 of the Public Acts of Michigan of 1976, as amended, entitled "Michigan Civil Rights Act." Harbor Shores agrees to take affirmative action in hiring, training and promoting minority group persons and women to bring about reasonable representative integration of its employees. For purposes of this Lease, a "minority" is a person who is a citizen or lawful resident of the United States who is:

(a)    **Black**. A person having origin in any of the black racial groups of Africa;

(b)    **Hispanic**. A person of Spanish or Portuguese culture, with origins in Mexico, Central America or the Caribbean Islands;

(c)    **Asian American**. A person having origin in any of the original peoples of the Far East, Southeast Asia, the Indian sub-continent or the Pacific Islands; or

(d)    **Native American**. A person having origin in any of the original peoples of North America.

Harbor Shores further agrees to review or examine with the City of Benton Harbor staff relevant employment data and other information pertaining to its hiring practices and, additionally, Harbor Shores agrees that it will require similar non-discrimination and affirmative action covenants from the golf course management company selected by Harbor Shores under this Lease.

Section 7.07 7.08. **Binding Effect**. This Lease, including all referenced Exhibits, shall bind the parties hereto and their successors and permitted assigns.

Section 7.08 7.09. **Rights and Remedies**. Except to the extent expressly limited herein, both of the Parties to this Lease shall have the right to avail itself of any equitable or legal right or remedy to enforce the provisions of this Lease.

Section 7.09 7.10. **Remedies Are Cumulative**. The remedies available to the Parties hereunder are cumulative and the exercise of any one or more of the remedies provided for herein shall not be construed as a waiver of the other remedies of such party unless specifically so provided herein.

Section 7.10 Section 7.11. **Amendment**. Except as may otherwise be expressly permitted in this Lease, this Lease and the Exhibits attached hereto may not be amended except by way of a written document signed by the Parties after providing the Attorney General of the State of Michigan and the head of the Charitable Trust Section of the Attorney General of the State of Michigan sixty (60) days advance written notice of any such amendment.

Section 7.11 Section 7.12. **Dispute Resolution**. Any dispute, controversy or claim arising under or in connection with this Lease ("Dispute") shall be settled exclusively as set forth in this Section (the **"Dispute Resolution Process"**). Initially, a Dispute shall be referred to the Parties to negotiate a resolution. If the Parties are unable to resolve, or do not anticipate resolving a Dispute within thirty (30) days after written notice of such Dispute provided from one party to this Lease to the other party, then either party may submit the Dispute to non-binding facilitative mediation. If the Parties are unable to resolve, or do not anticipate resolving a Dispute within sixty (60) days after submission to non-binding facilitative mediation, if applicable, then either party may submit the Dispute may be submitted to arbitration upon the election and written consent of all the parties to such Dispute.

Such arbitration shall be conducted before one (1) arbitrator in a mutually convenient location, in accordance with the rules of the American Arbitration Association ("Association") then in effect. The arbitrator shall be selected in accordance with the rules of the Association. The decision of the arbitrator shall be final and binding upon the City of Benton Harbor and Harbor Shores and judgment thereon may be entered in any court having jurisdiction. Unless otherwise provided by the rules of the Association, the arbitrator shall, in his or her award, allocate between the City of Benton Harbor and Harbor Shores the costs of arbitration, which shall include reasonable attorney fees and expenses of the City of Benton Harbor and Harbor Shores, as well as the arbitrator fees and expenses, in such proportions as the arbitrator determines is reasonably appropriate under the circumstances.

In the absence of election and written consent of the parties to submit the Dispute to arbitration as provided above, neither Harbor Shores nor the City of Benton Harbor shall be precluded from petitioning the courts to resolve a Dispute. During the Dispute Resolution Process, each Parties' representatives shall negotiate in good faith. ~~Each~~Except as otherwise provided herein, each party to this Lease agrees that it shall not commence litigation or such other remedies prior to the conclusion of the Dispute Resolution Process, unless a party to this Lease may suffer irreparable harm due to such delay.

**Section ~~7.12.~~7.13.  Consent to Mortgage of Leasehold Interest.**  Harbor Shores may from time to time without further consent assign this Lease or any interest herein as collateral security or create a sublease by way of mortgage of Harbor Shores' leasehold interest, provided that such leasehold mortgage or sublease by way of mortgage is to an institutional lender, and upon execution of any such assignment or mortgage a true copy thereof shall be delivered promptly to the City of Benton Harbor. Harbor Shores shall provide the Golf Course Oversight Panel with thirty (30) days' prior written notice of such proposed leasehold mortgage or sublease by way of mortgage. During such thirty (30) day period, the Golf Course Oversight Panel shall review the applicable proposal and provide Harbor Shores with reasonable input regarding such proposal. Any institutional lender acquiring the leasehold estate in consideration of the extinguishment of the debt secured by such mortgage or through the sale of the leasehold estate under a power of sale under such mortgage shall be liable to perform the obligations imposed on Harbor Shores by this Lease only during the period that such person has possession or ownership of the leasehold estate, subject to contrary provisions in any mortgage approved by the City of Benton Harbor; provided, however, that to the extent surplus funds are realized from any transfer permitted by this Section after payment of all amounts owing to the institutional lender under its leasehold mortgage, such funds shall be applied to the payment of all charges owing to the City of Benton Harbor hereunder. Any institutional lender shall not be required in such lender's own initial acquisition of the leasehold interest in this Lease to comply with the provisions of Section ~~7.04~~7.05 above, but it and its successors shall be required to fully comply with those provisions in connection with any retransfer. Notwithstanding the foregoing, the Leased Premises shall not be subject to a mortgage foreclosure or similar relief or utilized for purposes of any type of sale of the underlying land constituting the Leased Premises. The rights granted to Harbor Shores under this Section are for the purpose of providing financing for the Project and Golf Course.

**Section ~~7.13.~~7.14.  Protection of Mortgage of Leasehold Interest.**  During the existence of any mortgage of leasehold interest herein of which the Golf Course Oversight Panel or the City of Benton Harbor has been given notice by Harbor Shores or the mortgagee, the City of Benton Harbor will not terminate this Lease because of any default by Harbor Shores hereunder, if, within a period of thirty (30) days after the City of Benton Harbor has mailed written notice of its intention to terminate this Lease for such cause to the mortgagee at its last known address, the mortgagee shall cure such default, or if such default cannot reasonably be cured within such thirty (30) day period, the mortgagee shall begin such performance within such thirty (30) day period and thereafter continue such performance in good faith with due diligence until such default has been cured.

**Section ~~7.14.~~7.15.  Quiet Enjoyment.**  The City of Benton Harbor covenants that, upon Harbor Shores providing the consideration outlined hereunder and performing all of the terms,

covenants and conditions Harbor Shores is to perform hereunder, Harbor Shores shall peaceably and quietly enjoy the Leased Premises hereby demised, free of claims of paramount title or of any Person claiming under or through the City of Benton Harbor, and free and clear of all exceptions, reservations or encumbrances other than those set forth herein, and those Harbor Shores subsequently approves in writing.

The Parties acknowledge that this Section does not prohibit the City of Benton Harbor from holding any special events, including, but not limited to, public meetings and/or concerts, upon portions of Jean Klock Park or Parcel 8A that do not include the Leased Premises.

Section 7.15.7.16.  **Estoppel Certificate**.  At the request of Harbor Shores, the City of Benton Harbor shall within twenty (20) days deliver to Harbor Shores, or anyone designated by Harbor Shores, a certificate stating and certifying as of its date (a) the date to which all consideration and other charges under this Lease have been provided; (b) whether or not there are then existing any setoffs or defenses against the enforcement of any of the agreements, terms, covenants or conditions hereof on the part of the City of Benton Harbor to be performed or complied with (and, if so, specifying the same); (c) if such be true, that this Lease is unmodified and in full force and effect and that Harbor Shores is not in default under any provision of this Lease (or if modified, setting forth all modifications, and if Harbor Shores is in default, setting forth the exact nature of such default); and (d) such other information as Harbor Shores may reasonably request in connection with the landlord-tenant relationship established by this Lease. The City of Benton Harbor acknowledges that any statement delivered pursuant to this Section may be relied upon by any purchaser or owner of Harbor Shores' interest under this Lease, or by any holder of a mortgage, or by an assignee of any mortgagee under any mortgage, or by anyone else to whom Harbor Shores delivers it.  Upon the same terms and conditions as provided in this Section, Harbor Shores shall provide the City of Benton Harbor with a certificate within twenty (20) days of the City of Benton Harbor's request.

Section 7.16.7.17.  **Recording Memorandum of Lease**.  Neither party shall record this Lease without the prior written consent of the other party; however, upon the request of either party the other party shall join in the execution of a memorandum of this Lease for the purpose of recordation.  The memorandum of this Lease shall describe the parties, the property, the term of this Lease, and shall incorporate this Lease by reference.  The memorandum of lease may be recorded with the Berrien County Register of Deeds by the party requiring such memorandum at its sole cost.

Section 7.17.7.18.  **No Other Agreements**.  Except as may otherwise be expressly provided or referred to in this Lease and the Exhibits to this Lease, this Lease and the accompanying Park Improvements and Maintenance Agreement supersede all prior agreements, negotiations and discussions relative to the subject matter of this Lease and the Park Improvements and Maintenance Agreement, and represent the full understanding of the parties with respect to such subject matter. This Lease and the Park Improvements and Maintenance Agreement supersede the Prior Agreement in all respects.  Notwithstanding the foregoing, the Parties acknowledge that they have entered into the Act 425 Agreement, Memorandum of Understanding and the Rezoning Agreement referenced above in the "Recitals" Section, which shall remain in full force and effect.

Section 7.18. 7.19. **Governing Law.** This Lease shall be construed in accordance with the laws of the State without regard to such State's conflict of laws principles and any action brought in law or equity arising out of its construction or enforcement shall be filed in the Circuit Court for the 2d Judicial District of Michigan (Berrien County Circuit Court) or in the United States District Court for the Western District of Michigan, Southern Division.

Section 7.19. 7.20. **Notices.** All notices, requests, consents and other communications under this Lease shall be in writing, shall be addressed to the receiving party's address set forth below or to any other address a party may designate by notice under this Lease, and shall be either (i) delivered by hand, (ii) sent by facsimile or electronic mail, and mailed promptly by first class mail, (iii) sent by nationally recognized overnight courier, or (iv) sent by certified mail, return receipt requested, postage prepaid:

If to the City of Benton Harbor:

City of Benton Harbor
City Hall
200 East Wall Street
Benton Harbor, Michigan  49023
Attention:  City Manager
Facsimile:  (269) 927-0270
Email: rmarsh@bhcity.org and igill@bhcity.org

If to the Developer:

Harbor Shores Community Redevelopment Inc.
400 Riverview Drive
Suite 420
Benton Harbor, Michigan 49022
Attention:  Board of Trustees
Facsimile:  269.926.8088
Email: mhesemann@evgnmanagement.com and
D_Jeffrey_Noel–@Whirlpool.com

All notices, requests, consents and other communications under this Lease shall be deemed to have been given either (i) if by hand, at the time of the delivery of the notice to the receiving party, (ii) if by facsimile or electronic mail, at the time that receipt of the facsimile or electronic mail has been acknowledged by electronic confirmation or otherwise, or if no confirmation is received, on the fifth (5th) day following the day a hard copy of the transmission is mailed by first-class mail, (iii) if by overnight courier, on the next business day following the day the notice is delivered to the courier service, or (iv) if by certified mail, in on the fifth (5th) business day following the day of the mailing.  Any party by notice to the other parties to this Lease, may designate additional or different addresses for subsequent notices or communications.

28

Section 7.20.7.21. **Counterparts**. This Lease may be executed by the Parties hereto in one or more counterparts, each of which shall be an original and both of which, when taken together, shall constitute a single agreement. Faxed signatures, or scanned and electronically transmitted signatures, on this Lease, shall be deemed to have the same legal effect as original signatures on this Lease.

Section 7.21.7.22. **Successors and Assigns**. The terms, conditions, covenants and restrictions of this Lease shall extend and apply to and bind the successors and permitted assigns of the City of Benton Harbor and Harbor Shores.

Section 7.22.7.23. **Consent Not Unreasonably Withheld**. Unless otherwise specifically provided in this Lease, the Parties agree that under this Lease, wherever there is a requirement for a party securing the consent of the other party, such consent shall not be unreasonably withheld, delayed or conditioned.

Section 7.23.7.24. **Severability**. The invalidity or enforceability of any provision, or part of any provision of this Lease, including the Exhibits to this Lease, shall not affect the other provisions or parts hereof, and this Lease shall be construed in all respects as if such invalid or unenforceable provisions or parts were omitted, provided, that the removal of such provisions or parts does not materially change the terms and provisions of this Lease and the intent of the parties hereto.

Section 7.24.7.25. **Survival**. All obligations arising prior to the termination of this Lease and all provisions of this Lease allocating responsibility or liability between the parties, including, without limitation, the indemnity provisions, shall survive the termination of this Lease. No obligation which survives the term of this Lease shall give Harbor Shores any possessory interest in the Leased Premises nor have the effect of extending the term of this Lease.

Section 7.25.7.26. **No Partnership or Joint Venture**. The City of Benton Harbor and Harbor Shores are not partners, fiduciaries or joint venturers, and nothing in this Lease creates or will create the relation of partners, fiduciaries or joint venturers between them. Without limiting the generality of the foregoing, the Parties are each acting independently, are each obligated to separately account for their respective activities and they each expressly disclaim any fiduciary duty to the other.

Section 7.26.7.27. **No Third Party Beneficiaries**. The terms, conditions, obligations, and benefits of this Lease are intended solely for the Parties and no other Person as a third party beneficiary or otherwise.

Section 7.27.7.28. **Additional Documents and Good Faith**. Each of the Parties hereto agrees to execute any additional documents reasonably requested by the other party to carry out the intent of this Lease. Further, after the execution of this Lease, each of the Parties hereto agrees to promptly work together in good faith to cure any discrepancies or errors in this Lease and the attached Exhibits, to resolve issues that develop with regard to this Lease and to cure any title defects or discrepancies with regard to the properties described in this Lease. The City of

29

Benton Harbor hereby appoints and authorizes, for and on its behalf, the City Manager and the City of Benton Harbor City Clerk and the City of Benton Harbor Mayor (per the City of Benton Harbor Charter) to sign and deliver any other ancillary agreements, instruments, and documents with respect to this Lease, all containing such terms and conditions that are necessary to comply with the provisions of this Section.

     **Section 7.28.7.29.  Construction**.  In the event an ambiguity or question of intent or interpretation arises, this Lease shall be construed as if drafted jointly by the Parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Lease.

By signing this Lease, the Parties hereto hereby agree to enter this Lease effective as of __
_____, 2008 ("**Effective Date**").


**CITY OF BENTON HARBOR**


By: _____          _____
      Richard Marsh                                Wilce L. Cooke
Its: City Manager                                Mayor



By: _____          _____
      Char Pugh-Tall                              Joyce Taylor
Its: City Attorney                              City Clerk


[Signatures continued on next page]

**HARBOR SHORES COMMUNITY
REDEVELOPMENT INC.**

By: _____

Its:    Trustee

1484727-4521

32

**EXHIBIT A**

**HARBOR SHORES LEASE AGREEMENT**
**Jean Klock Park Sketch and Legal Description**



-1-

PART OF THE NORTHWEST AND NORTHEAST QUARTERS OF SECTION 13 AND PART OF THE NORTHEAST QUARTER OF SECTION 14, TOWNSHIP 4 SOUTH, RANGE 19 WEST, CITY OF BENTON HARBOR, BERRIEN COUNTY, MICHIGAN, DESCRIBED AS: BEGINNING AT THE WEST QUARTER CORNER OF SAID SECTION 13; THENCE NORTH 26° 56' 20" EAST 67.60 FEET; THENCE NORTH 53° 24' 45" WEST 52.36 FEET; THENCE NORTH 38° 52' 44" EAST 22.81 FEET; THENCE NORTH 01° 47' 09" EAST 55.92 FEET; THENCE NORTH 53° 50' 41" WEST 164.38 FEET; THENCE SOUTH 36° 12' 29" WEST 49.17 FEET; THENCE NORTH 53° 47' 31" WEST 352.39 FEET TO A MEANDER POINT; THENCE NORTH 42° 27' 15" EAST ON A MEANDER LINE 2698.29 FEET TO A MEANDER POINT; THENCE SOUTH 53° 07' 12" EAST 142.78 FEET TO THE WESTERLY LINE OF GRAND BOULEVARD CONDOMINIUM, BEING IN SAID SECTION 13; THENCE SOUTHWESTERLY 38.24 FEET ON SAID WESTERLY LINE AND ON A 95.00 FOOT RADIUS CURVE TO THE LEFT WHOSE CHORD BEARS SOUTH 53° 25' 12" WEST 37.99 FEET; THENCE SOUTH 63° 34' 09" EAST 42.32 FEET; THENCE SOUTH 10° 36' 03" WEST 238.14 FEET; THENCE SOUTH 20° 18' 25" WEST 224.06 FEET; THENCE SOUTH 48° 46' 04" EAST 257.73 FEET; THENCE SOUTH 33° 27' 55" EAST 497.33 FEET; THENCE SOUTH 05° 52' 19" EAST ALL ON SAID WESTERLY LINE 63.66 FEET TO THE SOUTHERLY LINE OF SAID GRAND BOULEVARD CONDOMINIUM; THENCE NORTHEASTERLY 113.01 FEET ON SAID SOUTHERLY LINE AND ON A 460.00 FOOT RADIUS CURVE TO THE RIGHT WHOSE CHORD BEARS NORTH 86° 48' 54" EAST 112.73 FEET; THENCE NORTH 16° 27' 23" EAST ON SAID SOUTHERLY LINE 33.12 FEET TO THE SOUTH RIGHT OF WAY LINE OF GRAND BOULEVARD; THENCE SOUTHEASTERLY 331.67 FEET ON SAID SOUTH RIGHT OF WAY LINE AND ON A 436.00 FOOT RADIUS CURVE TO THE LEFT WHOSE CHORD BEARS SOUTH 57° 25' 10" EAST 323.73 FEET; THENCE SOUTH 79° 16' 11" EAST ON SAID SOUTH RIGHT OF WAY LINE 293.16 FEET; THENCE EASTERLY 114.51 FEET ON SAID SOUTH RIGHT OF WAY LINE AND ON A 933.00 FOOT RADIUS CURVE TO THE LEFT WHOSE CHORD BEARS SOUTH 82° 47' 09" EAST 114.44 FEET TO THE NORTH AND SOUTH QUARTER LINE OF SAID SECTION 13; THENCE NORTH 01° 13' 49" EAST ON SAID NORTH AND SOUTH QUARTER LINE 33.03 FEET TO THE CENTERLINE OF GRAND BOULEVARD; THENCE EASTERLY 113.27 FEET ON SAID CENTERLINE AND ON A 900.00 FOOT RADIUS CURVE TO THE LEFT WHOSE CHORD BEARS SOUTH 89° 49' 00" EAST 113.20 FEET TO THE WESTERLY RIGHT OF WAY LINE OF MICHIGAN HIGHWAY 63; THENCE SOUTH 40° 45' 01" WEST ON SAID WESTERLY RIGHT OF WAY LINE AND SAID WESTERLY RIGHT OF WAY LINE EXTENDED 40.86 FEET; THENCE SOUTH 60° 51' 12" WEST 1974.78 TO THE NORTH RIGHT OF WAY LINE OF KLOCK ROAD EXTENDED; THENCE NORTH 88° 32' 08" WEST ON SAID NORTH RIGHT OF WAY LINE AND SAID NORTH RIGHT OF WAY LINE EXTENDED 411.11 FEET, SAID LINE BEING PARALLEL WITH AND 50.00 FEET NORTH OF THE EAST AND WEST QUARTER LINE OF SAID SECTION 13; THENCE SOUTH 01° 28' 23" WEST 50.00 FEET TO SAID EAST AND WEST QUARTER LINE; THENCE NORTH 88° 32' 08" WEST ON SAID EAST AND WEST QUARTER LINE 601.21 FEET TO THE POINT OF BEGINNING. ALSO ALL THAT LAND LYING BETWEEN SAID MEANDER LINE AND THE ORDINARY HIGH WATER MARK OF LAKE MICHIGAN BETWEEN THE NORTHEASTERLY AND SOUTHWESTERLY LINES OF SAID PARCEL EXTENDED NORTHWESTERLY ON THEIR RESPECTIVE BEARINGS.

**EXHIBIT B**

**HARBOR SHORES LEASE AGREEMENT**

**Leased Premises Surveys and Legal Descriptions**

See attached.



SCALE: 1" = 250'

0    125    250    500

JEAN KLOCK PARK
HOLE 7 & 8
15.58 ACRES

M-63

GRAND BLVD

JEAN DR

JKP
PARKING
LOT

LAKE MICHIGAN

P.O.B.

WATER
PLANT

WEST 1/4 COR
SEC.13,T.4S.,R.19W.

© COPYRIGHT 2008
ABONMARCHE CONSULTANTS, INC.

## ABONMARCHE CONSULTANTS, INC.

95 WEST MAIN STREET • BENTON HARBOR, MI 49023 • T (269) 927–2295 • F (269) 927–1017
Manistee, MI • South Bend, IN • Fort Wayne, IN

JOB NO. M4–1120 MIT

SHT. B  OF  9

DESCRIPTION OF A PARCEL OF LAND LOCATED IN THE NORTHWEST QUARTER OF SECTION 13, TOWNSHIP 4 SOUTH, RANGE 19 WEST, CITY OF BENTON HARBOR, BERRIEN COUNTY, MICHIGAN, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE WEST QUARTER CORNER OF SAID SECTION 13, THENCE SOUTH 88°32'08" EAST ALONG THE EAST-WEST QUARTER LINE, 398.31 FEET; THENCE NORTH 01°27'52" EAST, PERPENDICULAR TO SAID EAST-WEST QUARTER LINE, 719.60 FEET TO THE POINT OF BEGINNING OF THE PARCEL HEREIN DESCRIBED; THENCE NORTH 24°41'21" EAST, 74.40 FEET, TO A POINT OF INTERSECTION WITH A TANGENT CURVE, SAID CURVE HAVING A RADIUS OF 175.00 FEET, AND A CENTRAL ANGLE OF 47°08'02"; THENCE ALONG THE ARC OF SAID CURVE TO THE RIGHT, A DISTANCE OF 143.96 FEET, SAID ARC SUBTENDED BY A CHORD WHICH BEARS NORTH 48°15'22" EAST, A DISTANCE OF 139.94 FEET; THENCE NORTH 71°49'23" EAST, 215.42 FEET, TO A POINT OF INTERSECTION WITH A TANGENT CURVE, SAID CURVE HAVING A RADIUS OF 100.00 FEET, AND A CENTRAL ANGLE OF 49°24'53"; THENCE ALONG THE ARC OF SAID CURVE TO THE LEFT, A DISTANCE OF 86.24 FEET, SAID ARC SUBTENDED BY A CHORD WHICH BEARS NORTH 47°06'57" EAST, A DISTANCE OF 83.60 FEET; THENCE NORTH 22°24'30" EAST, 741.71 FEET; THENCE NORTH 29°03'47" EAST, 208.39 FEET, TO A POINT OF INTERSECTION WITH A TANGENT CURVE, SAID CURVE HAVING A RADIUS OF 75.00 FEET, AND A CENTRAL ANGLE OF 102°19'02"; THENCE ALONG THE ARC OF SAID CURVE TO THE RIGHT, A DISTANCE OF 133.93 FEET, SAID ARC SUBTENDED BY A CHORD WHICH BEARS NORTH 80°13'18" EAST, A DISTANCE OF 116.83 FEET; THENCE SOUTH 48°37'11" EAST, 129.59 FEET; THENCE SOUTH 08°08'34" EAST, 295.32 FEET, TO A POINT OF INTERSECTION WITH A TANGENT CURVE, SAID CURVE HAVING A RADIUS OF 75.00 FEET, AND A CENTRAL ANGLE OF 51°45'32"; THENCE ALONG THE ARC OF SAID CURVE TO THE LEFT, A DISTANCE OF 67.75 FEET, SAID ARC SUBTENDED BY A CHORD WHICH BEARS SOUTH 34°01'20" EAST, A DISTANCE OF 65.47 FEET; THENCE SOUTH 59°54'06" EAST, 290.61 FEET; THENCE SOUTH 47°23'03" EAST, 150 FEET MORE OR LESS TO THE MOST SOUTHWESTERLY CORNER OF THE PROPOSED FUTURE DEVELOPMENT OF THE ORIGINAL ISSUE OF GRAND BOULEVARD CONDOMINIUM, ALSO BEING A POINT OF INTERSECTION WITH A NON-TANGENT CURVE, SAID CURVE HAVING A RADIUS OF 460.00 FEET, AND A CENTRAL ANGLE OF 19°38'46"; THENCE ALONG THE ARC OF SAID CURVE TO THE RIGHT, ALSO BEING THE SOUTHERLY LINE OF SAID PROPOSED FUTURE DEVELOPMENT, A DISTANCE OF 157.73 FEET, SAID ARC SUBTENDED BY A CHORD WHICH BEARS SOUTH 83°52'55" EAST, A DISTANCE OF 156.96 FEET, TO A POINT OF INTERSECTION WITH A NON-TANGENT CURVE BEING THE SOUTHERLY RIGHT OF WAY LINE OF GRAND BOULEVARD, SAID CURVE HAVING A RADIUS OF 436.00 FEET, AND A CENTRAL ANGLE OF 28°10'00"; THENCE ALONG THE ARC OF SAID CURVE TO THE LEFT AND SAID SOUTHERLY RIGHT OF WAY LINE, A DISTANCE OF 214.34 FEET, SAID ARC SUBTENDED BY A CHORD WHICH BEARS SOUTH 56°44'10" EAST, A DISTANCE OF 212.19 FEET TO A POINT THAT IS NORTH 01°27'52" EAST, 1124.63 FEET AND SOUTH 88°32'08" EAST, 2160.05 FEET ALONG THE EAST & WEST QUARTER LINE FROM THE WEST QUARTER CORNER OF SECTION 13; THENCE SOUTH 46°03'50" WEST, 133.09 FEET; THENCE NORTH 71°16'48" WEST, 278.98 FEET; THENCE NORTH 87°33'55" WEST, 270.54 FEET; THENCE NORTH 64°08'14" WEST, 267.40 FEET, TO A POINT OF INTERSECTION WITH A TANGENT CURVE, SAID

CURVE HAVING A RADIUS OF 100.00 FEET, AND A CENTRAL ANGLE OF 99°49'03"; THENCE ALONG THE ARC OF SAID CURVE TO THE LEFT, A DISTANCE OF 174.21 FEET, SAID ARC SUBTENDED BY A CHORD WHICH BEARS SOUTH 65°57'15" WEST, A DISTANCE OF 153.00 FEET; THENCE SOUTH 16°02'44" WEST, 332.61 FEET, TO A POINT OF INTERSECTION WITH A TANGENT CURVE, SAID CURVE HAVING A RADIUS OF 200.00 FEET, AND A CENTRAL ANGLE OF 46°35'29"; THENCE ALONG THE ARC OF SAID CURVE TO THE RIGHT, A DISTANCE OF 162.63 FEET, SAID ARC SUBTENDED BY A CHORD WHICH BEARS SOUTH 39°20'28" WEST, A DISTANCE OF 158.19 FEET; THENCE SOUTH 62°38'12" WEST, 201.42 FEET; THENCE SOUTH 73°17'27" WEST, 96.54 FEET; THENCE NORTH 70°06'20" WEST, 71.12 FEET; THENCE NORTH 39°55'43" WEST, 59.68 FEET; THENCE NORTH 70°06'20" WEST, 204.27 FEET, TO THE POINT OF BEGINNING.



JEAN KLOCK PARK
HOLE 9

6.53 ACRES

SCALE: 1" = 250'

ABONMARCHE CONSULTANTS, INC.
95 WEST MAIN STREET • BENTON HARBOR, MI 49023 • T (269) 927-2295 • F (269) 927-1017
Manistee, MI • South Bend, IN • Fort Wayne, IN

JOB NO. M4–1120 MIT

SHT. 9  OF  9

TOGETHER WITH THE FOLLOWING:

DESCRIPTION OF A PARCEL OF LAND LOCATED IN THE NORTHWEST QUARTER OF SECTION 13, TOWNSHIP 4 SOUTH, RANGE 19 WEST, CITY OF BENTON HARBOR, BERRIEN COUNTY, MICHIGAN, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE WEST QUARTER CORNER OF SAID SECTION 13; THENCE SOUTH 88°32'08" EAST ALONG THE EAST-WEST QUARTER LINE, 383.07 FEET; THENCE NORTH 01°27'52" EAST PERPENDICULAR TO SAID EAST-WEST QUARTER LINE, 430.26 FEET TO THE POINT OF BEGINNING OF THE PARCEL HEREIN DESCRIBED, THENCE NORTH 82°18'24" WEST, 86.90 FEET, TO A POINT OF INTERSECTION WITH A NON-TANGENT CURVE, SAID CURVE HAVING A RADIUS OF 173.00 FEET, AND A CENTRAL ANGLE OF 64°20'57"; THENCE ALONG THE ARC OF SAID CURVE TO THE RIGHT, A DISTANCE OF 194.30 FEET, SAID ARC SUBTENDED BY A CHORD WHICH BEARS NORTH 11°06'40" EAST, A DISTANCE OF 184.25 FEET; THENCE NORTH 43°17'08" EAST, 82.37 FEET; THENCE SOUTH 70°06'20" EAST, 204.79 FEET; THENCE SOUTH 39°55'43" EAST, 59.68 FEET; THENCE SOUTH 70°06'20" EAST, 87.18 FEET; THENCE NORTH 73°17'27" EAST, 108.91 FEET; THENCE SOUTH 76°18'12" EAST, 500.07 FEET; THENCE SOUTH 79°58'15" EAST, 252.99 FEET; THENCE NORTH 78°43'50" EAST, 201.56 FEET TO THE EAST BOUNDARY LINE OF JEAN KLOCK PARK; THENCE SOUTH 60°50'53" WEST, ALONG SAID EAST BOUNDARY LINE, 578.30 FEET; THENCE SOUTH 84°04'52" WEST, 170.51 FEET; TO A POINT OF INTERSECTION WITH A NON-TANGENT CURVE, SAID CURVE HAVING A RADIUS OF 630.00 FEET, AND A CENTRAL ANGLE OF 53°21'56"; THENCE ALONG THE ARC OF SAID CURVE TO THE LEFT, A DISTANCE OF 586.79 FEET, SAID ARC SUBTENDED BY A CHORD WHICH BEARS NORTH 60°50'20" WEST, A DISTANCE OF 565.80 FEET; THENCE NORTH 87°31'18" WEST, 187.10 FEET TO THE POINT OF BEGINNING.



M-63

0.52 ACRES

P.O.B. SECOND PART

KLOCK RD.

SCALE: 1" = 250'

0    125    250    500

7.53 ACRES

PARCEL "A"
8.05 ACRES

P.O.B. FIRST PART

WEST 1/4 COR. SEC.13.,T.4S.,R.19W.

© COPYRIGHT 2006
ABONMARCHE CONSULTANTS, INC.

## ABONMARCHE CONSULTANTS, INC.

95 WEST MAIN STREET • BENTON HARBOR, MI 49023 • T (269) 927-2295 • F (269) 927-1017
Manistee, MI • South Bend, IN • Fort Wayne, IN

JOB NO. M4-1120 MIT

SHT. 1 OF 1

TOGETHER WITH THE FOLLOWING:

DESCRIPTION OF A PARCEL OF LAND LOCATED IN THE NORTHWEST QUARTER OF SECTION 13, TOWNSHIP 4 SOUTH, RANGE 19 WEST, CITY OF BENTON HARBOR, BERRIEN COUNTY, MICHIGAN, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE WEST QUARTER CORNER OF SAID SECTION; THENCE SOUTH 88°32'08" EAST ALONG THE EAST-WEST QUARTER LINE, 601.21 FEET; THENCE NORTH 01°27'52" EAST PERPENDICULAR TO SAID EAST-WEST QUARTER LINE, 33.00 FEET TO THE POINT OF BEGINNING OF THE PARCEL HEREIN DESCRIBED;

THENCE CONTINUING NORTH 01°27'52" EAST, 17.00 FEET;
THENCE SOUTH 88°32'08" EAST, PARALLEL WITH SAID EAST-WEST QUARTER LINE, 409.39 FEET;
THENCE NORTH 60°50'53" EAST, 1712.94 FEET,
TO A POINT OF INTERSECTION WITH A NON-TANGENT CURVE, SAID CURVE HAVING A RADIUS OF 100.00 FEET, AND A CENTRAL ANGLE OF 60°24'19", THENCE ALONG THE ARC OF SAID CURVE TO THE RIGHT, A DISTANCE OF 105.43 FEET, SAID ARC SUBTENDED BY A CHORD WHICH BEARS SOUTH 10°31'16" WEST, A DISTANCE OF 100.61 FEET;
THENCE SOUTH 40°43'24" WEST, 647.35 FEET;
TO A POINT OF INTERSECTION WITH A TANGENT CURVE, SAID CURVE HAVING A RADIUS OF 240.00 FEET, AND A CENTRAL ANGLE OF 54°45'50", THENCE ALONG THE ARC OF SAID CURVE TO THE RIGHT, A DISTANCE OF 229.39 FEET, SAID ARC SUBTENDED BY A CHORD WHICH BEARS SOUTH 68°06'18" WEST, A DISTANCE OF 220.76 FEET;
TO A POINT OF INTERSECTION WITH A REVERSE CURVE, SAID CURVE HAVING A RADIUS OF 165.00 FEET, AND A CENTRAL ANGLE OF 76°59'34", THENCE ALONG THE ARC OF SAID CURVE TO THE LEFT, A DISTANCE OF 221.72 FEET, TO THE PROPOSED NORTH LINE OF KLOCK ROAD AS SHOWN ON M-63/MDOT RECONSTRUCTION PLANS, SAID ARC SUBTENDED BY A CHORD WHICH BEARS SOUTH 56°59'26" WEST, A DISTANCE OF 205.41 FEET;
TO A POINT OF INTERSECTION WITH A NON-TANGENT CURVE, ALSO BEING SAID PROPOSED NORTH LINE OF KLOCK ROAD, SAID CURVE HAVING A RADIUS OF 377.29 FEET, AND A CENTRAL ANGLE OF 17°31'32", THENCE ALONG THE ARC OF SAID CURVE TO THE LEFT, A DISTANCE OF 115.40 FEET, SAID ARC SUBTENDED BY A CHORD WHICH BEARS NORTH 87°12'51" WEST, A DISTANCE OF 114.95 FEET;
THENCE SOUTH 84°01'23" WEST, ALONG SAID PROPOSED NORTH LINE OF KLOCK ROAD, 522.66 FEET;
TO A POINT OF INTERSECTION WITH A TANGENT CURVE, SAID CURVE HAVING A RADIUS OF 442.93 FEET, AND A CENTRAL ANGLE OF 05°38'36", THENCE ALONG THE ARC OF SAID CURVE TO THE RIGHT, ALSO BEING SAID PROPOSED NORTH LINE OF KLOCK ROAD, A DISTANCE OF 43.63 FEET, SAID ARC SUBTENDED BY A CHORD WHICH BEARS SOUTH 86°50'41" WEST, A DISTANCE OF 43.61 FEET;
THENCE SOUTH 01°27'52" WEST, LEAVING SAID PROPOSED NORTH LINE OF KLOCK ROAD AS SHOWN ON M-63/MDOT RECONSTRUCTION PLANS, 16.43 FEET,

TO A LINE THAT IS 33.00 FEET NORTH OF (PERPENDICULAR MEASURE) AND PARALLEL WITH SAID EAST-WEST QUARTER LINE OF SAID SECTION 13; THENCE NORTH 88°32'08" WEST, ALONG SAID PARALLEL LINE, 409.39 FEET TO THE POINT OF BEGINNING.

# EXHIBIT C

# HARBOR SHORES LEASE AGREEMENT

## Parcel 8A Survey and Legal Description



**12**

THAT PART OF SECTION 13, TOWNSHIP 4 SOUTH, RANGE 19 WEST, CITY OF BENTON HARBOR, BERRIEN COUNTY, MICHIGAN, DESCRIBED AS: BEGINNING AT A POINT ON THE EAST AND WEST QUARTER LINE OF SAID SECTION 13 THAT IS 601.21 FEET SOUTH 88° 32' 08" EAST OF THE WEST QUARTER CORNER OF SAID SECTION 13; THENCE NORTH 01° 28' 23" EAST (DEEDED NORTH 01° 28' 07" EAST) 50.00 FEET; THENCE SOUTH 88° 32' 08" EAST (DEEDED SOUTH 88° 32' 34" EAST) PARALLEL WITH SAID EAST AND WEST QUARTER LINE 409.38 FEET (DEEDED 411.11 FEET); THENCE NORTH 60° 50' 53" EAST 1875.84 FEET (DEEDED NORTH 60° 50' 46" EAST 1872.41 FEET TO THE NORTH AND SOUTH QUARTER LINE OF SAID SECTION 13; THENCE SOUTH 01° 13' 49" WEST (DEEDED SOUTH 01° 14' 02" WEST ON SAID NORTH AND SOUTH QUARTER LINE 95.23 FEET (DEEDED 93.91 FEET) TO THE NORTHWESTERLY RIGHT OF WAY LINE OF MICHIGAN HIGHWAY 63; THENCE SOUTH 40° 43' 24" WEST ON SAID NORTHWESTERLY RIGHT OF WAY LINE 1053.04 FEET (DEEDED SOUTH 40° 42' 53" WEST 1052.34 FEET); THENCE SOUTH 71° 11' 37" WEST (DEEDED SOUTH 71° 11' 21" WEST) 120.39 FEET; THENCE SOUTH 30° 43' 08" WEST (DEEDED SOUTH 30° 42' 52" WEST) 49.21 FEET; THENCE NORTH 59° 16' 52" WEST (DEEDED NORTH 59° 17' 08" WEST) 16.94 FEET; THENCE SOUTH 30° 43' 08" WEST (DEEDED SOUTH 30° 42' 52" WEST) 21.07 FEET TO SAID EAST AND WEST QUARTER LINE; THENCE NORTH 88° 32' 08" WEST (DEEDED NORTH 88° 32' 24" WEST) ON SAID EAST AND WEST QUARTER LINE 1195.67 FEET (DEEDED 1194.98 FEET) TO THE POINT OF BEGINNING. CONTAINING 12.13 ACRES MORE OR LESS.

*Together with the following:*

THAT PART OF THE NORTHWEST QUARTER OF SECTION 13, TOWNSHIP 4 SOUTH, RANGE 19 WEST, CITY OF BENTON HARBOR, BERRIEN COUNTY, MICHIGAN, DESCRIBED AS: COMMENCING AT THE WEST QUARTER CORNER OF SAID SECTION 13; THENCE SOUTH 88° 32' 08" EAST ON THE EAST AND WEST QUARTER LINE OF SAID SECTION 13 A DISTANCE OF 601.21 FEET; THENCE NORTH 01° 28' 23" EAST 50.00 FEET; THENCE SOUTH 88° 32' 08" EAST PARALLEL WITH SAID EAST AND WEST QUARTER LINE 409.35 FEET TO THE POINT OF BEGINNING OF THE LAND HEREIN DESCRIBED; THENCE NORTH 60° 50' 53" EAST 1875.84 FEET TO THE NORTH AND SOUTH QUARTER LINE OF SAID SECTION 13; THENCE SOUTH 01° 13' 49" WEST ON SAID NORTH AND SOUTH QUARTER LINE 1.22 FEET; THENCE SOUTH 60° 51' 12" WEST 1873.73 FEET; THENCE NORTH 88° 32' 08" WEST PARALLEL WITH SAID EAST AND WEST QUARTER LINE 1.73 FEET TO THE POINT OF BEGINNING. CONTAINING 0.04 OF AN ACRE MORE OR LESS.

BEARINGS ARE RELATED TO THE NAD83 MICHIGAN SOUTH ZONE STATE PLANE COORDINATE SYSTEM.

# EXHIBIT D

## HARBOR SHORES LEASE AGREEMENT

### Road Improvements Letter

See attached.

10/05/1996  09:51    2695568953            MARK MITCHELL                PAGE 03



# HARBOR SHORES

July 27, 2006

Mr. Dwight "Pete" Mitchell
City Manager
City of Benton Harbor
200 East Wall Street
Benton Harbor, MI 49022

RE: Application to MDOT for Harbor Shores Road Improvement Projects

Dear Mr. Mitchell:

On behalf of Harbor Shores Community Redevelopment, Inc. (HSCRI), I want to thank you for the City of Benton Harbor's continued cooperation in the development of the Harbor Shores Project. We truly believe that Harbor Shores will provide economic and community benefits for all of the residents of the Twin Cities area.

We appreciate the city's role as the lead applicant to MDOT's Transportation Economic Development Fund (TEDF) to support the road improvements for West Klock Road, East Klock Road and Graham Avenue. We also understand that this grant program has a matching fund requirement.

By this letter, HSCRI commits to providing the matching funds for the three projects, as outlined below:

1.)    West Klock Road
       Limits: From M-63 to North Shore Drive

       Cost Breakdown:
       MDOT TEDF Grant                 $544,550        Grant amount requested
       Matching Funds/Engineering      $213,848        Harbor Shores
       Non Participating               $881,100        Harbor Shores
       Contingency (15%)               $245,924        Harbor Shores
       Total Project                   $1,885,422

              Harbor Shores Total Cost:   $1,340,872

2.)    East Klock Road
       Limits: From North Shore Drive to Paw Paw Avenue

Cost Breakdown:

| | | |
|---|---|---|
| MDOT TEDF Grant | $498,300 | Grant amount requested |
| Matching Funds/Engineering | $124,595 | Harbor Shores |
| Non Participating | $105,400 | Harbor Shores |
| Contingency (20%) | $145,659 | Harbor Shores |
| Total Project | $873,954 | |

Harbor Shores Total Cost:    $375,654

3.)   Graham Avenue
      Limits: Existing Graham Avenue to Riverview Drive

Cost Breakdown:

| | | |
|---|---|---|
| MDOT TEDF Grant | $1,990,800 | Grant amount requested |
| Matching Funds/Engineering | $498,145 | Harbor Shores |
| Non Participating | $207,200 | Harbor Shores |
| Contingency (15%) | $404,421 | Harbor Shores |
| Total Project | $3,100,566 | |

Harbor Shores Total Cost:    $1,109,766

Again, we appreciate the City's cooperation in the Harbor Shores Project, and we look forward to our continued partnership on this project.

Sincerely,

D. Jeffrey Noel
President

1485035-10

## CITY OF BENTON HARBOR
## JEAN KLOCK PARK CONVERSION AND MITIGATION PROPOSAL

### SUMMARY OF CHANGES TO HARBOR SHORES LEASE AGREEMENT AND PARK IMPROVEMENTS AND MAINTENANCE AGREEMENT RESULTING FROM COMMENTS RECEIVED DURING THE PUBLIC REVIEW PERIOD AND COMMENTS FROM THE ATTORNEY GENERAL

The following is a summary of material changes to the Harbor Shores Lease Agreement and the Park Improvements and Maintenance Agreement as a result of public comment and comments from the Attorney General.

**A.    Lease Agreement.**

1.    **Recitals.** Background references were added in the recitals to the Klock deed and 1947 decree of the Berrien Circuit Court reforming the Klock deed by eliminating the portion of the property that the Klock's granted without warranty.

2.    **Recitals.** An acknowledgment was added to the recitals that Harbor Shores will provide an initial capital expenditure of at least $18,000,000 for the public golf course and that Harbor Shores does not intend to receive a monetary return from the golf course for that investment.

3.    **Section 1.01(d). Definition of "Golf Course Oversight Panel".** The Golf Course Oversight Panel was changed by (i) reducing the voting members from five to three, (ii) making the three voting members two City Commissioners and a city employee, and (iii) making the two non-voting members a representative of the golf course management firm and a city resident who is a C.P.A. or equivalent. The meetings of the Panel were made subject to the Open Meetings Act and the Freedom of Information Act.

4.    **Section 1.01(i).    Definition of "Permitted Use".** The definition of "Permitted Use" of the Leased Premises was modified by clarifying the right of the public to use the Leased Premises (except for tee boxes, sand traps, and greens) during the non-golfing season for non-motorized winter activities (not including sledding) which would not impede golf course operations or damage the golf course as determined by the City (instead of Harbor Shores). The City, with input from the golf management company, is given the authority to make reasonable rules for the winter activities. A definition of the "non-golfing season" was added being "the extended period of time during the winter months when the golf course is no longer open for members of the public to play golf and will not be open for golf."

5.    **Section 2.04. Use of Leased Premises.** The "Use of the Leased Premises" was modified to specifically state that neither Harbor Shores nor the City will use the

Leased Premises for any activity that would violate the terms of the deed to Jean Klock Park and to incorporate the specific wording of the restrictions in the deed. It was also modified to provide a more specific definition of the area of the dunes that are not part of the Leased Premises and cannot be utilized by Harbor Shores. (Western boundary of the Leased Premises instead of western portion of the dunes facing Lake Michigan. Same modification in related paragraphs throughout the Lease.)

6.    **Section 2.05.  Open to the Public; Fee Schedule.**  Language was added from the Klock deed regarding the use of the Leased Premises.  Additionally, the authority of the Golf Course Oversight Panel regarding rates for the golf course was changed from "review and comment" of the rates to "approval" of the rates. If the Golf Course Oversight Panel does not approve or reject the rates by March 31 of each year, the new rates are considered to be approved. The basis for the calculation of the discounted rates for Berrien County residents was changed so that it would not include any amount that would go into the Community Benefits Fund.  In the event there is a dispute regarding the fee schedule, the previous years rates stay in effect until the dispute is resolved under the Lease's dispute resolution mechanism.

7.    **Section 2.06.  Authority and Duties of Golf Course Oversight Panel.**  A sentence was added to the affect that if a member of the Golf Oversight Panel resigns, the remaining members shall continue to operate the Panel until a new member is appointed. The Golf Oversight Panel was given the authority to review and audit the financial records of the golf course operation for a three year following basis.

8.    **Section 3.02.  Improvements.**  The wording was modified to clarify that Harbor Shores will not receive a return for its $18,000,000 capital expenditure in the public golf course.

9.    **Section 6.02.  General Liability Insurance.**  A sentence was added to require the amount of insurance coverage required of Harbor Shores to increase over the term of the Lease.

10.    **Section 6.03.  Indemnification by Harbor Shores.**  This section was modified to the effect that Harbor Shores' obligation to indemnify the City does not include situations that were caused by the negligence of the City.

11.    **Section 6.04.  Indemnification by the City of Benton Harbor.**  This section was modified similar to the modification in Section 6.04 to provide that the City's obligation to indemnify Harbor Shores does not include situations that were caused by the negligence of Harbor Shores.

12.    **Section 7.02.  Surrender of Possession.**  This section was added to require Harbor Shores, in the event of termination or expiration of the Lease, to restore the dunes to their original state as reasonably appropriate, fill in sand traps, remove tee boxes and holes, and reseed those areas with grass seed.

-2-

13.    **Section 7.03.  The City of Benton Harbor Default and Harbor Shores' Remedies and Section 7.04.  Harbor Shores' Default and City's Remedies.**  The default and remedies sections were modified by giving both parties the right, in the event of a material breach by the other party, to terminate the lease after a 60 day notice to cure period.  If the City terminates the Lease, Harbor Shores is required to restore the Leased Premises as described in section 7.02 above.

14.    **Section 7.05.  Assignment Requirements.**  The assignment section was modified to prohibit Harbor Shores from assigning the Lease without 60 days written notice to and approval of the City, which approval may not be unreasonably withheld, delayed, or conditioned.

15.    **Section 7.11.  Amendment.**  Language was added to require 60 days advance written notice to the Attorney General before any modification of the Lease.

16.    **Section 7.12.  Dispute Resolution.**  The arbitration provision was changed from mandatory arbitration to arbitration upon the written consent of both parties.

**B.    Park Improvement and Maintenance Agreement.**

1.    **Section 3.02.  Improvements.**  This section has been modified by adding a one-year warranty by Harbor Shores against defective workmanship and materials for all construction and installation of the improvements Harbor Shores is required to make to Jean Klock Park, the Park Expansion Property and the trailway system.

2.    **Section 3.03(a).  Maintenance – Jean Klock Park, Parcel 8A and the Park Expansion Property.**  This section was modified by adding language to clarify that the requirement for Harbor Shores to maintain the Park and Park Improvements also includes the public trailway system.

3.    **Section 3.05  Access to Trail Improvements.**  This section was changed to require the City's prior written approval of any rules and regulations Harbor Shores may implement for use of the Trailways which are on Harbor Shores property.

4.    **Section 3.06.  Park Access.**  Language in this section was modified to be consistent with changes to the Lease defining the area that Harbor Shores may not have access to as the western boundary of the Leased Premises instead of the western portion of the dunes facing Lake Michigan.

5.    **Section 6.01.  Indemnification by Harbor Shores.**  This section was modified to the effect that Harbor Shores' obligation to indemnify the City does not include situations that were caused by the negligence of the City.

6.     **Section 6.02. Indemnification by City of Benton Harbor.**  This section was modified similar to the modification in Section 6.01 to provide that the City's obligation to indemnify Harbor Shores does not include situations that were caused by the negligence of Harbor Shores.

7.     **Section 7.02. The City of Benton Harbor Default and Harbor Shores' Remedies./Section 7.03. Harbor Shores' Default and City's Remedies.**  The default and remedies sections were modified by giving both parties the right, in the event of a material breach by the other party, to terminate the Agreement after a 60 day notice to cure period.

8.     **Section 7.05. Assignment Requirements.**  The assignment section was modified to prohibit Harbor Shores from assigning the Agreement without 60 days written notice to and approval of the City, which approval may not be unreasonably withheld, delayed, or conditioned.

9.     **Section 7.10. Amendment.**  Language was added to require 60 days advance written notice to the Attorney General before any modification of the Agreement.

10.    **Section 7.11. Dispute Resolution.**  The arbitration provision was changed from mandatory arbitration to arbitration upon the written consent of both parties.

KZLIB:578898.3\007666-00020

4-

Exhibit 4
Case No. 1:08-cv-01400

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JULIE WEISS, *et al.*,      ) | |
|      ) | |
|    Plaintiffs,      ) | |
|      ) | |
|    v.      ) | Case No. 1:08-cv-01400 (EGS) |
|      ) | |
| DIRK KEMPTHORNE, *et al.*,      ) | |
|      ) | |
|    Defendants.      ) | |

## AFFIDAVIT OF DR. MARCUS ROBINSON

**STATE OF MICHIGAN**

**COUNTY OF BERRIEN**

Dr. Marcus Robinson, being duly sworn, states as follows:

1. I serve as Vice Chairman of the Alliance for World Class Communities. I have personal knowledge of the facts set forth herein and, if called as a witness, am competent to testify to those facts.

2. The Alliance for World Class Communities is comprised of several local not-for-profit organizations that include the Citizens for Progressive Change, the Cornerstone Alliance and the Council for World Class Communities. Together these organizations are governed by over 45 local community and business volunteers who are dedicated to bridging the racial and economic divisions that have eroded our community's prosperity for decades. At the heart of the strategy to redevelop this community is a commitment to the Harbor Shores Development, which today is seriously jeopardized unless the project can continue to go forward.

3. The Alliance for World Class Communities has served as the convening body to bring the multitude of government and not-for-profit agencies together to integrate our efforts, avoid duplication and create a powerful engine of collaboration to create sustainable change in the city of Benton Harbor. That alliance is now more commonly referred to the Consortium for Community Development described more fully herein.

4. We have collectively spent 5 years to create an integrated strategy around literacy training, job training, improved educational delivery systems, and youth employment and after-school programming and mentoring to help the residents of our community.

5. The Harbor Shores Development serves as the enabler of change, and the organizations behind the project, the Alliance for World Class Communities, Cornerstone Alliance and the Whirlpool Foundation have committed that any economic proceeds that are derived from the Harbor Shores development will be directed to the initiatives of the Consortium for Community Development.

6. Continuing delays and threats to completion of the Harbor Shores Development as properly planned through an unprecedented public and private partnership stymies our ability to raise the funds needed to fully implement this community's vision of a sustainable community.

7. The tenets of opportunity through improved recreation, access to meaningful employment, improved educational opportunities and public safety that are contained in the vision of the Harbor Shores Development came from the voices of over 2,000 residents. The Alliance for World Class Communities conducted focus groups and one-on-one interview sessions to create a cohesive and accurate reflection of the ideals and aspirations of those who reside in our area. After the unfortunate civil disturbance 5 years ago, this vision was further validated by even more intense discussions and planning sessions with residents of the Benton Harbor community through a citizens panel that was convened by Michigan Governor Jennifer Granholm. By my estimate, over 175 meetings, hearings or discussions were held with the public to obtain feedback regarding the Project.

8. Ongoing delays in the Harbor Shores Development and the inaccurate assertions that are made by a handful of those in opposition to the Harbor Shores Development seriously threatens to undermine the very process of community involvement that was at the heart of bringing diverse individuals and organizations together to share a common vision.

9. The Consortium for Community Development is an association of accountable institutions, united in the dedication to the uplift of Benton Harbor. Our members and partners represent philanthropies, city and county governments, the judiciary, school systems, and community development organizations. Our mission: to stem the tide of poverty, to build a growing community, and to instill a sense of hope that the Greater Benton Harbor area can be a place of opportunity and upward mobility for everyone.

10. This process of community transformation is happening as we focus on areas of greatest need, including helping our citizens become better prepared for life at home, in school and in the workplace.

11. By creating strategic partnerships, breaking down barriers, and pooling financial resources, we are developing the investment and plans for lasting change.

12. <u>The Problems We Face</u>
   a. Benton Harbor, the poorest city in the State of Michigan, ranks number 633 out of 633 municipalities based on per capita income.
   b. 41% of the available workforce is disengaged due to illiteracy, lack of job skills and no high school diploma or GED.
   c. The home ownership rate is among the lowest in the State, with more than two-thirds of the population living in dilapidated rental units.
   d. 92% of students in Benton Harbor area schools are eligible for free or reduced-cost lunch program.
   e. MEAP scores for student achievement in BHAS are among lowest in the State with only 5% of students meeting academic standards. In addition, 40% of girls and 60% of boys drop out before completing 12th grade.

13. <u>The Solution We Embraced</u>
   a. Create an accountable organization, The Consortium of Community Development, dedicated to stem the tide of poverty and build a growing community in Benton Harbor.
   b. Through the Consortium, develop a strategic plan to leverage capital resources and organizational capabilities to reduce chronic poverty and lay a foundation for upward mobility for all citizens.
   c. Build individual capacity through an integrated workforce development strategy that removes barriers to employment, services adults in need of basic skills and provides workers specific training catered to the regional job market.
   d. Build community capacity through programs that help individuals transition from renting to home ownership and programs that promote diversity throughout Southwest Michigan.
   e. Accelerate educational capacity through efforts that make pre-school education available and accessible to all children, through programs that expand K-12 learning opportunities in and after school and through professional development of teaching staff.
   f. Providing city leaders with access to learning experiences for professional growth. The CCD will assist local government with subject matter experts who have insight in urban leadership.
   g. Citizen participation and urban place making is critical to the transformation. Build a participative program involving citizens in the master planning of Benton Harbor, which requires residents to care about their surroundings and a desire to make our neighborhoods and walkways desirable and enjoyable.
   h. Communicate a clear message that internal human development coincides with external physical development, and getting citizens invested is essential to the transformation process.

14. The momentum that has been gained over the past several years in moving this community forward will be seriously derailed with ongoing uncertainties around the completion of the Harbor Shores Development.

15. Over 300 local businesses, community foundations and individuals have provided the bulk of the funding necessary to advance this strategy that is tied to the Harbor Shores Development. To date over $20 million has been pledged through this effort to go towards the implementation of these many programs. Continuing delays and uncertainty over the completion of the Harbor Shores Development will threaten the process.

16. Developers that partake of the Harbor Shores Development must pledge to hire their employees through the Consortium for Community Development and lingering doubts as to whether or not the Harbor Shores Development will be completed only serves to retard the interests of these developers. Jobs are needed now.

17. The enthusiastic participation of hundreds of volunteers and the committed collaboration of such fine institutions such as Lake Michigan College, Michigan Works, the Benton Harbor Schools System and others impatiently await the completion of the Harbor Shores Development in order to propel the more important work of creating the individual opportunity so sorely needed in our community.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT. EXECUTED ON SEPTEMBER 2, 2008.

Dr. Marcus Robinson

Subscribed and sworn to me before this 2nd day of September, 2008.

Notary Public, BERRIEN County, Michigan
My Commission Expires: 3/18/2014

245838.1                                    4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


JULIE WEISS, *et al.*,                         )
                                               )
       Plaintiffs,                         )
                                               )
    v.                                      )    Case No. 1:08-cv-01400 (EGS)
                                               )
DIRK KEMPTHORNE, *et al.*,                     )
                                               )
       Defendants.                         )

-----------------------------------------------

### AFFIDAVIT OF ROBERT MCFEETER

**STATE OF MICHIGAN**

**COUNTY OF BERRIEN**


Robert McFeeter, being duly sworn, states as follows:

1. I have personal knowledge about the facts set forth herein and appended hereto as Exhibit A-1 and, if called as a witness, am competent to testify to those facts.

2. I am Director of Development at Evergreen Development Company, LLC.

3. Harbor Shores Community Redevelopment, Inc. has contracts with Evergreen Development Company, Inc. ("Harbor Shores") to be the project manager for the construction associated with the building of a Jack Nicklaus Signature Golf Course based out of Benton Harbor, Michigan.

4. One of my responsibilities is to manage the construction of the improvements to Jean Klock Park per the Lease Agreement between City of Benton Harbor and Harbor Shores. My responsibilities also include managing the construction of three holes of golf within the Park area leased by Harbor Shores from the City. The improvements, the construction and related matters are described in the appended Exhibit A, which is hereby re-affirmed and incorporated herein by reference.

245825.2

5.  No part of the contemplated work in the Park will result in new permanent structures on the crest of the dune in the Park. None of the three holes of golf would lie on the crest of the dune; they would lie on the leeward side of the dune below the crest.

6.  With respect to the 15 holes that lie outside the Park, weather permitting, Harbor Shores expects to be able to substantially complete them all in time for the planned opening of the 18-hole Jack Nicklaus Signature golf course in Summer 2009.

7.  With respect to the three holes that lie within the Park, Harbor Shores's ability to complete the work in time for the planned opening of the 18-hole Jack Nicklaus Signature golf course in Summer 2009 would be seriously jeopardized by any delay, as described below.

8.  The improvement works in the Park this Fall entails laying asphalt surfaces (e.g., for improved access). Asphalt must be worked hot and should be laid and finished in an uninterrupted sequence. As a practical matter, asphalting in the Park would need to cease by – and be complete by – the first or second week of November. It is impractical and imprudent to lay asphalt surfaces during the Winter months, given the risk of deterioration and damage in the interim.

9.  Seeding and sodding of the golf holes in the Park is already foreclosed this year by the advancing Fall season, since neither can be undertaken until the improvement works in the Park are complete. It remains feasible, however, to complete all other work in the Park this Fall and seed or sod next Spring in time for opening the 18-hole Jack Nicklaus course in 2009. Doing so requires commencing work in the Park within days.

10. If the improvements and the golf-course construction work in the Park (other than seeding or sodding) do not commence within days, the work cannot be completed before early November.

11. If the work in the Park (other than seeding or sodding) is not completed before early November, all work in the Park would need to be delayed until Spring. Since this work requires approximately 65 working days plus an additional 65 days for final grading, drainage, irrigation and seeding grass (or sodding) of the golf holes, the total 130-day period would preclude opening not only the three holes in the Park, but also the 18-hole Jack Nicklaus Signature course, in 2009.

12. The planned construction of the improvements in Jean Klock Park together with clearing and preliminary grading works on the three golf holes within the Park, if completed this calendar year, is of such a nature that all of it could be entirely removed and reinstated before next Fall if it became necessary to do so. Complete removal and reinstatement would leave minimal adverse long term change from the current status of the Park.

13. Such complete removal and reinstatement would be expensive and would require deliberately damaging existing facilities to return them to their current state of

dilapidation, including specifically the existing bathhouse and associated amenities, and it would entail recreating the cut in the dune that currently exists for the access road.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT. EXECUTED ON SEPTEMBER 2, 2008.

_____
Robert McFeeter

Subscribed and sworn to me before this 3rd day of September, 2008.

_____
Notary Public, Berrien County, Michigan
My Commission Expires: 4-12-2014

> PAULA HARVEY
> Notary Public, State of Michigan
> County of Berrien
> My Commission Expires Apr. 12, 2014
> Acting in the County of Berrien

245825.4                    -3-

South Bend Tribune

Exhibit 6
Case No. 1:08-cv-01400

   

SAVE $1.00 HERSHEY'S BLISS

SAVE $1.00 Neutrogena Hand Cream

SAVE $1.00 Pure & Natural Soap

Save Money, Be Happy

This is a printer friendly version of an article from www.southbendtribune.com
To print this article open the file menu and choose Print.

For a printer friendly version that includes the article's picture click here: Print Story with picture

Back

Article published Aug 9, 2008

# A step forward for Harbor Shores

There was good news for supporters of Harbor Shores. Last month, the 530-acre mixed used development that spans Benton Harbor, St. Joseph and Benton Township cleared a major hurdle: The National Park Service approved plans to convert a large section of Jean Klock Park into a Jack Nicklaus Signature golf course.

This long-awaited good news came after the park service had denied an early version of the plan. In the new plan, Harbor Shores would add 38 acres of land to the park and would pay for park updates and upkeep in exchange for leasing 22 acres of the park.

The approval came just before Michigan Gov. Jennifer Granholm made a visit to Benton Harbor, touring the site as well as the community improvements that have been made since the city was torn by rioting five summers ago.

The Harbor Shores project -- backed by the Whirlpool Foundation, the Alliance for World Class Communities and Cornerstone Alliance -- promises even more improvements, given that profits will help create work force readiness programs, improve literacy rates and support education, and assist homebuyers. These are some -- though not all -- of the reasons that we believe the project represents a tremendous opportunity for the city of Benton Harbor.

To be sure, there have been hurdles along the way, and Harbor Shores officials are awaiting approval for the project from the Army Corps of Engineers. We hope that approval will be forthcoming and any further legal challenges will be resolved.There is a sense of confidence and optimism about the project that was born two years ago when leaders and other members of the Benton Harbor community came together to create something better for the city by the lake.

We congratulate all whose hard work in this challenging undertaking is paying off. We wish them much luck in the road that lies ahead. Considering Harbor Shores' enormous potential for transforming a community, their efforts are worthwhile.

SouthBendTribune.com

Search this site | Contact Us | Site Map | Archives | RSS Feed | Reader Rewards | Subscribe to The Tribune

**Discover what's in it for you**

South Bend
43°F
AccuWeather.com
Weather Forecast

Searchmichiana.com
your complete local source

Home    News    Sports    Business    Entertainment    ourLives    Obituaries    Classifieds    Jobs    Cars    Homes    Marketplace

Search

SouthBendTribune.com    SearchMichiana    Classifieds    Archives    Jobs  Go

News by Email

Email This Story

March 21, 2008

# Move ahead on Harbor Shores

**OUR OPINION**

The Harbor Shores project has the look of a winner -- and it certainly appears to be just what the city of Benton Harbor needs.

We hope that nothing, including a recent setback involving the National Park Service, gets in the way of this project moving forward.

The potential for transformation is enormous: The 530-acre, half-billion dollar enterprise that will involve Benton Harbor, St. Joseph and Benton Township will create thousands of jobs. Harbor Shores, on the lakeshore just north of Benton Harbor, is projected to nearly double the city's tax base, from $93 million to $180 million.

There's another sort of "green" associated with Harbor Shores that has already had an enriching effect: So far, the environmental transformation has included removing some 100,000 tons of debris from the land -- that's enough to fill a football field, stacked 60 feet high.

A closer look reveals even more of the project's potential positive effect on the people of Benton Harbor. As one would expect from any endeavor that involves Whirlpool Corp. -- a company that has shown its commitment to the city time and time again -- much thought has gone into developing a plan that is inclusive of the community. Consider that The Alliance for World Class Communities, one of three non-profits that owns Harbor Shores (along with the Whirlpool Foundation and Cornerstone Alliance) has a community development consortium in addition to an economic development consortium. In an effort to make sure people are prepared to fill the new jobs, there are stepped-up efforts to improve literacy and life and work skills. And to make sure that workers have quality homes to live in, there are home ownership workshops every weekend, which include credit counseling and financial management.

Sounds quite impressive -- and that's not even including the 110-acre Jack Nicklaus golf course that is the centerpiece of the Harbor Shores enterprise -- and is at the center of an issue that could derail the project.

Last October, the National Park Service rejected a plan to use part of the Lake Michigan beach property for the Nicklaus golf course. The rejection was based on concerns about some provisions of the lease agreement, the land use plans and a required 30-day public notice/public comment period. Those concerns have been addressed: Management issues are now being handled in an agreement separate from the lease agreement; Harbor Shores is finalizing plans for developing a linear park system that meets NPS requirements; and a 30-day public comment period will take place, with a public hearing to be held within that period.

If the resubmitted proposal is approved, officials believe they can still keep the course on schedule for its planned early summer 2009 completion date.

We hope that the NPS approval is forthcoming. Five years after Benton Harbor faced its greatest challenge in the devastation of the June 2003 riots, the city has moved away from that hopelessness, thanks to the hard work of many. Now, with the opportunities provided by Harbor Shores, the little city by the lake is poised to move even further toward a better and brighter future.

Our Privacy Policy and Direct Notice To Parents

Contact the southbendtribune.com Web staff.
News coverage and editorial content provided by
the South Bend Tribune unless otherwise specified.
Copyright © 1994-2008 South Bend Tribune



September 02, 2008

# Opinion
## SouthBendTribune.com

Search this site | Contact Us | Site Map | Archives | RSS Feed | Reader Rewards | Subscribe to The Tribune

South Bend
89°F
AccuWeather.com
Weather Forecast

Taste of Home
Cooking School
made easy

Homemade for the Holidays

| Home | News | Sports | Business | Entertainment | ourLives | Obituaries | Classifieds | Jobs | Cars | Homes | Marketplace |

Front page gifts | Bookstore & Gift Shop | Today's Ads | SBT Photo Store | Coupons | Advertise with us

Search     ⦿ SouthBendTribune.com  ○ SearchMichiana  ○ Classifieds  ○ Archives  ○ Jobs [Go]        📧 News by Email



CLICK HERE!   0 to a thousand in 5 seconds!
That's how fast it is to find information
on thousands of Michiana cars!
100  120  140
michiana.com

August 30, 2008 6:59AM

**Story Toolbox**
✉ E-Mail   🔍 Archives   🛒 SBT Photo Store
🖨 Print   ✉ Newsletter
RSS   💬 Talk about it

# Time to accept Harbor Shores

OUR OPINION

Last week's news that a judge had thrown out a lawsuit challenging the Harbor Shores project represented a major victory for supporters of the $500 million development.

Some of the project opponents apparently have stated that they will appeal this decision. We hope that they decide not to continue this fight in the courts. In the past year, project organizers have explained their plan and made adjustments to it, partly in response to local opposition — all part of a public process that seems fair and quite appropriate to us.

As we said in an earlier comment, it is only right that residents be afforded the opportunity to offer their feedback on a project that is sure to have a profound impact on the Benton Harbor community and the people who live there.



Front Page Gifts
See yourself on the front page of the South Bend Tribune! Select from many affordably priced gifts!
Click Here!
MUG ○ MOUSEPAD ○ T-SHIRT
PRINTS ○ FRAMES

Opponents of Harbor Shores have had their say. Their concerns, as well as those raised in other quarters, have been addressed and resolved. Now it is time for acceptance of this plan, a 530-acre mixed-use development spanning Benton Harbor, St. Joseph and Benton Township.

Organizers of this project have met every challenge and obstacle placed before them — much as the Benton Harbor community has come through its own series of challenges in recent years to make for a more hopeful future. We believe that thanks to Harbor Shores, that future looks even brighter. We hope that all will come to appreciate that promise.

**Recent Opinion Stories:**

■ Get teens reading by turning the page
■ Deconstructing consumer confidence
■ College presidents didn't do their homework
■ A man of many gifts, but few accomplishments
■ Give parole board authority to decide on inmates

More Opinion Stories

**Most Viewed Stories:**

■ Watching and waiting
■ Local-laden Valparaiso stuns Notre Dame
■ Palin says daughter is pregnant
■ Arrangements Pending
■ Tips lead police to suspected drunken driver, 17
■ Is mid-August too early to start school?
■ Four Winds Casino: Room to grow in New Buffalo
■ Fallen law enforcement memorial destroyed in second incident
■ ABATE rides for "Jerry's kids"
■ Make A Wish sends local family to Disney World



**Featured Employers**
Click Here to View All Videos
SELECT A CATEGORY:
View All
**Communications**
Boys and Girls Club of St. Joseph County
**Order Writer**
Tyler Refrigeration
**Material Planner**
Tyler Refrigeration
POWERED BY DIGITAL MEDIA COMMUNICATIONS

Login >>    Register >>

Be the first to comment on this story!

- *You must register and be logged in to post a comment.*
- *We encourage your comments, but we ask that you keep them civil and appropriate.*
  *Please read our rules of engagement*
- *By clicking on "Post Comment" you acknowledge that you have read the Terms of Service and the comment*
  *you are posting is in compliance with such terms. Be polite. Inappropriate posts may be removed by the*
  *moderator. Contact site Administrator*

Our Privacy Policy and Direct Notice To Parents
Contact the southbendtribune.com Web staff.
News coverage and editorial content provided by the South Bend Tribune unless otherwise specified.
Copyright © 1994-2008 South Bend Tribune

IN OUR OPINION

# Harbor Shores

City residents need to let their voices be heard

A lot of people have been making a lot of noise about the **Harbor Shores** development plan in Benton Harbor . Now it's time to hear from the city's residents.

A 30-day public comment period begins today on the latest plan seeking National Parks Service approval to use part of the city's Jean Klock Park for a Jack Nicklaus Signature Golf Course. The golf course is the centerpiece of the proposed $500 million development. Without the golf course, the entire **Harbor Shores** project collapses.

We urge city residents who have been sitting on the sidelines in the **Harbor Shores** debate to take advantage of this public comment period to let their voices be heard.

Opponents of the project have been quite vocal. Their opposition to the use of Jean Klock Park for three holes of the golf course will and should be voiced during this comment period. But the regulators deciding this issue also need to hear from some other people:

► The residents of Benton Harbor who hear that some developers want to invest a halfbillion dollars – a half-billion dollars! – in their community and wonder, Why is that a bad thing?

► The long-time residents who

have seen bulldozers and dump trucks clean up the toxic eyesores in long-abandoned industrial areas throughout the city and wonder, Why is that a bad thing?

► The city's entrepreneurs who know that people who will buy million-dollar homes on a Jack Nicklaus Signature Golf Course will come to town and spend money supporting local businesses and jobs, and they wonder, Why is that a bad thing?

► The city residents who have figured out that $500 million in development will eventually translate into millions of dollars in property taxes to support the local school district and city government, improving services and reducing the burden on local taxpayers, and they wonder, Why is that a bad thing?

The evil-corporation-comingto- rape-and-pillage-Benton-Harbor story line is getting old. We believe most Benton Harbor residents recognize **Harbor Shores** for what it truly is: a once-in-alifetime opportunity to revitalize the city and a project that will benefit all city residents, even those who never play a round of golf or own a luxury townhouse in Harbor Shores .

It's time for those residents to add their voices to the chorus of opinions about Harbor Shores .

The community cannot afford to let this opportunity slip away.

Top

Powered by TECNAVIA

Copyright (c)2008 The Herald-Palladium 04/02/2008

SouthBendTribune.com

Search this site | Contact Us | Site Map | Archives | RSS Feed | Reader Rewards | Subscribe to The Tribune

South Bend
43°F
AccuWeather.com
Weather Forecast

Searchmichiana.com
your complete local source

**Discover what's in it for you**

Home    News    Sports    Business    Entertainment    ourLives    Obituaries    Classifieds    Jobs    Cars    Homes    Marketplace

Search          ⊙ SouthBendTribune.com  ○ SearchMichiana  ○ Classifieds  ○ Archives  ○ Jobs  Go    📧 News by Email

Email This Story

March 21, 2008

# Move ahead on Harbor Shores

**OUR OPINION**

The Harbor Shores project has the look of a winner -- and it certainly appears to be just what the city of Benton Harbor needs.

We hope that nothing, including a recent setback involving the National Park Service, gets in the way of this project moving forward.

The potential for transformation is enormous: The 530-acre, half-billion dollar enterprise that will involve Benton Harbor, St. Joseph and Benton Township will create thousands of jobs. Harbor Shores, on the lakeshore just north of Benton Harbor, is projected to nearly double the city's tax base, from $93 million to $180 million.

There's another sort of "green" associated with Harbor Shores that has already had an enriching effect: So far, the environmental transformation has included removing some 100,000 tons of debris from the land -- that's enough to fill a football field, stacked 60 feet high.

A closer look reveals even more of the project's potential positive effect on the people of Benton Harbor. As one would expect from any endeavor that involves Whirlpool Corp. -- a company that has shown its commitment to the city time and time again -- much thought has gone into developing a plan that is inclusive of the community. Consider that The Alliance for World Class Communities, one of three non-profits that owns Harbor Shores (along with the Whirlpool Foundation and Cornerstone Alliance) has a community development consortium in addition to an economic development consortium. In an effort to make sure people are prepared to fill the new jobs, there are stepped-up efforts to improve literacy and life and work skills. And to make sure that workers have quality homes to live in, there are home ownership workshops every weekend, which include credit counseling and financial management.

Sounds quite impressive -- and that's not even including the 110-acre Jack Nicklaus golf course that is the centerpiece of the Harbor Shores enterprise -- and is at the center of an issue that could derail the project.

Last October, the National Park Service rejected a plan to use part of the Lake Michigan beach property for the Nicklaus golf course. The rejection was based on concerns about some provisions of the lease agreement, the land use plans and a required 30-day public notice/public comment period. Those concerns have been addressed: Management issues are now being handled in an agreement separate from the lease agreement; Harbor Shores is finalizing plans for developing a linear park system that meets NPS requirements; and a 30-day public comment period will take place, with a public hearing to be held within that period.

If the resubmitted proposal is approved, officials believe they can still keep the course on schedule for its planned early summer 2009 completion date.

We hope that the NPS approval is forthcoming. Five years after Benton Harbor faced its greatest challenge in the devastation of the June 2003 riots, the city has moved away from that hopelessness, thanks to the hard work of many. Now, with the opportunities provided by Harbor Shores, the little city by the lake is poised to move even further toward a better and brighter future.

Our Privacy Policy and Direct Notice To Parents

Contact the southbendtribune.com Web staff.
News coverage and editorial content provided by
the South Bend Tribune unless otherwise specified.
Copyright © 1994-2008 South Bend Tribune

Exhibit 7
Case No. 1:08-cv-01400

STATE OF MICHIGAN

BERRIEN COUNTY CIRCUIT COURT

CAROL DRAKE AND CLELLEN BURY,

      Plaintiffs,                        Case No. 08-0247-CE

-vs-                               Hon. Scott Schofield, by assignment

CITY OF BENTON HARBOR, a Michigan
municipal corporation; and HARBOR SHORES
COMMUNITY REDEVELOPMENT INC. a
Michigan nonprofit corporation,

      Defendants.

---

OLSON, BZDOK & HOWARD, P.C.
Scott W. Howard (P52028)
Michael C. Grant (P68830)
420 East Front Street
Traverse City, MI 49686
(231) 946-0044

*Attorneys for Plaintiffs*

DICKINSON WRIGHT PLLC

Dennis W. Archer (P10237)
Michelle Thurber Czapski (P47267)
Tammy L. Helminski (P69431)
500 Woodward Ave., Suite 4000
Detroit, Michigan 48226-3425
(313) 223-3500

John G. Cameron, Jr. (P28751)
200 Ottawa Ave., N.W., Suite 900
Grand Rapids, Michigan 49503-2427
(616) 458-1300

*Attorneys for Defendant Harbor Shores Community
Redevelopment Inc.*

---

## AFFIDAVIT OF WENDY DANT CHESSER

Wendy Dant Chesser, being duly sworn, states as follows:

1. I have personal knowledge about the facts set forth herein and, if called as a witness,
   am competent to testify to those facts.

2. I am the President of Cornerstone Alliance, having served in a leadership role since
   2005. Cornerstone Alliance is a 501(c) 3 non-profit corporation and one of the owners

of Harbor Shores Community Redevelopment, Inc. I have worked towards the Harbor Shores project as a trustee of Harbor Shores Community Redevelopment, Inc. since its formation in 2005. My primary responsibilities to support the Harbor Shores project include overseeing state and federal grant and loan submissions, land acquisitions, economic development opportunities, and public and media relations.

3. The governance of the project and related developments fall under my role as trustee, in addition to serving the overall mission of Cornerstone Alliance.

4. If the commencement of work in Jean Klock Park is delayed, the current construction season will be lost and the Harbor Shores project will be delayed an additional year.

5. As designed, the overall project will create development opportunities which in turn will create jobs and tax base of an estimated $400 million. Without prompt resolution on the final holes of the golf course, the partners in Harbor Shores are less likely to secure firm commitments from developers.

6. Delaying the opening of the golf course by one year will delay the greens fees generated from the investment. The lease agreement between Benton Harbor and Harbor Shores calls for all of the operating profits from golf operations to go to community benefits plans implemented by Harbor Shores and the City of Benton Harbor.

7. With the help of the Berrien County Brownfield Redevelopment Authority, over $1,847,000 of grant funds and $2,000,000 in low-interest loan funds have been either awarded or dedicated from the Michigan Department of Environmental Quality and the US Environmental Protection Agency for environmental clean-up associated with the project. The low-interest loans were made to Berrien County, which in turn

2

loaned the funds to Harbor Shores Community Redevelopment, Inc. Harbor Shores Community Redevelopment, Inc., will repay the loans from the proceeds of the Harbor Shores project, but delay of these proceeds would jeopardize timely repayment.

8. The Michigan Department of Transportation has awarded, to the city of Benton Harbor, $3.03 million in transportation economic development grant funds for three construction projects that will serve as connectors to points within the Harbor Shores project. Harbor Shores Community Redevelopment, Inc. has agreed to pay the City of Benton Harbor's portion of the matching funds for these road projects, which include one reconstruction and two road extensions. This grant award would be jeopardized if the project were not to continue within the timeframe specified in the grant regulations.

9. Partners in Harbor Shores have expended funds to help prepare local residents for the jobs anticipated by Harbor Shores. Further project delays would also delay the jobs that will be created, resulting in a negative impact on the return of the investment already made by these individuals who are hoping to fill the jobs.

10. Partners in Harbor Shores have supported projects in conjunction with Michigan Works! and Heartland Alliance such as The Opportunity Center which has customized training into modules focused on high-growth employment sectors. Since July 1, 2007, 320 individuals have graduated from the services offered, including 60 GED certificates and specialized training in Construction, Landscaping, Customer Service and Culinary Art programs. Many of these individuals are seeking employment in the hospitality and skilled construction trades sectors and are hoping

3

to find work on the Harbor Shores project. Further delays in the Harbor Shores project will produce resulting delays in business development which creates jobs for which these individuals are now prepared to fill.

11. Without posting any job positions, the City of Benton Harbor has already received over 65 resumes from individuals looking for employment within the contracting opportunities expected from Harbor Shores.

Further affiant sayeth not.

Wendy Dant Chesser

Subscribed and sworn to before me this 18TH day of August, 2008.

MARGARET ADAMS
Notary Public, BERRIEN County, Michigan.
My Commission Expires: Oct. 3, 2013

4

Exhibit 8
Case No. 1:08-cv-01400

STATE OF MICHIGAN

BERRIEN COUNTY CIRCUIT COURT

CAROL DRAKE AND CLELLEN BURY,

      Plaintiffs,

      Case No. 08-0247-CE

-vs-

      Hon. Scott Schofield, by assignment

CITY OF BENTON HARBOR, a Michigan
municipal corporation; and HARBOR SHORES
COMMUNITY REDEVELOPMENT INC. a
Michigan nonprofit corporation,

      Defendants.

---

OLSON, BZDOK & HOWARD, P.C.
Scott W. Howard (P52028)
Michael C. Grant (P68830)
420 East Front Street
Traverse City, MI 49686
(231) 946-0044

*Attorneys for Plaintiffs*

DICKINSON WRIGHT PLLC

Dennis W. Archer (P10237)
Michelle Thurber Czapski (P47267)
Tammy L. Helminski (P69431)
500 Woodward Ave., Suite 4000
Detroit, Michigan 48226-3425
(313) 223-3500

John G. Cameron, Jr. (P28751)
200 Ottawa Ave., N.W., Suite 900
Grand Rapids, Michigan 49503-2427
(616) 458-1300

*Attorneys for Defendant Harbor Shores Community
Redevelopment Inc.*

---

## <u>AFFIDAVIT OF D. JEFFREY NOEL</u>

D. Jeffrey Noel, being duly sworn, states as follows:

1. I have personal knowledge about the facts set forth herein and, if called as a witness,

   am competent to testify to those facts.

2. I am the President of Harbor Shores Redevelopment Inc.

3. If the Harbor Shores development project experiences any further delays, a season will be lost and the Summer-of-2009 scheduled golf course opening would not occur until 2010. Such a delay would: put at risk the State Grants for road work and the $46 million already expended on the project; cost $2.56 million in carrying costs on existing financing; and possibly deter a hotel developer from committing to the project, because a number of the independent developers associated with the project are requiring completion of the golf course before consummating transactions on the project. In addition, the $16 million note that comes due in February of 2009 may be called if a definitive path to repayment cannot be shown by a development start date that is tied to the developers' interest.

Further affiant sayeth not.

_____
D. Jeffrey Noel

Subscribed and sworn to before me this
18th day of August, 2008.

Notary Public, Berrien County, Michigan.
My Commission Expires: 9/21/2012

Exhibit 9
Case No. 1:08-cv-01400

STATE OF MICHIGAN

BERRIEN COUNTY CIRCUIT COURT

CAROL DRAKE AND CLELLEN BURY,

      Plaintiffs,                            Case No. 08-0247-CE

-vs-                                 Hon. Scott Schofield, by assignment

CITY OF BENTON HARBOR, a Michigan
municipal corporation; and HARBOR SHORES
COMMUNITY REDEVELOPMENT INC. a
Michigan nonprofit corporation,

      Defendants.

---

OLSON, BZDOK & HOWARD, P.C.
Scott W. Howard (P52028)
Michael C. Grant (P68830)
420 East Front Street
Traverse City, MI 49686
(231) 946-0044

*Attorneys for Plaintiffs*

DICKINSON WRIGHT PLLC

Dennis W. Archer (P10237)
Michelle Thurber Czapski (P47267)
Tammy L. Helminski (P69431)
500 Woodward Ave., Suite 4000
Detroit, Michigan 48226-3425
(313) 223-3500

John G. Cameron, Jr. (P28751)
200 Ottawa Ave., N.W., Suite 900
Grand Rapids, Michigan 49503-2427
(616) 458-1300

*Attorneys for Defendant Harbor Shores Community
Redevelopment Inc.*

---

## AFFIDAVIT OF ROBERT MCFEETER

Robert McFeeter, being duly sworn, states as follows:

1. I have personal knowledge about the facts set forth herein and, if called as a witness,
   am competent to testify to those facts.

2.  I am Director of Development at Evergreen Development Company, LLC.

3.  Harbor Shores Community Redevelopment, Inc. has contracted with Evergreen Development Company, Inc. ("Harbor Shores") to be the project manager for the construction associated with the building of a Jack Nicklaus Signature Golf Course based out of Benton Harbor, Michigan.

4.  One of my responsibilities is to manage the construction of the improvements to Jean Klock Park per the Lease Agreement between City of Benton Harbor and Harbor Shores.

5.  These improvements include: building a new park entrance, beachside boulevard, and connector road; renovating the existing bathhouse and associated amenities; developing the interior park area by demolishing the existing car park and roads, restoring the section of the dune that was previously cut for the access road, building new trails and a picnic area and relocating the existing pavilion and overhead powerlines.

6.  The design and construction of the new entryway along the north side of the existing water treatment plant from Upton Drive to the Jean Klock Park beach requires cutting and filling, only to the extent necessary to match the elevation of the existing beach profile and comply with standard traffic engineering practices.

7.  The construction must be managed such that the park must remain open to the public at all times and the existing road and parking lot cannot be demolished until the new park entrance and connector road are completed.

8.  A limiting factor on the construction schedule is the weather.  These improvement works are scheduled to take approximately 65 working days.  The completion of the

roads is highly dependent on the supply of asphalt. Typically, asphalt plants close for winter beginning the first or second week of November.

9. My responsibilities also include managing the construction of three holes of golf within the park area leased by Harbor Shores from the City. None of this work will take place on the beach or the lakeside of the dunes. The work mostly entails slight contouring, rebuilding portions where the parking lot now stands, and grassing certain areas. The construction and grassing of these holes will take approximately 130 working days, with the opportunity for fall grassing ends around October 31st.

10. The construction of the park improvements and the golf holes will be carried out by separate independent contactors and will overlap somewhat. However, the final grading, drainage, irrigation and grassing of the three holes cannot commence until after the park improvements are complete and open.

11. If construction is delayed, it would be considered neither prudent nor feasible to commence the park improvement works this year because it is highly possible that asphalt will not be available for paving of the new entry way, boulevard and connector road.

12. If construction is delayed, the earliest the three holes of golf could be grassed (seed or sod) is mid summer 2009 and therefore the 18 hole course would not be playable until 2010; a loss of a whole year.

13. If construction is delayed, there would be an adverse financial impact of approximately $1,642,000, including, among other costs, $942,000 worth of increases in labor, materials, any many other construction related costs and an anticipated $700,000 in course maintenance costs for those portions that will be completed

outside the park without opportunity for offset by revenues generated by golfers. (*See* attached chart.)

Further affiant sayeth not.

_____
Robert McFeeter

Subscribed and sworn to before me this
18 day of August, 2008.

_____
Notary Public, Berrien County, Michigan.
My Commission Expires: 4-12-2014

PAULA HARVEY
Notary Public, State of Michigan
County of Berrien
My Commission Expires Apr. 12, 2014
Acting in the County of Berrien

**ESTIMATED COSTS OF CONSTRUCTION DELAYS**

| Description | Estimated Cost | Comments |
|---|---|---|
| **Golf Course Construction** | | |
| Contractor demobilization & remobilization | $60,000 | Contractor and subcontractors (1/6 of original mobilization cost i.e. $359K) |
| Performance/Payment Bond extension | $55,000 | 6 months, 1 % per annum of total contract sum |
| Cost increases (materials & labor) | $82,500 | $550K/hole, 3 holes, 5% increase |
| Contractor overheads | $288,750 | $550K/hole, 3 holes, 17.5% overheads |
| Sod allowance | $175,750 | Sod 3 holes to ensure course opening 5/2010. 1/3 of 22 acres, $0.55/sq ft |
| **Park Improvements** | | |
| Cost increases (material & labor) | $90,000 | $1800K, 5% increase |
| **Construction Management Fees** | | |
| Delay in completion | $72,000 | Kemper $12K/month, 6 months |
| **Nicklaus Design costs** | | |
| Fees | $68,000 | $50K Notional fees, Rent and expenses $3k/month-6 months |
| Visits by Jack Nicklaus | $50,000 | 2 visits |
| **SUBTOTAL** | **$942,000** | |
| **Golf Course Maintenance** | **$700,000** | |
| **TOTAL ESTIMATED COST** | **$1,642,000** | |



Exhibit 10-b
Case No. 1:08-cv-01400



**JEAN KLOCK PARK TRAILWAY SYSTEM**

Exhibit 11
Case No. 1:08-cv-01400

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

Julie Weiss
866 Pearl St.
Benton Harbor, MI 49022

       and

Nicole Moon
134 Territorial Road, #2
Benton Harbor, MI 49022

       and

Emma Kinnard
207 East May
Benton Harbor, MI 49022

       and

James H. Duncan
1160 Broadway St.
Benton Harbor, MI 49022

       and

Lea' Anna Locey
1950 Territorial Rd.
Benton Harbor, MI 49022

       and

Scott Elliott
1989 Colfax Ave.
Benton Harbor, MI 49022

       and

Ronnie Whitelow
1134 Union St.
Benton Harbor, MI 49022.

       Plaintiffs,

-vs-

Dirk Kempthorne, Secretary

Case No. 1:08-cv-01400
Hon. Emmet G. Sullivan

1

U.S. Department of the Interior
1849 C Street, N.W.
Washington, DC 20240

     and

Mary A. Bomar, Director
National Park Service
1849 C Street NW
Washington, DC 20240

     and

Ernest Quintana, Regional Director
National Park Service Midwestern Office
601 Riverfront Drive
Omaha, NE 68102

     and

Rebecca A. Humphries, Director
State of Michigan
Department of Natural Resources
Mason Building, Sixth Floor
P.O. Box 30028
Lansing, MI 48909

     and

City of Benton Harbor Benton Harbor
City Hall 200 E. Wall Street
Benton Harbor, MI 49022

     Defendants.

Oliver Hall, Esq.
1835 16th Street N.W. #5
Washington D.C.

*Attorneys for Plaintiffs*

2

## AFFIDAVIT OF MICHAEL HAYES

Michael Hayes, being duly sworn, states as follows:

1. I have personal knowledge about the facts set forth herein and, if called as a witness, am competent to testify to those facts.

2. I am a Senior Ecological Resource Specialist with JFNew and have worked professionally as a coastal regulatory specialist for over 14 years. I specialize in environmental assessments of coastal properties including evaluations under numerous statutes, state and county health regulations, and local zoning. I have been recognized as an expert witness by Michigan's Office of Administrative Hearings and in Circuit Court.

3. I have visited the site on 3 occasions to review aspects of existing conditions. I have reviewed the materials developed for both the federal and state applications for regulated activities, numerous site plans as the project evolved, and numerous aerial photos of the site including overlays of proposed activities.

4. The dunes in Jean Klock Park in Benton Harbor, Michigan, already have been disturbed with the presence of the existing water plant, asphalt trails cut through the center of the dunes, a 3.75-acre asphalt parking lot built into the back of the dunes, and structures built on the crest of the dune. The proposed activities associated with the Harbor Shores development project do not represent a significant increase in the impacts to the existing dunes.

5. Jean Klock Park is not an exemplary dune ecosystem. The ecology of the dunes in this area is one of shifting sands, as evidenced by the buried road and other structures. Grading and similar disruption will not change that dynamic. There is a presence of

3

human activity befitting a public park but also discouraging animal and plant species sensitive to human interaction. As an ecosystem, the spatial integrity is also compromised by the access road running east to west through the center of the dunes, the existing drive along a portion of the lakeward side of the dunes and the large parking area abutting the landward side of the dunes.

6. The park was not designated as a critical dune area in 1989 under the Sand Dune Protection and Management Act (Part 353 of NREPA, as amended). This implies that the legislative findings of this statute did not apply to this property and that the park's dunes are not included in the Atlas of Critical Dunes as "a unique, irreplaceable, and fragile resource." Evaluations performed by the Center for Remote Sensing, Michigan State University, titled <u>Evaluation of Critical Dune Areas</u> published in June 1996 appear to confirm this assessment and did not recommend the park's addition to the Atlas. This report is attached.

7. Proposed grading of the dunes at the park will not impact any significant or protected species. Graded areas outside the course will be replanted with native vegetation immediately following construction. The re-establishment of a native plant community will maintain the quality of the local dune ecosystem at a level equal to or above the current conditions.

8. The proposed grading will eliminate the current vehicle and foot traffic through the existing east to west corridor in the middle of the park. The proposed grading, followed by replanting with native vegetation, will unite the north and south dunes in the park. This will improve the spatial integrity of the dunes and the continuity of the dunes as an ecological unit.

9. Improvements to the park will include stairs, boardwalks, and signage that will direct public traffic to defined corridors. This will eliminate future degradation of natural resources due to the adverse impact from dispersed human activity.

Further affiant sayeth not.

_Michael Hayes_ (signature)

Michael Hayes

Subscribed and sworn to before me this
_2_ day of September, 2008.

_Kimberly Buchanan_ (signature)

Notary Public, Ottawa County, Michigan.
My Commission Expires: May 25, 2014

KIMBERLY J. BUCHANAN
Notary Public, State of Michigan
County of Ottawa
My Commission Expires May 25, 2014
Acting in the County of Ottawa

5



# Political Townships Containing Designated Critical Dune Areas

**Map Information:**

The highlighted areas indicate those political townships which contain designated Critical Dune Areas regulated under Part 353, Sand Dunes Protection and Management, of the Natural Resources and Environmental Protection Act, 1994 PA 451 as amended. This map is intended to provide the general distribution of Critical Dune Areas. Only a portion of each highlighted township is contained within the actual Critical Dune Area. Refer to the Atlas of Critical Dunes (available on-line) for specific Critical Dune boundary locations. Contact the Geological and Land Management Division at (517) 241-1515 for more information about Critical Dune Area regulations.

**Legend**

- Political Townships Containing Critical Dune Areas
- Michigan Counties
- Political Townships

0    25    50    100 Miles

Map Date: 06-17-2003

FINAL REPORT

# EVALUATION OF CRITICAL DUNE AREAS
## Designated Under Part 353
## (Sand Dune Protection And Management)
## of the
## Natural Resources and Environmental Protection Act
## 1994 PA 451



David P. Lusch, Ph.D.
William D. Hudson, Ph.D.
Linda K. Erickson
Frank Krist
Mark Zweifler

Center for Remote Sensing
Michigan State University

To
Michigan Department Of Environmental Quality
Land And Water Management Division
Great Lakes Shorelands Section

June 1996



FINAL REPORT

# Evaluation Of Critical Dune Areas Designated Under Part 353 (Sand Dune Protection And Management) of the Natural Resources and Environmental Protection Act 1994 PA 451

David P. Lusch, Ph.D.
William D. Hudson, Ph.D.
Linda K. Erickson
Frank Krist
Mark Zweifler

Michigan State University
Center for Remote Sensing
115 Manly Miles Building
1405 South Harrison Road
East Lansing, MI 48823-5243

Phone: (517) 353-7195
Fax: (517) 353-1812
EMAIL: 17872LWS@MSU.EDU

## Statement Of The Problem

According to Buckler (1978):

> The sand dunes along the shorezone of Michigan's Great Lakes are among the youngest and largest geomorphic features within the state. Because of favorable conditions, nowhere are they better developed than on the eastern and southern shores of Lake Michigan. These dunes are somewhat unique and collectively probably represents the largest accumulation of sand dunes along any fresh water body in the world. They are valued by many for their aesthetically pleasing backdrop to the lakeshore, for the ecological communities which they support and for the recreational potential they provide. Because the environmental (climatic and geomorphic) conditions under which they formed no longer exists, once destroyed, they are not likely to regain their present significant size and extent.

In an effort to preserve the quality of the state's dunal topography, the Michigan Legislature passed the Sand Dune Protection and Management Act (1976 PA 222). This act gave authority to the Michigan Department of Natural Resources (MDNR) to undertake specific steps to ensure the wise use and protection of Michigan's sand dunes within two miles of the ordinary high water mark along all of its Great Lakes shorelines.

Act 222 was amended in 1989 by PA 146 and 147, to include the regulation of all vegetation removal, earthmoving, and construction activities within designated Critical Dune Areas (CDAs) which were recognized as a "unique, irreplaceable and fragile resource that provides significant recreational, economic, scientific, geological, scenic, botanical, educational, agricultural and ecological benefits to the people of this state and to people from other states and countries who visit this resource." These Critical Dune Areas were mapped by staff from the Land and Water Management Division, MDNR to define areas which were subject to regulation under PA 222, as amended by PA 146 and 147, and were published in the *Atlas of Critical Dunes* (MDNR, 1989). These CDAs were based on an analysis of the delineated barrier dune formations, a review of soil surveys and U.S.G.S. topographic maps, and maps of exemplary dune-associated plant species provided by the Natural Features Inventory.

Further amendments to the Sand Dune Protection and Management Act occurred in 1994 (1994 PA 135). The first portion of Section 23a of PA 135 (1994) stipulated:

> Within 1 year of the effective date of this section, the department shall appoint a team of qualified ecologists who may be employed by the department or may be persons with whom the department enters into contracts who shall review "the atlas of critical dune areas" dated February 1989. The review team shall evaluate the accuracy of the designations of critical dune areas within the atlas and shall recommend to the legislature any changes to the atlas or underlying criteria revisions to the atlas that would provide more precise protection to the targeted resource.

In January, 1995, all environmental protection acts were codified and repealed and became parts of the Natural Resources and Environmental Protection Act (1994, PA 451). The Sand Dune Protection and Management Act as amended became Part 353 of Act 451.

In April 1995, the Center For Remote Sensing at Michigan State University responded to a Request For Proposal issued by the Office of Purchasing, State of Michigan, Department of Management and Budget (Invitation To Bid Number: 071I5001458) on behalf of the Great Lakes Shorelands Section, Land and Water Management Division, MDNR (now the MDEQ, Michigan Department of Environmental Quality.



**Center for Remote Sensing**
**Michigan State University**

## Criteria for Identifying and Mapping Critical Dune Areas

Section II-C-1 of the RFP (Work Statement - Tasks - Evaluation of Atlas of Critical Dune Areas) states:

A. Detailed evaluation of the accuracy of designated CDAs dated February 17, 1989, utilizing remote sensing, U.S.G.S. topographic maps, soil surveys, on-site inspections, vegetation determinations, geomorphologic interpretation and other methods determined useful. The purpose of this review is to determine if the current CDA designations accurately represent the CDAs of this state.

B. Detailed evaluation of sand dune areas which were not designated as CDAs to determine if they meet the definition of CDAs utilizing the methods listed in Item 1 above. The purpose of this review is to determine if all sand dunes which exhibit CDA qualities have been included in the designation.

The Sand Dune Protection and Management Part (353) of the Natural Resources and Environmental Protection Act (1994 PA 451) stipulated that the MDNR was to make or cause to have made several types of comprehensive studies and inventories relating to the dunes and their values for environmental, recreational and industrial purposes. The "Dune Type Inventory and Barrier Dune Classification Study of Michigan's Lake Michigan Shore" (Buckler, 1978; 1979) [hereafter refered to as the Buckler Study] was authorized under the old Act 222 (1974) and contracted by the Geological Survey Division, MDNR. The Remote Sensing Project [the precursor to the Center For Remote Sensing] at Michigan State University was the contractor. The Buckler Study created the Dune Morphology Classification of the Lake Michigan Shore (Figure 1) which greatly aided the present reevaluation project.

The Buckler Study was conducted within seven high priority areas consisting of nine shoreline segments along Michigan's Lake Michigan shoreline. The boundaries of the segments were predetermined by the MDNR for the Series I Designated Sand Dune Areas (MDNR, 1978). In subsequent contracts, Buckler continued the inventory and classification of dunes types and the delineation of the barrier dune within the confines of Series II and Series III Designated Sand Dune Areas. All of these studies by Buckler resulted in the creation of a set of map folders, one for each 7.5-minute quadrangle (many 7.5-minute quadrangles were photographically created from 15-minute quads for these studies), which contained stable-base overlays registered to the USGS maps. The overlays depicted the dune classification of the area, delimited the barrier dune, and portrayed other miscellaneous delineations (Figure 2).

As stated earlier, in response to the 1989 amendments to Act 222 of 1976 [now Part 353, 1994 PA 451] the Critical Dune Areas (CDAs) were mapped by the MDNR in order to define which areas were subject to regulation. These were documented in the *Atlas of Critical Dunes* dated February 17, 1989. In the review of background materials germain to this project, the specific criteria used by the MDNR to map CDAs were made available and are listed in Table 1.



**Center for Remote Sensing**
**Michigan State University**

3

| Dune Form | Relative Relief of Dune Form | Orientation of Dune Form with Respect to Present Shoreline | Arrangement of Dune Form | Underlying and/or Associated Landforms |
|---|---|---|---|---|
| Parabolic dune | high<br>moderate<br>low | parallel<br>normal<br>arcuate<br>irregular | singular<br>repetitive | n/a |
| linear dune Ridge | high<br>moderate<br>low | parallel<br>normal<br>arcuate<br>irregular | singular<br>repetitive | n/a |
| dune Terrace | high<br>moderate<br>low | parallel<br>normal<br>arcuate<br>irregular | singular<br>repetitive | n/a |
| dune PLatform | high<br>moderate<br>low | parallel<br>normal<br>arcuate<br>irregular | singular<br>repetitive | n/a |
| Domal dune | high<br>moderate<br>low | | singular<br>repetitive | n/a |
| Complex dune field | high<br>moderate<br>low | n/a | n/a | n/a |
| dune Flat | n/a | n/a | n/a | n/a |
| marginal sand Apron | high<br>moderate<br>low | n/a | n/a | lacustrine plain<br>Outwash plain<br>alluvial plain<br>moraine<br>till plain |
| inter-dune Lowland | n/a | n/a | n/a | as above |

> On the maps, polygons are identified by concatenating selected letters (shown as bold capitals above) from the categories listed under the criteria Form, Relief, Orientation, Arrangement, and Associated Landforms. For example, the capitalized items in line one above (Parabolic, High, Parallel, Repetitive) would be shown as "Phpr" on the map. **Pmpr** is a related dune assemblage, but exhibiting a moderate amount of local relief. **Cl** refers to a Complex dune field of low relief. A low relief, marginal sand apron formed on an outwash plain is shown as "**Alo**".

Figure 1.  Dune morphology classification of the Lake Michigan shore (Buckler, 1978; 1979).



**Center for Remote Sensing**
**Michigan State University**



Figure 2.  Example of the topographic map overlay created by Buckler displaying both the outlines of the various dune assemblages and the landward boundary of the Barrier Dune Formation.  See Figure 1 for an explanation of the codes used to identify the various dune types.



**Center for Remote Sensing**
**Michigan State University**

Table 1.  1989 Criteria for Identifying Critical Dune Areas, Land and Water Management Division, Michigan Department of Natural Resources

Critical Dune Areas include the following:

1. Barrier dune formations designated pursuant to 1976 PA 222.

2. Areas outside the barrier dune formations which meet all three of the following criteria:

   a. Areas composed primarily of dune sand, as identified on soil surveys.

   b. Areas containing dunes at least 20 feet in height. Isolated occurrences of single dunes meeting height criteria were not included.

   c. Areas exhibiting a minimum length (measured more or less parallel to the shoreline) of 1.5 miles.

3. Additional areas were included if they met the following criterion:

   Areas supporting exemplary dune asssociated plant communities as identified by MNFI, within the boundaries of a designated sand dune area.

   plant communities:
   > interdunal wetlands
   > coastal plain marsh
   > dune and swale complex
   > open dunes
   > mesic southern forest
   > dry mesic southern forest
   > mesic northern forest



During the initial phase of the work, all available background and source materials were reviewed by the team. Each team member became familiar with all phases of the interpretation project including the MDEQ mapping criteria (see Table 1), definitions, and standards. Following this familiarization phase, the team analyzed a pilot area as a means of evaluating the MDEQ criteria. All project participants (project manager, senior analyst, and the photo interpreters) worked together to study an arbitrarily selected stretch of shoreline to review existing and potential Critical Dune Areas. A series of questions resulted from this initial method review. On October 4, 1995, the MSU team met with the following staff from the Great Lakes Shorelands Section, Land and Water Management Division to resolve these issues: Steve Debrabander, James Ribbens, and Christy Fox. The following decisions were made at this meeting:

1.   *Is there a spatial contiguity requirement for CDAs? That is, do otherwise acceptable dune polygons which are physically separated from the shore-bound CDA polygon get included?*

     No, there is no contiguity requirement, detached polygons within the two mile shore buffer are acceptable.

2.   *How irregular may the boundary of a CDA polygon be? Is there a minimum width for protrusions of CDA or intrusions of non-CDA lands?*

     Be as accurate as possible in delineating the CDA boundary. There is no prescribed width criteria to peninsulas or reentrants.

3.   *What unit area of analysis should be used to evaluate the local relief (e.g., 40 ac, 10 ac, 2.5 ac)?*

     No decision was taken on this issue. It was determined that a strict unit area of analysis had not been employed by MDEQ staff during their mapping of CDAs. There was consensus among MDEQ staff and the MSU team that the unit area should be somewhere in the range of 10 to 40 acres. The MSU team committed to a mini-study to evaluate this issue. Upon conclusion of the mini-study, MDEQ staff will review the recommendations of the MSU team and finalize the relief criteria method.

4.   *How was the 1.5 mile shore length criteria actually employed? Does it refer to the actual length of the polygon measured along its longest axis or to the length of the shoreline subtended by rays projected from the ends of the CDA polygon at right angles to the shoreline?*

     This criteria was not rigorously employed in a quantitative manner. Rather, the polygon was visually evaluated to estimate whether a trend line quasi-parallel to the shore and passing through the polygon was about 1.5 miles in length.



**Center for Remote Sensing**
**Michigan State University**

5.   *Is there a minimum area threshold for individual CDA polygons?*

After some discussion, and refering back to the previous dialog about shore length, a concensus rule was developed that CDA polygons must be >= 40 acres in size. The rationale was that a 40 ac. or larger CDA polygon (considering only the portion within the 2 mile shore buffer) might not have a projected shore length of 1.5 miles but would nevertheless be recognized as a Critical Dune Area by most observers. Conversely, it was decided that if any of the very abrupt, longitudinal dunes which might be 1.5 miles or greater in length were not 40 acres or more in size they would be too small to include in the regulated class of CDA. In order for a polygon to be less than 40 acres in size and be 1.5 miles in length, its width must be less than 220 feet. At the mapping scale of 1:24,000 (1":2,000'), this ground distance distance appears as a width of only 0.11 inches.

6.   *Which soil textures should be used for "dune sand"?*

Concensus was reached that the upper horizons (A, E, or B) could be loamy sand or sand, but that the C horizon must be sand (but not stratified sand and gravel).

7.   *Regarding the two-mile inland limit of the study, if a CDA polygon extends beyond the two-mile limit does it get truncated at the limit line or mapped inland to its natural border?*

This should not happen since the two-mile limit was created in part to handle this problem. If some rare circumstance does occur, the CDA must be truncated along the two-mile inland limit.

On October 18, 1995, the MSU team met with MDEQ staff (Steve Debrabander and James Ribbons) to review the results of the local relief mini-study (see question 3 above). Several new questions were discussed and resolved:

*Regarding map generalization, should two or more CDA polygons be merged into one larger polygon when they occur close to one another? If so, what is the maximum gap size? Also, what is the minimum size of an area to be excluded from within a CDA polygon when it fails the local relief criteria.*

The aim of the project is to capture as little non-CDA terrain as possible within any CDA polygon. Therefore, do not merge proximal CDAs, show them as distinct areal units. In an attempt to be as precise as possible, necks and blanks of non-CDA terrain within and around a CDA polygon must be wider than 0.1 inches to be shown at the scale of 1 inch: 2,000 feet (i.e., they must be approximately 200 feet or more wide to be mapped.



**Center for Remote Sensing**
**Michigan State University**

After a thorough review of the mapping results of the various criteria trials over the same test area (i.e., local relief assessed in unit areas of 10 ac., 40 ac., and 160 ac. using local-relief thresholds of 20 ft., 40 ft, and 60 ft.) the MSU team recommended and the MDEQ staff concurred that the standard for mapping Critical Dune Areas should be:

> ❑    The unit area for assessing local relief shall be 10 acres
>
> ❑    The local relief threshold for inclusion as a CDA shall be >= 40 feet
>
> ❑    CDAs must be 40 acres or larger in size irrespective of their projected shoreline length
>
> ❑    A CDA must be composed primarily of dune sand (C horizon = sand not stratified sand and gravel)
>
> •    These criteria do not apply to Barrier Dunes as designated pursuant to 1976 P.A. 222 as amended

The above analysis and discussion was conducted in fullfillment of the directive given in Section 23a of the 1994 amendments to the Sand Dune Protection and Management Act (1994 PA 135) and restated in Section I-A of the Request For Proposal that the contractor was to conduct "... a review of the underlying criteria used to determine critical dune areas that would provide more precise protection to the targeted resource." *Several changes in the criteria to be used for mapping CDAs were recommended and adopted by the Land and Water Management Division, MDEQ. These changes are:*

1.    Employ a 10-acre unit area within which to evaluate local relief. This makes the relief criterion much more spatially precise. The previous MDNR criteria did not include this parameter.

2.    Use a minimum local relief threshold of 40 feet. The implemented procedure required four 10-ft. contour lines to be within the sand dune feature (i.e., the interpreters did not interpolate between contour lines in order to "get" 40 ft. of local relief). The previous MDNR criterion used a threshold of 20 feet. This change ensured that the targeted resource that was mapped would be very obvious in the field and on maps and airphotos.

3.    Employ a 40-acre minimum polygon size for CDAs. This criterion was much easier to impliment than the previous MDNR criterion of 1.5 miles of projected shore length. Once again, this change was agreed upon in order to ensure that the CDAs that were mapped would be very obvious in the field as well as on maps and airphotos.



**Center for Remote Sensing**
**Michigan State University**

## Barrier Dunes and their Relationship to Critical Dune Areas

The following discussion is extracted from the original Barrier Dune report (Buckler, 1978):

The Sand Dune Protection and Management Act (Michigan Legislature, 1976) defines a barrier dune as "the first landward sand dune formation along the shoreline of a Great Lake or a sand dune formation designated by the department" (Michigan Department of Natural Resources, 1978). This definition is somewhat ambiguous, and it is most difficult, if not impossible, to clearly designate a barrier dune from a morphological point of view, given the types, arrangements, ages and evolutionary processes of the lakeshore dunes.

The delineation of the "barrier dune", therefore, is not included in the scheme of the Dune Morphology Classification of the Lake Michigan Shore. It must be defined as a separate entity. Dune types vary along the shoreline and so must the morphologic and geometric characteristics of the barrier dune.

...

In the spirit of P.A. 222 the barrier dune seems to refer to a dune assemblage which separates the present-day shorezone and the interior environments. It is the landward edge of the recreationally oriented, "aesthetically pleasing" shoreland and the lakeward edge of inland oriented activities. It is a sand formation whose relief and location impede interaction between the two areas. In essence, the barrier dune is a buffer zone, but a buffer zone which seems more important, and unique, to the littoral rather than the terrestrial environment. ...

To realistically delimit the barrier dune formation the following prerequisites were assumed:

1. Logical criteria should be establised so that it can be defined as objectively as possible.

2. Its definition must allow for variation in its morphologic and geometric characteristics.

3. Its boundaries, and especially its landward limit, should be relatively easily recognized and delineated on stereo-paired aerial imagery at a scale of 1:20,000 and larger.

4. It should be a relatively permanent formation.

...

As a practical definition, this study has identified the BARRIER SAND DUNE FORMATION as <u>that first* dune assemblage whose forms display the greatest relative relief within the officially designated "sand dune areas"</u> (Michigan Deparment of Natural Resources, 1978); <u>its inland boundary is at the base of the assemblage's landward limit.</u> ...

* In cases where two different dune assemblages within the sand dune area have similar relative relief, the most lakeward assemblage would normally be the recognized barrier sand dune formation.



As Buckler clearly pointed out, the barrier dune is not a morphologically defined landform.  It is defined solely on the basis of its position relative to the shoreline.  Critical Dune Areas, on the other hand, are defined on the basis of morphology, primarily their local relief.  As discussed above, one of the original MDNR criteria that was not changed was that all barrier dunes designated pursuant to 1976 P.A. 222 were automatically members of the Critical Dune Areas.  It should be noted, however, that because they are delineated using different criteria, *numerous portions of the designated Barrier Dunes do not meet the relief criteria established for Critical Dunes Areas.*

In keeping with the terms of this contract, the MSU team did not alter the delineation of any of the previously mapped barrier dunes except in two cases.  First, where obvious digitizing errors had occurred (i.e., the map in the Atlas of Critical Dunes did not match the original Barrier Dune delineation - the so-called Buckler maps) the correct line position is shown on the evaluation maps. The second case involves correcting mapping errors in the original Series I, II or III Barrier Dune Mapping Projects conducted for the Geological Survey Division, MDNR.  This is necessary, because at the time the Barrier Dune Mapping Projects were conducted, numerous areas along the Lake Michigan shore, in west and northwest Lower Michigan in particular, were mapped by the USGS only at the 15-minute quadrangle level of detail (1:62,500 scale, usually with a 20 ft. contour interval).  In comparison, the largest-scale topographic map now available for these areas is the 7.5-minute, 1:24,000 quadrangle which typically has a 10 ft. contour interval.  In the original Barrier Dune Mapping Projects, all maps were compiled at the 1:24,000 scale, but those areas lacking a 7.5-minute map were completed by photo-enlarging the 15-minute (1:62,500) quadrangle by a factor of 2.604.  In such cases, the basemap becomes a 1:24,000-scale product, but its inherent spatial accuracy in both the horizontal and the vertical domains remains those associated with the original 1:62,500 scale.

The horizontal National Map Accuracy Standard (NMAS) for both the 1:24,000 and the 1:62,500 quadrangles is *90% correct +/- 1/50 inch at scale*.  For the 7.5-minute quadrangle that measures +/- 40 feet; for the 15-minute quadrangle it measures +\- 104 feet.  The vertical NMAS for both maps is *90% correct +\- one-half a contour interval*.  For maps with a 10 ft. contour interval that means +/- 5 feet; for those with a 20 ft. contour interval (e.g. many of the 15-minute quads) it measures +/- 10 feet.  It should be expected that some "errors" exist in the original Barrier Dune Maps, induced solely as result of the scale differences of the topographic maps.

## Examples of Problem or Change Areas

Figure 3 illustrates the application of the 40 ft. local relief criterion regarding the delineation Critical Dune Areas.  Polygons "A" and "B" are examples of the type of terrain which were added as new CDAs.  The sand ridge noted at "C", however, does not exhibit 40 feet of relief and therefore is not a qualified CDA.  Also shown on Figure 3, at "D", are two portions of a designated Barrier Dune which do not meet the relief criterion for CDA. Areas such as this



**Center for Remote Sensing**
**Michigan State University**

exist in many places within the Designated Sand Dunes Areas of Michigan. As discussed above, this project was not authorized to, and did not, edit any of the Designated Barrier Dune polygons due to low relief. Digitizing errors were, however, corrected. In Figure 4, the area shown at "1" illustrates the correction of such an error. The sand ridge at "2" is typical of a dune area that is too small in size to qualify as a CDA. Finally, the dune at "3" is an example of a newly added CDA. In this case, the addition itself is less than 40 acres in size but it is acceptable due to its contiguity with an adjoining dune assemblage (a designated Barrier Dune).

T. 7 R. 16 W.



Figure 3. Examples of CDA mapping problems.



**Center for Remote Sensing**
**Michigan State University**

12



Figure 4.  Examples of change areas from the reevaluation of the *Atlas of Critical Dunes.*

## Reevaluation of the Atlas Critical Dunes

Appendix A presents the details of the quadrangle folders, their relationship to the pages of the *Atlas of Critical Dunes*, the names of the USGS quadrangles (both current and previous) involved , the relationship of the folder number to the Series I, II, or III Sand Dune Area designations used by the Geological Survey Division, the status of the soil surveys in the various areas, and the status of the revision mapping conducted by this project.  Of the 72 pages in the *Atlas of Critical Dunes,* changes are recommended on 60 of them (as shown in the extreme right hand column of Appendix A).

The actual changes (additions, deletions, or linework alterations) are graphically depicted on the various registered overlays presented in Appendix B.  Where changes to the *Atlas* were suggested or suspected by MDEQ staff (as shown by circled question areas), the page from the *Atlas* is reproduced and annotated regarding the review recommendations.  Following the page from the *Atlas,* the one or more overlays to the 7.5-minute quadrangles are presented.  These graphics are plotted at the scale of 1:24,000 and serve as registered overlays to the USGS 7.5-minute quads to which they refer.  Registration is achieved via the section-corner tic marks.  These maps are presented in Folder number sequence with respect to the USGS quadrangle format.  The folder number generally increments northward along the west shore of the Lower Peninsula.  In the Upper Peninsula, the folder numbers increment westward along the north shore of Lake Michigan and again westward along the Lake Superior shoreline from Chippewa County to Keeweenaw County.



**Center for Remote Sensing**
**Michigan State University**

13

# References

Buckler, William R.  1978.  Dune Type Inventory and Barrier Dune Classification Study of
    Michigan's Lake Michigan Shore.  Contract report from the Remote Sensing Project,
    Michigan State University submitted to the Geological Survey Division, Michigan
    Department of Natural Resources.  71 p.

Buckler, William R.  1979.  Dune Type Inventory and Barrier Dune Classification Study of
    Michigan's Lake Michigan Shore.  Report of Investigation 23. Lansing, Michigan: Geo-
    logical Survey Division, Michigan Department of Natural Resources.  31 p.

MDNR.  1978.  Proposed designated dune areas: Series I. Lansing, Michigan: Geo
    logical Survey Division, Michigan Department of Natural Resources.  18 p.

MDNR.  1989.  Atlas of Critical Dunes.  Lansing, Michigan: Land and Water Management
    Division, MDNR.  February 17, 1989 (reprinted February, 1993).  74 p.

Exhibit 12
Case No. 1:08-cv-01400

**SUMMARY DOCUMENT**
**For Public Review**

**CITY OF BENTON HARBOR**
**JEAN KLOCK PARK CONVERSION AND MITIGATION PROPOSAL**
**In reference to**
**Land and Water Conservation Fund Grant #26-00568**

*This Summary Document is intended to be read in conjunction with the documents contained in the attachments. Together, these documents provide an overview of the Conversion and Mitigation requested under the Land and Water Conservation Fund Grant program and an examination of the potential impacts of this request on the human environment.*

### City of Benton Harbor's Land and Water Conservation Fund (LWCF) Grant

The City of Benton Harbor (City), Michigan received a LWCF grant (#26-00568) in 1977 in the amount of $50,000 for site improvements and construction of a bathhouse in Jean Klock Park ("Park"). The federal LWCF grant was issued by the National Park Service (NPS), administered by the Michigan Department of Natural Resources (DNR), and matched with $50,000 provided by the City. The City completed the project and the final grant payment was made in 1979.

### Land and Water Conservation Fund (LWCF) Program

The federal LWCF Grants Manual Section 675.9 states, in part: "Property acquired or developed with L&WCF assistance shall be retained and used for public outdoor recreation. Any property so acquired or developed shall not be wholly or partly converted to other than public outdoor recreation uses without the approval of the NPS Regional Director pursuant to Section 6(f)(3) of the L&WCF Act and 36 CFR Part 59. The Director has the authority to disapprove conversion requests and/or to reject proposed property substitutions." The entire LWCF Grants Manual is available on the National Park Service website at: *www.nps.gov/ncrc/programs/lwcf/manual/ lwcf.pdf/*

Under certain circumstances, conveyance of rights in park land (through lease, easement, or sale) meets the regulatory definition of a conversion. Converted land area is normally required to be replaced with land of equal or greater monetary value and recreation usefulness. The replacement land is often referred to as "mitigation" for the conversion.

The City of Benton Harbor initiated the conversion process and is the applicant. The administering agency in the process is the Department of Natural Resources (DNR). The DNR works with the grant recipient (the City of Benton Harbor) to compile all required information and prepare a submittal to the National Park Service (NPS) for approval. Public review of the conversion and mitigation proposal is an important step in the process. The grant recipient is responsible for publishing a public notice, conducting public meetings, making the proposal documents available for public review, gathering comments from the public, and addressing any substantive comments in the final proposal.

*Description of the Proposed Conversion and Mitigation*

The City requests approval for partial conversion of Jean Klock Park, a City-owned grant-assisted site along Lake Michigan in Benton Harbor. The proposal is to convert 22.11 acres of the 74-acre Park for three holes of a public golf course to be designed by Nicklaus Design as a Jack Nicklaus "signature" public golf course.

Thirty-eight acres of replacement land will be provided as part of the conversion, with over $2,500,000 of upgrades, road improvements and walking trails provided for the park system. An important element of the conversion is the mitigation acreage, connecting the Park from Lake Michigan to the St. Joseph and Paw Paw Rivers, with walking trails into the downtown and neighborhoods of the community.

The conversion area includes part of the Park's sand dunes, current parking lot, Jean Drive, and a portion of the wetland. The City will continue to own the conversion area and will lease the property to Harbor Shores Community Redevelopment, Inc., a not-for-profit corporation, ("Harbor Shores") for development and management of the public golf course and maintenance of the Park. Refer to **Attachment F**, Lease Agreement, and **Attachment G**, Park Improvements and Maintenance Agreement. The golf development area will not include any of the Lake Michigan beach or the lake side of the sand dunes.

## Information for Meeting Federal Responsibilities Under the National Environmental Policy Act

**1) Brief discussion of: the need for the proposed action, alternatives to the action, description of the affected environment, environmental impacts of the proposed action, and any other applicable environmental laws or executive orders.**

*Background:*

Jean Klock Park was established in 1917 when John Nellis Klock and Carrie E. Klock deeded land, including all reversionary rights, to the City. The Park was a popular public beach into the 1950's, when state highway M-63 was constructed and the Paw Paw River consequently redirected. The highway and river effectively separated and isolated the City's downtown and residential areas from the Lake Michigan beach.

In the past 40 years, use of Jean Klock Park has declined, paralleling the City's economic downturn. The City's population and tax base declined, while poverty statistics, such as unemployment and illiteracy rates rose.

Following a civil unrest in 2003, Governor Jennifer Granholm formed a 22-member task force to address the many issues affecting the City's residents. The task force consisted of community residents, and leaders from the civic, business, faith and government sectors of the City. The Citizens for Progressive Change (CPC) organization was formed, with membership open to anyone wanting to participate. Ten workgroups were established to gather input from the community on issues of concern, and offer solutions to the task force for addressing those issues. The workgroups and task force were to search for solutions and partnerships that involved leveraging existing public resources with corporation, foundation, and charitable resources. "Economic Development" and "Recreation, Arts and Culture" were two of the issue areas addressed by the workgroups. Refer to **Attachment A**, Executive Summary of "Benton Harbor, A Plan for Positive Change: Final Report of the Governor's Benton Harbor Task Force" dated October 15, 2003.

2

The conversion proposal described here is part of the larger Harbor Shores Community Redevelopment Project (the Project), a community redevelopment initiative involving over 500 acres of land in the cities of Benton Harbor and St. Joseph, and Benton Charter Township, in Southwestern Michigan. The development is being led by Cornerstone Alliance and the Alliance for World Class Communities, two long standing not for profit organizations. The third partner is the Whirlpool Foundation. The not for profit development structure is intentional so that any and all cash flow that is realized from the project will be granted back to the community in the future. Land in St. Joseph is ready for development and needs little to no infrastructure improvements. Land in Benton Harbor remains burdened with much needed and expensive infrastructure improvements, environmental clean up and special preparation requirements due to the current soil conditions.

An agreement commonly referred to as an "Act 425 Agreement," between the city of St. Joseph and the city of Benton Harbor permits use of incremental tax revenues from property that was located in St. Joseph to finance approximately $70 million of infrastructure work, including dredging and environmental cleanup of the Paw Paw River. The agreement, and hence the use of tax revenues from St. Joseph for the sooner of 25 years or when the costs are reimbursed are in effect paying for costs that would normally have burdened the residents of Benton Harbor.

The Harbor Shores Project is redeveloping land, including abandoned industrial sites, and addressing community needs such as job creation, education, literacy, housing, and recreation. Over the course of more than two years, the City has worked with Harbor Shores, together with local partners, state and federal agencies, and planning experts, to design the Harbor Shores Project.

***The proposed action:***

The Project includes converting 22.11 acres of Jean Klock Park to other outdoor recreation uses and redeveloping the remainder of the Park to better suit public access and use. The current use of the proposed conversion area is the access road known as Jean Drive, the large parking lot for 306 vehicles, an overgrown picnic pavilion, a trail from the pavilion to the beach and the roadway which provides access to the beach between the dunes. Thirty-eight (38) acres of mitigation land will be provided for the park system, and over 12 miles of walking trails will be constructed. See **Attachment B**, Description and drawing of Jean Klock Park and the proposed improvements. In regards to public recreation, the Harbor Shores Project will provide and fund the following:

    <u>$1,000,000 for Improved Beach Access and Parking</u>
Currently, Jean Drive provides the primary access to Jean Klock Park, with a large parking lot located more than 100 yards from the beach. The sand dunes present a formidable barrier between the parking lot and beach, with a paved road cutting through the dunes and a paved circle driveway available for visitors to navigate. As part of the planned improvements, the current access road and parking lot will be removed and replaced with a new Park entrance, driveway and parking options. The beach boulevard will be re-constructed along its historic footprint, providing vehicular access across the length of the Park in front of the dunes and parallel with the shoreline. Public parking near the new Park entrance and along the boulevard will be provided. The new configuration for the driveway and parking for 298 vehicles will provide barrier-free access for all Park visitors. See **Attachment B, Exhibit 2**, Drawing of Jean Klock Park Improvements.

    <u>$500,000 to Redevelop and Maintain Park Facilities</u>
Jean Klock Park currently has an awkward configuration for parking and beach access, which likely contributes to the low number of visitors at the Park. Some facilities were fairly recently

3

constructed and are in good condition, including a beach pavilion/stage, raised boardwalk along the base of the dunes, and a sidewalk with benches and lighting at the base of the dunes on the Lake Michigan side.   These facilities will remain in place as the redevelopment plan is implemented.   The City and Harbor Shores have entered into a formal written agreement for extensive improvements to Jean Klock Park facilities in need of replacement. New facilities to be constructed include picnic areas in the Park's interior open space.

Maintenance of the Park has been a challenge for the City in light of its recent economic condition.  Removal of shifting sands has been a constant concern, in addition to general upkeep of infrastructure, removal of trash, obstructed access to the beach, and repair and cleaning of facilities.  The Park's concession building, which also incorporates the public restrooms, is in a state of disrepair and is not hooked up to the public sewer system.   Some areas of the Park apparently have been used as unofficial dump sites – for household trash and, occasionally, appliances.  To address these issues, the City and Harbor Shores have entered into an agreement requiring Harbor Shores to provide for maintenance of the entire Park and encourage local use of the public golf course, making it part of the outdoor recreation provided within Jean Klock Park. Harbor Shores will pay for extensive repairs to the concession building: plumbing, electrical, tiling, carpentry, etc.  A new sewer lift station is also planned to link the facility to the public sewer.  Refer to **Attachment G,** Park Improvement and Maintenance Agreement.

<u>Create a Trail System</u>
The public will have improved and expanded access and use of public spaces through the creation of an extensive 1.5 million-dollar, 12.8-mile public trail system and foot bridges linking Jean Klock Park to park sites along the Paw Paw River, downtown Benton Harbor, and residential areas.

See **Attachment B, Exhibit 1,** Trailway System Map.


*Alternatives to action, including no action:*

In forming this proposal, the City, Harbor Shores, and planners worked extensively with government agencies which resulted in selection of the preferred alternative to place three holes of a signature public golf course in Jean Klock Park, as explained below.  The preferred alternative will allow the City of Benton Harbor to make much needed improvements to the Park for the benefit of the community and allow for maintenance of the Park.  Maintenance of the Park is a significant problem, and the Park's degraded condition is one reason for its low use.


<u>Alternative #1: Take no action; leave Jean Klock Park "as is."</u>
By taking no action the current conditions in the city of Benton Harbor would continue, and Jean Klock Park would remain underutilized, with continued poor access and state of continual disrepair.   The network of bike trails and foot bridges linking the downtown to the Park would not be built. Improvements to the Park would not be made.

<u>Alternative #2: Do not construct a signature golf course within the city of Benton Harbor.</u>
From the standpoint of both the City and Harbor Shores, development must occur within City borders to provide the much-needed demand for jobs and increased tax base to transform the community from economically depressed to a vibrant city with bustling commerce.  In seeking to design a golf course that will attract visitors and outside investors to a project of this caliber, the planning team had to seriously consider a Jack Nicklaus Signature golf course.  A Signature course can generate the level of adjacent home sales, investor attention, and golfer interest necessary to produce enough revenues to fund the

4

improvements and community benefits offered by the project. A Signature course requires dramatic elements along the course to warrant the Signature designation. (The dramatic element identified for the golf course in Benton Harbor was the view of Lake Michigan from Jean Klock Park.)

Constructing less than a Signature golf course within the Benton Harbor City limits, not placing three holes within Jean Klock Park, would significantly undermine the ability of the community to attract private investment and could leave the larger community redevelopment project without investors and without a sustaining source of income for maintaining the infrastructure and facilities across the City. Such a lesser golf course: (a) would not attract enough play to generate an operating profit, with the result that the course would be a financial drain; and (b) could be built only by utilizing land designated for development -- development necessary to generate revenues to make the project financially viable.

<u>Alternative #3: Locate golf holes to the west of the proposed location within Jean Klock Park.</u>
The Lake Michigan beach with boardwalk, beach house and pavilion are located west of the proposed layout for the golf holes in Jean Klock Park. Using this area for part of the golf course was determined to be unacceptable early on in the planning process. Though golf holes constructed along the beach would be breathtaking – and would dramatically increase the value of the course – this alternative would be inconsistent with one of the stated goals of the community redevelopment project: to improve, not hinder, the public's access to and use of Jean Klock Park's beach.

<u>Alternative #4: Locate golf holes outside of Jean Klock Park to the south,</u>
The land to the south of the Park is not as conducive for linking to the golf course because of physical impediments associated with the CSX railway. Even if the holes could be located in this area at great financial expense, the land in this location is within the "Act 425" agreement, and must be developed to generate tax revenues to finance infrastructure and environmental cleanup necessary in the city of Benton Harbor to make the larger redevelopment project financially feasible.

<u>Alternative #5: Locate golf holes outside of Jean Klock Park to the east.</u>
Golf holes cannot feasibly be relocated within the City's borders to the east; the design team exhausted alternatives for locating golf holes within the city due to environmental, land, water and regulatory constraints. In an effort to help revitalize Benton Harbor, the project is using property that includes large tracts of land that were abandoned industrial sites, wetland and/or floodplain. The design team thus had to address issues including wetland mitigation, environmental clean up, and limited site accessibility due to topography and poor soil conditions. The designers worked extensively with the United States Environmental Protection Agency, United States Army Corps of Engineers, Michigan Department of Environmental Quality, and Michigan DNR to redesign holes to meet governmental requirements that resulted in the present golf course layout. Additionally, there were extensive negotiations, searches and review conducted by Harbor Shores to acquire land so as to minimize and mitigate impacts to natural resources and still maintain the design requirements of a Jack Nicklaus Signature course.

<u>Alternative #6: Locate golf holes outside of Jean Klock Park to the north.</u>
It is theoretically possible to redirect golf holes to the north into Benton Township, though Harbor Shores has not acquired property for this purpose. The visual elements of the course needed to attract visitors to the area and outside investors would be significantly curtailed. Moving the development north into Benton Township would be at the expense of the city of Benton Harbor, thus creating more of the tax base outside of the City and thus defeating the transformational benefits of the project to the community. In this regard, it should be noted that a 1988 proposal failed largely because it promised to benefit the city of St. Joseph, not Benton Harbor.

<u>Alternatives generally.</u>

When Harbor Shores submitted the first wetlands application for the larger project, 13.57 acres of wetland impact were proposed. Multiple meetings with the above-referenced agencies, and two fully-noticed public hearings were held. The first Public Notice was issued on September 21, 2005, with the Public Hearing held on November 1, 2005, and the second Public Notice was issued on November 9, 2006, with the Public Hearing held on January 9, 2007. Through this process, the wetland impact was reduced to 3.82 acres in response to community (including public comments from the Paw Paw Watershed Group) and government agency input. This 72% reduction of wetland impact was achieved through numerous re-designs of the golf course over a one-and-a- half-year period to minimize and avoid wetland impacts. In areas where natural slopes were proposed, retaining walls were put into the design to minimize wetland impact. Entire golf holes were re-positioned to avoid and minimize wetland impacts, resulting in less land available for future residential development (due also in part to the lack of additional property available for expansion of the project).

<u>Loss of Improvements to Park & Mitigation Parcels Associated with Alternatives #1-6.</u>
If any of Alternatives #1-6 are implemented, none of the following improvements will be made to the park system.

- Boat launch on the Paw Paw River (motorized boats)
- Boat launch for canoes and kayaks
- Fishing platforms
- Pedestrian bridges over wetland areas, and a large walking bridge over the Paw Paw river to improve access to the Park
- Picnic tables, barbecue grills, trash receptacles & bike racks
- Elevated wooden observation decks
- A riverwalk
- A network of bike, rollerblade and walking trails
- Removal of the oversized parking lot that dominates the center portion of the Park, and restoration of that area to open space with trails and picnic areas
- Restoration of the original Park design with non-obstructed parking accessible to the beach
- Extensive renovations to the concession facility (now in bad disrepair) and hook-up to sanitary sewer.

*Affected environment, including baseline conditions that may be impacted by the proposed action and alternatives:*

Refer to **Attachment B, Exhibit 2** for location map and drawings depicting Jean Klock Park before and after conversion of the Park property.

*Environmental impacts of proposed action and alternatives, including any unresolved conflicts concerning alternative uses of available resources:*

Refer to **Attachment C** for an environmental assessment report for the conversion area in Jean Klock Park.

The environmental assessment report describes the conversion area as "composed of dunes near Lake Michigan, and lower and essentially flat land to the east." The dunes within Jean Klock Park, although characterized as a low dune system, are not regulated as a "critical dune" under Part 353 Sand Dune

Protection and Management of Michigan's Natural Resources and Environmental Protection Act (NREPA 1994 PA 451, as amended).

Three rare plants were identified within Jean Klock Park during the field work conducted in preparation of the environmental assessment: rose pink (*Sabatia angularis*), wild bean (*Strophostyles helvula*) and swamp rose mallow (*Hibiscus moscheutos*). The state of Michigan lists swamp rose mallow and wild bean as species of "special concern" and lists the rose pink as a "threatened" species under Part 365 Endangered Species Protection of NREPA. Species of special concern are not afforded regulatory protection under Part 365, but are of interest due to concerns with declining population or undetermined extent of occurrence within the state.

Threatened species are protected under Part 365 regulations, and the DNR Wildlife Division provided comments on how negative effects to rose pink could be avoided. Measures for avoiding impacts to the rose pink population in Jean Klock Park include: marking the rose pink population and avoiding the area during construction of the golf course; removing woody vegetation to improve conditions for rose pink; minimizing use of fertilizers and pesticides for golf course maintenance; not mowing areas where rose pink is known to occur; identifying rose pink areas as "no play" zones for golfers; and maintaining proper hydrology in the Park's wetland. The DNR Wildlife Division also recommended development of a rose pink monitoring program. Such a program could provide valuable information by annually estimating the size and distribution of the rose pink population and by assessing any relevant effects of construction, management and maintenance in adjacent areas.

***Environmental justice and socioeconomic considerations:***

Executive Order 12898 directs federal agencies to incorporate environmental justice into their decision making process by identifying and addressing, where appropriate, any disproportionately high and adverse environmental effects of their decisions on minority or low-income populations. According to the 2000 census, the City of Benton Harbor is made up of 94.5% of people identifying themselves as a minority. This is in contrast to 56.5% for the combined population for the City of Benton Harbor, the City of St. Joseph, and Benton Charter Township and 20.3% for Berrien County as a whole. Because Jean Klock Park is located within the City of Benton Harbor, the minority residents of that city are potentially the most affected by any impacts to the Park.

The 22.11 acres being converted to public golf holes are located on the east side of the dunes. The lakeside of the dunes will not be disturbed. Mitigation measures will be taken to protect the state-listed threatened species in the Park, and the management plan will ensure no adverse impacts from the management of the golf holes. See **Attachment C**, Environmental Assessment – Conversion Parcels. Additionally, residents' use of the Park will not be interrupted. The new proposed roadway and parking areas will be built before the existing ones are removed. The use of the Park for public, family and religious events will remain as before the Conversion.

Benton Harbor residents' use of and access to the Park will be substantially enhanced. The maintenance and upkeep of the Park will be improved, the bathhouse will be restored, and the Park facilities will be connected to the municipal sewer system. An interconnected Trailway System will be created that links downtown Benton Harbor, the Paw Paw River, the St. Joseph River, and the Park, significantly increasing minority residents' ability to use and enjoy the Park. See **Attachment B, Exhibit 2.** No negative environmental impacts are anticipated associated with the Mitigation Parcels. See **Attachment E**, Environmental Assessment – Mitigation Parcels.

The Trailway System will link the Park to one of the largest per capita funded federal Hope VI Projects in the country. Over 325 units of new affordable and Renaissance Zone homes (including Benton Harbor Housing Commission and Jimmy Carter "Harbor Habitat" units) are being constructed at the entrance of Hull Park, which will be connected by the walking system through the downtown and into Jean Klock Park.

The Park improvements, Mitigation Parcels and trail system will provide new and expansive active and passive outdoor recreational opportunities, such as volleyball, picnicking, hiking, fishing, biking, canoeing, golfing, and viewing of wildlife, wetlands, and the Paw Paw and St. Joseph Rivers. As a result, there are no high and adverse impacts to the minority residents of Benton Harbor resulting from the Conversion.

Without the Project, the Park infrastructure improvements will not be conducted. Maintenance will remain the responsibility of the City of Benton Harbor, which has limited funds for the Park. The minority residents of the City of Benton Harbor will not gain the increased recreational opportunities.

Converting these 22.11 acres to three golf holes provides a way for the City of Benton Harbor to participate in the Harbor Shores Community Redevelopment project, a project whose profits will be returned to the community as part of a broad-based effort to transform the City of Benton Harbor. *Twenty percent (20%) of the annual net operating income of the overall golf course will be paid to the City of Benton Harbor Community Benefits Program. The remaining eighty percent (80%) will be applied to the Harbor Shores Community Benefits Program, a program that will be established by Harbor Shores to benefit the residents of the City of Benton Harbor, St. Joseph, and Berrien County.* See **Attachment F**, Lease Agreement. The goals of the Harbor Shores Community Benefits Program include improving K-12 student performance, increasing literacy and providing adults with life skills and workforce training, facilitating home ownership opportunities, and developing a strong local government.

Additionally, the Lease Agreement provides certain commitments to employ City of Benton Harbor residents for the construction and maintenance of the improvements to Jean Klock Park and for the overall golf course. See **Attachment F**, Lease Agreement.

*Other applicable environmental laws and executive orders:*

Michigan Natural Resources and Environmental Protection Act (1994 PA 451, as amended)
| | |
|---|---|
| Part 31 | Water Resources Protection; floodplains |
| Part 91 | Soil Erosion and Sedimentation Control |
| Part 201 | Environmental Remediation |
| Part 301 | Inland Lakes and Streams Protection |
| Part 303 | Wetlands Protection |
| Part 365 | Endangered Species Protection |

National Historic Preservation Act
Section 106; administered by the Michigan Department of History, Arts and Libraries, Michigan State Historic Preservation Office

Federal Clean Water Act
Section 404; administered by the Michigan Department of Environmental Quality, Land and Water Management Division, in conjunction with the US Army Corps of Engineers with oversight by, and in consultation with, the US Environmental Protection Agency

**2) Listing or summary of consultation undertaken with any federal agency, state or local government, federally-recognized Indian tribe regarding compliance with applicable laws and executive orders**

      United States Environmental Protection Agency
      United States Army Corp of Engineers
      Michigan Department of Natural Resources, Michigan Natural Resources Trust Fund Board
      Michigan Department of Natural Resources, Grants Management
      Michigan Department of Natural Resources, Wildlife Division, Endangered Species Program
      Michigan Department of Natural Resources, Office of Land and Facilities
      Michigan Department of Environmental Quality, Land and Water Management Division
      Michigan Department of Environmental Quality, Remediation and Redevelopment Division
      Michigan State Historic Preservation Office
      Southwestern Michigan Commission
      Southeast Michigan Council of Governments
      Berrien County, Michigan

**3) Identification and description of mitigation measures considered, including any mitigation measures that must be adopted to ensure the action will not have significant impacts.**

As explained previously, conversion of all or part of a LWCF grant assisted site requires mitigation with replacement land. The proposed mitigation needs to meet certain criteria for approvability as specified in the LWCF Grants Manual. In addition to the brief descriptions provided here, refer to **Attachment D** for a location map and site plans for recreational development of the mitigation properties. Refer to **Attachment E** for an environmental assessment report for the mitigation properties. Note that some changes have been made to the proposed mitigation since the report was completed. Acreages and current status of the mitigation sites is as described in this narrative and as shown on the drawings found in Attachment D.

Mitigation steps also include: Harbor Shores' agreement to assume the responsibility and cost of maintaining the Park; complete renovation of the concession and public restrooms building; connection of the Park to sanitary sewer; construction and maintenance of pedestrian bridges, trails, wooden observation areas, picnic tables, barbecue grills, and boat launches.

The environmental assessment report describes the mitigation properties as follows:

    Mitigation Parcel A: located northwest of the intersection of M63 and Klock Road, adjacent to Jean Klock Park. Wetlands described as emergent, scrub-shrub, and wet meadow cover most of the parcel. (Note that Parcel A is no longer proposed as part of the mitigation properties, although the City plans to reincorporate the parcel into Jean Klock Park.)

    Mitigation Parcel B: undeveloped land along the Paw Paw River just southeast of Klock Road. About one third of the parcel is scrub-forest upland, with the remainder being wetlands of the emergent and scrub-shrub types associated with the Paw Paw River.

    Mitigation Parcel C: upland and wetland along the north shore of the Paw Paw River between highway M-63 and North Shore Drive.

Mitigation Parcel D: upland and wetland; part of the upland is mowed with the rest comprised of scrub forest over uneven terrain comprised of old fill and waste material. The wetland portion of the parcel is made up of scrub-shrub, emergent, and submergent wetland types.

Mitigation Parcel E: undeveloped land within a large bend of the Paw Paw River. About 14 acres is wetland, primarily of the emergent type, but also including scrub-shrub and forested wetland, and some open water areas. About one half acre is characterized as upland, with shrubs growing on top of old fill and waste material.

Mitigation Parcel F: land along the Paw Paw River near the CSX rail bridge and Graham Avenue. Less than 1 acre of the parcel is wetland, mostly scrub-shrub and emergent wetland along the edges of the property. The upland portion of the parcel is comprised of scrub forest on top of old fill and waste material, and remnants of a gravel road.

Mitigation Parcel G: undeveloped land within another large bend of the Paw Paw River, east of the CSX railroad near Stevens Drive. About 5 acres of the parcel is wetland of the emergent and scrub-shrub types, within the river's floodplain. The small upland portion of the parcel is scrub forest on top of old fill material.

Mitigation Parcel H: undeveloped land at the confluence of the St. Joseph and Paw Paw rivers; some wetland along the water's edge, but most of the parcel's area is comprised of upland with gravel parking lot, some old asphalt surfacing, and dredge spoil deposits.

The environmental assessment identified two rare plant species on the mitigation sites: rose pink (*Sabatia angularis*), listed by the state of Michigan as "threatened," and swamp rose mallow (*Hibiscus moscheutos*) listed by the state of Michigan as "special concern." See **Attachment E**. Part 365 of NREPA provides regulatory protection for threatened species, and the recommendations outlined for avoiding harm to the rose pink in Jean Klock Park also apply to the mitigation sites. Parcel A, adjacent to Jean Klock Park, is the only mitigation site where the rose pink has been found to occur. Note that although this City-owned parcel will be reincorporated into Jean Klock Park, it has been dropped from consideration as a mitigation site. Even so, the City will be required to avoid harm to the rose pink population and to ensure that golf course operations do not cause harm to this threatened plant species.

As explained earlier, Part 365 of NREPA does not provide regulatory protection for species of special concern, but species with this designation are of interest due to declining populations or unknown extent of occurrence in the state. According to the environmental assessment report, swamp rose mallow was found throughout the emergent wetlands on all of the mitigation sites.

In addition to an environmental assessment report, a "due care" plan for compliance with Part 201 Environmental Remediation of NREPA was prepared and submitted to the Remediation and Redevelopment Division of the Michigan Department of Environmental Quality (DEQ). The DEQ reviewed the data and provided comments to the DNR regarding remedial work needed for the mitigation sites to be appropriate for public recreational use.

In the absence of generic statewide clean-up criteria for outdoor recreation sites, the DEQ applied generic residential clean-up criteria – the strictest set of criteria – for most substances found on the mitigation sites. Site-specific recreational clean-up criteria had been previously developed for another location in Berrien County, a site in the city of Buchanan. The DEQ determined that the recreational clean-up criterion of 25 ppm for Arsenic direct contact at the Buchanan site was appropriate and reasonable for the Benton Harbor mitigation sites to be used for public outdoor recreation.

Using these criteria, the DEQ analysis of the data indicated that Mitigation Parcel D and Mitigation Parcel F are in need of remedial action to address soil contamination. The City and Harbor Shores will continue to work with the DEQ and the DNR to ensure the sites will meet standards for public outdoor recreation use. Harbor Shores will conduct all recommended environmental response activities and measures for these two parcels, as advised by the DEQ in its documentation of compliance with the Part 10 Rules, in order to ensure that the public will have a safe environment in which to enjoy the new recreational areas.

### *LWCF eligibility criteria for mitigation properties:*

The LWCF Grants Manual specifies criteria for eligibility of properties to be used as mitigation for conversion of a grant-assisted site. To meet the eligibility criteria, the mitigation properties must::
    (1) be of equal or greater fair market value than the conversion area;
    (2) be of reasonably equivalent usefulness and location as the conversion area;
    (3) not have been previously designated as Parkland by the grant recipient, and;
    (4) otherwise meet eligibility criteria for LWCF grant assistance.

These criteria are addressed below.

(1) Fair Market Value:

The conversion area in Jean Klock Park totals 22.11 acres, with an appraised value of $900,000. The mitigation properties total 38.41 acres, with a total appraised value of $999,500.

Appraisals were performed by an independent appraiser and the reports were approved by the DNR appraisal reviewer in the Office of Land and Facilities. The total fair market value of the mitigation properties was shown to exceed the fair market value of the conversion area.

(2) Reasonably Equivalent Usefulness and Location:

The LWCF Grants Manual outlines (in Chapter 675.9, B(3)) conditions for meeting eligibility criteria, including: "The property proposed for replacement is of reasonably equivalent usefulness and location as that being converted." The paragraph continues… "Equivalent usefulness and location will be determined based on the following criteria:

    (a) Property to be converted must be evaluated in order to determine what recreation needs are being fulfilled by the facilities which exist and the types of outdoor recreation resources and opportunities available. The property being proposed for substitution must then be evaluated in a similar manner to determine if it will meet recreation needs which are at least like in magnitude and impact to the user community as the converted site. **This criterion is applicable in the consideration of all conversion requests with the exception of those where wetlands are proposed as replacement property.**" (Emphasis added)

Approximately 3/4 of the total mitigation acreage is made up of wetlands associated with the Paw Paw River. In addition to the wetlands on the mitigation properties meeting LWCF eligibility criteria in their current condition, the mitigation sites will be developed to accommodate public access and use of the properties. Improvements to the mitigation sites will provide the public with direct access to the Paw Paw River, a continuous biking/walking trail system, and wildlife areas for passive recreation such as bird watching and quiet enjoyment of the natural surroundings.

11

Planned facilities are designed for minimal disturbance to wetlands and riverbanks while accommodating public access needs. Specific elements will include boardwalks, open-pile fishing and viewing decks, trails on upland, parking areas sized appropriately for the sites, and a small boat launch facility. The public outdoor recreation opportunities to be provided by the mitigation properties exceed the usefulness of the area to be converted within Jean Klock Park. As previously described, the conversion area includes part of the Park's sand dunes, current parking lot, Jean Drive, and a portion of the wetland.

A new Park entrance and parking areas will be constructed within Jean Klock Park to replace the facilities removed for golf course development. Refer to **Attachment B** for depiction of Jean Klock Park before and after conversion. Refer to **Attachment D** for site plans depicting development of the mitigation properties.

> The LWCF Grants Manual further states: "In accordance with Section 6(f)(3) of the L&WCF Act as amended by Section 303 of the Emergency Wetlands Resources Act of 1986, wetland areas and interests therein which have been identified in the wetlands provisions of the Statewide Comprehensive Outdoor Recreation Plan shall be considered to be of reasonably equivalent usefulness with the property proposed for conversion regardless of the nature of the property proposed for conversion."

Michigan's Statewide Comprehensive Outdoor Recreation Plan (SCORP) references wetlands and floodplains in the context of providing outdoor recreation opportunities in urban areas. Refer to the discussion of the state's recreation plan in the following section of this narrative.

Regarding location of the mitigation properties, the LWCF Grants Manual indicates that this generally involves selecting mitigation property that serves the same community as the conversion site. The mitigation sites for the Jean Klock Park conversion are located nearby, along the Paw Paw River and were chosen for the purpose of providing new public access and use of Parkland within close proximity for local residents as well as visitors.

(3) Previous Ownership and Designation of Mitigation Properties:

Chapter 675.9, Section B, item (4) of the LWCF Grants Manual indicates that in order to be eligible as mitigation, the property must meet the eligibility requirements for L&WCF grant assisted acquisition. The mitigation property must be able to function as a stand alone park, or be part of a viable recreation area. In addition, land currently owned by another public agency may not be used as mitigation unless all of the following conditions are met.

> (a) The replacement land was not originally acquired by the sponsor or selling agency for recreation.
> (b) The replacement land has not previously been dedicated or managed for recreational purposes while in public ownership.
> (c) No Federal assistance was provided in the replacement land's original acquisition unless the assistance was provided under a program expressly authorized to match or supplement L&WCF assistance as described in 670.1.5.
> (d) Where the project sponsor acquires replacement land from another public agency, the selling agency must be required by law to receive payment for the land so acquired.

> The LWCF Grants Manual specifies that "An exception may be made to condition 4(d) only in the case of development projects for which the State match was not derived from the cost of the purchase or value of a donation of the land to be converted, but from the value of the development itself. In this case, public land that has not been previously dedicated or managed

for recreation/conservation use may be used as replacement land even if this land is currently owned by the project sponsor or is transferred from one public agency to another without cost."

Mitigation Parcel A is a small piece of land that was included in the property deeded to the City by the Klock family in 1917. It was purchased from the City by the Michigan Department of Transportation in 1952 along with adjacent acreage, which was conveyed back to the City by the Michigan Department of Transportation in 2003. The City plans to reincorporate the parcel into Jean Klock Park. Due to the parcel's ownership history (it was previously designated for public outdoor recreation), it has been dropped from consideration as mitigation.

Mitigation Parcel B is 3.16 acres of City-owned vacant land along the Paw Paw River just southwest of Klock Road. This parcel will provide direct access to the Paw Paw River for the public as well as support the development of the planned trail system.

Mitigation Parcel C is 5.58 acres of land along the north shore of the Paw Paw River between highway M-63 and the North Shore Drive bridge. Several private residences were located on this property, and the City has acquired the river frontage and wetland for a trail loop and connection with the trail system. This parcel will also provide multiple opportunities for the public to access the river.

Mitigation Parcel D is 5.61 acres of land that had been owned by a convenience store operator and road contractor and was previously targeted for development and operation as a gas station. It was recently acquired by the City and will provide the public with scenic views and opportunities for wildlife observation from an upland trail surrounded by wetland.

Mitigation Parcel E is 14.56 acres of land presently owned by the City and surrounded on three sides by a large bend of the Paw Paw River. This parcel will be incorporated into the City's public park system as a wildlife area with additional river access for the public.

Mitigation Parcel F is 2.38 acres of land along the Paw Paw River near the CSX rail bridge and Graham Avenue. The site is owned by the City and will be developed with a public boat launch and parking.

Mitigation Parcel G is 5.65 acres of land on the Paw Paw River east of the CSX railroad near Stevens Drive. It was recently conveyed to the City for the planned trail system. Including this parcel in the City's public park system will preserve another large bend of the Paw Paw River and bring parkland closer to City residents.

Mitigation Parcel H is 1.47 acres of land at the confluence of the St. Joseph and Paw Paw rivers. The parcel is City-owned and will be developed as a public walkway with waterfront viewing. A popular pastime for residents and visitors to Michigan's coastal areas is to watch boats go by; both recreational and commercial vessels. This particular parcel will provide optimum viewing for this purpose.

Mitigation Parcels H1 and H2 comprise a linear area extending from Parcel H to be used for a public walkway along the new marinas at the north side of the St. Joseph River. Although the City and Harbor Shores have agreed to construct and maintain the public walkway, Parcels H1 and H2 have been dropped from consideration as mitigation.

(4) Eligibility criteria for LWCF grant assistance:

13

The types of <u>acquisition</u> projects eligible for LWCF grant assistance are enumerated in the LWCF Grants Manual, as follows:

    A.  Areas with frontage on oceans, rivers, streams, lakes, estuaries, and reservoirs that will provide water-based public recreation opportunities, or the acquisition of the water bodies themselves.

    B.  Land for creating water impoundments to provide water-based public outdoor recreation opportunities.

    C.  Areas that provide special recreation opportunities, such as floodplains, wetlands, and areas adjacent to scenic highways.

    D.  Natural areas and preserves and outstanding scenic areas where the objective is to preserve the scenic or natural values, including areas of physical or biological importance and wildlife areas.

    E.  Land within urban areas for day-use picnic areas, neighborhood playgrounds, and tot lots; areas adjacent to school playgrounds and competitive nonprofessional sports facilities, as well as more generalized parklands.

The mitigation properties meet the eligibility criteria in A, C, D, and E above. Specifically, the properties:

    A.  include frontage on the Paw Paw River;

    B.  provide special recreation opportunities associated with floodplains and wetlands;

    D.  will preserve wildlife areas; and

    E.  secure land within an urban area for day-use picnic areas and as generalized parklands.

Refer to descriptions of the mitigation properties in previous sections of this document as well as to the maps and site plans in **Attachment D**.

The types of <u>development</u> projects eligible for LWCF grant assistance are also listed in the LWCF Grants Manual. Specific types of eligible projects pertaining to the mitigation properties include: picnic facilities, trails, boating access sites, and fishing access facilities.

<u>Statewide Comprehensive Outdoor Recreation Plan</u>

The 2008-2012 Michigan Statewide Comprehensive Outdoor Recreation Plan (SCORP) was recently approved by the National Park Service for Michigan's Land and Water Conservation Fund Program. The 2008-2012 SCORP replaces the 2003-2007 SCORP, which expired December 31, 2007.

The new updated SCORP presents the results of a supply and demand analysis for outdoor recreation in the state of Michigan. On the supply side, the SCORP concludes (on page 9):

*"The supply of recreational lands and facilities is not always readily accessible for much of the state's population and visitors, with the majority of public land in the northern two-thirds of the state where 15% of the population reside. However, restoration of urban environments coupled with development/renovation of outdoor recreation facilities in or near population centers is feasible and can provide significant outdoor recreation opportunities for the majority of the state's population. Land acquisition by local and state agencies in and near urban areas also provides increasingly valued islands of green space. Linking such islands together with greenways and blueways provides outdoor recreation opportunity as well as ecologically important corridors and connectors for a host of plant and animal species."*

The demand side of the SCORP analysis indicates (on page 9):

14

> *"Demand for land and water trail recreation, motorized and non-motorized, appears to be increasing. This suggests a need to better link existing trail systems. It also suggests integrating trail systems with goods, services and key destinations in ways that promote social harmony through walkable communities and rail-trails for motorized users that allow safe, non-disruptive access to businesses while not using surface streets, thereby promoting safety. Finally, properly integrating trail corridors, as part of greenways and green space, are critical to strategies to help protect sensitive environments such as floodplains and wetlands by appropriate facility location and through design and educational efforts."*

And on page 10:

> *"Population shifts to suburbs and northern Lower Michigan will increase demand for outdoor recreation facilities in these areas. However, urban environments, often with aging facilities, are also in need of facility renovation and new facilities and may struggle with stagnant tax bases."*

The Harbor Shores Project is expressly designed to meet the recreational needs as summarized in Michigan's SCORP, and that are so well documented in Benton Harbor. The City is an urban environment, with a decaying infrastructure and stagnant tax base. City residents need access to safe, adequately funded recreational facilities that are integrated through greenways and trail corridors. The Harbor Shores Project provides a linked trail and park system within the city limits of Benton Harbor, offering green space connected by recreational trails.

The SCORP identifies issues and goals for public outdoor recreation in Michigan. The Harbor Shores Project, of which this conversion proposal is a part, finds relevance under three of these issue areas: resource conservation, trails, and community outdoor recreation.

*Resource Conservation*
Under the subheading of "Urban Opportunities" the SCORP states (on page 71):

> *"An important case for targeted action is restoring or enhancing impaired outdoor recreation resources in urban environments. Urban residents often have borne the burden of pollution, and nearby potential recreational environments such as urban waterfronts have been less than desirable recreation sites. The growing movement for greenways, walkable communities and restoration of degraded urban natural resources to provide quality outdoor recreation opportunities represents a priority conservation issue in Michigan's SCORP.*

*Trails*
Under the subheading of "Non-motorized Trail Opportunities" the SCORP points out (on page 76) that trails:

> *"...provide valued links between recreation venues and opportunities for physical fitness and wildlife viewing."*

*Community Outdoor Recreation*
On page 80, the SCORP relates that:

> *"The goal is to improve the range, quality and quantity of community outdoor recreation opportunities. This is focused on the development, restoration and renovation of facilities and infrastructure that support outdoor recreation at the local level."*

15

The Harbor Shores Project, involving multiple sites for access to the Paw Paw and St. Joseph rivers, including facilities for fishing from shore and for launching a boat, provides improved and expanded opportunities for public recreation at the local level.

In keeping with Michigan's SCORP, the Harbor Shores Project will upgrade the City's aging recreation infrastructure; provide better recreation for City residents in an urban environment in need of redevelopment; increase water recreation opportunities, and; integrate City recreation programs with state and federal initiatives.

### 4) Incorporation of Documents by Reference

Attachment A:  Executive Summary of "Benton Harbor, a Plan for Positive Change: Final Report of the Governor's Benton Harbor Task Force"

Attachment B:  Description and drawings of Jean Klock Park and the proposed improvements
              Exhibit 1….. Trailway System Map
              Exhibit 2….. Jean Klock Park Improvements Drawing

Attachment C: Environmental Assessment analysis for the Conversion Area in Jean Klock Park

Attachment D: Description and drawings of the Mitigation Parcels
              Exhibit 1….. Parcel B
              Exhibit 2….. Parcel C
              Exhibit 3….. Parcel D
              Exhibit 4….. Parcel E
              Exhibit 5….. Parcel F
              Exhibit 6….. Parcel G
              Exhibit 7….. Parcel H

Attachment E:  Environmental Assessment analysis for the Mitigation Properties

Attachment F:  Lease Between City of Benton Harbor and Harbor Shores Community Redevelopment, Inc.

Attachment G:  Park Improvement and Maintenance Agreement Between City of Benton Harbor and Harbor Shores Community Redevelopment, Inc.

KZLIB:578960.1·007666-00020

Exhibit 13
Case No. 1:08-cv-01400

## STATE OF MICHIGAN

## BERRIEN COUNTY CIRCUIT COURT

CLELLEN BURY, et al.,

        Plaintiffs,

                                    Case Number 03-3430-CE-F

v.

                                      Honorable Lynda A. Tolen

CITY OF BENTON HARBOR,

        Defendant.

_____/

William T. Burgess (P36922)               Charlette Pugh Tall (P48780)
Geoffrey A. Fields (P41788)             Benton Harbor City Attorney
Dickinson Wright PLLC
Attorneys for Benton Harbor
200 Ottawa NW, Suite 900               Thomas R. Fette (P13396)
Grand Rapids, MI 49503                Paul A. Taglia (P21241)
(616) 458-1300                            Attorneys for Plaintiffs

_____/

## CONSENT JUDGMENT
### AND PERMANENT INJUNCTION
At a session of the Court in St. Joseph, Berrien
County, Michigan on *January 27, 2004*

Present: Hon. **LYNDA A. TOLEN**
                        Circuit Court Judge

       Upon the Stipulation of the parties, having conducted a hearing on January 27, 2004,

pursuant to the Notice of Hearing filed in advance by the parties, and being advised in the

premises:

       A Consent Judgment is entered to adjudicate, declare, find, and order the following:

### Findings

       Based on pleadings and evidence in the record, including evidence presented at earlier

hearings, the Court makes the following findings:

EXHIBIT **1**

1.    The City of Benton Harbor ("Benton Harbor") owns Jean Klock Park.

2.    On June 2, 2003, six members of the City Commission voted to sell part of Jean Klock Park to Grand Boulevard Renaissance LLC ("Developer") for residential development (the "Residential Project").

3.    On June 16, 2003, Plaintiffs commenced this action to litigate the question of whether, and to what extent, the City may sell any portion of Jean Klock Park for uses other than bathing beach, park, or other public purposes.

4.    On August 12, 2003, the Court entered a Preliminary Injunctive Order ("Injunction Order").   The Injunction Order provided for temporary injunctive relief under MCR 3.310, and depended upon a preliminary legal ruling on an issue of first impression in Michigan regarding the ability of a municipality to make a permanent dedication of public lands (the "Municipal Dedication Claim").   The Injunction Order also made a preliminary ruling that Plaintiffs are not likely to prevail on their other claims in this matter, including the claims relating to the deed from J.N. and Carrie Klock to the City (the "Deed Claim"), and claims arising under the environmental laws of the State of Michigan (the "Environmental Claims"). The Injunction Order did not make any final ruling on the merits with respect to any of the claims of this case.

5.    On October 14, 2003, the Court entered an Order for Alternative Dispute

Settlement Agreement is attached to this Consent Judgment as Exhibit A. The terms and conditions of the Settlement Agreement attached to this Consent Judgment are incorporated by reference into this Consent Judgment.

7.    On December 24, 2003, the Court entered a Stipulated Order ("MCR 2.106 Order") to Continue Preliminary Injunctive Order and Modify Case Management and Scheduling Order. Pursuant to the MCR 2.106 Order, counsel for the parties published the MCR 2.106 Order in The Herald Palladium for three successive weeks. See Exhibit B. No other person filed an application to intervene in this action as required by the MCR 2.106 Order by the court-imposed deadline of January 21, 2004.

8.    On January 20, 2004, at a public hearing, the City Commission voted to authorize entry of this Consent Judgment and initiated proceedings to amend the City's Master Plan to exclude certain portions of Jean Klock Park as contemplated by the Settlement Agreement entered by the parties and this Consent Judgment.

## Conclusions of Law and Orders of the Court

Based upon the facts of this case, the consent of the parties, and taking into consideration the history, present-day concerns, and future interests of the City, Jean Klock Park, and the people who use Jean Klock Park, as well as the time and expense incurred and about to be incurred in connection with the Residential Project, the Court makes the following conclusions of law and orders as follows:    a Permanent Injunction LAT

1.    This Consent Judgment is intended to and may be recorded. It relates to the present and future use of Jean Klock Park and the Residential Project.

2.    This Consent Judgment replaces and supersedes all prior rulings made by the Court in this matter, including the Injunction Order, as amended or extended from time to time, all of which are dissolved.

3.    Subject to paragraph 4 below, the Court defines Jean Klock Park to mean and include all property depicted in Exhibit C to this Consent Judgment.  The Court permanently enjoins the City from using any portion of the property depicted as "Jean Klock Park" in Exhibit C to this Consent Judgment for any purpose other than bathing beach, park purposes, or other public purposes related to bathing beach or park use; provided, however, that there shall be no recreational vehicle park campsites; provided, further, that the City shall for all time be authorized and empowered to operate its water treatment facility, located at the south end of the park, including but not limited to capital improvements and expansion.  The restrictions in this paragraph 3 shall run with the land and shall be binding upon the City and its successors.

4.    Notwithstanding any other provision of this Consent Judgment, the City may sell the parcel ("Grand Boulevard Parcel"), which is depicted in Exhibit D to this Consent Judgment, to Grand Boulevard Renaissance LLC ("Developer"); provided, that the residences to be constructed as part of the Residential Project in the Grand Boulevard Parcel depicted on Exhibit D shall not exceed 35 feet in height from the present-day level of Grand Boulevard.  If, for any reason, the City is unable to complete sale of the Grand Boulevard Parcel to the Developer for the Residential Project, and the Developer is unable to complete the Residential Project, then this Consent Judgment shall be dissolved, and any party to this action may petition to reopen this action, in which case the Court shall hear and decide the Municipal Dedication Claim.  In addition, the City may also use the parcel ("M-63 Parcel"), which is depicted in Exhibit E to this Consent Judgment, for purposes other than bathing beach, park, or other public purposes;

provided, however, that the City may only use the M-63 Parcel for such other use(s) if each of the following conditions is met: (a) the City Commission must approve such other use(s) as required by the City Charter; and (b) the Michigan Department of Natural Resources ("MDNR") must approve such other use(s) to the extent the MDNR is required to do so under the terms of grants made by the State of Michigan to the City.

5.    This Court shall retain jurisdiction of this matter for the purpose, and to the extent necessary, of enforcing the terms and provisions of this Consent Judgment, and for deciding any issues arising from the implementation of the terms of this Consent Judgment and the Settlement Agreement.

6.    Except as otherwise provided above in this Consent Judgment, this action (including the Deed Claim and Environmental Claims) is dismissed with prejudice.

7.    Based upon the foregoing, and subject to the provisions of paragraphs 4 and 5 above, this Consent Judgment resolves all pending claims and closes this case.

_____
Honorable Lynda A. Tolen      1/27/04

<u>Stipulation</u>

The parties, by their respective counsel, pursuant to their Settlement Agreement, stipulate and consent to entry of the above Consent Judgment.

_____          _____
Thomas R. Fette (P13396)                 Geoffrey A. Fields (P41788)
Attorney for Plaintiffs                  Attorney for City of Benton Harbor

GRAPIDS 61926-1 144724



STATE OF MICHIGAN
CIRCUIT COURT FOR COUNTY OF BERRIEN
I certify that I have compared this copy with the original on file in this court & that it is a correct copy of the whole of such original

JAN 27 2004

M. LOUISE STINE
By _____
Deputy Clerk

# EXHIBIT A

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into by the City of Benton Harbor ("City"), on the one hand, and Clellen Bury, Carol Drake, Gladys Peeples-Burks, Joseph Shum, Norman Stemm, and Princella Tobias (collectively, "Plaintiffs"), on the other hand.  The effective date ("Effective Date") of this Agreement is December 18, 2003.

### Recitals

The City owns Jean Klock Park.  On June 2, 2003, six members of the City Commission voted to sell part of Jean Klock Park to Grand Boulevard Renaissance LLC ("Developer") for residential development.  On June 16, 2003, Plaintiffs commenced a lawsuit ("Lawsuit") against the City in Bury, et al. v. City of Benton Harbor, Berrien County Circuit Court ("Court"), Case Number 03-3430-CE-F.  The primary issue in the Lawsuit involves whether, and to what extent, the City may sell any portion of Jean Klock Park for uses other than bathing beach, park, or other public purposes.  On August 12, 2003, the Court entered a Preliminary Injunctive Order; and, on October 14, 2003, the Court entered an Order for Alternative Dispute Resolution ("ADR Order").  Plaintiff Harrell Taylor is being dismissed from this lawsuit with prejudice due to health problems.  Pursuant to the ADR Order, the remaining parties engaged in facilitative mediation, and as a result of meetings with the mediator ("Mediator"), and taking into consideration the history, present-day concerns, and future interests of the City, Jean Klock Park, and the people who use Jean Klock Park, these parties have agreed to settle their dispute, including the Lawsuit, based on the terms and conditions set forth below.

### Terms and Conditions

The City, Clellen Bury, Carol Drake, Gladys Peeples-Burks, Joseph Shum, Norman Stemm, and Princella Tobias agree as follows:

1.    This Agreement is conditioned upon the approval of the City of this entire Agreement, without changes or amendments, as authorized by law. The City shall obtain such approval from the City Commission at any of its regular meetings scheduled after January 1, 2004.

2.    Upon execution of this Agreement, counsel for the parties shall inform the Court of this Agreement.

3.    Upon execution of this Agreement, counsel for the parties shall file a Stipulated Order to Continue Preliminary Injunction Order and Modify Case Management and Scheduling Order (in the form attached to this Agreement as Exhibit A) for entry by the Court.

4.    Upon approval of this Agreement by the City as described in paragraph 1 above, counsel for the parties shall submit a Consent Judgment (in the form attached to this Agreement as Exhibit B) for entry by the Court at a hearing to be scheduled by filing a Notice of Hearing (in the form attached to this Agreement as Exhibit C) with the Court.

5.    Upon execution of this Agreement, counsel for the City shall seek to obtain any required approval by the Michigan Department of Natural Resources ("MDNR") for the sale of the "Grand Boulevard Parcel" (as defined in the Consent Judgment attached to this Agreement as Exhibit B).

6.    In addition, subject to approval by the City Commission and any other required governmental entity, the City agrees to (a) provide for the reopening of Grand Boulevard as depicted on Exhibit D to the Consent Judgment out of proceeds from the sale of the Grand Boulevard Parcel, and (b) replace the fence at Jean Klock Park out of proceeds from the sale of the Grand Boulevard Parcel.

2

7.    Each of the parties to this Agreement agrees to cooperate to take all necessary measures to obtain, and to refrain from actions that might impede, entry and implementation of the Consent Judgment and approval by the MDNR as provided for by paragraphs 4 and 5 above.

8.    This Agreement is conditioned upon the successful completion of the sale of the "Grand Boulevard Parcel" as defined in and provided for by the Consent Judgment attached to this Agreement as Exhibit B.

9.    Each of the parties supports, agrees to publicly support and promote, and authorizes counsel of record in the Lawsuit to publicly support and promote this Agreement, the Consent Judgment, and the successful implementation of all of the provisions of this Agreement and the Consent Judgment, including the sale and residential development of the "Grand Boulevard Parcel" as provided for in the Consent Judgment.

10.    This Agreement binds and inures to the benefit of the parties and their respective successors and assigns.

11.    This Agreement is entered into for the purpose of compromise, and neither this Agreement, nor any of its terms or conditions, shall be considered to be an admission by, or evidence of liability by or on behalf of any party to this Agreement.

12.    This Agreement is the entire agreement of the parties regarding the resolution of their dispute over the transactions and occurrences regarding the Lawsuit, and no prior agreements, negotiations, or other understandings may be used to explain this Agreement or any of its terms and conditions.

13.    This Agreement, its terms and conditions, and all exhibits may not be amended, modified, waived, or assigned, except in a writing signed by all parties to this Agreement, or their authorized representatives.

3

14.    This Agreement was negotiated jointly by counsel for the parties, with the assistance of the Mediator, and shall not be construed against any party as the drafter if there is any question as to the meaning of this Agreement or any of its terms and conditions.

15.    Michigan law governs this Agreement.

16.    The undersigned counsel for the parties have discussed this settlement with the parties, and each is fully authorized to sign on behalf of and bind his respective clients to this Agreement.

17.    This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which together shall constitute one and the same instrument. It is agreed that the counsel for the parties may transmit this Agreement to one another by facsimile and that their facsimile signatures shall be accepted as original signatures.

Geoffrey N. Fields (P41788)
Attorney for City of Benton Harbor

Thomas R. Fette (P13396)
Attorney for Plaintiffs

4

Exhibit 14
Case No. 1:08-cv-01400

## CITY OF BENTON HARBOR
## JEAN KLOCK PARK CONVERSION AND MITIGATION PROPOSAL

### PUBLIC COMMENT SUMMARY & RESPONSE DOCUMENT

Over 400 individuals, businesses, government entities and organizations submitted written comments or spoke at the April 17, 2008 Public Hearing. Commenters in favor of the conversion exceeded those against by nearly a 7-to-1 ratio. Commenters' input on various categories of issues is summarized and tallied below. A significant number of public comments were beyond the scope of the conversion proposal and discussed other aspects of the Harbor Shores proposed redevelopment project. Therefore, in an effort to be as responsive as possible, responses to substantive questions about the conversion as well as other substantive negative and advisory comments are attached.

### I.    SUMMARY OF PUBLIC COMMENTS

*Favorable Comments:*

A majority of the 372 commenters who were in favor of the proposal came from within Berrien County, although a significant number from outside the region were also received. Comments voicing approval for the conversion came from: several hundred private citizens; forty-eight businesses (mostly local small businesses, including environmental consulting firms); the Director of Berrien County's Parks & Recreation Department; the Berrien County Parks & Recreation Department Special Projects Officer; a former Park Supervisor; the former Mayor of Benton Harbor; three City of Benton Harbor Commissioners; U.S. Congressman Fred Upton (Benton Harbor's federal district); the State Representative for the 79th District (Benton Harbor's state district); the Berrien County Commissioner for the 4th District (Benton Harbor's county district); a St. Joseph's City Commissioner (Benton Harbor's "twin city"); three St. Joseph Charter Township Trustees, as well as the Township's Supervisor, Clerk and Treasurer; the Mayor of Bridgman (also in Berrien County); a Trustee of Lincoln Charter Township (Berrien County); the Village of Stevensville Council (Berrien County); directors and officers of community organizations such as the Housing and Homeownership Consortium, Citizens for Progressive Change, the 700-member Cornerstone Chamber of Commerce, St. Joseph Chamber of Commerce, former members of the Friends of Jean Klock Park, Benton Harbor Street Ministry, Council for World-Class Communities, the Consortium for Community Development; the Benton Harbor Alumni Chapter of Kappa Alpha Psi; local clergy; and the local chapter of the American Society of Landscape Architects, the Krasl Art Center, and the Sarett Nature Center.

Multiple commenters expressed favorable approval about the social and economic benefits of the projects, such as new jobs (104 comments), providing an economic stimulus for the City and/or region (148 comments), and increased tourism and business opportunities (94 comments). Other comments expressed numerous

times in favor of the project include that the current condition of the Park is poor (77 comments) and that the conversion proposal will enhance the park (67 comments).

*Comments in Opposition:*

A majority of the 59 commenters opposed to the proposal also came from within Berrien County.    Comments voicing disapproval of the conversion came from: approximately forty private citizens;    four businesses; a City of Benton Harbor Commissioner;  and several community and environmental organizations – Friends of Jean Klock Park, Alliance for the Great Lakes, Friends of the Detroit River, the Michigan Environmental Council, and Defense of Place.   The majority of the documents and volume submitted in this matter came from one individual, Luanne Kozma of Defense of Place, an organization located in Novi, Michigan, a suburb of Detroit approximately 175 miles east of Benton Harbor.  The material Ms. Kozma submitted represented in volume more than double the submissions of all other commenters (positive, negative and advisory) combined.

Many of the commenters opposed to the proposal expressed almost identical concerns.  Multiple comments were made expressing the commenter's distrust of the City and/or the Developer (18 comments).  Other common comments concerned the value of conversion and mitigation parcels (16 comments), the impact the golf course construction and management will have on the environment (15 comments), and the legality of the conversion (15 comments).

*Advisory Comments:*

Advisory comments were received from 16 commenters.  They included private individuals, a local pastor, a few local businesses, a homeless shelter in Benton Harbor, and the Twin Cities chapter of the NAACP.

The advisory comments were highly individualized, with most providing specific suggestions for changes to the Summary Document (6 comments) and to the Lease and the Park Improvement and Maintenance Agreement (5 comments).   There were also comments about the job preference for Benton Harbor residents (5 comments).

**A.    Comments Favorable To The Conversion**

1. Commenter is **in favor** of the project.    (372 commenters in favor)

A.  POOR CURRENT PARK CONDITION, SAFETY  & ACCESSIBILITY.

2. Commenter said Jean Klock Park is currently in poor condition/ run down.  (77 commenters)
3. Commenter said the Park currently is rarely used.  (62 commenters)
4. Commenter said the Park currently is unsafe.  (26 commenters)

5. Commenter said the Park currently is inaccessible and/or difficult to access. (28 commenters)

B. CONVERSION APPROVAL = REPAIRS, FUTURE MAINTENANCE & UPKEEP, ACCESS AND USE.

6. Commenter is enthused/pleased that the Park (concessions, restrooms, trash, beach, etc.) will be repaired and upgraded. (38 commenters)
7. Commenter is enthused/pleased that the Park will be maintained and cared for in the future. (57 commenters)
8. Commenter is enthused/pleased that access to the Park will improve. (41 commenters)
9. Commenter is enthused/pleased that the Park will be used more. (31 commenters)
10. Commenter is enthused/pleased that the Park will be a better place for our families, children and/or grandchildren. (59 commenters)
11. Commenter is enthused/pleased that beach-front parking and the boulevard on the beach are good. (18 commenters)

C. ENVIRONMENTAL CLEANUP.

12. Commenter is enthused/pleased that environmental contamination is being cleaned-up, trash removed, abandoned buildings knocked down and hauled away, and/or unused land restored. (38 commenters)

D. INCREASED RECREATIONAL OPPORTUNITIES.

13. Commenter said the conversion will enhance the beauty and/or recreational opportunities of the Park. (67 commenters)
14. Commenter is enthused/pleased that there will be increased access to and use of the river. (8 commenters)
15. Commenter is enthused/ pleased about the trail system. (56 commenters)

E. SOCIAL & ECONOMIC BENEFITS OF THE PROJECT.

16. Commenter is enthused/pleased regarding improvement in the local tax base. (37 commenters)
17. Commenter believes the project will bring news jobs. (104 commenters)
18. Commenter believes the project will bring tourists, investors, new residents, and new business activity. (94 commenters)
19. Commenter believes the project will be an economic stimulus to the city and/or region. (148 commenters)

F. MISC.

20. Commenter said no one has put forth an alternative plan and/or the project is a once-in-a-lifetime opportunity. (51 commenters)

14

21. Commenter said the golf holes would not interfere with the beach or the use of the dunes, but mostly with inaccessible areas and the existing parking lot. (21 commenters)
22. Commenter said the Jack Nicklaus Signature course is important to the project's success and/or is a good thing. (70 commenters)
23. Commenter is enthused/pleased that a portion of the income from the project will be spent on literacy programs. (64 commenters)
24. Commenter believes the Klock family would have wanted the conversion and/or the conversion meets the Klock family's true intentions for the Park. (35 commenters)
25. Commenter is enthused/pleased regarding the impact on and increased availability of housing. (32 commenters)
26. Commenter believes the conversion will result in an improved image for Benton Harbor. (8 commenters)
27. Commenter is enthused/pleased about increased boating opportunities. (7 commenters)

## B.    Comments Opposed To The Conversion

28. Commenter is **opposed** to the project. (59 commenters opposed)

## A.  CONCERN OVER SAFETY TO THE ENVIRONMENT.

29. Commenter expressed concern about the pre-existing contamination of some of Mitigation Parcels. (10 commenters)
30. Commenter expressed concern about the negative impacts from the runoff of pesticides and chemicals associated with golf course maintenance. (6 commenters)
31. Commenter expressed concern about the negative impact of the golf course on the eco-system. (15 commenters)
32. Commenter expressed concern about the impacts to endangered species. (8 commenters)

## B. IMPACT TO THE DUNES.

33. Commenter expressed concern that the dunes will be destroyed. (14 commenters)
34. Commenter expressed concern that the public can no longer walk on dunes. (3 commenters)
35. Commenter expressed concern about how blowing sand would inevitably end up on the golf holes. (7 commenters)

## C.  BENEFITS TO THE CITY.

36. Commenter wanted to know full consideration City is receiving for leasing the land in Jean Klock Park. (14 commenters)

## D.  CONTROL OF THE LAND.

37. Commenter expressed concern that some of the Mitigation Parcels are located in other municipalities. (10 commenters)
38. Commenter wanted to know what happens if the golf course fails. (7 commenters)

E.  VALUATION CONCERNS.

39. Commenter wanted to know how the park land and mitigation parcels were valued. (16 commenters)

F.  CONCERNS RELATING TO SELECTION OF GOLF COURSE AND VIABILITY OF MITIGATION PARCELS.

40. Commenter wanted to know why the developer chose to build a golf course. (13 commenters)
41. Commenter wanted to know how this is a public course. (7 commenters)
42. Commenter expressed concern that Benton Harbor residents cannot afford to use the course. (5 commenters)
43. Commenter wanted to know why three holes had to be built in the park. (7 commenters)
44. Commenter expressed concern about the viability and usefulness of the mitigation parcels. (10 commenters)

G.  CONCERN OVER NEGATIVE IMPACTS ON AREA RESIDENTS.

45. Commenter questioned job creation efforts. (7 commenters)
46. Commenter expressed concern that this project raised environmental justice issues. (9 commenters)
47. Commenter expressed concern that project will lead to gentrification. (1 commenter)

H.  ORIGINAL DEED AND CONSENT JUDGMENT DISALLOW PROPOSED CONVERSION USE.

48. Commenter believes that the Original Deed did not allow use of the park for a golf course. (15 commenters)
49. Commenter believes the Consent Judgment/Settlement Agreement did not allow use of the park for a golf course. (10 commenters)

I.  CONCERNS REGARDING SAFETY AND USE OF THE TRAIL SYSTEM.

50. Commenter expressed concern about the interaction between people using the trail system and the park and those using the golf course regarding safety and noise. (8 commenters)

J.  EXISTING PARK VERSUS AS-IMPROVED.

51. Commenter expressed opinion that park has been intentionally run-down to promote this development. (4 commenters)
52. Commenter stated belief that the park is great as-is. (7 commenters)
53. Commenter expressed concern that the beach would be ruined. (7 commenters)
54. Commenter stated that the improvements to the park will result in worse access and parking. (8 commenters)
55. Commenter expressed concern that the improvements to the park would really result in a loss of amenities. (5 commenters)

K.  TERMS OF THE AGREEMENTS.

56. Commenter had questions about the terms of the Lease and Park Maintenance and Improvements Agreements, including length of lease, management of park, and providing busing to the park. (17 commenters)

L.  ALLEGATIONS OF IMPROPRIETY.

57. Commenter expressed concern that there was an improper transfer of park property in 1998. (3 commenters)
58. Commenter expressed concern relating to attorney Geoff Fields' representation. (3 commenters)

M.  MORAL OPPOSITION.

59. Commenter expressed opinion that project is immoral. (9 commenters)

N.  CONCERNS REGARDING LACK OF PUBLIC PARTICIPATION.

60. Commenter expressed concern about National Environmental Policy Act violations. (5 commenters)
61. Commenter expressed concern that there was inadequate time to review the Summary Documents. (13 commenters)

O.  MISC.

62. Commenter questioned whether land would be restored if the project fails. (6 commenters)
63. Commenter expressed opinion that Whirlpool had a conflict of interest. (2 commenters)
64. Commenter expressed concern whether the Developer and/or the City could be trusted to do what they were committing to. (18 commenters)
65. Commenter questioned whether project was in compliance with the State Comprehensive Outdoor Recreation Plan (SCORP). (1 commenter)
66. Commenter questioned whether project met the approval of the State Historic Preservation Office. (2 commenters)

67. Commenter questioned whether the conversion was in violation of previous grant agreements with the State of Michigan.  (1 commenter)

### C.    Advisory Comments

68. Commenter is providing advisory comments regarding the project.  (16 commenters)

### A.  ALLOWING CURRENT EVENTS THAT USE THE PARK TO CONTINUE.

69. Commenter expressed opinion that annual events that use the park should be able to continue.  (1 commenter)

### B.  BUSINESS OPPORTUNITY.

70. Commenter emphasized that the project should ensure business opportunities for Benton Harbor residents.  (1 commenter)

### C.  GOLF COURSE USE AND MEMBERSHIP.

71. Commenter stated that the project should provide for golf course use and membership for Benton Harbor residents, regardless of criminal record.  (1 commenter)

### D.  ACCESS ISSUES.

72. Commenter wanted to ensure there was barrier-free access to the park.  (1 commenter)
73. Commenter requested a comparison of number of parking spaces before and after park improvements.  (1 commenter)
74. Commenter had concern about the number of road crossings associated with the trails.  (1 commenter)

### E.  RENTS.

75. Commenter stated that the City should consider raising the amount of rent.  (2 commenters)

### F.  PUBLIC BENEFITS.

76. Commenter wanted to ensure that were adequate benefits to Benton Harbor.  (3 commenters)
77. Commenter wanted to ensure that there were adequate jobs for Benton Harbor residents.  (5 commenters)

### G.  AMENDMENTS TO SUMMARY DOCUMENT.

18

78. Commenter suggested language that should be added/changed in Summary Document. (6 commenters)

## H.  LEASE.

79. Commenter suggested language that should be added/changed to Lease and Park Improvements and Maintenance Agreement. (5 commenters)
80. Commenter had questions regarding lease term and the potential for default. (2 commenters)

## I.  MISC.

81. Commenter had question about the loss of commercial property in Benton Harbor. (2 commenters)
82. Commenter to ensure that Harbor Shores would be held accountable. (2 commenters)
83. Commenter stated that the public should have access to legal advice regarding the project. (1 commenter)
84. Commenter had question about the impacts of the project on other local golf course communities. (1 commenter)
85. Commenter had question regarding whether there was adequate sewer capacity for the increased use by the development. (1 commenter)

**A.** While JKP is the focal point for the overall development, success in this project will mean a significant increase in the City's tax revenue that could allow the City to make needed improvements in all aspects of its park system.

**Q.22. There are also concerns that the proposed new entrance would create security risks to the safety of the Water Plant in terms of its vulnerability to bioterrorism. What happens if a threat arises to the Water Plant and the only access to Jean Klock Park will be restricted? How will the public access their park?**

**A.** A security risk of the nature envisioned by this question raises the threat level for all residents and visitors in proximity to the Water Plant. Therefore, the City of Benton Harbor and Harbor Shores will follow the guidance provided by Homeland Security authorities, the County of Berrien and City of Benton Harbor public safety officials. The new entrance will pass along the north and east sides of the Water Plant. The plant is fenced on these sides for protection from intruders. If a threat arises and access is restricted to the point that the entrance needs to be controlled or closed the alternative access would be from the north through Grand Boulevard, which has been established as the emergency access route.

**Q.23. Why deprive the children of the City total access to the views from the top of the dunes while allowing golfers exclusive access?**

**A.** The general public, including children, will not be restricted from experiencing the views atop the dunes at JKP. Unimpeded access will be provided along the top of the bluff. Children and adults will have access to the dunes and views of the lake. Today access to the north dune from the parking area is very difficult. Access after the proposed improvements are completed will be considerably easier due to the removal of thick brush.

**Q.24. The area around the 8th and 9th tees is unnecessarily large.**

**A.** The areas around the 8th and 9th tees are consistent with the applicable safety zone requirements.

**Q.25. Users of the mitigation parcels have only limited parking available. In addition, occupants of the proposed housing could easily park a few cars there, thus making it difficult or impossible for area residents to use these mitigation parcels.**

**A.** The mitigation parcels will be part of the overall park system. As such it is expected that residents will be able to access the trails in many ways. One way will be to bike or walk from their homes along existing streets or trails such as Riverview Drive or the Bobo Brazil to Jean Klock Park trail. These connect directly to the new mitigation trail system. Those that prefer to drive to a trail head to use the facilities have many options

38

with ample parking available. The parking facilities at Jean Klock Park will allow for hundreds of cars to park with direct access to the mitigation trail facilities. Trail Head Number One has capacity for eight vehicles to park and use the trail system with overflow parking immediately adjacent. Trail Head Number Two, in the Arts District, allows for five vehicles to park with additional parking on the street in the newly renovated streetscape area. Trail Head Number Three provides space for eight vehicles at the canoe and kayak launch. Trail Head Number Four provides parking for eight vehicles with overflow parking at the proposed boat launch. Parking is also available at various other locations along the trail route. Residents of the proposed housing units will have direct access to the trail system and will have little need to drive and park at the trail heads.

### E.    Benefits to the City of Benton Harbor

**Q.1.    What is the full consideration that the City of Benton Harbor will receive for this project? Both from the lease and the growth and development?**

**A.** The lease between the City of Benton Harbor and Harbor Shores provides the following consideration to the City:

- $30,000 for the first year for the lease, with 1% added each year the lease is in effect;
- Maintenance on the existing Jean Klock Park for the life of the lease, saving the City approximately $20,000 per year;
- Improvements to the existing Jean Klock Park, estimated at about $1.5 million;
- Ownership interest in over 38 acres of additional park space, valued at $999,500;
- Recreational improvements to the new park land, estimated at about $1.5 million;
- On-going maintenance on the new park land for the life of the lease, valued at approximately $95,000;
- 20% of the profits from the golf operations (guaranteed to be at least $5,000 per year); and
- $2,826,292 in matching dollars to secure the MDOT grants for the extension of Graham Avenue to connect to Riverview Drive, improvements to Klock Road between North Shore Drive and the Paw Paw River, and the extension of Klock Road from North Shore Drive to Paw Paw Avenue.

The overall economic impact from the project is expected to provide the following benefits to the City of Benton Harbor:
*Economic Transformation:*

- Development of 174 acres within the City of Benton Harbor – excluding the 22 acres within Jean Klock Park that are proposed for inclusion under the lease agreement
- Estimated Tax Base increase of $90 million within project area
- At least 275 housing units projected
- Estimated 50% as second homes (non-homestead)
- Value added to properties surrounding the project site

– Increases in revenue sharing and utility customers

*Environmental Transformation*
– Recreational Amenities
➢ Jack Nicklaus Signature Golf Course business operations located within city limits
➢ Improvements to Jean Klock Park
➢ Development of the Linear Trail System
– $6 million Estimated in Environmental Remediation
➢ Elimination of formerly contaminated sites (Superior Steel and Malleable Steel) along Graham Avenue
➢ Elimination of former dumping areas and formerly contaminated truck terminal site along Paw Paw Avenue

*Social/Cultural Transformation*
– Residents will have access to Community Benefits Plan

**Q.2. The bottom line is that a whole lot of outside people stand to make a tremendous amount of money from the 105-year lease of Jean Klock Park; and when the park is destroyed and the profits stolen by outsiders, then they will walk away and leave their mess once again on the backs of the Benton Harbor residents.**

A. None of the partners in Harbor Shores will profit from this development, and safeguards are in place to ensure the project will benefit local municipalities and residents. Harbor Shores Community Redevelopment, Inc. was incorporated as a non-profit entity to serve as Master Developer for the project. Its offices are located on Riverview Drive within the City of Benton Harbor. Its ownership consists of three non-profits: Cornerstone Alliance, which for its 20-year history has been located within the City of Benton Harbor (presently on Wall Street); the Alliance for World Class Communities, which is comprised of four non-profits, all of which are located within the City of Benton Harbor; and Whirlpool Foundation, which is located in Benton Township but has a multi-decade history of supporting initiatives in the City of Benton Harbor.

The partners in Harbor Shores are the same individuals and organizations that have worked together on community initiatives over the past 20 years. As a group, these non-profit organizations have helped bring about new strategies to build capacity for economic and community issues. Cornerstone Alliance, Council for World-Class Communities, Citizen's for Progressive Change, Community Partnership for Lifelong Learning, Whirlpool Foundation and Alliance for World-Class Communities were formed as non-profit organizations with IRS designation as 501-c-3 charitable foundations with public missions. Although, the organizations have uniquely different focuses, they share that same common ingredient of people willing to work together to pool their resources and talents to bring about change for the individuals most in need.

These non-profit corporations have combined their efforts to transform the community through the Harbor Shores development. Proceeds that may be generated from the development will be funneled back into the local communities through programming, in accordance with the Community Benefits Plan. The non-profit status of these organizations ensures, under Michigan law and IRS regulations, that any proceeds will be used for charitable purposes. These activities will be subject to scrutiny of local volunteer boards, through annual audits by reputable accounting firms, and through reporting to state and federal agencies.

**Q.3.  Will the current water treatment facility have the capacity to meet the demands of the associated amenities/ development project of this expansion?**

**A.**  The 2008 City of Benton Harbor Drinking Water Revolving Fund Project Plan indicates that "the water treatment facility is of adequate size and appropriate location to supply the service area with water for the planning period. At optimum performance the water plant can supply 12 million gallons per day ("MGD") of clean water. Historic peak demands of 9.4MGD can be easily met even when the projected area population growth over the planning period is considered. The average daily flow over the past five years is 4.6MGD. The available excess capacity during peak flow periods is 2.6MGD. This translates into an additional population equivalent capacity of 6500 persons.

**Q.4.  How can Benton Harbor benefit to the extent promised when the majority of the Harbor Shores project is not in Benton Harbor?**

**A.**  There are numerous benefits accruing to the City of Benton Harbor. These include: 1) several million dollars in land sales to support the project, 2) over $900,000 worth of additional land deeded to the City of Benton Harbor for purposes of the JKP mitigation requirements, 3) $3 million dollars of needed upgrades and improvements to enhance/expand the recreational viability of JKP and the park system, 4) ongoing lease payments, 5) forecasted increase in tax base revenue, and 6) multi-million dollar investment into the community via the implementation of the Community Benefits Plan.

**Q.5.  Benton Harbor will not see any revenues from the project for at least 20 years.**

**A.**  The City of Benton Harbor has already received $1,484,055 from land sales (82.86 acres) for the development. The City has also received land parcels deeded to it for purposes of mitigating the approximately 22 acres being leased in JKP, valued at over $900,000. Furthermore, the Community Benefits Plan calls for a Harbor Shores supported investment in the community exceeding $3 million per year. These programs are already being implemented and have been since 2007. Finally, the City has already begun receiving rental installments from Harbor Shores under the Lease.

**F.    Lease/Management Issues**

**Q.1.    Can the rent be paid in 3 installments, with the first 1/3 paid up front?**

41

Exhibit 15
Case No. 1:08-cv-01400

# CITY OF BENTON HARBOR, MICHIGAN

## A RESOLUTION REGARDING THE REVISED CONVERSION AND MITIGATION PROPOSAL FOR A PORTION OF JEAN KLOCK PARK

### Resolution No. *060908-1*

Whereas, the City Commission approved a Conversion and Mitigation Proposal for a portion of Jean Klock Park on October 9, 2006, which was submitted to the Michigan Department of Natural Resources for transmittal to the National Park Service for its review and approval, and

Whereas, the National Park Service did not approve the previous Proposal and requested certain changes in the Proposal and related documents and that the City submit the revised Proposal to a public review and comment period, including a public hearing, and

Whereas, the City, in cooperation with the developer, Harbor Shores Community Redevelopment Inc., has revised the Proposal in response to the changes requested by the National Park Service, and

Whereas, the City has submitted the revised Proposal to a 45-day public review and comment period, including a public hearing on April 17, 2008, and

Whereas, the City has reviewed the public comments received at the public hearing and in writing, and

Whereas, the City has made certain changes to the revised Proposal in response to certain substantive comments submitted by the public during the public review and comment period and to comments received from the Office of the Attorney General, and

Whereas, the City has summarized the public comments received during the public comment period which are substantive to the issue of the conversion and mitigation of a portion of Jean Klock Park and has prepared responses to submit to the National Park Service.

NOW, THEREFORE, BE IT RESOLVED THAT:

1.    The Mitigation and Conversion Proposal of a Portion of Jean Klock Park as revised to incorporate the changes requested by the National Park Service, substantive public comments received during the public review and comment process, and comments received form the Office of the Attorney General is hereby approved, including the

revised Lease Agreement and the revised Park Improvements and Maintenance Agreement.

2.   The Public Comment Summary and Response Document which summarizes and responds to the substantive public comments received during the public review process is hereby approved for submission to the Michigan Department of Natural Resources and the National Park Service.

3.   The Mayor, City Manager, City Clerk, City Attorney, Special Counsel, and any other city official or representative are hereby authorized to take any necessary actions to submit the revised Proposal to the Michigan Department of Natural Resources and the National Park Service.

4.   The City Manager is hereby authorized to submit any additional information or documents or make minor changes to the revised Proposal and related documents which may be requested by the Michigan Department of Natural Resources or the National Park Service.

5.   The Mayor, City Manager, City Clerk, City Attorney, and any other city official or representative are hereby further authorized, after approval of the revised Proposal by the National Park Service, to execute the revised Harbor Shores Lease Agreement, the revised Park Improvements and Maintenance Agreement, grant amendments, and any other related documents and to take any further action necessary to implement the revised Conversion and Mitigation Proposal.

Ayes: _Mayor Pro-Tem Crenshaw, Commissioners *(Absent (Joseph) Hightower, Shaw, Hill, Abdullah, Marshall, Mayor Cooke_
Nayes: _Commissioner Henry_

Resolution declared adopted.

### Certificate

I, Joyce Taylor, City Clerk of the City of Benton Harbor, Michigan, hereby certify that the attached is a true, compared and correct copy of a Resolution adopted by the City Commission of the City of Benton Harbor, Michigan on June 9, 2008.

_Joyce A. Taylor_
Joyce Taylor, City Clerk

KZLIB:578615.1'007666-00020

Granholm, Upton Applaud NPS Decision

Exhibit 16
Case No. 1:08-cv-01400

www.michigan.gov
(To Print: use your browser's print function)
**Contact:** Liz Boyd 517.881.6713

Release Date: July 25, 2008
Last Update: July 25, 2008

Granholm, Upton Applaud NPS Decision

**July 25, 2008**
LANSING- Governor Jennifer M. Granholm and U.S. Congressman Fred Upton today applauded a decision by the National Park Service (NPS) to approve conversion of Jean Klock Park in Benton Harbor to become part of the Harbor Shores Community Redevelopment Plan.

The NPS announced its decision earlier today.

"Harbor Shores is a signature project for Benton Harbor that will revitalize the community and create jobs," said Governor Granholm and Congressman Upton. "We applaud the NPS for its decision that makes it possible for this project to move forward."

The action by the NPS clears the way for a portion of the park to be converted into three holes of a public Jack Nicklaus Signature Golf Course. Through an extensive coordinated effort with several state agencies, and the city of Benton Harbor and the NPS, the conversion will formalize approval of converting 22 acres of Jean Klock Park. In return, developers will mitigate 38 acres of new public park land and construct a non-motorized, public-use trail system connecting the park lands with residential and commercial areas.

Governor Granholm noted that in addition to the work completed by the Michigan Department of Natural Resources to assist the community in preparing this for NPS review, the state will monitor the progress of Benton Harbor's redevelopment plan to ensure compliance with long-term obligations of the Land and Water Conservation Fund grant program.

Harbor Shores Community Redevelopment Inc. is co-owned by Cornerstone Alliance, the Whirlpool Foundation, and the Alliance for World-Class Communities. The 530-acre, mixed-use development will include 800 residential units around the golf course, 45,000 square feet of commercial and retail space, a marina, and one or two hotels with a conference center and an indoor water park. Developers have estimated the cost of the project to be $500-$650 million.

# # #

Copyright © 2008 State of Michigan

Exhibit 17

STATE OF MICHIGAN

Case No. 1:08-cv-01400

# DEPARTMENT OF NATURAL RESOURCES

LANSING

JENNIFER M. GRANHOLM
GOVERNOR

REBECCA A. HUMPHRIES
DIRECTOR

June 16, 2008

Dr. Robert Anderson, Director
Midwest Region
National Park Service
601 Riverfront Drive
Omaha, NE 68102-4226

Dear Dr. Anderson:

SUBJECT:    REVISED SUBMITTAL
City of Benton Harbor Jean Klock Park Conversion and Mitigation
Land and Water Conservation Fund Grant 26-00568, Amendment #3

Enclosed is a revised proposal for partial conversion of Jean Klock Park in Benton Harbor, Michigan. The National Park Service (NPS) did not approve the conversion proposal submitted by the Michigan Department of Natural Resources (Department) in June 2007. In a letter dated October 16, 2007 the NPS outlined concerns with: Replacement Lands (connectivity and immediate availability of the mitigation sites); Control and Tenure (lease and maintenance agreement); and Environmental Analysis (public review process). The October 16th letter also indicated that the NPS was open to considering a revised proposal that addressed the agency's concerns.

The Department has continued to work diligently with the city of Benton Harbor to address all outstanding issues expressed by the NPS. Regarding replacement lands, the NPS was not convinced that the parcels were adequately connected by a public pathway system. This is more clearly demonstrated in the enclosed proposal and is specified in the amendment to the project agreement between the Department and the NPS. In addition, the schedule for remediation and development of the mitigation sites is included in the enclosed proposal.

The NPS expressed concern with control and tenure due to provisions of the lease agreement between the city of Benton Harbor and Harbor Shores Community Redevelopment, Inc. To address these concerns, the parties agreed to separate the lease into two documents: the lease agreement, and the park improvement and maintenance agreement. The Michigan Attorney General's Office was directly involved in review and approval of these documents. Please refer to the enclosed summary of changes made and to the black-lined versions of the documents.

The city of Benton Harbor conducted a 30-day public review process that was extended to 45 days to allow additional opportunity for public comment. Enclosed in the proposal are the public review summary, public hearing transcript, summary of written public comments and the city's response to the comments. The enclosed proposal is the city's final version, which incorporates concerns and ideas expressed by the public during the public review process. Through this extensive process, the resulting proposal addresses the public's concerns and has greater local support.

NATURAL RESOURCES COMMISSION
Keith J. Charters, Chair • Mary Brown • Hurley J. Coleman, Jr. • Darnell Earley • John Madigan • J. R. Richardson • Frank Wheatlake

STEVENS T. MASON BUILDING • P.O. BOX 30028 • LANSING, MICHIGAN 48909-7528
www.michigan.gov/dnr • (517) 373-2329
*Great Lakes, Great Times, Great Outdoors!*

Dr. Robert Anderson
Page 2
June 16, 2008

The state of Michigan requests your review of the enclosed materials listed below and recommends approval of the revised proposal.

Enclosures
PART I: Public Review Process
PART II: Conversion Proposal and Attachments A through G
PART III: Lease and Park Improvements & Maintenance Agreement Analysis
PART IV: Federal Forms and Required Documentation
    ❖ Project Amendment #3 (3 copies)
    ❖ 424 Form
    ❖ Description and Notification Form
    ❖ Revised 6(f)(3) Boundary Map for Jean Klock Park Conversion Site
    ❖ 6(f)3 Boundary Maps for Seven Mitigation Properties
    ❖ Department of Natural Resources Appraisal Reviews
    ❖ State Historic Preservation Office Letter
    ❖ Single Point of Contact Letter

Please contact Ms. Maureen Kay Houghton of Grants Management at 517-373-2965 or houghtonm@michigan.gov with any questions or to discuss the proposal. As always, you may contact me at 517-335-4050. Thank you for your consideration of this proposal.

Sincerely,

James Wood, Manager
Grants Management
517-335-4050
woodj@michigan.gov

JW:lh
Enclosures
cc: Mr. Rich Marsh, Benton Harbor City Manager
    Mr. Don Schmidt, Benton Harbor Special Counsel
    Mr. Rodney A. Stokes, Chief of Staff, DNR
    Ms. Deborah Apostol, DNR
    Ms. Maureen Kay Houghton, DNR
    Ms. Judy Chamberlain, DNR

Exhibit 18
Case No. 1:08-cv-01400



# United States Department of the Interior

### National Park Service

Midwest Region
601 Riverfront Drive
Omaha, Nebraska 68102-4226



26-00568(MWR-P/G)

JUL 2 5 2008

Mr. Jim Wood
Manager, Grants Management
Michigan Department of Natural Resources
P.O. Box 30425
Lansing, Michigan 48909-7925

Dear Mr. Wood:

This correspondence is in response to the city of Benton Harbor's revised request for National Park Service (NPS) approval to convey control and tenure for 22.11 acres of Jean Klock Park to Harbor Shores Community Redevelopment, Inc. This park was developed with assistance from the Land and Water Conservation Fund under grant 26-00568 entitled Jean Klock Park Bathhouse. The purpose for this conveyance is to allow Benton Harbor to lease the subject parkland for the placement of 3 holes of an 18-hole public golf course. Based upon our review of the information provided in the revised conversion proposal, we are approving the city's request.

Enclosed are an executed copy of amendment number 3 and a copy of the Standard Form 424 for this action.

The issues related to this conversion have been somewhat unusual in nature and complexity, and we thank you for your patience as we completed our review. Any questions you have may be directed to Jim Krejci at 402-661-1560.

Sincerely,

Robert Anderson
Chief, Recreation Grants Division

Enclosures 2



UNITED STATES                                 STATE_____**Michigan**_____
DEPARTMENT OF THE INTERIOR
NATIONAL PARK SERVICE                         Project Amendment No._____**3**_____

## AMENDMENT TO PROJECT AGREEMENT
*(OMB No. 1024-0033, August 31, 2010)*

**THIS AMENDMENT To Project Agreement No.**   **26-00568**   **is hereby made and agreed upon by the United States of America, acting through the Director of the National Park Service and by the State of** **Michigan** **pursuant to the Land and Water Conservation Fund Act of 1965, 78 Stat. 897 (1964).**

**The State and the United States, in mutual consideration of the promises made herein and in the agreement of which this is an amendment, do promise as follows:**

**That the above mentioned agreement is amended by adding the following:**

The project scope is hereby revised to delete 22.11 acres from Jean Klock Park for a golf course development. Mitigation consists of replacement land in seven parcels totalling 38.41 acres in the city of Benton Harbor, city of St. Joseph and Benton Charter Township, all within Berrien County, Michigan. Mitigation also includes development of a public pathway connecting Jean Klock Park with the replacement land parcels, which are listed below:

Parcel B; 3.16 acres @ 42/07/19 N 86/27/57 W.  Parcel C; 5.58 acres @ 42/07/31 N 86/27/34 W.  Parcel D; 5.61 acres @ 42/07/24 N 86/27/25 W.  Parcel E; 14.56 acres @ 42/07/33 N 86/27/07 W.  Parcel F; 2.38 acres @ 42/07/05 N 86/28/03 W.  Parcel G; 5.65 acres @ 42/07/33 N 86/26/42 W.  Parcel H; 1.47 acres @ 42/06/50 N 86/28/22 W.

**In all other respects the agreement of which this is an amendment, and the plans and specifications relevant thereto, shall remain in full force and effect. In witness thereof the parties hereto have executed this amendment as of the date entered below.**

**THE UNITED STATES OF AMERICA**              **STATE**

By _____           _____
        **(Signature)**                                       Michigan
                                                            **(State)**
**CHIEF, RECREATION GRANTS DIVISION**
                                              By _____
        **(Title)**                                       **(Signature)**

**National Park Service**                              James B. Wood
**United States Department of the Interior**              **(Name)**

                JUL  2 5  2008                 Manager, Grants Management
**Date**_____               **(Title)**

Estimated Burden Statement: The public reporting burden for this collection of information is estimated to average 3 hours per response including time for reviewing instructions, gathering and maintaining data, and completing and reviewing the form. Direct comments regarding this burden estimate or any aspect of this form should be sent to the National Park Service, State and Local Assistance Programs Division, 1849 C Street NW, Washington, DC 20240.

Paperwork Reduction Act Statement:  This form is necessary to provide data input into an NPS project database which provides timely data on projects funded over the life of the program. Such data is used to monitor project progress and to analyze program trends. A Federal Agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.  Any comments on the burden estimate or other aspects of this collection of information may be addressed to the National Park Service, State and Local Assistance Programs Division, 1849 C Street NW, Washington, DC 20240.

NPS 10-902A  (July 1981)

# APPLICATION FOR FEDERAL ASSISTANCE

Version 7/03

| 1. TYPE OF SUBMISSION: | | 2. DATE SUBMITTED | Applicant Identifier |
|---|---|---|---|
| Application | Pre-application | 3. DATE RECEIVED BY STATE | State Application Identifier NA |
| ☐ Construction | ☐ Construction | 4. DATE RECEIVED BY FEDERAL AGENCY | Federal Identifier |
| ☑ Non-Construction | ☐ Non-Construction | JUN 1 7 2008 | 26-00568 |

## 5. APPLICANT INFORMATION

| | |
|---|---|
| Legal Name: STATE OF MICHIGAN | Organizational Unit: |
| | Department: NATURAL RESOURCES |
| Organizational DUNS: 805339991 | Division: GRANTS MANAGEMENT |
| Address: | Name and telephone number of person to be contacted on matters involving this application (give area code) |
| Street: 530 W. Allegan (PO BOX 30028) | Prefix: Ms.   First Name: Maureen |
| City: LANSING | Middle Name: Kay |
| County: INGHAM | Last Name: Houghton |
| State: MICHIGAN   Zip Code: 48909-7528 | Suffix: |
| Country: USA | Email: houghtonm@michigan.gov |

| 6. EMPLOYER IDENTIFICATION NUMBER (EIN): 38-6000134 | Phone Number (give area code) 517 373-2965 | Fax Number (give area code) 517 335-6813 |
|---|---|---|

| 8. TYPE OF APPLICATION: Revision | 7. TYPE OF APPLICANT: (See back of form for Application Types) A. State |
|---|---|
| If Revision, enter appropriate letter(s) in box(es) (See back of form for description of letters.) | Other (specify): |
| Other (specify): 6(f) CONVERSION & MITIGATION | 9. NAME OF FEDERAL AGENCY: U.S. Dept. of Interior, National Park Service, Midwest Region |

| 10. CATALOG OF FEDERAL DOMESTIC ASSISTANCE NUMBER: | 11. DESCRIPTIVE TITLE OF APPLICANT'S PROJECT: |
|---|---|
| TITLE (Name of Program) `15 - 916` Outdoor Recreation, Acquisition, Development & Planning | City of Benton Harbor Jean Klock Park |
| 12. AREAS AFFECTED BY PROJECT (Cities, Counties, States, etc.): City of Benton Harbor, city of St Joseph, Benton Township, Berrien County, State of Michigan | Conversion of 22.11 acres of Jean Klock Park; mitigation with 7 sites totaling 38.41 acres of replacement land within the city of Benton Harbor and adjacent city of St Joseph and Benton Township. |

| 13. PROPOSED PROJECT | | 14. CONGRESSIONAL DISTRICTS OF: | |
|---|---|---|---|
| Start Date:   Ending Date: | | a. Applicant: 08 | b. Project: 6 |

## 15. ESTIMATED FUNDING:

| | | 16. IS APPLICATION SUBJECT TO REVIEW BY STATE EXECUTIVE ORDER 12372 PROCESS? | |
|---|---|---|---|
| a. Federal | $ 0.00 | a. YES ☑ | THIS PREAPPLICATION/APPLICATION WAS MADE AVAILABLE TO THE STATE EXECUTIVE ORDER 12372 PROCESS FOR REVIEW ON |
| b. Applicant | $ 0.00 | | DATE: |
| c. State | $ 0.00 | | |
| d. Local | $ 0.00 | b. NO ☐ | PROGRAM IS NOT COVERED BY E. O. 12372 |
| e. Other | $ 0.00 | ☐ | OR PROGRAM HAS NOT BEEN SELECTED BY STATE FOR REVIEW |
| f. Program Income | $ 0.00 | 17. IS THE APPLICANT DELINQUENT ON ANY FEDERAL DEBT? | |
| g. TOTAL | $ 0.00 | Yes ☐ If "Yes" attach an explanation.   No ☑ | |

18. TO THE BEST OF MY KNOWLEDGE AND BELIEF, ALL DATA IN THIS APPLICATION/PREAPPLICATION ARE TRUE AND CORRECT. THE DOCUMENT HAS BEEN DULY AUTHORIZED BY THE GOVERNING BODY OF THE APPLICANT AND THE APPLICANT WILL COMPLY WITH THE ATTACHED ASSURANCES.

| a. Authorized Representative | | |
|---|---|---|
| Prefix: Mr.   First Name: James | | Middle Name: |
| Last Name: Wood | | Suffix: |
| b. Title: Manager, Grants Management | | c. Telephone Number (give area code) 517 373-9125 |
| Signature of | | e. Date Signed: 6/16/08 |

| Previous Edition Usable | Standard Form 424 (Rev. 9-2003) |
|---|---|
| Authorized for Local Reproduction | Prescribed by OMB Circular A-102 |

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WEISS, *ET AL.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Civil Action No. 1:08-cv-01400 (EGS) |
| vs. | ) |
| | ) |
| KEMPTHORNE, *ET AL.,* | ) |
| | ) |
| Defendants, | ) |
| | ) |
| AND | ) |
| | ) |
| HARBOR SHORES COMMUNITY | ) |
| REDEVELOPMENT, INC. | ) |
| | ) |
| Applicant for Intervention. | ) |

## <u>ORDER</u>

THIS MATTER, having come before the Court on the Motion of Harbor Shores Community Redevelopment, Inc. to Intervene as a defendant and upon consideration of the Motion and the record herein, it is hereby

ORDERED, that Harbor Shores Community Redevelopment, Inc.'s motion be and hereby is GRANTED,

ORDERED, that Harbor Shores Community Redevelopment, Inc. is made a party defendant to this action, and it is further

ORDERED, that the proposed answer or other responsive pleading of Harbor Shores Community Redevelopment, Inc. be filed on _____.

SO ORDERED, this ___ day of _____, 2008.

_____
Emmett G. Sullivan, USDJ

Copies to:

Dirk Kempthorne, Secretary
U.S. Department of the Interior
1849 C St. NW
Washington, D.C. 20240

Mary A. Bomar, Director
National Park Service
1849 C St. NW
Washington, D.C. 20240

Ernest Quintana, Regional Director
National Park Service
Midwestern Office
601 Riverfront Dr.
Omaha, NE 68102

Rebecca A. Humphries, Director
State of Michigan
Department of Natural Resources
Mason Building, Sixth Floor
P.O. Box 30028
Lansing, MI 48909

City of Benton Harbor
Benton Harbor City Hall
200 E. Wall St.
Benton Harbor, MI 49022

Mike Tiernan
Department of Interior
Office of the Solicitor General
950 Pennsylvania Avenue NW
Washington D.C. 20530-0001

Pamela C. Enslen
Miller, Canfield, Paddock & Stone
P.L.C.
277 South Rose St.
Kalamazoo, MI 49007

Oliver Hall
1835 16th St NW #5
Washington, D.C. 20009

Keith Saxe
U.S. Department of Justice
Environmental & Natural Resources
Division
950 Pennsylvania Ave. NW
Washington, D.C. 20530-0001